## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>SC SJ HOLDINGS LLC, *et al.*[1]<br><br>Debtors. | Chapter 11<br><br>Case No. 21-10549 (JTD)<br><br>(Jointly Administered)<br>**Hearing Date: April 29, 2021 at 3:00 p.m. (ET)**<br>**Obj. Deadline: March 30, 2021 at 4:00 p.m. (ET)** |

## MOTION OF DEBTORS FOR ORDER
## UNDER BANKRUPTCY CODE SECTION 502(c) AND BANKRUPTCY RULE 3018
## ESTIMATING MAXIMUM AMOUNT OF CONTINGENT AND UNLIQUIDATED
## CLAIM OF FAIRMONT HOTELS & RESORTS (U.S.) INC.

The above captioned debtors and debtors in possession (collectively, the "**Debtors**"), respectfully submit this motion for entry of an order under section 502(c) of title 11 of the United States Code (the "**Bankruptcy Code**") and Rule 3018 of the Federal Rules of Bankruptcy Procedures (the "**Bankruptcy Rules**"), estimating the allowed amount of the potential contingent and unliquidated claims for breach, termination, and/or rejection of the HMA and Ownership Agreement (each, defined below) of Fairmont Hotels & Resorts (U.S.) Inc. against the Debtors.[2] In support thereof, the Debtors rely upon the *Declaration of CRO Neil Demchick in Support of Debtors' Motion for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc.* ("**Demchick Declaration**"), and respectfully represent as follows:

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SC SJ Holdings LLC (5141) and FMT SJ LLC (7200). The mailing address for both Debtors is 3223 Crow Canyon Road, Suite 300 San Ramon, CA 94583.

[2] Upon information and belief, Fairmont Hotels & Resorts (U.S.) Inc. is now known as Accor Management US Inc. ("**Accor**"). For continuity and convenience, in this Motions we will continue to refer to Accor and its predecessor as "**Fairmont**."

## JURISDICTION AND VENUE

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the Amended Standing Order of Reference from the United States District Court for the District of Delaware, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  The Debtors confirm their consent, pursuant to Bankruptcy Rules 7008 and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "**Local Rules**") to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      Venue in the Court is proper pursuant to 28 U.S.C. § 1408.

3.      The predicates for the relief requested herein include, among other bankruptcy laws, sections 105 and 502(c) the Bankruptcy Code and Bankruptcy Rule 3018.

## PRELIMINARY STATEMENT

4.      On March 5, 2021, roughly 12 hours before the first bankruptcy petition in this case was filed and before the Hotel was closed, Fairmont asserted, without any warning or basis, a $30 million claim against debtor FMT SJ LLC, in a newly-commenced arbitration proceeding, for alleged breach of the HMA (defined below).  While the Debtors dispute Fairmont's contingent and unliquidated claim arising from the Debtors' breach of the HMA (due to rejection or otherwise), if allowed in the alleged amount, it would render Fairmont a disproportionately large creditor in these proceedings.  The Debtors cannot effectively advance their restructuring efforts without greater certainty as to the magnitude of Fairmont's claims against the Debtors arising from the breach, termination, and/or rejection of the HMA and Ownership Agreement (the "**Fairmont**

**Rejection Damages Claim**").[3]  Because fully liquidating the Fairmont Rejection Damages Claim may "unduly delay the administration of the[se] case[s]," 11 U.S.C. § 502(c)(1), the Debtors request that this Court estimate, for all purposes, the maximum allowed amount of the Fairmont Rejection Damages Claim at $2,004,408.  This amount should be no surprise to Fairmont.  It is the calculation of damages contractually agreed to under the HMA as Fairmont's liquidated damages in the event of a breach and termination of the HMA.

5.     The Debtors must responsibly establish the amount of the Fairmont Rejection Damages Claim to confirm and consummate a plan, obtain firm commitments for a new manager (as well as exit-financing), and realize the benefits of the RSA (which allow for the extension of the maturity date under the Debtors' $175 million secured loan by up to five years from the effective date of a plan).  Among other things, quantifying the Fairmont Rejection Damages Claim is necessary to: (a) ascertain Fairmont's entitlement to vote on a plan; and (b) appropriately address the Fairmont Rejection Damages Claim in the Debtors' chapter 11 plan.  In addition, the Debtors do not anticipate that its creditors will support a plan without some assurance concerning the amount of the potential Fairmont Rejection Damages Claim.

6.     Further, prompt estimation of the Fairmont Rejection Damages Claim is critical to the Debtors' timely emergence from bankruptcy.  *First*, it will allow the Debtors to satisfy the milestones under the RSA between the Debtors, their ultimate equity owner, the Secured Lender, and Preferred Member (each as defined below), which was the subject of extensive negotiation and provides a roadmap for the Debtors' and the Hotel's successful restructuring.  *Second*, estimation is necessary in light of the Debtors' liquidity needs.  The Debtors' budget shows that

---

[3]  The Debtors do not seek through this Motion to estimate Fairmont's claim for unpaid Management Fees (as defined in the HMA) that were due and unpaid prior to the FMT SJ Petition Date.  Such claims, if any, do not constitute part of the Fairmont Rejection Damages Claim.

they will run out of cash and exhaust their DIP Facility (defined below) by early July 2021, which is when the Debtors must exit chapter 11 under the RSA. Estimation of the Fairmont Rejection Damages Claim will be more efficient and avoid the potential damage to the Debtors' restructuring efforts caused by liquidating Fairmont's claim in an alternative proceeding or forum.

7.     This is precisely the circumstance that Bankruptcy Code section 502(c) was enacted to address. Section 502(c) reflects the policy that contingent and unliquidated claims can and should be promptly and efficiently administered in the bankruptcy proceeding. It therefore directs the Court to estimate such claims if their liquidation in the normal course would "unduly delay the administration of the case." 11 U.S.C. § 502(c)(1).

8.     Unless this Court undertakes to definitively estimate Fairmont's claim on a shortened and truncated schedule, the prospects of a prompt resolution of the Debtors' disputes with Fairmont are at best uncertain, placing the Debtors' ability to satisfy the milestones under the RSA (including plan confirmation by June 18, 2021) in jeopardy. Estimation will promote the efficient administration of the estate by permitting the plan process to proceed on an appropriate timeline.

9.     Particularly given the liquidated damages provision in the HMA, the Debtors believe that this Motion can be adjudicated promptly and without the need for protracted evidentiary presentations, consistent with the summary nature of section 502(c) proceedings. Once a reasonable estimate of the Fairmont Rejection Damages Claim is established, the Debtors expect that these cases will advance toward a swift resolution.

## BACKGROUND

### A.    The Chapter 11 Cases

10.     On March 5, 2021 (the "**FMT Petition Date**"), Debtor FMT SJ LLC ("**FMT SJ**") commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. On March

4

10, 2021 (the "**SC Petition Date**" and together with the FMT Petition Date, the "**Petition Dates**"), Debtor SC SJ Holdings LLC ("**SC SJ**") commenced a voluntary case under chapter 11 of the Bankruptcy Code in this Court. As of the date hereof, no trustee, examiner, or official committee has been appointed in these cases.

11.     The factual background regarding the Debtors' business, capital structure, and the events leading up to these chapter 11 cases is more fully set forth in the *Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings* (the "**First Day Declaration**") [Dkt 11]. Mr. Demchick serves as the Chief Restructuring Officer for the Debtors.

**B.      The Hotel, Secured Loan, and Management Agreement**

12.     Debtor SC SJ is the owner of an 805-room luxury hotel (the "**Hotel**") located at 170 South Market Street, San Jose, California, in the heart of Silicon Valley. The 20-story, two tower Hotel contains 805 rooms and suites, 65,000 square feet of state-of-the-art meeting and event space, three restaurants with bars, a café bakery, a fitness center, and a rooftop pool and gazebo. The Hotel historically hosted many conferences and conventions, particularly in the technology industry. While located near many of the largest Fortune 1000 corporations, the Hotel's long-term success will depend in part on also attracting more events from a national audience.

13.     Prior to the Petition Dates, the Hotel was managed pursuant to that certain Amended and Restated Hotel Management Agreement, dated as of December 2, 2005, between the Debtors and Fairmont (as amended, supplemented, or otherwise modified from time to time, the "**HMA**"). The HMA is attached as **Exhibit D** to the First Day Declaration. While SC SJ, as the owner of the Hotel, is not an immediate signatory to the HMA, it is directly obligated to perform certain duties under the HMA pursuant to that certain Owner Agreement, dated as of January 2, 2018, between the Debtors and Fairmont ("**Owner Agreement**"). The Owner Agreement is attached as **Exhibit E** to the First Day Declaration.

5

14.     The secured debt encumbering the Hotel is evidenced by a loan agreement, dated as of January 2, 2018, between the Debtors, as co-borrowers, and CLNC 2019-FL1 Funding, LLC as lender ("**Secured Lender**") (said loan agreement, as amended, modified, and supplemented from time to time, is the "**Secured Loan Agreement**").  The Secured Loan Agreement provided for a term loan of up to $173,485,000 secured by a first-priority mortgage lien on the Hotel and the underlying real property (the "**Mortgage**") and a first-priority security interest in substantially all of the Debtors' personal property (the "**Secured Loan**").  The amount outstanding on the Secured Loan as of the Petition Dates is approximately $175 million.  The maturity date under the Secured Loan Agreement under the Secured Loan Agreement is April 9, 2021.

### C.     The Debtors' Pre-Petition Restructuring Efforts

15.     As described in the First Day Declaration, the hospitality industry was amongst the hardest hit by COVID-19.  This is particularly true here because a significant amount of the Hotel's business was derived from conventions, business travelers and other large-group events.  Since the onset of the pandemic, large-group events have not been held due, in part, to government-imposed gathering restrictions.  While the long-term prospects for the Hotel are positive, until the pandemic eases and related restrictions are lifted, the Hotel will continue to face significant challenges and require supplemental capital to fund operations and service the Secured Loan.

16.     The Hotel's average occupancy during the pandemic has been approximately 7.7%.  Because the Hotel is not a "vacation-destination" resort, much of its business during the pandemic has been to accommodate airline and essential-health workers.

17.     Since the start of the pandemic, the Debtors have received millions of dollars in capital contributions from Mr. Sam Hirbod (directly or indirectly), the beneficial owner of the Hotel, to pay operating expenses and monthly debt service on the Secured Loan.

62358/0001-40375953v1

18.     The Debtors' indirect parent company issued preferred equity to CLNC Fair Jose Pref, LLC (the "**Preferred Member**"), in exchange for funds that were then contributed to the Debtors to help them address their inability to pay (i) monthly debt service payments, and (ii) costs and expenses for capital improvement projects at the property.

19.     The Preferred Member has a third-party arms'-length relationship with the Debtors and the applicable preferred shares do not confer any voting rights. The rights of the Preferred Member are senior to the beneficial ownership and control of the Hotel (Mr. Hirbod), and therefore Mr. Hirbod negotiated the terms of the Preferred Member's interest. The proceeds of the Preferred Member's investment were applied to reduce the accrued interest on the Secured Loan and, therefore, did not prejudice any other creditor.

20.     As the pandemic persisted, the Debtors sought a longer-term solution. Jones Lang Lasalle was retained in August 2020 to solicit investors to, among other things, purchase the Hotel or provide debt or equity financing sufficient to help fund the Hotel's operations during the pandemic. Jones Lang LaSalle conducted a comprehensive solicitation process, but its efforts yielded only interest from those willing to providing "rescue capital" on "lender of last resort" terms (including interest rates of up to 15% and austere corporate control provisions). The Debtors determined, in their business judgment, that pursuing this course was not in the best interest of the Hotel. Notably, several interested parties submitted indications of interest that would have required termination of the HMA with Fairmont.

### D.     Leveraging Operating Rights for Capital

21.     Subsequently, CHMWarnick, a hotel asset manager and owner-advisor, was retained to perform a market analysis for the Hotel and to reach out to competing hotel management companies, with strong reputations for managing hotels focused on business clientele, to assess their level of interest in the Hotel on the assumption that the Hotel could be re-

7

branded (in light of section 16.11 of the HMA, which details "Breach Termination" by the Debtors).

22.     Virtually every major brand appropriately suited to manage the Hotel expressed potential interest.  Significantly, one brand indicated it would consider providing subordinate financing to the Hotel as part of the package.  Some of the brands that expressed interest in managing the Hotel would also provide significant marketing prospects, including robust guest/booking pipelines.  These brands are well positioned to capture a larger share of the convention and large-event business as COVID-19-related restrictions continue to ease.  If implemented, re-branding will maximize the value of the Hotel and enhance the prospect of the Hotel's ability to satisfy operating expenses and debt service on a go-forward basis.

**E.     Debtors' Efforts to Engage Fairmont in Constructive Solutions**

23.     In conjunction with the Debtors' outreach to competing hotel brands, the Debtors also engaged with Fairmont to see if it would be willing to provide new capital for the Hotel.

24.     The Debtors also approached Fairmont to discuss fixing its "liquidated damages" claim under section 16.11 of the HMA, so that the Debtors could transition Hotel management to a brand willing to advance new financing.  *See* Demchick Declaration **Exhibit 1**.

25.     However, Fairmont refused on both points.  It refused to provide capital of any kind, and it also refused to engage in any discussions aimed at establishing its liquidated damages claim.

**F.     Fairmont's Pre-Pandemic Underperformance Aggravated the Circumstances**

26.     Unfortunately, the Hotel's under-performance is not solely attributable to the COVID-19 pandemic.  Even before the pandemic's onset, Fairmont struggled with successfully managing the Hotel.

62358/0001-40375953v1

27.     For example, Hotel revenue under Fairmont's management went from $80 million in 2018, to $71.8 million in 2019 (against its own 2019 target of $83.6 million).

28.     Similarly, the Hotel's gross operating profit under Fairmont's management went from 26.5% ($21.2 million) in 2018, to 22.5% ($16.1 million) in 2019 (against its own 2019 target of 27.4% ($22.9 million).

29.     Further, even Fairmont's 2020 budget revenue of $79.6 million is below the HMA's "Performance Test" (ignoring what occurred during the pandemic).

30.     Fairmont's actual performance and reservations pipeline in the first two months of 2020 (before anything COVID-related impacted the industry), demonstrate that Fairmont was destined to fall woefully short of the Performance Test set forth in the HMA in 2020.

31.     In addition, Fairmont maintained inferior books and records, and failed to satisfy Hotel ownership's questions regarding a $2 to $3 million cash irregularity.

### G.      **FMT SJ's Initial Effort to "Breach Terminate" the HMA and Fairmont's Response**

32.     In light of all considerations, including but not limited to: (a) Fairmont's pre-COVID-19 and post-COVID-19 underperformance, (b) the Hotel losses suffered largely due to COVID-19 over the last year (and the losses anticipated during 2021), (c) Fairmont's inability and unwillingness to look for solutions to support the Hotel other than (i) pointless litigation (via AAA) and (ii) unspecified "cost cutting measures" (for a Hotel that was at 7% occupancy and nearly closed already), and (d) the real prospect of replacing Fairmont with a brand/operator with both a better business "pipeline" and a willingness to fund nearly $50 million on a subordinated basis, the Debtors decided to Breach Terminate the HMA.  On February 4, 2021, FMT sent a letter to this effect to Fairmont, with a termination date of March 10, 2021.  *See* Demchick Declaration **Exhibit 2**.

33.     In response, on February 5, 2021, Fairmont wrote the Debtor to (a) dispute any termination of the HMA and (b) assert that Debtor-Fairmont disputes should be addressed through arbitration, and asked FMT SJ to engage in pre-arbitration discussions. *See* Demchick Declaration **Exhibit 3**. Thus, as of February 5, 2021, Fairmont's position was that the HMA had not been terminated.

34.     On February 9, 2021, FMT SJ responded, agreeing to participate in discussions with Fairmont. *See* Demchick Declaration **Exhibit 4**.

35.     On February 16, 2021, representatives of both parties (*i.e.*, FMT SJ and Fairmont), and their counsel, participated in a WebEx video meeting/call. FMT SJ was fully transparent with Fairmont, expressly stating that FMT believed arbitration was a litigation tactic that distracts from resolving the Hotel's real financial and other challenges, and that rather that participate, FMT would soon be filing for chapter 11 relief in order to (among other things) reject the Fairmont HMA, and seek to leverage the Hotel management rights for subordinate capital. During the call, FMT inquired (yet again) as to whether Fairmont was willing to provide financial assistance to the Hotel, and Fairmont's response (through its CEO of the Americas (the "**Fairmont's CEO**")), was negative.

36.     On February 17, 2021, Fairmont's CEO contacted the Debtors' principal, Mr. Sam Hirbod, and for the first time (after rebuffing the Debtors for months), said Fairmont would approach Accor senior management in Paris, France, to see if they would approve advancing capital to the Hotel.

37.     On February 18, 2021, FMT SJ (through counsel) responded, expressing surprise that Fairmont would consider extending capital, given that just the day before, Fairmont's CEO indicated that it would provide no financing. *See* Demchick Declaration **Exhibit 5**.

62358/0001-40375953v1

38.     In response, on February 19, 2021, Fairmont's attorney (Mr. Peter Benudiz) contacted undersigned counsel for FMT SJ, indicating that the decision to consider financing was an idea considered after the February 16, 2021 WebEx meeting. However, a significant portion of the call was devoted to Mr. Benudiz repeatedly inquiring as to why FMT SJ felt the need to promptly file for chapter 11; and urging a delayed bankruptcy filing because, according to Mr. Benudiz, the Secured Lender could not complete a foreclosure sale against the Debtors "for at least 120 days."

**H.     FMT SJ Withdraws its HMA Termination Letter and Yet Fairmont Refuses Financing**

39.     In light of the efforts that Fairmont indicated were being undertaken to seek financing by Fairmont, on February 23, 2021, FMT SJ withdrew its February 4, 2021 HMA termination letter. *See* Demchick Declaration **Exhibit 6**.

40.     However, later that same day, after making the Debtors wait a week, Fairmont advised Mr. Hirbod that (consistent with what Fairmont had been saying for at least a month) the answer from Paris was "no"; Fairmont would not provide financing to the Hotel. *See* Demchick Declaration **Exhibit 7**.

41.     Understandably frustrated, on February 25, 2021, the Debtors wrote to Fairmont asking if Fairmont would consider "any accommodations of any kind to assist the Hotel." *See* Demchick Declaration **Exhibit 8**.

**I.     Ownership's Decision to Close the Hotel in Anticipation of Chapter 11 and Fairmont's Refusal to Cooperate**

42.     At or about the same time (late February 2021), the decision was made to close the Hotel to curtail the negative cash flow. The Debtors communicated this decision to Fairmont.

43.     On February 26, 2021, Fairmont responded to FMT SJ's February 25, 2021 "accommodations" request, as well as FMT SJ's request for an orderly and cooperative closing of

11

the Hotel.  *See* Demchick Declaration **Exhibit 9**.  In its letter, Fairmont (a) contested the Debtors' right to close the Hotel, (b) stated that the Hotel's economic woes could be resolved through further "cost cutting" measures (without providing specificity or credible projections for how this could be achieved), (c) demanded payment of nearly $2 million in allegedly delinquent management fees, and (d) continued to insist on a litigated resolution through arbitration. *Id.*

44.     In response, on March 1, 2021, Debtors' counsel called Fairmont's counsel to advise that the Hotel would be closed imminently and reiterated that the Hotel would be placed into chapter 11 imminently.  In the interests of the Hotel, its employees, and guests, the Debtors repeatedly urged Fairmont to work cooperatively on closing the Hotel.  Fairmont's counsel requested an opportunity to consult with Fairmont before responding.

45.     On March 3, 2021, Fairmont's counsel responded by requesting a second WebEx meeting with principal representatives and counsel.  The Debtors agreed.  *See* Demchick Declaration **Exhibit 10**.  Rather than use the call to facilitate a resolution or at least an orderly closure of the Hotel that would benefit everybody, Fairmont used the opportunity to effectively depose the Debtors about their chapter 11 plans.  In response, the Debtors continued their policy of honesty and transparency, stating once again that chapter 11 filings were imminent, and that the Hotel would be closed, preferably with Fairmont's cooperation.  In contrast, when FMT SJ asked whether Fairmont would cooperate with a smooth closing, its representatives refused to answer.

**J.      Fairmont Interferes with the Debtor-Secured Lender Relationship Hours Before Filing an "Emergency" Arbitration**

46.     On March 4, 2021, Fairmont's North America CEO called senior management for the Secured Lender to discuss whether the Secured Lender was going to cooperate with the Debtors' restructuring efforts.  Fairmont's CEO referred to the SNDA in place between Fairmont and the Secured Lender, which Fairmont appears to contend would bind the buyer at a foreclosure

sale to Fairmont, implying that Secured Lender should be seeking to foreclose, rather than to cooperate with the Debtors, because the SNDA is relevant only in the event of a foreclosure by the Secured Lender. This call by Fairmont to the Secured Lender was just another manifestation of Fairmont's desperate strategy of delaying and preventing the Debtors from accessing capital, to force the Debtors into further insolvency, all with the hope (if not intention) of orchestrating a foreclosure, thereby enabling Fairmont to keep its name on the Hotel.

47. A few hours thereafter, with full knowledge that the Debtors were preparing to file for chapter 11, Fairmont (in the proverbial "race to the courthouse") commenced an arbitration proceeding with the AAA, seeking a temporary restraining order to prevent closure of the Hotel. *See* *Accor Management Us Inc. (F/K/A Fairmont Hotels & Resorts (U.S.) Inc.) v. FMT SJ LLC*, Case No. 01-21-0002-1684).

48. In contrast to the Debtors' honesty and transparency, Fairmont did not disclose its intention to seek emergency relief at any time during either the (a) March 3, 2021 WebEx call with FMT SJ, or (b) March 4, 2021 call with Secured Lender's senior management. Similarly, nowhere in its AAA emergency filing did Fairmont advise the AAA that the Debtors had already informed Fairmont that the Debtors would be imminently seeking chapter 11 relief.

**K.** **Closure of the Hotel and the Chapter 11 Filings**

49. On March 5, 2021, the Hotel was closed, with all care being given to the guests, employees and preservation of the asset. At the same time, FMT SJ filed its chapter 11 petition with this Court. FMT SJ promptly advised the AAA of its bankruptcy filing, and no action whatsoever has been taken by the AAA in that proceeding.

50. On March 10, 2021 Debtor SC SJ (which owns the Hotel real estate and improvements) filed its chapter 11 petition with the Court.

**L.** **Debtor Restructuring Support Agreement**

13

51.     On March 9, 2021, the Debtors, the Secured Lender, the Preferred Member, and certain principals of the Debtors, including Mr. Hirbod, entered into a restructuring support agreement ("**RSA**").  The RSA is attached as **Exhibit C** to the First Day Declaration.

52.     The RSA is consistent with and was negotiated to implement the Debtors' goal of transitioning from Fairmont to a new hotel operator that is willing to provide mezzanine financing. Accordingly, under the RSA the Debtors committed to promptly file a motion to reject the HMA and related Owner Agreement, and a motion to approve procedures to solicit a new hotel operator that will provide mezzanine financing.

53.     The RSA also requires the Debtors to (a) file a chapter 11 plan and disclosure statement by March 20, 2021, (b) obtain approval of the disclosure statement by April 29, 2021, (c) solicit votes on the plan by May 4, 2021, and (d) obtain confirmation of the chapter 11 plan by June 18, 2021.

54.     As required under the RSA, an affiliate of Mr. Hirbod, FJT SJ Catering LLC (the "**DIP Lender**") agreed to provide up to $7.5 million in unsecured post-petition financing (the "**DIP Facility**") to fund SC SJ's operating and administrative expenses during the projected timing of these cases under the RSA—through early July 2021.  On March 12, 2021, the Court granted interim approval of the DIP Facility, allowing SC SJ to borrow $2.5 million under the DIP Facility, pending entry of a final order.

### M.     The Debtors' Rejection and Procedures Motions

55.     On February 10, 2021, the Debtors filed their *Debtors' Motion for Order Authorizing the Debtors to Reject Amended and Restated Hotel Management and Owner Agreements Between Debtors and Fairmont, Effective as of the Debtors' Respective Petition Dates* [Dkt. 22] (the "**Rejection Motion**"), seeking an order of the court authorizing rejection of the HMA and related Ownership Agreement.

56.     On March 11, 2021, the Debtors filed their *Debtors' Motion for an Order Authorizing Marketing Process to Solicit Hotel Brands* [Dkt. 41] (the "**Procedures Motion**"), seeking an order of the court authorizing procedures to negotiate with qualified operators for the Hotel's management rights.

57.     The Debtors believe that if the Court grants both motions and the Debtors solicit qualified parties with respect to the Hotel Management Rights (as defined in the Procedures Motion"), the solicitation process will result in (a) a new hotel management agreement with a leading hotel brand and (b) a substantial subordinate capital investment that will help fund the Hotel's operations beyond the end of the pandemic.

**N.     The Debtors' March 15, 2021 Renewed HMA Termination**

58.     On March 15, 2021, the Debtors wrote to Fairmont indicating their "Breach Termination" of the HMA.  *See* Demchick Declaration **Exhibit 11**.  Termination of the HMA will occur in accordance with the Debtors' letter.

**RELIEF REQUESTED**

59.     By this Motion, the Debtors request entry of an order, pursuant to Bankruptcy Code section 502(c) and other applicable law, estimating the Fairmont Rejection Damages Claim in the amount of $2,004,408 (the "**Estimated Amount**").  The Debtors propose that the Estimated Amount be deemed (a) the maximum amount in which the Fairmont Rejection Damages Claim may be finally allowed for any purpose in these chapter 11 cases; (b) the amount in which the Fairmont Rejection Damages Claim is deemed temporarily allowed for voting purposes pursuant to Bankruptcy Rule 3018(a); and (c) the amount to be used to determine treatment of the Fairmont Rejection Damages Claim under the Debtors' proposed chapter 11 plan.  The Estimated Amount will include any and all claims of Fairmont, excluding only any claim for unpaid Management Fees (as defined in the HMA) that were due and unpaid prior to the FMT SJ Petition Date, if any.

15

<u>**BASIS FOR RELIEF AND APPLICABLE AUTHORITY**</u>

**I      The Court Should Estimate the Fairmont Rejection Damages Claim to Promote the Efficient Administration of the Chapter 11 Cases.**

      **A      <u>The Court Has Authority to Estimate the Fairmont Rejection Damages Claim.</u>**

60.     Congress intended that "all claims, including unliquidated and contingent claims, be 'dealt with' in the bankruptcy proceeding." *Addison v. Langston (In re Brints Cotton Mktg., Inc.),* 737 F.2d 1338, 1340 (5th Cir. 1984) (citation omitted).   Recognizing, however, that liquidating all contingent and unliquidated claims in the normal course could "unduly delay the administration of the case," 11 U.S.C. § 502(c)(1), Congress afforded bankruptcy courts wide latitude to estimate contingent and unliquidated claims using whatever methods best suit the needs of the case.   *See In re Armstrong World Indus., Inc.,* 348 B.R. 111, 123 (D. Del. 2006).

61.     Estimation serves two purposes.   First, it facilitates the efficient resolution of the case by eliminating the need to defer the confirmation and consummation of a chapter 11 plan pending the final resolution of the contingent and unliquidated claims.   Second, it promotes fair distributions to creditors by requiring that uncertain claims be assessed realistically. *See First* City *Beaumont* v. *Durkay (In re Ford),* 967 F.2d 1047, 1053 (5th Cir. 1992).

62.     Estimation is a pragmatic procedure, and courts have considerable flexibility to adapt it to the needs of the case.   The Bankruptcy Code does not prescribe a specific methodology for estimating claims; instead, "the bankruptcy court should use whatever method is best suited to the circumstances." *In re Brints*, 737 F.2d at 1341; see *also Kool, Mann, Coffee & Co.* v. *Coffey*, 300 F.3d 340, 356 (3d Cir. 2002) ("[T]here [wa]s no requirement that a particular kind of procedure be employed in estimating the value of [a] claim."); *Armstrong World Indus.*, 348 B.R. at 123 ("The Code does not provide a roadmap for estimation. . . . The only requirement is that the value of the claim be determined in accordance with the legal rules that will govern the final amount of

16

the claim, and 'there are no other limitations . . . save those general principles which should inform all decisions made pursuant to the Code.'" (citations omitted)).

63.     The manner in which claims estimation is conducted is generally left to the discretion of the court.  "[A] District Court . . . 'can reverse a bankruptcy court's decision on the method for ascertaining the value of claims only when it is so fundamentally wrong that no reasonable person could agree with it.'"  *Beatrice Co. v. Rusty Jones, Inc.*, 153 B.R. 535, 536 (N.D. Ill. 1993) (citing to *Libby v. Illinois High School Ass'n*, 921 F.2d 96 (7th Cir. 1990)).  This does not, however, "require that a bankruptcy court be clairvoyant."  *In re Federal Press Co.*, 116 B.R. 650, 653 (Bankr. N.D. Ind. 1989) (quoting *In re Baldwin—United Corp.*, 55 B.R. 885, 898 (Bankr. S.D. Ohio 1985)).  "A bankruptcy court's estimation of the value of an unliquidated claim, the liquidation of which would unduly delay the proceedings, may be disturbed on appellate review only in the event of an abuse of discretion."  *In re Brints*, 737 F.2d at 1341 (citing *Bittner v. Borne Chem. Co.*, 691 F.2d 134, 136 (3d Cir. 1982).

64.     Not only does the Court have wide latitude to frame appropriate procedures of estimating claims, it may apply the estimated claim amount for a variety of purposes.  Thus, courts have estimated claims not only to determine their ultimate allowed amount, but also for such purposes as establishing the maximum amount of a particular claim or determining the amount of plan consideration to be reserved on account of the claim.  *See, e.g., In re Jacom Comput. Servs., Inc.,* 280 B.R. 570, 571, 573 (Bankr. S.D.N.Y. 2002) (granting an application to estimate certain disputed claims at zero for the purpose of establishing an appropriate reserve); *In re DrexelBurnham Lambert Grp. Inc.,* 138 B.R. 723, 740 (Bankr. S.D.N.Y. 1992) (requiring that a trustee fund a claims reserve based on such amounts for disputed claims as the court would "estimate for reserve purposes"); *Order Estimating the Maximum Amount of Post's Proof of Claim*

17

at 1, *In re Phoenix Payment Sys., Inc.,* No. 14-11848 (MFW) (Bankr. D. Del. Feb. 27, 2015) (establishing maximum allowed amount of disputed claim).

65.     Similarly, under Bankruptcy Rule 3018(a), the Court may deem a claim temporarily allowed for voting purposes in its estimated amount.  Fed. R. Bankr. P. 3018(a); see *also In re Pac. Sunwear of Cal., Inc.,* No. 1610882 (LSS), 2016 WL 4250681, at *3-4 (Bankr. D. Del. Aug. 8, 2016).

**B.      Estimating the Fairmont Rejection Damages Claim Is Necessary to Avoid Undue Delay in the Administration of the Chapter 11 Cases and Ensure Fair Treatment for All Creditors.**

66.     The need to estimate the Fairmont Rejection Damages Claim is manifest: The claim is "contingent [and] unliquidated" on its face.  *See* 11 U.S.C. § 502(c)(1).  Liquidating Fairmont's claim, either through the formal claim objection process or outside of this Court would substantially delay these proceedings, add an additional layer of costs that the Debtors simply do not have the financial resources to absorb, and likely put the Debtors in a position where they cannot satisfy the milestones under the RSA, which is a critical component of the Debtors' restructuring efforts with the support of their Secured Lender.  As of the date of this Motion, the Debtors only have access to $2.5 million in proceeds under the DIP Facility.  Upon final approval of the DIP Facility, the Debtors will have access to an additional $5 million, for an aggregate amount of $7.5 million.  Under the Debtors' projections, the DIP Facility will fund the costs and expenses of these cases through July 7, 2021, after which point the Debtors will run out of cash, rending a successful restructuring under chapter 11 potentially challenging without additional financing and requiring additional negotiation with the Secured Lender and other stakeholders in these cases.  Fully litigating the Fairmont Rejection Damages Claim should not be permitted to derail the Debtors' restructuring efforts.  This is, in fact, the precise result that Bankruptcy Code section 502(c) was designed to avoid.

67.     Estimation of the Fairmont Rejection Damages Claim will not only allow the Debtors to keep to the budget and milestones negotiated with key stakeholders, it will also provide creditors with information regarding the potential claims pool, which may impact ultimate creditor recoveries.  With solicitation of a chapter 11 plan required under the RSA by May 4, 2021, a targeted and efficient estimation proceeding prior to such date, as contemplated under Bankruptcy Code section 502(c), could allow the Debtors to provide creditors with additional detail regarding the impact of any chapter 11 plan on their recoveries.

68.     Finally, the relief requested is fair to Fairmont.  *First*, this Court has the authority and experience resolving contract damage disputes, and there is no evidence that Fairmont will receive worse treatment than in an alternative forum.  *Second*, establishing the maximum amount of the Fairmont Rejection Damages Claim now will afford Fairmont an opportunity to vote on a plan and participate in recoveries.  *Third*, Fairmont has been in a litigation posture as to its rights under the HMA, including its potential claim, for weeks if not longer.

69.     Bankruptcy Code section 502(c) is designed to provide the Debtors and stakeholders an opportunity to recognize the benefits of a chapter 11 restructuring without being over-burdened or slowed by full litigation to liquidate unliquidated and contingent claims, such as the Fairmont Reject Damages Claim.  This is the exact result the Debtors face in the absence of estimation.  Accordingly, estimation of the Fairmont Rejection Damages Claim under Bankruptcy Code section 502(c) is necessary and appropriate.

## II.     The Estimated Amount Is Appropriate and Determined by Application of HMA Section 16.11(b).

70.     Bankruptcy courts look to the applicable state law when they enforce a liquidated damages provision.  *See e.g. In re Vantage Invs., Inc.*, 328 B.R. 137, 143 (Bankr. W.D. Mo. 2005) (honoring contract's Arizona choice of law and applying the liquidated-damages law of Arizona).

62358/0001-40375953v1

Here, the HMA is governed by California law, which statutorily recognizes the enforceability of a contract's liquidated damages provision. *See* California Civil Code Section 1671(b) ("Except as provided in subdivision (c) [which addresses consumer transactions], a provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made.").

71.     The proposed Estimated Amount for Fairmont's Rejection Damages Claim, $2,004,408, is reasonable. This is because the Estimated Amount represents the amount owed under the liquidated damages clause set forth in Section 16.11(b) of the HMA. The calculation of the Estimated Amount is illustrated in Demchick Declaration **Exhibit 12**.

72.     Section 16.11(b) defines a Breach Termination as "termination of this Agreement by the Owner in breach of this Agreement." The Debtors have or by virtue of rejection under Section 365 pursuant to their Rejection Motion will have, breached the Agreement. *See e.g.*, *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1661 (2019). Fairmont is no longer managing (and will no longer manage) the Hotel and has been removed from the property. By virtue of the Procedures Motion, the Hotel will be operated by a brand/operator other than Fairmont. As a practical matter, the Hotel cannot be the subject of multiple unterminated management agreements. Moreover, on March 15, 2021, the Debtors sent Fairmont written notice of termination that will be effective coincidental with Court approval of Debtors' rejection of the HMA and Owner Agreement. Consequently, the Debtors will have terminated the HMA by a breach of the HMA.

73.     Section 16.11 specifies the damages arising from a Breach Termination as follows:

Given the inherent uncertainty as to the measure of such damages and the parties desire to establish a methodology for the calculation of damages, the Owner and

20

the Operator agree that the Operator shall be entitled to receive as liquidated damages in the event of a Breach Termination an amount (the "Liquidated Damage Amount") equal to (i) the Imputed Management Fees times (ii) the Multiplier, provided that the Liquidated Damage Amount shall not apply and the Operator shall be entitled to receive damages as proven with respect to any Breach Termination effected within the final two years of the final Extension Tenn. For such purposes:

      (A)    "Imputed Management Fees" shall be the aggregate Management Fees paid or payable to the Operator under the Agreement based on the 12-month period for which monthly operating reports have been delivered to the Owner immediately preceding the date of the written notice or other action of Owner which effects a Breach Termination; and

      (B)    The applicable "Multiplier" shall be 24 with respect to any Breach Termination prior to the second anniversary of the date of this Agreement and, thereafter, shall reduce by one point as of the close of each successive two-year period during the Initial Operating Term and the five Extension Terms, down to a minimum Multiplier of three. For example, the Multiplier for the two-year period commencing following the 10th anniversary of this Agreement would be 19 and the Multiplier for the initial two years of the second Extension Term would be nine.

74.    With respect to (A), the operative 12-month period is March 1, 2020 through February 28, 2021. While Fairmont has not delivered the February 2021 operating report, the Hotel's books for February 2021 are (or should be) closed, and Fairmont's failure or refusal to deliver the February report is not a basis to use a different 12-month lookback period.

75.    With respect to (B), the original Multiplier of 24 is reduced by one point for the passage of every two years during the "Initial Operating Term." Section 2.1 of the HMA defines the Initial Operating Term as follows: "Subject to Section 2.2 [governing term extensions], the term of this Agreement in respect of the Operation of the Hotel shall be the period that commenced on September 14, 1999 and ending December 31, 2025 (the "Initial Operating Term")."

76.    Thus, reducing the Multiplier one point for every two years that have passed without a Breach Termination since September 14, 1999, results in a multiplier of fourteen (14).

77. The Management Fees paid or payable for the period March 1, 2020 through February 28, 2021 are approximately $143,172. When multiplied by fourteen (14), Fairmont is entitled to liquidated damages for rejection, breach and/or termination of the HMA and Owner Agreement equal to $2,004,408.

78. Accordingly, the Debtors respectfully request that the Court estimate the Fairmont Rejection Damages Claim at $2,004,408.

## RESERVATION OF RIGHTS

79. Nothing herein is intended or shall be construed to: (a) constitute an admission as to the validity, amount or priority of any claim or lien by any party against the Debtors or a promise or requirement to pay any claim; (b) constitute a waiver of the Debtors' rights to dispute any claim by any party, including, but not limited to, an administrative expense claim, or assert any defenses or counterclaims to any such claim; (c) constitute a waiver or limitation of any claim, cause of action, right, or defense of the Debtors against any party; or (d) prejudice the Debtors' rights under contract, applicable law, or otherwise. Moreover, the Debtors reserve the right to request that the Court definitively liquidate Fairmont's Rejection Damages Claim at any time, whether before or after resolution of the Motion.

## NOTICE

80. Notice of this Motion will be provided to: (i) the Office of the United States Trustee for the District of Delaware; (ii) the United States Attorney for the District of Delaware; (iii) the Internal Revenue Service; (iv) the Debtors' twenty largest unsecured creditors on a consolidated basis; (v) counsel to Fairmont; (vi) counsel to Secured Lender; and (iv) all parties requesting notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested herein, no other or further notice is necessary.

81.     A copy of this Motion is available on (i) the Court's website: www.deb.uscourts.gov, and (ii) the website maintained by the Debtors' proposed claims and noticing agent, Stretto: https://cases.stretto.com/FairmontSJ/

## NO PRIOR REQUEST

82.     No previous request for the relief sought herein has been made to this Court or any other court.

*[Remainder of Page Intentionally Left Blank]*

62358/0001-40375953v1

## **CONCLUSION**

WHEREFORE, the Debtors respectfully request that the Court enter an order substantially in the form of the Proposed Order attached hereto as **Exhibit A** and grant such other relief as is just and proper under the circumstances.

Wilmington, Delaware

| | | |
|---|---|---|
| Dated: | March 16, 2021 | **COLE SCHOTZ P.C**. |
| | Wilmington, Delaware | |

*/s/ Justin R. Alberto*

Justin R. Alberto (No. 5126)
Patrick J. Reilley (No. 4451)
500 Delaware Avenue, Suite 1410
Wilmington, Delaware 19801
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: jalberto@coleschotz.com
       preiley@coleschotz.com

- and –

Patrick J. Potter (Admitted *Pro Hac Vice*)
Jonathan R. Doolittle (Admitted *Pro Hac Vice* )
Rahman Connelly (Admitted *Pro Hac Vice)*
PILLSBURY WINTHROP SHAW PITTMAN
LLP
1200 Seventeenth Street, NW
Washington, DC 20036
Telephone: (202) 663-8928
Facsimile: (202) 663-8007
patrick.potter@pillsburylaw.com
jonathan.doolittle@pillsburylaw.com
rahman.connelly@pillsburylaw.com

*Proposed Counsel to the Debtors and
Debtors in Possession*

62358/0001-40375953v1