# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF DELAWARE

In re:

SC SJ HOLDINGS LLC, *et al.*[1]

Debtors.

Chapter 11

Case No. 21-10549 (JTD)

(Jointly Administered)

# EXPERT REBUTTAL REPORT OF MR. FRANCIS J. NARDOZZA DATED

# MAY 28, 2021

# TO EXPERT REPORT OF GREIG TAYLOR DATED MAY 19, 2021

---

[1]      The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SC SJ Holdings LLC (5141) and FMT SJ LLC (7200).  The mailing address for both Debtors is 3223 Crow Canyon Road, Suite 300 San Ramon, CA 94583.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## Table of Contents

*Table of Contents*...........................................................................................................................*ii*

**I.   SUBMISSION OF EXPERT REBUTTAL REPORT AND RETENTION** ........................................ **4**

*A.   Submission of Expert Rebuttal Report* ........................................................................................ *4*

*B.   Retention* .................................................................................................................................... *4*

**II.   EXPERT REBUTTAL OPINIONS AND REBUTTAL SUMMARY** .......................................... **6**

*A.   Opinion 1 – Regarding Mr. Taylor's Flawed Theory and Approach to Calculating Lost Management Fees Damages.* 6

*B.   Opinion 2 – Regarding Mr. Taylor's Unreasonable and Unreliable Estimates and Assumptions Pertaining to Forgone Hotel Revenues and Lost Management Fees Damages.* .................................................................... *6*

*C.   Rebuttal Summary* ...................................................................................................................... *6*

*D.   Alternative Damages Calculations* ............................................................................................... *8*

**III.   PROFESSIONAL EXPERIENCE AND EXPERTISE** .......................................................... **11**

**IV.   BACKGROUND AND UNDERSTANDING OF DISPUTE** ................................................. **15**

*A.   Background* ................................................................................................................................ *15*

*B.   Understanding of the Situation with Accor* ................................................................................ *17*

**V.   SCOPE OF WORK** ................................................................................................................ **18**

**VI.   INFORMATION, ANALYSES, FINDINGS AND CONCLUSIONS IN SUPPORT OF MY PRIMARY EXPERT OPINIONS** ...... **21**

*A.   Opinion 1 – Regarding Mr. Taylor's Flawed Theory and Approach to Calculating Lost Management Fees Damages.* 21

*B.   Opinion 2 – Regarding Mr. Taylor's Unreasonable and Unreliable Estimates and Assumptions Pertaining to Forgone Hotel Revenues and Lost Management Fees Damages.* ........................................................................... *30*

*C.   Mr. Taylor's Alternative Case Damages Calculations* ................................................................ *59*

*D.   Other Alternative Damages Calculations* ................................................................................... *62*

**VII.   CLOSING** ........................................................................................................................... **66**

**VIII.   APPENDIX OF EXHIBITS** .................................................................................................. **69**

*A.   EXHIBIT A – DOCUMENTS RELIED UPON AND CONSIDERED* ..................................................... *69*

*B.   EXHIBIT B – SEGMENTATION OF BUSINESS* ............................................................................... *73*

*C.   EXHIBIT C – ALTERNATIVE 1 CALCULATION OF DAMAGES – WEIGHTED AVERAGE LIQUIDATED DAMAGES* ............. *74*

*D.   EXHIBIT D – ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 1* ................................... *75*

*E.   EXHIBIT E– ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 2* ................................... *78*

**REH Capital Partners, LLC**

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

F.   *EXHIBIT F – ACCOR MANAGEMENT AND FRANCHISE FEE REVENUES BY GEORGRAPHY FROM ACCOR'S ANNUAL REPORT DECEMBER 31, 2020* ............................................................................................................ 80

G.   *EXHIBIT G - FRANCIS J. NARDOZZA CURRICULUM VITAE* ............................................................................ 81

**REH Capital Partners, LLC**

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## I. SUBMISSION OF EXPERT REBUTTAL REPORT AND RETENTION

### A. Submission of Expert Rebuttal Report

1.    I, Francis J. Nardozza, hereby submit my Expert Rebuttal Report on behalf of SC SJ Holdings LLC ("SCSJ") and FMT SJ LLC ("FMSJ") (for convenience only, SCSJ and FMSJ collectively "Debtors" or "Owner"[2]) to the Expert Report of Greig Taylor dated May 19, 2021 ("Taylor Report" or "Expert Report") in the above referenced Chapter 11 cases pending in the United States Bankruptcy Court for the District of Delaware (the "Court"). This pertains to the former Fairmont Hotel San Jose ("Former Fairmont SJ", "Hotel" or "Property") located in San Jose, California owned by SCSJ and previously operated by Accor Management US Inc. (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) ("Accor," "Fairmont," or "Operator") pursuant to the Amended and Restated Hotel Management Agreement dated as of December 2, 2005 (as amended and otherwise modified, the "HMA") prior to the "Breach Termination" of the HMA by Owner on March 5, 2021.

### B. Retention

2.    I and my firm, REH Capital Partners, LLC ("REH"), have been retained by Pillsbury Winthrop Shaw Pittman LLP ("Pillsbury" or "Debtors' Counsel"), acting as counsel to Debtors, to provide expert consulting assistance and possible expert testimony in the above-referenced Chapter 11 cases on issues and subjects falling within my expertise, and specifically to provide this Expert Rebuttal

---

[2] While I recognize the existence of two separate debtor entities, with their own distinct assets and liabilities, any reference to Debtors or Owner throughout my Expert Report is meant to refer to either or both entities, without making a distinction between the two entities, and is (a) for convenience and (b) because that does not affect my analysis or opinions.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Report, and, potentially, expert testimony in proceedings before the Court in connection with these Chapter 11 cases (collectively, the "Matter" or the "Case").

3.      I understand that Accor has asserted a number of breach of contract claims arising out of (i) Debtors' removal of Accor management from the Hotel and closure of the Hotel, (ii) Debtors' rejection of the Amended and Restated Hotel Management Agreement between San Jose Fairmont Lessee, LLC, and Fairmont Hotels and Resorts (U.S.) Inc. dated as of December 2, 2005, (as further amended, assumed, modified, and/or restated, and together with any annexes, exhibits, and ancillary agreements) (the "HMA") pursuant to which Accor managed the Hotel, and rejection of the Owner Agreement between SC SJ Holdings LLC, FMT SJ LLC and Fairmont Hotels & Resorts (U.S.) Inc. dated as of January 2, 2018 (the "Owner Agreement"), (iii) Debtors' termination of the HMA, and (iv) Debtors' failure to pay management fees and reimbursable amounts due and owing to Accor (collectively, "Debtors' Alleged Breaches of Contract").

4.      More specifically for this Expert Rebuttal Report, I have been asked by Debtors' Counsel as a hospitality industry expert to provide my independent and objective expert rebuttal to the findings, conclusions, and opinions expressed by Mr. Taylor in the Taylor Report on alleged damages owing Accor by Debtors due to Debtors' Alleged Breaches of Contract.

5.      I am being compensated at the hourly rate of $650 per hour. My fees are not in any way contingent or based on the content of my opinions or the outcome of this Case or any other matter.

6.      This Expert Rebuttal Report must not be construed as expressing opinions on matters of law, which are outside my expertise.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## II.  EXPERT REBUTTAL OPINIONS AND REBUTTAL SUMMARY

### A. Opinion 1 – Regarding Mr. Taylor's Flawed Theory and Approach to Calculating Lost Management Fees Damages.

*Opinion 1 - In my professional opinion, Mr. Taylor's theory, and approach to calculating "Lost Management Fees Damages" and hence, "Total Damages" allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract, are flawed and unsupported by the plain language reading of the HMA, which specifically provides for a calculation of liquidated damages in the event of a "Breach Termination" of the HMA by Owner.*

### B.  Opinion 2 – Regarding Mr. Taylor's Unreasonable and Unreliable Estimates and Assumptions Pertaining to Forgone Hotel Revenues and Lost Management Fees Damages.

*Opinion 2 - In my professional opinion, Mr. Taylor failed to establish a reasonable and reliable basis for his estimates of future Hotel Revenues, Profits, Management Fees, and Damages over the 29-plus - years of future Hotel operations over his specified damages period from March 5, 2021 through December 31, 2050, and such estimates and calculations, in my opinion, are based on numerous flawed and/or unreasonable, and unreliable assumptions that ignore historical trends in Hotel performance and trends in the historical management fees earned by Operator since the inception of the HMA.*

### C.  Rebuttal Summary

7.      In summary, Mr. Taylor's primary approach (instructed by counsel, Sidley & Austin, as later discussed) and conclusion on Lost Management Fees Damages allegedly suffered by Accor due to Debtors' Alleged Breaches of Contract, in my professional opinion, ignores the provisions of Section 16.11 of the HMA dealing with Breach Termination by Owner and Liquidated Damages calculations.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Furthermore, Mr. Taylor's Lost Management Fees Damages determination that he made under a highly speculative and prospective analysis of estimating and calculating future Hotel Total Revenues and Management Fees is (i) unfounded in reliable evidence or findings, (ii) ignores substantial specific and actual historical trends in performance and operations of the Hotel, (iii) is based in chief on broad-based lodging market predictions made and presented in a general publication of CBRE, (iv) is not based on any sound hospitality expert analysis of issues, trends, and competitive metrics specific to the Hotel in support of his projection assumptions, and in my opinion does not provide a reasonable and sound foundation for calculating Lost Management Fees damages in this Case (assuming there is even a basis for undertaking such calculation, which I do not).

8.      Following his conclusion and presentation of the amount of Lost Management Fees Damages and Total Damages allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract, Mr. Taylor made and presented four additional calculations that he labeled as "Liquidated Damages Amounts."  In his Expert Report, he stated, "Counsel also asked me to calculate damages under the Liquidated Damages provision in the HMA under certain assumptions regarding the appropriate "Imputed Management Fees" amount."[3] Three of the four calculations he made in this regard were based on assumptions regarding the periods and amounts of "Imputed Management Fees" not in conformity with Section 16.11(b)(B) that was the basis of my own calculation of the Liquidation Damages Amount under the HMA due to Breach Termination by the Owners, that I presented and opined on in my Expert

---

[3] Taylor Expert Report, pg. 5, para. 10.

**REH Capital Partners, LLC**

## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Report on Liquidated Damages that I submitted to the Court on May 19, 2021, wherein I opined, "In my professional opinion, the amount of Liquidated Damages owing Accor by Debtors under Section 16.11(b) of the HMA due to Breach Termination of the HMA is $2,433,924 as of March 5, 2021, the date of the Breach Termination of the HMA."

9.      Mr. Taylor did not specifically render an affirmative opinion on the amount of damages, if any, suffered by Accor due to the Debtors' termination of the HMA in a "Breach Termination" or any other construct of alleged breaches of the HMA by Debtors, under any one of the damages calculations he presented and detailed in his Expert Report.

## D.  Alternative Damages Calculations

10.      I was asked by Counsel to (a) assume arguendo that the Liquidated Damages provision in Section 16.11(b) of the HMA is not enforced in accordance with its plain language meaning and (b) consider and make two other alternative calculations of Liquidated Damages and Damages Amounts pertaining to Lost Management Fees allegedly suffered by Accor due to Debtor's termination of the HMA, which are presented in Exhibits C and D in the Appendix to this Expert Rebuttal Report.  Provided below is a summary of these calculations:



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

### Alternative 1 and 2 Summary of Damages Amounts

| | |
|---|---|
| **Alternative 1 - Weighted Average Liquidated Damages Amount – Exhibit C:** | |
| (A) Weighted Average Liquidated Damages (Tr. 12 Mos. Feb. 20 [20%] / Tr. 12 Mos. Feb. '21 [80%] | $8,260,031 |
| (B) Less: Extraordinary Operating Deficits Funded by Owner due to Covid-19 Downturn | ($11,500,000) |
| (C) Net Damages Calculation | ($3,239,969) |
| **(D) Say** | **$0** |
| **Alternative 2 – Net Damages Amount Using Taylor Prospective Revenue Model with Revised Assumptions – Exhibit D:** | |
| (A) Total Gross Fees to 12/31/2050 | $66,249,030 |
| (B) Total PV of Lost Management Fees to 12/31/50 | $19,025,362 |
| (C) Less: Extraordinary Operating Deficits Funded by Owner due to Covid-19 Downturn | ($11,500,000) |
| **(D) Net Damages Amount** | **$7,525,362** |

11.     Each of these alternative calculations are discussed at length later in this Expert Rebuttal Report.

12.     For Alternative 2, I was further instructed by Counsel to make calculations through the end of the Initial Operating Term that ends on December 31, 2025 and through each of the five 5-Year Extension Terms through December 31, 2050 under the HMA, hypothetically assuming that the HMA would have remained in effect with Accor as Manager under the HMA's current terms, fee structures and other provisions having an impact on Management Fee calculations.  I was also asked by Counsel to use the same damages period used by Mr. Taylor in his calculations.  Also, I adjusted the discount



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

rate by 100 basis points above the WAAC Rate of 8.7% used by Mr. Taylor in his calculations to account for the unusually high projection risk as is discussed later in this Expert rebuttal Report based on the highly speculative nature of revenues and fee estimates over 29-plus years into the future for the assumed damages period, especially in consideration of the present instability of the lodging market due to the Covid-19 Pandemic.

13.     I believe additional adjustments are warranted to amounts so determined under the Alternative 2 analysis, as described more fully later in this Expert Rebuttal Report, for Accor's avoidable costs and expenses due to the closure of the Hotel and termination of the HMA, and to account for Accor's potential to mitigate damages by no longer being subject to the non-compete Radius Restriction under the HMA that would allow Accor to brand and manage another hotel in a 25 radius of the Hotel, which is a plausible and realistic future outcome over the next 29-plus years in the damages period.

14.     These additional adjustments should also apply to Mr. Taylor's calculation of damages.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## III. PROFESSIONAL EXPERIENCE AND EXPERTISE

15.    I have over 43 years of diversified experience in the areas of investment, finance, accounting, operations, project planning, performance improvement, and market and business strategy pertaining to the real estate and hospitality industries.

16.    I am currently the Chairman and CEO of REH, a national investment and advisory services firm whose primary focus is on providing investment, transactional services, and business advisory services to the real estate and hospitality industries.  REH offers a depth of focus and capabilities to assist a wide range of public and private sector clients involved in the real estate and hospitality industries through a full range of transactional advisory services, project planning services, economic analysis, accounting and financial analysis, operational analysis, valuation, dispute resolution, financial restructuring, turn-around advisory services, performance improvement, and strategic advisory services.

17.    Prior to launching REH in 2001, I was a Partner and served as the National and Global Real Estate and Hospitality Consulting Practice Leader for KPMG, LLP and KPMG Consulting, Inc.  I am recognized nationally and internationally for my work in the areas of strategic business planning, mergers and acquisitions, complex transaction advisory services, project planning, and business performance improvement pertaining to the real estate and hospitality industries, with an emphasis on hospitality, and I have advised on over $15 billion in real estate and hospitality transactions throughout my professional career.

18.    I possess extensive background and experience in working with both branded and independent luxury hotels and resorts throughout the U.S., Caribbean, and Latin America and have



**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

evaluated and advised on management, operations and branding matters pertaining to major global upper-upscale and luxury brands such as Marriott, Hyatt, Hilton, Four Seasons, and Ritz-Carlton, as well as smaller scale or emerging luxury brands such as One&Only, Jumeirah, Stein Eriksen, and Edition, as examples.

19.    I am active in many industry programs and forums pertaining to the real estate and hospitality industries including the Urban Land Institute, the American Hotel & Lodging Association, American Resort Development Association, the FSU Real Estate Network Forum, and various other organizations.  I am the founding Chairperson and current member of the U.S. Lodging Industry Investment Council and serve on the Executive Advisory Committee of the New York University International Hospitality Industry Investment Conference and the Executive Planning Board of the Americas Lodging Investment Summit (ALIS).

20.    I am currently Chairman of the Executive Advisory Board of the Real Estate Center for Education & Research at Florida State University ("FSU") and serve as a Director on the Advisory Board of the FSU Dedman College of Hospitality.  In addition, I serve on the Board of Trustees of the FSU Foundation and FSU Real Estate Foundation, and in April 2013, I was honored by my induction into the Florida State University College of Business Hall of Fame.  I frequently participate as a guest lecturing at classes in real estate, finance, and hospitality at a variety of colleges and universities.

21.    I have reviewed or assisted in negotiations and preparation of hundreds of hotel management agreements, brand affiliation agreements, license and franchise agreements, joint venture agreements, development agreements, shareholder agreements, LLC operating agreements, services



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

agreements, and lease agreements, as well as advised on, and participated in the evaluation and selection (and, in some cases, termination) of developers, brands, operators and managers of hotels and resorts.

22.     I have served as a consulting expert and testifying expert on numerous occasions in litigation, arbitration, and bankruptcy proceedings involving disputes pertaining to hotel brand license agreements, franchise agreements, hotel management agreements, hotel partnership and joint venture agreements, project pre-development and pre-opening matters, accounting and finance matters, hotel operations and management matters, and the calculation of damages.  In this regard, I have also served as an expert many times in the past in arbitration proceedings pertaining to large and complex commercial disputes involving hotel management agreements before the American Arbitration Association (AAA), the International Court of Arbitration of the International Chamber of Commerce (ICC Arbitration), Judicial Arbitration and Mediation Services (JAMS), and other arbitration venues.  I have also served as an arbitrator on several occasions in connection with hotel and resort matters before the AAA, including an active case involving a luxury hotel management agreement dispute that I am currently presiding over.

23.     My work as an expert in litigation matters frequently entails conducting accounting, finance, and operational reviews, assessments of markets and competition, assessments of brand strength and performance, assessments of compliance with key provisions of hotel brand license and management agreements, financial analysis and valuations, and determination of damages.

24.     I obtained a B.S. in Accounting from Florida State University in 1977.  I also completed the Executive Partner Certificate Program on International Business at The Wharton School, University



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

of Pennsylvania in May 1993, and I have completed thousands of hours of continuing professional education on a wide range of topics pertinent to my areas of practice throughout my professional career.

25.    I am a Certified Public Accountant in the State of Florida.

26.    Attached as Exhibit G is my curriculum vitae and list of my expert testimony I have provided over the past ten years.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## IV. BACKGROUND AND UNDERSTANDING OF DISPUTE

### A. Background

27.     The Debtors' filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") on March 5, 2021 in the case of FMT SJ (the "FMT SJ Petition Date") and on March 10, 2021 in the case of SC SJ (the "SC SJ Petition Date" and together with the FMT SJ Petition Date, the "Petition Dates").[4]

28.     The Hotel, formerly known as the Fairmont Hotel San Jose, is a 20-story hotel located at 170 South Market Street in San Jose, California, in the heart of San Jose's financial, entertainment, and convention districts. The Hotel, with its two high-rise towers, consists of 805 room (728 guestrooms and 77 suites), approximately 65,000 square feet of state-of-the-art meeting and event space, three hotel operated restaurants with bars (as well a leased space containing The Grill on the Alley Steakhouse), a café bakery, a lobby bar-lounge, in-room dining, a business center, a fitness center, and a rooftop pool and gazebo. The Hotel features grand ballrooms for large conferences and conventions as well as intimate spaces for smaller gatherings. The Hotel first opened in 1987 and was expanded in 2002. It is one of the tallest buildings in San Jose and an iconic landmark for the City.[5] Due to the Hotel's large size and ample meeting and events spaces, the Hotel's business is heavily focused on meetings and conventions.

---

[4] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, pg. 3, para. 8.
[5] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, pgs. 9-10, para. 31-32.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

29.     It is my understanding that SCSJ acquired the Hotel on January 2, 2018 and on the same date, the HMA was assigned to FMT SJ by the previous Hotel owners.[6]  Prior to the Petition Date, FMT SJ leased the Hotel from SC SJ pursuant to a lease agreement, dated as of January 2, 2018 (the "Lease"). The Lease was terminated pursuant to a lease termination agreement on March 5, 2021.[7]

30.     Though normally a profitable enterprise, the Hotel experienced a dramatic and sudden downturn in business following the spread of the global pandemic caused by the COVID-19 virus ("Covid-19 Pandemic" or "Pandemic") and the related travel, gathering, and other restrictions implemented throughout the U.S. and globally to stem the spread of the COVID-19 virus.  Consequently, the Hotel experienced a high volume of cancellations of large group meetings and conventions, cancellations of guest reservations, and a tremendous reduction in guest stays at the Hotel since the start of the Pandemic.  This resulted in nearly an 80% drop in Hotel revenues in 2020 compared to 2019, with occupancy since March 2020, during the Pandemic, averaging approximately 7.8% prior to the Hotel closing compared to approximately 68.5% occupancy for the full year of 2019.  The Hotel's losses for 2020 exceeded $18.6 million, and losses for 2021 were projected to exceed $18.8 million. Because the Hotel is not generally considered a "vacation-destination" hotel, much of its business during the pandemic has been to accommodate airline pilots, flight attendants, and essential health workers.[8]

---

[6] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, para. 35-36.
[7] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, pg. 3, para. 8.
[8] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, pg. 3, para. 11



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

31.      In light of historical and anticipated operating losses, the Hotel was closed on March 5, 2021.[9]  On March 10, 2021, the Debtors' filed a motion with the Court for entry of an order authorizing the Debtors to reject the HMA and the Owner Agreement, effective as of the Debtors' respective Petition Dates.[10]  On April 5, 2021, the Court authorized the Debtors to reject the HMA and Owner Agreement effective as of the date of each Debtors' respective bankruptcy petitions.[11]

## B.  Understanding of the Situation with Accor

32.      It is my understanding that Accor alleges it suffered damages as a result of the termination of the HMA, , as well as perhaps the Court's subsequent approval of Debtors' rejection of the HMA and Owner Agreement.

33.      The Operator and Debtors are referred collectively herein as the "Parties".

---

[9] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, pg. 9, para. 30.
[10] Debtors Motion For Entry Of An Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreements Between Debtors And Fairmont, Effective As Of The Debtors' Respective Petition Dates, dated March 10, 2021.
[11] Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreement Between Debtors And Fairmont, dated April 5, 2021.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## V.  SCOPE OF WORK

34.    In connection with the retention described above, I, Francis J. Nardozza, together with REH staff working under my direction[12], performed various procedures pertinent to this Expert Rebuttal Report, including but not limited to:

35.    I reviewed various pleadings of Debtors and Accor before the Court in this Case as background information, but not for reliance in forming my opinion on liquidated damages.

36.    I reviewed the HMA, the Owner Agreement between SCSJ, FMSJ and Fairmont dated January 2, 2018 (the "Owner Agreement"), and an appended unsigned and undated Lease Agreement between Lessor and Lessee.

37.    I reviewed various Hotel Financial Statements, Budgets, Cash Flow Statements, STR STAR Reports (benchmarking Hotel Occupancy, Average Daily Rate ("ADR") and Revenue per Available Room ("RevPAR")), and other schedules and documents pertinent to Hotel operations, and relied on the Hotel's Summary Income Statement (12 months) for the year 2020[13] and Summary Income Statement February 2021[14] in connection with my calculation of liquidated damages under the HMA.

38.    I read the Declaration of Mr. Greig Taylor in Support of Accor's Supplemental Opposition in Response to the Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of

---

[12] As used herein this Expert Report, the use of the words "We," "Our," or "Us" refers to me, Francis J. Nardozza, and my staff working under my direction and supervision.
[13] FHR - San Jose - Dec 1-05 Contract Summary Income Statement (By Month) Year 2020.
[14] FHR - San Jose - Dec 1-05 Contract Summary Income Statement February 2021.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Fairmont Hotels & Resorts (U.S.) Inc. filed with the Court on April 23, 2021, (including supporting documents) ("Taylor Declaration").

39.    I read the Expert Reports submitted for Accor to the Court in this Case as follows (including their uploaded Expert files):

a.    Expert Report prepared by Mr. Greig Taylor, AlixPartners LLP, dated May 19, 2021 ("Expert Report" or "Taylor Report").

b.    Expert Report prepared by Mr. John Dent, Dent Legal Strategy LLC, dated May 19, 2021 ("Dent Report").

c.    Expert Report prepared by Mr. Eben Perison, Armory Securities, LLC, dated May 19, 2021 ("Perison Report").

40.    I read the Accor Bid Letter dated May 7, 2021 to Mr. Richard Warnick, CHMWarnick, Owner's Representative, and accompany Appendices A-E.

41.    I read numerous documents and information produced in discovery in this Case pertaining to Accor, Debtors, their respective representatives, and other parties or matters relevant to this Case.

42.    I read and considered numerous documents relied upon by Mr. Taylor, as indicated in Mr. Taylor's Expert Report.

43.    I and my staff assembled various Hotel business and financial analysis that are presented throughout this Expert Rebuttal Report.

44.    I and my staff conducted independent research and analysis of real estate and hospitality industry trends and conditions pertinent to this Case.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

45.     Relying on my extensive real estate and hospitality industry knowledge, experience, and educational training in the areas including, but not limited to, markets, operations, investment, finance, and accounting, and my extensive experience in litigation and arbitration proceedings (including several arbitrations involving hotel management agreements) as an expert and arbitrator, I formulated various observations, findings, and conclusions pertinent to the Case, and, specifically relating to my rebuttal to the Taylor Expert Report and the calculation of liquidated damages under the HMA and alternative damages calculations (not based upon the express terms of the HMA) which are discussed in this Expert Rebuttal Report.

46.     A list of other documents and information on which I considered or relied on in formulating my conclusions and opinions are referenced throughout this Expert Rebuttal Report and/or presented in Section VIII – Exhibits to this Expert Rebuttal Report.

47.     I respectfully reserve the right to amend or supplement this Expert Rebuttal Report based upon later learned facts, or to express additional professional opinions pertaining to additional information and observations not fully covered by this Expert Rebuttal Report in connection with additional work I may be asked to perform after the date of this Expert Rebuttal Report, and after reviewing additional discovery materials, witness statements and other expert reports submitted in this proceeding.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## VI. INFORMATION, ANALYSES, FINDINGS AND CONCLUSIONS IN SUPPORT OF MY PRIMARY EXPERT OPINIONS

### A. Opinion 1 – Regarding Mr. Taylor's Flawed Theory and Approach to Calculating Lost Management Fees Damages.

*Opinion 1 - In my professional opinion, Mr. Taylor's theory, and approach to calculating "Lost Management Fees Damages" and hence, "Total Damages" allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract, are flawed and unsupported by the plain language reading of the HMA, which specifically provides for a calculation of liquidated damages in the event of a "Breach Termination" of the HMA by Owner.*

48.     Provided below is an excerpt from Mr. Taylor's Expert Report, showing the summary of his calculation of quantum damages allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract.

**Table 1, Mr. Taylor's Summary Calculation of Damages**

| Figure 1 | Summary of Damages | |
|---|---|---|
| | Item | Amount (US$) |
| | Lost Management Fees | 24,657,609 |
| | Unpaid Fees and Reimbursements[5] | 2,029,201 |
| | Less: Present Value of Shortfall Payments | (2,417,097) |
| | **Total** | 24,269,713 |

49.     Mr. Taylor's primary theory, approach, and method to determining and calculating "Lost Management Fee Damages" and "Total Damages" allegedly suffered by Accor as a result of Debtors'



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Alleged Breaches of Contract is contrary to the theory and method prescribed under Section 16.11(b) and (c) of the HMA pertaining to a "Breach Termination" of the HMA by Owner.

50.    Provided below is the excerpt of Section 16.11(b) and (c) of the HMA[15]:

**Table 2, Excerpt of Sections 16.11(b) and (c) of the HMA**

> (b)    The Owner and the Operator further acknowledge and agree that the Operator's damages in the event of termination of this Agreement by the Owner in breach of this Agreement (a "Breach Termination") would be difficult or impossible to determine, including, without limitation, loss of Management Fees and other revenue under this Agreement, harm to the Operator's reputation, loss of goodwill, disruption of operations, loss of contributions to budgeted system expenses and loss of a hotel with strategic significance to the Operator's system. Given the inherent uncertainty as to the measure of such damages and the parties desire to establish a methodology for the calculation of damages, the Owner and the Operator agree that the Operator shall be entitled to receive as liquidated damages in the event of a Breach Termination an amount (the "Liquidated Damage Amount") equal to (i) the Imputed Management Fees times (ii) the Multiplier, provided that the Liquidated Damage Amount shall not apply and the Operator shall be entitled to receive damages as proven with respect to any Breach Termination effected within the final two years of the final Extension Term.  For such purposes:

---

[15] HMA p.67-68 (Amended and Restated HMA December 2, 2005 (as applicable)).



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

> (A)    "Imputed Management Fees" shall be the aggregate Management Fees paid or payable to the Operator under the Agreement based on the 12-month period for which monthly operating reports have been delivered to the Owner immediately preceding the date of the written notice or other action of Owner which effects a Breach Termination; and
>
> (B)    The applicable "Multiplier" shall be 24 with respect to any Breach Termination prior to the second anniversary of the date of this Agreement and, thereafter, shall reduce by one point as of the close of each successive two-year period during the Initial Operating Term and the five Extension Terms, down to a minimum Multiplier of three.   For example, the Multiplier for the two-year period commencing following the 10th anniversary of this Agreement would be 19 and the Multiplier for the initial two years of the second Extension Term would be nine.
>
> (c)    The Owner and the Operator specifically acknowledge that the calculation of the Liquidated Damages Amount requires the use of a significant Multiplier in an effort to reflect (1) the Operator's loss of Management Fees and the benefit of the Agreement over the full remaining term of the Agreement (assuming the effective exercise of all extension rights), (2) the material impact of inflation on Management Fees over such an extended period, (3) the inability to predict with a more certain method absolute growth in the measure of Net Operating Income and, therefore, the Incentive Fee payable to the Operator over the balance of the term of the Agreement and (4) the inherent difficulty in predicting or quantifying the measure of damages from the non-fee components of the Operator's damages described in clause (b) above.

51.    Mr. Taylor Tries to Corroborate the Soundness of His Damages Methodology by Citing an Article He Discovered as Authored by Mr. Scott Berman and Professor Dan DeRoos.

52.    While the correct methodology to follow pertaining to a Breach Termination under the HMA is very clearly set out in Section 16.11(b) of the HMA (as presented and highlighted in Table 1, above), that being the calculation of Liquidated Damages for Breach Termination, Mr. Taylor failed to provide any reason in his Expert Report on why he chose an alternative methodology for calculating damages for the "Breach Termination" of the HMA in this case or under any other theories of contract breach.  While his report does not say so, Mr. Taylor testified during his May 27, 2021 deposition that he was instructed by counsel (Sidley & Austin) to formulate an opinion on said alternative methodology. However, Section 16.11(b) of the HMA provides, "The Owner and the Operator further acknowledge



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

and agree that the Operator's damages in the event of termination of this Agreement by the Owner in breach of this Agreement (a "Breach Termination")…."   Instead of following the prescribed methodology for calculating the "Liquidated Damages Amount" under the HMA, Mr. Taylor, pursuant to Sidley's instructions, followed a completely different methodology to calculate Lost Management Fees Damages that led to Mr. Taylor making estimates of Hotel Revenues, Profits, and Management Fees on a forward-looking basis for over 29-years into the future, covering what he described as his Damages Period through the remaining years in the Initial Operating Term of the HMA plus five 5-Year Extension Terms provided for in the HMA under certain conditions, through December 31, 2050. Obviously, the Sidley-instructed methodology is highly speculative in nature and subject to a great degree of uncertainty as to how the Hotel will perform, or even if it will remain in existence in its present form or continue to be managed by Accor for the next 29-plus years to the end of the long damages period proffered by Mr. Taylor.  Furthermore, the type of analysis required to make estimates of future Hotel Revenues, Profits and Management under Mr. Taylor's chosen methodology requires a great degree of hotel operational and analytical knowledge, experience, and training, which I understand Mr. Taylor testified during his May 27, 2021 deposition that he does not possess.

53.    In an attempt to corroborate the soundness of his chosen methodology for calculating damages, Mr. Taylor states in his Expert Report,

*"In general, my damages methodology follows the damages methodology in an article authored by Professor Jan A. deRoos, the HVS Professor of Hotel Finance and Real Estate at the Cornell University School of Hotel Administration, and Scott D. Berman, the industry leader of the hospitality and leisure practice of PricewaterhouseCoopers LLP, in the Cornell Hospitality*



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

*Report entitled "Calculating Damage Awards in Hotel Management Agreement Terminations"*
*.... ".*

54.     It is unclear to me why Mr. Taylor had to look outside the HMA for the methodology for calculating damages in a Breach Termination by Owner, when a method is clearly described under Section 16.11 of the HMA.  Assuming counsel for Accor instructed him to do so, or if he did so (as he testified), it is further puzzling as to why he had to be informed or seek "step-by-step" guidance on a methodology for calculating damages upon termination of a hotel management contract by owner, by finding and relying on a published article by two other industry consultants, unless of course, Mr. Taylor himself possesses limited hospitality industry background and reputation as being an expert or authority on such matters; which he also confirmed at some length during his May 27 deposition.

55.     I am personally well acquainted with Mr. Berman and Professor DeRoos.  Although these gentlemen, like me, are highly experienced with hotel matters, neither of them is an absolute authority on how to calculate hotel damages upon termination of a hotel management contract, and there is no single methodology that fits all cases for calculating damages pertaining to a hotel management contract dispute and breach.  It became clear to me after reading the article cited by Mr. Taylor that the methodology presented was a proposed methodology, describing considerations to make when more contemporarily drafting management agreement terms, and, of course, the proposed methodology in the article should not and cannot override situations where there are specific contractual terms for calculating liquidating damages in the event of a defined type of termination, in this case, a Breach Termination. Furthermore, to the best of my knowledge, neither Mr. Berman nor Professor deRoos are lawyers and neither were providing legal advice for Mr. Taylor to rely on regarding the meaning of contractual



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

provisions of hotel management agreements and when the Berman-deRoss Methodology should apply for calculating damages.

56.    In agreeing to the HMA, the Parties appear to have made clear their intent with respect to a Breach Termination, whereby they agreed to calculate Liquidated Damages using a "Multiplier" (pursuant to Section 16.11(b)(B) of the HMA) as applied to actual historical management fees, over a set period (the "Imputed Management Fees" pursuant to Section 16.11(b)(A) of the HMA).  The Parties intent was further clarified in the plain language of the various subparts of Section 16.11 in order to avoid using the very type of more speculative and uncertain methodology as the one chosen Sidley and undertaken by Mr. Taylor to calculate Lost Management Fees Damages in this case before the Court, in general following the Berman-deRoos Methodology.  One need only refer to Section 16.11(c) (2), (3) and (4) of the HMA for clarification of the Parties intent (Section 16.11(c)(2)(3)(4) is presented in Table 2, above).  As noted in these sections of the HMA, the Multiplier was meant to take into account: "(2) the material impact of inflation on Management Fees over such an extended period, (3) the inability to predict with a more certain method absolute growth in the measure of Net Operating Income and, therefore, the Incentive Fee payable to the Operator over the balance of the term of the Agreement and (4) the inherent difficulty in predicting or quantifying the measure of damages from the non-fee components of the Operator's damages."

57.    The HMA further clarifies the intent of the parties with respect to liquidated damages as stated in bold capitalized lettering in Section 16.11(d) of the HMA as presented in in Table 3, below:



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 3, Excerpt of Section 16.11(d) of the HMA**

> (d) THE OWNER AND THE OPERATOR AGREE THAT THE LIQUIDATED DAMAGE AMOUNT IS THE PARTIES' BEST AND MOST ACCURATE ESTIMATE OF THE DAMAGES THE OPERATOR WOULD SUFFER IN THE EVENT OF A TERMINATION BREACH, AND THAT SUCH ESTIMATE IS REASONABLE UNDER THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT. THE OWNER AND THE OPERATOR AGREE THAT THE OPERATOR'S RIGHT TO RECEIVE THE LIQUIDATED DAMAGE AMOUNT SHALL BE THE SOLE REMEDY OF THE OPERATOR AT LAW, EXCEPTING THE OPERATOR'S RIGHT TO RECEIVE PAYMENT OF AMOUNTS ACCRUED, DUE OR OWING TO THE OPERATOR AS OF THE DATE OF THE BREACH TERMINATION UNDER THIS AGREEMENT AND WITHOUT AFFECTING OR LIMITING ANY RIGHTS THE OPERATOR MAY HAVE IN EQUITY. THE OWNER SPECIFICALLY GRANTS THE OPERATOR THE RIGHT TO SEEK AND SECURE INJUNCTIVE RELIEF WITHOUT BOND IF THE OWNER SHOULD ATTEMPT A BREACH TERMINATION.

58.    Table 4, below provides an excerpt from the Taylor Report, describing the step-by-step methodology lifted from the Berman-deRoos Methodology article that Mr. Taylor indicated in general, he followed in calculation of the "quantum of damages" in this case.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 4, Berman-deRoos Methodology for Damages that Mr. Taylor Generally followed.**

> **EXHIBIT 2**
>
> **Methodology for estimating damages in a management contract termination**
>
> **(1) Establish the Period Covering the Loss**—The starting point for all damage estimates is the period covering the loss, which is the remaining term of the contract, plus the term expected from any renewal options in the contract or a reasonably expected renewal.
>
> **(2) Estimate Property Level Performance**—Lost management fee revenues and other contributions are a function of the expected performance of the terminated hotel; thus hotel revenues and expenses must be estimated over the period covering the loss.
>
> **(3) Estimate Gross Lost Fee Revenue**—Three categories of revenue loss are estimated using the estimates of property performance over the period covering the loss:
> - *Base fees*—generally based on hotel revenues,
> - *Incentive fees*—generally based on hotel profitability, and
> - *Other contributions by the owner*—these include marketing fees, reservation fees, shared accounting services, shared marketing costs, shared regional management, training costs, and similar items enumerated in the management contract.
>
> **(4) Estimate Avoided Costs**—The gross lost revenue estimates need to be adjusted for any costs so that only the net lost fees are used in the economic loss calculation. The appropriate adjustment is to consider the actual marginal costs avoided, not average costs avoided.
>
> **(5) Determine Present Value of the Net Fee Losses**—The lost fees (adjusted for avoided costs) are discounted using an appropriate discount rate to establish a present value at the time of the termination.
>
> **(6) Estimate of Other Damages**
> - *Investments in the Hotel*—The damages may include the recovery of investments in the terminated hotel. These include working capital, key money or loans to the owner or the property, adjustments necessary to reconcile accounts receivable and accounts payable, provisions for future claims from former guests, or other direct investments.
> - *Human Capital Damages*—Damages can include the costs related to the lost costs of recruitment, training, and professional development, and the cost of severance packages for the existing staff, as well as the costs to recruit, train, and develop new employees for reentry into the market.
> - *Reputation Damages*—Reputation damages result from the loss of reputation among guests, both at the unit level and system wide. Perhaps even more germane, reputation damages should be considered with the community of hotel owners, the community of hotel lenders, and the community of hotel operators.
> - *Damages Due to Reentry*—Damages due to the cost of reentry into the market include the costs to identify a suitable property, negotiate a contract, and staff, train employees, and prepare the property for operation.
>
> **(7) Total the Damages**—The sums from 5 and 6 are added to produce a total estimate of damages.

59.    Sidley's chosen methodology, undertaken by Mr. Taylor, for calculating damages ignores or in essence seeks to override what is required under Section 16.11 of the HMA for applying Liquidated Damages in the case of a Breach Termination of the HMA by Owner.

60.    In my own Expert Report on Liquidated Damages that I submitted in this case on May 19, 2021, I opined that, in my professional opinion, the amount of Liquidated Damages owing Accor by



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Debtors under Section 16.11(b) of the HMA due to Breach Termination of the HMA is $2,433,924 as of March 5, 2021, the date of the Breach Termination of the HMA.

61.    Provided below is the calculation I presented in my Expert Report in support of my opinion of liquidated damages:

| LIQUIDATED DAMAGES CALCULATION - HMA SECTION 16.11 | | | Management Fees (Actual Fees) Mar. '20 to Feb. '21 (A) |
|---|---|---|---|
| Mar-20 | Actual | 1 | $41,525 |
| Apr-20 | Actual | 2 | $4,760 |
| May-20 | Actual | 3 | $7,475 |
| Jun-20 | Actual | 4 | $6,600 |
| Jul-20 | Actual | 5 | $10,142 |
| Aug-20 | Actual | 6 | $10,456 |
| Sep-20 | Actual | 7 | $11,887 |
| Oct-20 | Actual | 8 | $12,229 |
| Nov-20 | Actual | 9 | $10,324 |
| Dec-20 | Actual | 10 | $9,618 |
| Jan-21 | Actual | 11 | $7,792 |
| Feb-21 | Actual | 12 | $10,364 |
| **Imputed Management Fees Sec. 16.11(b)(A) HMA** | | | **$143,172** |
| **Applicable Multiplier Sec. 16.11(b)(B) HMA** | | | 17 |
| **Liquidated Damages Amount** | | | **$2,433,924** |

**(A) Source:** Management Fees for March 2020 to December 2020 derived from "FHR - San Jose - Dec 1-05 Contract Summary Income Statement (By Month) Year 2020", and for January 2021 to February 2021 derived from "FHR - San Jose - Dec 1-05 Contract Summary Income Statement February 2021."

62.    In summary, Mr. Taylor's primary theory, approach, and method to determining and calculating "Lost Management Fee Damages" and "Total Damages" allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract is contrary to the theory and method prescribed under Section 16.11(b) and (c) of the HMA pertaining to a "Breach Termination" of the HMA by Owner, and Mr. Taylor provided no clear or plausible reason in his Expert Report on why he calculated Lost


REH Capital Partners, LLC

## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Management Fees damages using a completely different approach and methodology then called for under the HMA.

**B.  Opinion 2 – Regarding Mr. Taylor's Unreasonable and Unreliable Estimates and Assumptions Pertaining to Forgone Hotel Revenues and Lost Management Fees Damages.**

*In my professional opinion, Mr. Taylor failed to establish a reasonable and reliable basis for his estimates of future Hotel Revenues, Profits, Management Fees, and Damages over the 29-plus -years of future Hotel operations over his specified damages period from March 5, 2021 through December 31, 2050, and such estimates and calculations, in my opinion, are based on numerous flawed and/or unreasonable, and unreliable assumptions that ignore historical trends in Hotel performance and trends in the historical management fees earned by Operator since the inception of the HMA.*

63.     Mr. Taylor, who testified during his deposition at length that he is not a hotel or hospitality industry expert, did not establish a reasonable and reliable basis for his estimates of future Hotel Revenues, Profits and Management Fees over nearly 30-years into the future, through December 31, 2050, as foundation for his Lost Management Fees damages calculations that, in many material respects, ignore historical trends in the Hotel's performance.

**MR. TAYLOR FAILED TO ESTABLISH A HIGHLY RELIABLE FOUNDATION FOR HIS ASSUMPTION REGARDING THE DAMAGES PERIOD THAT SPANS OVER 29-YEARS THROUGH DECEMBER 31, 2050.**

64.     **Speculative Assumption Regarding Term, Extensions, and Key Provisions of the HMA** – Mr. Taylor assumed that the HMA, but for the Breach Termination by Owner, would have remained in place, without any material modification of terms, conditions, or fees, throughout the remainder of the Initial Operating Term to December 31, 2025, and for each of five, 5-Year Extension



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Terms through December 31, 2050. In my opinion and based on my experience in the hotel and hospitality industry, this is not a reasonable assumption. It is also not supported by the history of the Hotel and management arrangement with Accor.

65.    History reveals that events and circumstances have occurred in the past resulting in a complete amendment and restatement of the HMA in 2005, and numerous subsequent amendments to the HMA, some of which materially altered key contract terms and provisions.

66.    For example, in 2009 the parties entered a Tri-Party Agreement and Amendment to the HMA dated December 24, 2009 ("Tri-Party Amendment") which, among other things:

a.    Under Article 3(e) of the Tri-Party Amendment, the parties agreed to materially reduce the Basic Fee portion of the Management Fee pursuant to Article 9.1 of the HMA from 2.75% of Total Hotel Revenues to 2.0% of Total Hotel Revenues until December 31, 2013, until reverting to 2.75% of Total Hotel Revenues after January 1, 2014. This was a material reduction of approximately 25% of the Basic Fee percentage over the reduction period. Mr. Taylor, in his calculation of damages, assumed the Basic Fee would remain at 2.75% throughout his entire estimated damages period, from March 5, 2021 through December 31, 2050, no matter what, which ignores the history of the parties having previously modified the Basic Fee percentage downward for a period of time. If a similar reduction hypothetically had occurred at the start of Mr. Taylor's estimated damages period, based on my calculations, the alleged present value of Lost Management Fees as stated in Mr. Taylor's expert report would be reduced by approximately $6.7 million.

---

31


REH Capital Partners, LLC

**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

b.   Under Article 3(f) of the Tri-Party Amendment, the parties also materially altered the Performance Test criteria under Section 16.10 of the HMA, whereby the Owner waived its termination right for a Performance Test Failure for the Fiscal Period 2009 and modified the NOI Base used to determine the "Shortfall" pertaining to the Performance Test for termination to 30% of the 2010 Base NOI for Fiscal Periods 2010 through 2013, and then reverting to what it would have been pursuant to the existing provisions of the HMA for Fiscal Period 2014 as if the interim change had not taken place.  This was a significant modification during the effective period of applicability.

67.    In another example, under the Third Amendment to Amended and Restated Hotel Management Agreement dated as of January 2, 2018, as of the date of the Debtors' purchase of the Hotel, among other things, the parties agreed to fix a specific amount as the "Threshold Net Operating Income" used as a basis for calculating the Incentive Fee portion of the Management Fee and to waive the Operator's right, including any right of offer or right of first refusal to purchase the Hotel, a major revision in the HMA and, this revision added a further degree of uncertainty that the HMA will continue well into the future.

68.    Mr. Taylor's opinion is thus flawed because he fails to consider the near certainty the HMA will be further modified during the next 29 years, in ways that could easily impact the management fees payable to the Operator.

69.    **Other Factors That Could Impact the Damages Period** - There are many other factors that could result in future material revisions of the terms and fees under the HMA, or impact the continuation of the HMA, or the viability and future revenues and Management Fees for the Hotel,



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

especially over such a long damages period proffered by Mr. Taylor in his damages calculations. Based on the facts and circumstances of this Case and informed by my extensive experience in hotel management contract matters, examples of factors that could result in future material revisions of the terms and fees under the HMA, or impact the continuity of the HMA factors are presented below for the Court's consideration:

- As has happened several times in the past, a future sale of the Hotel that more likely than not could result in material changes to terms and fee provisions of the HMA and the relationship of the parties.

- A future expansion/and/or conversion of part or all the Hotel, for example, to residential use or other adaptive reuse, that could impact the HMA terms and fees. Indeed, as Accor knows, there has been substantial discussion around the Hotel's south tower being converted into a residential project.

- A condemnation of the Hotel due to fire, earthquake, state of disrepair or other peril, with a history of such events occurring in Northern California, especially wild-fires in recent years that have consumed and destroyed hotels in the wine-country of Northern California, which could result in a temporary or permanent closure of the Hotel.[16]

- Major new direct hotel competitors entering the market with newly developed hotels, targeting similar customers and business segments as those targeted by the Hotel, which

---

[16] Reference is made to Section 13.3 of the HMA that provides for Owner's and Operator's rights on condemnation.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

is a highly likely occurrence in Northern California and could negatively impact future Total Hotel Revenues and Management Fees or cause changes to the Performance Test under the HMA.

- Accor seeking relief in the future on the non-compete "Radius Restrictions" pursuant to Section 19.11 of the HMA to allow them to add additional hotel(s) in the restricted area and in return, offer the Owner more favorable fee arrangements or contract concessions (this frequently happens in the hotel industry when such radius restrictions apply in hotel management contracts).

- Accor deciding not to exercise its right to extend the HMA prior to the start of any one of the five remaining 5-Year Extension Terms to pursue affiliation and management of a newer vintage or newly built hotel, or even a more luxurious hotel, or an opportunity to enter into a much longer management contract operating term than afforded under the remaining Extension Terms under the HMA - a very plausible occurrence in the future.

- A major or prolonged economic recession resulting in a material reduction in Hotel Revenues and Profits; something that has occurred several times in the past since the start of the Initial Operating Term of the HMA in 1999, for example, (i) the major downturn in 2001 following the terrorist events of 9-11, (ii) the major U.S recession that started in Q4 2008, and (iii) the recent Covid-19 Pandemic and economic fallout that started in 2020 and continues through the date of my writing of this report.  These type of events can lead to a reduction in the Basic or Incentive Management Fees under the HMA or major contract revisions, like happened in the past as earlier discussed.  It is not only reasonable,



**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

but more likely than not, to expect similar disruptive events to occur in the future, possibly multiple times over the next 29-plus years through the end of all Extension Terms of the HMA.

- Future defaults and/or breaches of the HMA by Accor or future Breach Termination by Owner, maybe even in connection with or following one of the disruptive events described immediately above – (presumably Section 16.11 of the HMA would apply for calculating liquidated damages).

- Physical or structural obsolescence of the Hotel over the next 30 years rendering it not fit for continued affiliation under the Fairmont brand; a common occurrence for luxury hotel brands operators to terminate hotel management agreements under these circumstances.

- Major impacts of technology on travel and group meetings and conventions in the Silicon Valley market, something that was already having an impact on hotel-stays prior to the Covid-19 Pandemic and is taking greater hold by many major companies that plan to restrict or reduce levels of business travel in the future, which could lead to HMA revisions impacting fees.

- Insufficient cash resources to fund Hotel operations and debt service that could once again could lead to bankruptcy or hotel foreclosure.

- Major events of terrorism that could disrupt travel and hotel stays in the future over a extended time periods.

- These and many other occurrences of a similar nature that could render any assumptions regarding the exercise of all five of the 5-Year Extension Terms under the HMA or



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

estimates of future Hotel Revenues, Profits and Management Fees over nearly 30-years into the future as highly speculative assumptions.

## MR. TAYLOR'S ESTIMATES OF FUTURE HOTEL REVENUES AND FUTURE MANAGEMENT FEES ARE HIGHLY SPECULATIVE AND UNREASONABLE BASED ON THE HOTEL'S PAST PERFORMANCE

70.     As a next step in his prospective damages calculations, Mr. Taylor made a highly speculative estimate of future Total Hotel Revenues over a 29-plus year damages period as the basis for his Lost Management Fees damages calculations.  In my opinion, his analysis is materially flawed and resulted in unreliable, unreasonable, and, in large part, an irreplicable set of assumptions he used to estimate future Hotel Revenues that ignore, in large part, historical revenue trends of performance of the Hotel since inception of the HMA in 1999.

71.     **Mr. Taylor Made No Attempt to Estimate Future Hotel Revenues Based on Common Hospitality Expert Methods Used to Estimate Future Hotel Performance**.  Instead, Mr. Taylor made what appear to be general guestimates of the Hotel's Post-Covid-19 recovery of total revenues of the Hotel (with no specific analysis of all components of total hotel revenues that include rooms revenues, food and beverage revenues, banquet and catering revenues, and other hotel department revenues).  As more fully discussed later in this Expert Rebuttal Report, Mr. Taylor based his assumptions on Total Hotel Revenue growth (that included food and beverage revenues and other ancillary department revenues) for the Post-Covid-19 recovery period, on some broad-based predictions he found in general industry publications authored by CBRE and other industry observers pertaining to their Post-Covid-19 forecasts of rooms revenue performance metrics, not on total hotel revenue forecasts that would include food and beverage and other revenues.  Mr. Taylor failed to undertake a true



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

hospitality expert analysis of all components of future hotel revenues (in essence, what was called for in Step 2 of the Berman-deRoos Methodology that he purports to follow).

72. **Mr. Taylor Failed to Analyze and Account for the Business Segmentation of the Hotel and Varying Levels of Expected Future Recovery of Each Major Business Segment.** Instead, Mr. Taylor merely grouped all future revenues of the Hotel into one big bucket for making his revenue estimates for his damages calculations. By segments of business, I refer to the major categories or segments of customer business tracked by Accor and reported in the Hotel's monthly financial statements that consist of Transient, Corporate, Group/Meetings, Leisure/Wholesale, and Miscellaneous (Flight-Crew/Contract) segments.[17] In 2019, Corporate and Group /Meetings segments together totaled 57.2% of total Occupied Room Nights of the Hotel. These two segments are widely understood in the hotel industry as the ones most negatively impacted by the Pandemic and, on a continuing basis, are expected to take the longest of all business segments to recover. Considering the Hotel's high dependency on the Corporate and Group/Meetings' segments for its occupancy and revenue production, and considering the Hotel's large size and meeting's business orientation, by Mr. Taylor not analyzing and taking business segmentation into account in making his estimates of recovery, this is a serious flaw in Mr. Taylor's damages analysis and renders his revenue estimates, in my opinion, unreliable.

---

[17] FHR - San Jose - Dec 1-05 Contract Month-End Market Segmentation Report December 2019 Currency: USD



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

73.     Table 5 below presents business segmentation of the Hotel for 2017-2020, and Exhibit B in the Appendix to the Expert Rebuttal Report presents the same information for a broader period of time, from 2015-2020.

**Table 5, Hotel Business Segmentation 2017-2020**

Fairmont Hotel San Jose
Historical Perofmance (US$)

Historical Actual

| BUSINESS SEGMENTATION | 2017 | % Bus. | % Chg. | 2018 | % Bus. | % Chg. | 2019 | % Bus. | % Chg. | 2020 | % Bus. | % Chg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | |
| Transient | 13,649,909 | 28.3% | 2.9% | 11,694,714 | 23.2% | -14.3% | 12,300,931 | 25.2% | 5.2% | 3,931,942 | 34.7% | -68.0% |
| Corporate | 9,866,850 | 20.4% | -11.5% | 11,662,218 | 23.1% | 18.2% | 11,158,067 | 22.8% | -4.3% | 2,026,213 | 17.9% | -81.8% |
| Group/Meetings | 20,564,065 | 42.6% | -8.8% | 22,328,267 | 44.3% | 8.6% | 18,406,691 | 37.7% | -17.6% | 3,471,106 | 30.6% | -81.1% |
| Leisure/Wholesale | 30,084 | 0.1% | -31.1% | 79,286 | 0.2% | 163.5% | 132,420 | 0.3% | 67.0% | 5,344 | 0.0% | -96.0% |
| Misc. - Flight Crew/Contract | 4,184,069 | 8.7% | 58.8% | 4,638,281 | 9.2% | 10.9% | 6,843,492 | 14.0% | 47.5% | 1,890,937 | 16.7% | -72.4% |
| **Total Segments** | **48,294,977** | **100.0%** | **-2.7%** | **50,402,766** | **100.0%** | **4.4%** | **48,841,601** | **100.0%** | **-3.1%** | **11,325,542** | **100.0%** | **-76.8%** |
| **Paid Occupied Room Nights** | | | | | | | | | | | | |
| Transient | 64,385 | 29.6% | 8.1% | 46,015 | 21.9% | -28.5% | 51,340 | 25.5% | 11.6% | 21,316 | 40.2% | -58.5% |
| Corporate | 38,866 | 17.9% | -14.3% | 45,155 | 21.5% | 16.2% | 42,324 | 21.0% | -6.3% | 8,805 | 16.6% | -79.2% |
| Group/Meetings | 90,063 | 41.4% | -10.7% | 93,545 | 44.5% | 3.9% | 72,942 | 36.2% | -22.0% | 13,722 | 25.9% | -81.2% |
| Leisure/Wholesale | 119 | 0.1% | -40.2% | 350 | 0.2% | 194.1% | 587 | 0.3% | 67.7% | 40 | 0.1% | -93.2% |
| Misc. - Flight Crew/Contract | 24,010 | 11.0% | 42.7% | 25,171 | 12.0% | 4.8% | 34,189 | 17.0% | 35.8% | 9,158 | 17.3% | -73.2% |
| **Total Segments** | **217,443** | **100.0%** | **-2.4%** | **210,236** | **100.0%** | **-3.3%** | **201,382** | **100.0%** | **-4.2%** | **53,041** | **100.0%** | **-73.7%** |
| **ADR by Segment** | | | | | | | | | | | | |
| Transient | $212.00 | NA | -4.8% | $254.15 | NA | 19.9% | $239.60 | NA | -5.7% | $184.46 | NA | -23.0% |
| Corporate | $253.87 | NA | 3.3% | $258.27 | NA | 1.7% | $263.63 | NA | 2.1% | $230.12 | NA | -12.7% |
| Group/Meetings | $228.33 | NA | 2.2% | $238.69 | NA | 4.5% | $252.35 | NA | 5.7% | $252.96 | NA | 0.2% |
| Leisure/Wholesale | $252.81 | NA | 15.3% | $226.53 | NA | -10.4% | $225.59 | NA | -0.4% | $133.60 | NA | -40.8% |
| Misc. - Flight Crew/Contract | $174.26 | NA | 11.3% | $184.27 | NA | 5.7% | $200.17 | NA | 8.6% | $206.48 | NA | 3.2% |
| **Total Segments** | **$222.10** | | **-0.3%** | **$239.74** | | **7.9%** | **$242.53** | | **1.2%** | **$213.52** | | **-12.0%** |

Source: FHR - San Jose - Dec 1-05 Contract - Summary Income Statement Dec. 2015, 2016, 2017, 2018, 2019, 2020.

74.     As can be seen in Table 5, above, fluctuations in business segmentation of the Hotel have had a profound impact on Total Hotel Room Revenue and ADR, and this is precisely why it is so important to analyze this data and take segmentation into account when estimating future revenues, particularly for the Post-Covid-19 recovery period.  What stands out in the Table 5 above, is that in 2019, the Hotel lost a considerable amount of Group/Meetings business, representing a 22% reduction in Occupied Room Nights and a 17.6% reduction in Rooms Revenues from this segment compared to 2018. This was a concerning downturn well before the start of the Covid-19 Pandemic.  As can also be seen in


REH Capital Partners, LLC

**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

Table 5, the Hotel, in part, replaced some of this business through a shift to more Transient and Misc.-Flight Crew/Contract business, but at much lower room rates, also a concerning Pre-Pandemic shift in business segmentation  In analyzing trends for the broader period 2015-2020, as presented in Exhibit B in the Appendix to this Expert Rebuttal Report, the Hotel has been trending on a consistent downward spiral in declining occupied room nights, and this trend is manifested in flat ADR growth in 2019.  Mr. Taylor appears to have simply ignored the concerning trends in business segmentation, both in assessing historical trends as well as in formulating his assumptions and making his estimates of future Hotel Revenues for his damages calculations over his proffered long damages period.

75.    As can be seen in Table 6, below, which was excerpted from PWC's Hospitality Directions U.S. Outlook Tables, occupancy for the Group Segment dropped significantly in 2020 and even further in the Spring of 2021, especially for high-ADR-contributing Corporate Groups, which is forecast to be amongst the last segments to recover across the Luxury class of hotels.  City center hotels like the subject Hotel are expected to be amongst the last to experience recovery from the Group Segment.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 6, PWC's Hospitality Directions U.S. Outlook Tables Group Versus Transient Segments[18]**



76.      By not accounting for expected trends in segmentation, particularly Group/Meetings business, both in occupancy and ADR, in my opinion, Mr. Taylor's estimates and assumptions on Hotel revenue and growth are rendered unreasonable and unreliable.  I also point out that the Group/Meetings segment is a key driver of the Hotel's Food and Beverage Revenues, Banquet and Catering Revenues, and other ancillary revenues, each being major components of Total Hotel Revenues upon which the Basic Management Fees are calculated.  Yet, Mr. Taylor presents no assumptions or estimates pertaining to these categories of Hotel revenues anywhere in his Expert Report, (or, for that matter, no estimate even of Room Revenues, but instead he made his estimates of Total Hotel Revenues, as one bulk number, with the exception of Parking Revenues (needed for a parking management fee calculation).  Likewise,

---

[18] Source: PwC Hospitality Directions US Outlook Tables based on PwC and STR May 2021.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Mr. Taylor presents no assumptions or estimates of shifts in business or recovery of the very business segments of the Hotel, further evidencing that he made only broad-brushed revenue estimates that, in my experience and opinion, lack the foundation necessary to be reliable estimates of future Total Hotel Revenues.

77.     I present below a summary of the Hotel's Occupancy, ADR, RevPAR, and Revenue performance for the years 2015 to 2020, derived from my review of the Hotel's profit and loss statements for each of the corresponding years.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 7 Hotel Occupancy, ADR, RevPAR, and Revenue Performance - 2015-2020.**

**Fairmont Hotel San Jose**
**Historical Perofmance (US$)**

| | | | Historical Actual | | | |
|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Statistics** | | | | | | |
| Occupancy | 78.80% | 75.64% | 74.00% | 71.55% | 68.54% | 18.00% |
| ADR | $204.53 | $222.71 | $222.10 | $239.74 | $242.53 | $213.52 |
| RevPAR | $161.16 | $168.45 | $164.37 | $171.54 | $166.23 | $38.44 |
| | | | | | | |
| Rooms | 47,353,503 | 49,631,410 | 48,294,977 | 50,402,766 | 48,841,602 | 11,325,542 |
| Food | 13,524,392 | 12,926,527 | 13,302,776 | 15,797,279 | 11,671,486 | 2,721,809 |
| Beverage | 4,416,867 | 3,477,474 | 3,238,997 | 3,490,365 | 2,719,917 | 510,473 |
| Other | 5,416,401 | 4,859,117 | 4,882,177 | 6,133,916 | 5,094,321 | 1,137,631 |
| **Total Food and Beverage** | 23,357,660 | 21,263,118 | 21,423,950 | 25,421,560 | 19,485,724 | 4,369,913 |
| **Minor Operated Departments** | 3,146,238 | 3,127,605 | 2,708,297 | 2,637,205 | 2,366,311 | 535,178 |
| **Other Income (Incl. Store Rentals)** | 1,545,307 | 1,118,549 | 1,287,462 | 1,545,288 | 1,127,746 | 936,250 |
| **Total Revenue** | 75,402,708 | 75,140,682 | 73,714,686 | 80,006,819 | 71,821,383 | 17,166,883 |
| | | | | | | |
| **Annual % Change** | | | | | | |
| Occupancy (absolute) | | -3.16% | -1.64% | -2.45% | -3.01% | -50.54% |
| ADR | | 8.89% | -0.27% | 7.94% | 1.16% | -11.96% |
| RevPAR | | 4.52% | -2.43% | 4.36% | -3.10% | -76.88% |
| | | | | | | |
| Rooms | | 4.81% | -2.69% | 4.36% | -3.10% | -76.81% |
| Food | | -4.42% | 2.91% | 18.75% | -26.12% | -76.68% |
| Beverage | | -21.27% | -6.86% | 7.76% | -22.07% | -81.23% |
| Other | | -10.29% | 0.47% | 25.64% | -16.95% | -77.67% |
| **Total Food and Beverage** | | -8.97% | 0.76% | 18.66% | -23.35% | -77.57% |
| **Minor Operated Departments** | | -0.59% | -13.41% | -2.62% | -10.27% | -77.38% |
| **Other Income (Incl. Store Rentals)** | | -27.62% | 15.10% | 20.03% | -27.02% | -16.98% |
| **Total Revenue** | | -0.35% | -1.90% | 8.54% | -10.23% | -76.10% |

Source: FHR - San Jose - Dec 1-05 Contract
Summary Income Statement Dec. 2015, 2016,
2017, 2018, 2019, 2020.

78.      As shown in Table 7, above, Food and Beverage revenues along with all other ancillary department revenues declined materially in 2019, prior to any impacts from the Covid-19 Pandemic, and this major decline can readily be attributable to a decline in Group/Meetings business, the primary driver of Food & Beverage Revenue (especially highly profitable banquet and catering revenue) and other Ancillary Revenues of the Hotel.  Mr. Taylor's oversight in not analyzing segmentation and the impacts of these segments on other major categories of revenue of the Hotel, provides further evidence of a lack


REH Capital Partners, LLC

## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

of foundation for Mr. Taylor's speculative estimates of foregone future revenues used in his calculations of Lost Management Fees damages in the case.

79.    **Most surprising, Mr. Taylor failed to make or present any estimates of Hotel Occupancy, Average Daily Room Rate ("ADR") and Revenue Per Available Room ("RevPAR") in estimating future Hotel Revenues of the Hotel for his damages calculations – a standard foundation for any Hotel analysis or estimate of future hotel revenues by experts in the hotel industry.**  Occupancy, ADR and RevPAR are the standard metrics used by hospitality experts in making estimates or projections of future room revenues and the key driver of revenue estimates for all other categories of hotel revenues– the basic building blocks used in hotel analysis.  Yet, Mr. Taylor made no such assumptions or estimates pertaining to these key hotel metrics in making his damages calculations.

80.    The only mention or presentation of Occupancy, ADR and RevPAR metrics made by Mr. Taylor in his Expert Report was on an historical basis from 2015 to 2020 and Partial 2021 and only for the purpose of wrongly concluding, in my opinion, that 2019 was a suitable base year for making his estimates of future Hotel total revenues on a bulk basis, as I further discuss later in this report.  Without presenting any sound analysis and stated assumptions pertaining to projected Hotel Occupancy, ADR, and RevPAR by customer segment or in total, and without sound analysis or stated assumptions on the estimated composition of Total Hotel Revenues by category of Room Revenues, Food & Beverage Revenues, and other Ancillary Revenues, Mr. Taylor's estimates of Total Hotel Revenues become nothing more than broad-brushed estimates that are unreliable, in my opinion, as a basis for calculating Lost Management Fees Damages in this Case.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

81.    Further to this material flaw in Mr. Taylor's analysis, I make the following additional observations.

a. **Mr. Taylor failed to take into account a steady and significant decline in the Hotel's Occupancy from 2015 to 2020 in formulating his estimates of future Hotel Revenues**. In Paragraph 37 of his Expert Report, Mr. Taylor presents Occupancy percentages for the Hotel from 2015 to 2020 as embedded in bar charts (which I present in my own schedule in Table 7, above) that clearly show a steady and significant decline in Occupancy of the Hotel.    Occupancy percentages were presented as follows: 2015 – 79%, 2016 – 76%, 2017 – 74%, 2018 – 72%, 2019 – 69%, and 2020 – 18%.[19]    This was an obvious steady decline, at a rate of 2.6% per year, and overall representing a 10-percentage point decline in Occupancy from 2015-2019, during the 5-year period prior to the start of Covid-19 Pandemic.    I point out as a hospitality expert, and I believe most hospitality experienced professionals would agree with me, that a 10-percentage point drop in occupancy, Pre-Covid-19, is alarming and considered to be major decline.    Instead of acknowledging this decline, Mr. Taylor merely points out an average occupancy rate of 74% achieved for the Hotel from 2015-2019 in his Expert Report.    Furthermore, Mr. Taylor either failed to investigate, or acknowledge in his Expert Report that the Hotel's occupancy was trending further downward in Q1 of 2020 in the months of January and February 2020, before any

---

[19] Taylor Report, pgs. 14-15, para. 37.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

notable impacts of Covid-19 had surfaced with respect to hotel stays. The Hotel's occupancy percentage declined to 65% through YTD February 29, 2020 compared to 73.1% for the same period in 2019, an 8.1 percentage point drop in Occupancy going into 2020, before the Pandemic really took hold.[20]

b. **Mr. Taylor also failed to acknowledge or take into account a major drop in RevPAR in 2019 from 2018, driven mainly by the steady decline in Occupancy.**  I note for the Court that RevPAR can be calculated as the product of multiplying a hotel's ADR by its average Occupancy percentage.  Mr. Taylor presented the following rounded RevPAR metrics for the Hotel for 2015-2020 in his Expert Report: 2015 – $161, 2016 – $168, 2017 – $164, 2018 – $172, 2019 – $166, and 2020 – $38.[21]  RevPAR declined by $6 from 2018 to 2019, which is significant in my opinion, and as already discussed, was driven by steady declines in occupancy and a major drop in Groups/Meetings business, and shifts of business to other business segments at much lower ADR's.  This is shown in Table 5 above, pertaining to the Business Segmentation of the Hotel.  Despite this major drop in RevPAR in 2019, Mr. Taylor states in Paragraph 39 of his Expert Report, "The average RevPAR between 2015 and 2019 was $166." "Due to the countervailing factors of higher relative ADR and lower relative occupancy rate, the RevPAR for 2019 was in line with

---

[20]. FHR - San Jose - Dec 1-05 Contract - Month-End Market Segmentation Report February 2020
[21] Taylor Expert Report, pgs. 15-16, para. 39.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

the average for the preceding years ($166)." In my opinion, this should not be an averaging exercise to hide or ignore declining trends. Furthermore, Mr. Taylor failed to investigate, and in any event, did not acknowledge in his Expert Report that the Hotel's RevPAR was trending even further downward in Q1 of 2020 for the months of January and February 2020, before any notable impacts of Covid-19 had surfaced with respect to hotel stays, when the Hotel's RevPAR declined to $159.08 YTD February 29, 2020 compared to $184.98, for the same period in 2019, a year-over-year RevPAR decline of approximately $26 or 14%, a very alarming Pre-Covid trend.

c. **The negative Occupancy and RevPAR trends discussed above, together with the overall negative revenue and segmentation trends discussed above, should have been "red flags" for Mr. Taylor before concluding in Paragraph 40 of his Expert Report, "Therefore, in terms of RevPAR I consider 2019 an appropriate base-line performance level for the Hotel."** In my opinion, this was an unfounded conclusion based on the historical trends of the Hotel's performance presented above, further evidencing the serious flaws in Mr. Taylor's analysis and estimates of future Hotel revenues and calculations of Lost Management Fees Damages.

d. The Hotel's 2019 results became the predicate for Mr. Taylor's estimates of future Hotel revenues in making his damages calculations in a conflated and erroneous manner, as discussed below, and without making any key assumptions in support of his future Hotel revenues estimates for key Hotel performance metrics or categories of revenues going forward, rendering his future Hotel revenues estimates materially flawed and unreliable.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

82.    **Mr. Taylor Conflates RevPAR Growth with Revenue Growth** – In Paragraph 47 of his Expert Report, Mr. Taylor states, "I utilize the CBRE report for the San Jose area to forecast Total Revenue from 2022 through 2025. Specifically, I apply the RevPAR for upper priced hotels in the San Jose market forecast by CBRE for those years relative to the 2019 RevPAR and apply that to the Hotel's 2019 revenue."    Possibly Mr. Taylor is not aware that RevPAR metrics presented by CBRE and in general, pertain only to hotel room revenues, not total hotel revenues that would also include food and beverage revenues and other ancillary hotel revenues. For the Hotel, in 2019, Food and Beverage and Other Revenues comprised over 30% of Total Hotel Revenues, and in some years even more. Historically, year-over-year increases or decreases in the Hotel's RevPAR and Room Revenues, do not correlate with year-over-year increases or decreases in Food and Beverage Revenues and Other Ancillary Revenues of the Hotel.  This is also true in general for full large full-service hotels.  For example, as presented in Table 7 above, for 2019 in comparison with 2018, RevPAR and Room Revenues each decreased by 3.10%, whereas Food and Beverage Revenues decreased by 23.35% and Total Hotel Revenues decreased by 9.76%.  This is another major flaw in Mr. Taylor's damages analysis.

83.    Provided in the table below, is an excerpt from Mr. Taylor's Expert Report, showing the application of CBRE estimates of San Jose Upper-Priced Hotel for 2022-2025, to his estimates of Total Revenues for the Hotel:



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 8, Excerpt from Page 45 of the Taylor Report – 2022-2025 Hotel Revenue Estimates Using CBRE RevPAR Predictions.**

**Figure 16      Recovery of Hotel's Total Revenues[80]**

| Item | 2019A | 2020A | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|
| RevPAR (US$) per CBRE (SJ Upper-priced) | 187.1 | 50.3 | 77.3 | 161.1 | 192.7 | 202.6 | 208.0 |
| Hotel Total Revenues (US$ millions) | 69.8 | 16.6 | 18.9 | 60.1 | 71.8 | 75.6 | 77.6 |
| Annual Growth in Total Revenue (%) | N/A | (76.2%) | 13.8% | 217.5% | 19.6% | 5.2% | 2.6% |

[80] See Exhibit 3.

84.    In calculating the Hotel's Total Revenues for 2022 to 2025, for 2022, Mr. Taylor applied the ratio of CBRE's RevPAR for 2022 of 161.1 divided by CBRE's RevPAR for 2019 of 187.1, to the Hotel's 2019 Revenue of $69.8M, to arrive at $60.1M for his 2022 Total Hotel Revenue estimate for his damages calculations– again a flawed analysis in his attempt to correlate or conflate RevPAR changes to Total Hotel Revenue changes, when this direct correlation does not exist in a hotel expert's approach to estimating Hotel Total Revenue changes.  He went on to do similar calculations for each subsequent year. i.e., determining the CBRE RevPAR ratio for 2023 compared to 2022, and growing 2022 Total Hotel Revenues to 2023 Total Hotel Revenues based on the ratio.  Once he reached 2025 Total Hotel Revenues using this approach, he inflated the erroneously determined 2025 revenues by 2.2% per year for each of the remaining years in his damages period for the next 25 years through 2050.

85.    Mr. Taylor fails to consider in his analysis the fact that the Hotel, with its 805 rooms, has 57.8% more rooms to fill than the next largest hotel in its competitive set, the 510-room Marriott San Jose and will most likely lag the recovery that was forecasted by CBRE.  The Hotel also will most likely take longer to return to 2019 RevPAR levels than its direct Sam Jose competitors.  Furthermore, Mr.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

Taylor failed to consider the Hotel's expansive meeting space and large number of food and beverage outlets when compared to, not only the Marriott San Jose, but also the other hotels in the downtown San Jose submarket.  The food and beverage outlets, and banquet and related revenues of the Hotel also will most likely take longer to return to 2019 levels than other competing hotels.  Mr. Taylor fails to consider this in his analysis.

86.     **Mr. Taylor's approach to estimating the Hotel's Total Revenues from 2022 to 2025 is tantamount to a "back of the napkin" calculation using CBRE general market predictions for the Upper-Price tier of San Jose lodging market, and worse yet, uses non-correlating data as a foundation for his Total Revenue Estimates that should be disregarded as erroneously determined and unreliable for estimating Total Hotel Revenues and Lost Management Fees damages in this Case.**

87.     Mr. Taylor either failed to review or chose to ignore the Hotel's STR STAR Reports that Accor routinely uses to track the Hotel's Occupancy, ADR, and RevPAR performance against two sets of hotels that the Hotel has designated as its main competitors, Comp Set 1, and Comp Set 2.  In fact, most U.S hotels subscribe to and use STR STAR Reports routinely as a primary basis for room metrics benchmarking analysis.

88.     Provided in the table below is an excerpt from the Hotel STAR Report as of December 31, 2019.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 9, STR STAR REPORT – COMP SET 1 SAN JOSE MARKET – DECEMBER 31, 2019[22]**

| Occupancy (%) | Year To Date | | | Running 3 Month | | | Running 12 Month | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 |
| My Property | 74.0 | 71.6 | 68.5 | 70.7 | 65.1 | 71.3 | 74.0 | 71.6 | 68.5 |
| Competitive Set | 81.0 | 80.8 | 77.7 | 74.4 | 72.0 | 72.9 | 81.0 | 80.8 | 77.7 |
| Index (MPI) | 91.3 | 88.6 | 88.2 | 94.9 | 90.4 | 97.8 | 91.3 | 88.6 | 88.2 |
| Rank | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 4 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |

| ADR | Year To Date | | | Running 3 Month | | | Running 12 Month | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 |
| My Property | 222.10 | 239.74 | 242.53 | 221.86 | 244.91 | 230.30 | 222.10 | 239.74 | 242.53 |
| Competitive Set | 233.40 | 250.52 | 253.60 | 232.12 | 251.33 | 239.64 | 233.40 | 250.52 | 253.60 |
| Index (ARI) | 95.2 | 95.7 | 95.6 | 95.6 | 97.4 | 96.1 | 95.2 | 95.7 | 95.6 |
| Rank | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 | 4 of 5 |

| RevPAR | Year To Date | | | Running 3 Month | | | Running 12 Month | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 | 2017 | 2018 | 2019 |
| My Property | 164.37 | 171.54 | 166.23 | 156.75 | 159.35 | 164.17 | 164.37 | 171.54 | 166.23 |
| Competitive Set | 189.12 | 202.40 | 197.10 | 172.76 | 180.84 | 174.65 | 189.12 | 202.40 | 197.10 |
| Index (RGI) | 86.9 | 84.8 | 84.3 | 90.7 | 88.1 | 94.0 | 86.9 | 84.8 | 84.3 |
| Rank | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 5 of 5 | 3 of 5 | 5 of 5 | 5 of 5 | 5 of 5 |

89.    Comp Set 1 is comprised of the following hotels:

| Name | City, State | Rooms | Open Date |
|---|---|---|---|
| Fairmont San Jose | San Jose, CA | 805 | 198710 |
| Hyatt Place San Jose Downtown | San Jose, CA | 240 | 197409 |
| Westin San Jose | San Jose, CA | 171 | 192606 |
| Hilton San Jose | San Jose, CA | 353 | 199210 |
| Marriott San Jose | San Jose, CA | 510 | 200304 |
| | | 2079 | |

90.    The STR STAR Report above reveals that the Hotel was materially underperforming the directly competitive San Jose hotels that it routinely tracks for performance measurement, in occupancy, ADR and RevPAR, as shown by indices below 100.  An index of 100 means that the Hotel is performing

---

[22] Monthly STAR Report: Fairmont San Jose For the Month of: December 2019, Tab 4, STR # 25366 / Created January 17, 2020.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

exactly to its fair share of the market as to each metric presented. In fact, as to RevPAR, for the full years 2017, 2018, and 2019 the Hotel was last in the set (in other words, the Hotel had the lowest RevPAR), placing 5th out of the 5 hotels comprising Comp Set 1.  The same was true for occupancy.

91.    This is another indication of why Mr. Taylor's reliance on general market predictions or forecasts by CBRE for Upper-Priced hotels in San Jose, as compared to specific forecasts and analysis for the Hotel and its direct competitors in San Jose, is not very meaningful or reliable based on the level of underperformance of the Hotel against its direct competitors revealed by the STR Star Reports in terms of RevPAR, putting aside for the moment the issue of Mr. Taylor's erroneous use of the CBRE RevPAR predictions as a proxy for estimating Total Hotel Revenues.

**Mr. Taylor's Estimates of Future Total Hotel Revenues for 2022 and 2023 Are Unreasonably High, Even Higher Than Accor's Own Estimates as Presented in the Projections Accompanying Their Bid to Owner to Remain as Manager, Further Evidencing Their Unreliability.**

92.    In Exhibit E to Accor's bid letter to the Owner's Representative, Richard Warnick, dated May 7, 2021, to continue operating the Hotel, Accor presented Hotel Operating Projections that projected Total Hotel Revenues for 2022 substantially below the Total Hotel Revenue amount estimated by Mr. Taylor for 2022 in his Lost Management Fees calculations.  For 2022, Mr. Taylor estimated Total Hotel Revenues at $59,349,661[23] compared to Accor's estimate of $49,768,400[24], with Mr. Taylor's estimate

---

[23] Taylor Expert Report, Exhibit 1: Calculation of Lost Management Fees (US$) following pg. 54.
[24] Exhibit E, pg. 18 accompanying Accor Bid Letter dated May 7, 2021 from Ms. McCrory, CEO North & Central America, to Richard Warnick, CHMWarnick, Owner's Representative.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

being nearly $10 million or 19% higher than Accor's for 2022. For later years, starting in 2024, Accor assumed a major renovation of the Hotel would occur and based their forward estimates as if the Hotel were fully renovated. This is a consideration, of course, that would not reflect the current state of the Hotel for damages calculations as of the date of Termination of the HMA.

**Mr. Taylor's Reliance and Use of His Unreliable Estimates of Total Hotel Revenues in Calculating Lost Management Fees through 2050, Results in an Unreliable Estimate of Lost Management Fees Allegedly Suffered by Accor, in the absence of the Owner's Termination of the HMA.**

93.    Mr. Taylor's "broad-brushed" approach to estimating Total Hotel Revenues, in my opinion, results in an unreasonable and unsubstantiated basis and amounts for his estimation of Accor's Lost Management Fees, in the absence of Owner's Termination of the HMA, totaling approximately $78.7 million over his proffered damages period through December 31, 2050.

**Mr. Tailor Failed to Reasonably Investigate or Consider Avoidable Expenses that the Operator Reasonably Could Avoid as a Consequence of the Closure of the Hotel and Termination of the HMA.**

94.    In my opinion, Mr. Taylor failed to reasonably investigate or properly consider what costs and expenses, if any, Accor could reasonably avoid in the future as a consequence of the closure of the Hotel and termination of the HMA. Such avoidable costs should be subtracted from Lost Management Fees to calculate alleged damages suffered by Accor in this case.

95.    Mr. Taylor concludes in his Expert Report, "While Accor may avoid expenses as a result of the Debtors' Alleged Breaches of Contract, such as expenses from travelling to the Hotel, such



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

expenses are reimbursable, and consequently, Accor's claim for reimbursement of the expenses will be equally reduced. As a result, the net impact on Accor's revenues and expenses is nil." Mr. Taylor cites Article VI of the HMA as justification for his conclusion, but apparently fails to recognize that Article VI pertains solely to the Operator recovering the costs of providing "Centralized Services" and the benefits of the "Global Reservations System," two defined terms in the HMA, with specifically defined and limited types of costs and expenses that the Operator can recover in these categories. In fact, Mr. Taylor did not cite the whole of Article VI, but specifically cited only Section 6.4 of the HMA dealing with "Adjustment of Charges," and not Section 6.1 pertaining to the "Global Reservations System" and Section 6.2 pertaining to "Centralized Services," which provide for fees and recoveries of the Operator's costs from the Owner only for specific and limited categories of the Operator's costs and expenses incurred in support of the Hotel in these categories.

96.     The Hotel, with 805 rooms, to the best of my knowledge, is one of Fairmont's largest hotels in the U.S. and it is simply unreasonable to assume that Accor would not avoid any corporate headquarter or regional costs and overhead outside of the narrowly defined Global Reservation System and Centralized Services categories. Exhibit C of the HMA details the specific categories and types of cost reimbursement falling under Centralized Services that mainly relate to Hotel support for Sales and Marketing, Human Resources Training and Development, Accounting and MIS Support Services, Recruitment and Employee Recognition, Legal Services and Property Tax Management on an a-la-carte



**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

basis, the Global Reservation Center, and Retail Leasing support on an a-la-carte basis.[25]  In fact, nearly every one of these categories as delineated in Exhibit C to the HMA provides for some level of reimbursement for a-la-carte services.  It is simply not reasonable to assume that there would be no impact on the Operator's cost base and cost avoidance by discontinuance of one of Fairmont's, and for that matter, Accor's, largest hotels in the U.S from its support base for a-la-carte Centralized Services. Possibly there could be staff reductions in this regard.  Then of course, there are other categories of Operator costs and expenses falling outside of Global Reservations Systems and Centralized Services that Mr. Taylor simply did not consider in reaching his conclusion on "nil" avoided costs as a result of Debtors' termination of the HMA.

97.    Excerpts from the HMA of Sections 6.1 and 6.2 are presented in Tables 10 and 11, below.

---

[25] Exhibit C to the HMA, pgs. 1-6.



**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

**Table 10, HMA Section 6.1 – Global Reservation System**

| |
|---|
| **6.1     Global Reservations System** |
| The Operator shall provide, or shall cause any of its Affiliates to provide, for the Hotel and its guests the full benefit of the Global Reservations System to the extent available to other Operator Hotels.  The Owner shall be charged as an Operating Expense a reasonable monthly fee on a charge per key for such service as well as a charge on a per-reservation basis, to be described in the Annual Budget and charged, subject to the guidelines and policies approved from time to time by the Operator, on the same basis or formula as charged to other Operator Hotels and, in all cases, consistent with Section 6.4 below. |

**Table 11, HMA Section 6.1 – Global Reservation System**

| |
|---|
| **6.2     Centralized Services** |
| The Operator shall provide, or shall cause any of its Affiliates to provide, for the Hotel and its guests the full benefit of its centralized services (the "Centralized Services") as normally provided to other Operator Hotels, including, without limitation, human resources and industrial relations services, employee group benefits, payroll and office management services, safety, disability and workers' compensation management services, finance, accounting and audit services, Marketing, product development, advertising and public relations services, educational and training programs and facilities, insurance services, real property tax appeal services, and computerized management information services.  The Centralized Services currently provided by the Operator are shown in Schedule "C" hereto, which is set forth herein for reference only and is subject to such additions, deletions and modifications from time to time as the Operator, in its sole discretion, shall deem appropriate for Operator Hotels operated in accordance with the Standard.  The Hotel shall participate, on the terms and conditions herein specified, in all of the Centralized Services. |

**MR. TAYLOR'S INFLATION FACTOR IS NOT REFLECTIVE OF THE HOTEL'S MORE RECENT HISTORICAL REVENUE AND FEE GROWTH TRENDS OVER THE LAST FIVE YEARS OR THE LARGE SWINGS IN REVENUE GROWTH RATES UP AND DOWN OVER THE LAST 20 YEARS.**

98.     In Appendix 3, paragraph 19 of his Expert Report, Mr. Taylor states, "For the steady state period post-2025, I assume the Hotel's revenues will grow at the long-term inflation rate of 2.2% starting from 2026 to 2050.  He based the long-term inflation rate on the Federal Reserve Bank of Philadelphia, Survey of Professional Forecasters, February 12, 2021.



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

99.    The issue here is that the Hotel's more recent Pre-Covid historical revenue growth rate over the last five years from 2015-2019 has been all but flat with a simple average growth of .4%, which does not correlate with the U.S. long-term inflation rate, and his analysis ignores the Hotel's longer-term wild swings in revenue growth trends.  The long-term inflation rate does not appear appropriate to use over the next ten years based on the most recent flat trend line in revenue growth of the Hotel over the last 5 years and large downward swings in 2019 and 2020 that occurred.  The impact of major swings in the near term, 5 to 10 years out, for example should another recession or downturn event occur sometime in the next 10 years, would have a profound impact on Management Fees and discounted Management Fees for damages calculations – under Mr. Taylor's theory that every year revenues and fees will go up based on the long-term inflation rate, not down, no matter what.  Said another way, after reaching recovery at some point in the next five years, it is highly likely that the Hotel will struggle to grow revenue further, considering it was already flat in average revenue growth Pre-Covid-19 from 2015-2019, it experienced negative revenue growth of 9.8% in 2019 as pointed out earlier in this Expert Rebuttal Report, and was consistently struggling with performing under its fair market share in RevPAR against its direct competitors before the Pandemic began.

100.    Table 12 below presents a line-chart depicting the Hotel's long-term growth trend in Total Hotel Revenues showing wild up and down swings over the last 20 years through 2019 (ignoring 2020 that would show a very deep decline) demonstrating the earlier points made on this subject.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**Table 12, Annual Percentage Changes in Total Hotel Revenues – 1999 to 2019**[26]



| 1999 | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 |
|------|------|------|------|------|------|------|------|------|------|------|
|  | 16.5% | -21.9% | -3.2% | -10.7% | 5.4% | 10.6% | 12.9% | 7.0% | -3.1% | -29.2% |

| With Amendment | | | | | | | | | |
|------|------|------|------|------|------|------|------|------|------|
| 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
| 19.1% | 2.9% | 15.9% | 8.7% | 16.0% | 6.5% | -0.5% | -1.9% | 7.8% | -9.8% |

---

[26] Source: REH Calculations from Accor Annual Revenue and Fee Summary, ACCOR_0000083.xlsx.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

**The Discount Rate Used by Mr. Taylor to Discount his Estimated Lost Management Fees is Based Solely on His Estimation of a Weighted Average Cost of Capital Rate ("WAAC Rate") Without Any Adjustment for Projection Risk Specific to His Highly Speculative Estimates of Future Hotels Revenues and Fees Over a 29-Plus Year Damages Period, which is Unreasonable.**

101.    I reviewed Mr. Taylor's determination and calculation of a WAAC Rate for discounting of future Lost Management Fee estimates to their present value, as Mr. Taylor detailed in Appendix 4 to his Expert Report.  While perhaps academically sound in approach, I question why Mr. Taylor did not use Accor's WAAC Rate, the company that would earn and realize the future Management Fee income stream.  I point out that Accor is headquartered and domiciled outside the U.S. and earns only 13% of its management and franchise fee revenue in North America/Central America/ Caribbean ("NACACA") (presumably a much lower percentage in the U.S.) while earning the rest of its fee revenues outside the NACACA.[27]  (See Exhibit F in the Appendix to this Expert Rebuttal Report for an excerpt from Accor's Annual Report).  Yet, Mr. Taylor computed an industry beta for his calculations based on the data of five publicly listed hotel operators, including Marriott International, Inc, Hyatt Hotels Corporation, Choice Hotels International, Inc., Hilton Worldwide Holdings, Inc., and Accor, S.A, with all but Accor being U.S. domiciled and, to the best of my knowledge, having most of their revenue earned in the U.S, and North America.  Furthermore, Mr. Taylor's debt calculations and related tax rates appear to be based solely on the U.S.

102.    More concerning was that Mr. Taylor made no adjustment for long-term projection risk specific to his speculative analysis over the next 29-plus years.  No Beta adjustment related to companies

---

[27] Accor – Consolidated financial statements and notes December 31, 2020, pg. 23.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

with diversified risk profiles could possibly account for the projection risks inherent in his calculations, with such projection risk premiums for similar and specific analysis of the type prepared by Mr. Taylor typically requiring a 100 to 200 basis points adjustment to a WAAC Rate determined and calculated in the manner that Mr. Taylor calculated it.

103.    I believe additional adjustments should be made to amounts determined by Mr. Taylor under the Berman-deRoos Methodology he followed to (i) increase the discount rate upward by at least 100 to 200 basis points to account for projection risk inherent under the specific approach and principally unreliable and speculative estimates he made in his analysis, incorporating estimates of Hotel revenues and Management Fees over a very long projection period of 29-plus years, (ii) determine and subtract a reasonable estimate of Accor's avoidable costs and expenses as a result of the closure of the Hotel and termination of the HMA, which he has not reasonably addressed, and (iii) to potentially adjust the time frame and estimates of Lost Management Fees for Accor's potential to mitigate damages by no longer being subject to the non-compete Radius Restriction under the HMA that would allow Accor to brand and manage another hotel in a 25 radius to the subject hotel, which is a plausible and realistic future outcome over the next 29-plus years over Mr. Taylor's proffered damages period.

## C.  Mr. Taylor's Alternative Case Damages Calculations

104.    Following his conclusion and presentation of the amount of Lost Management Fees Damages and Total Damages allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract, Mr. Taylor made and presented four additional calculations that he labeled as "Liquidated Damages Amounts."  In his Expert Report, he stated, "Counsel also asked me to calculate damages under the Liquidated Damages provision in the HMA under certain assumptions regarding the appropriate



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

"Imputed Management Fees" amount."[28] Three of the four calculations he made in this regard were based on assumptions regarding the periods and amounts of "Imputed Management Fees" not in conformity with Section 16.11 (b)(B) that was the basis of my own calculation of the Liquidation Damages Amount under the HMA due to Breach Termination by the Owners, that I presented and opined on in my Expert Report on Liquidated Damages and that was submitted to the Court on May 19, 2021.

105.    Provided below is a table excerpted from Mr. Taylor's Expert Report on Liquidated Damages calculations.

**Table 13, Excerpt from Page 5 of Mr. Taylor's Expert Report– Mr. Taylor's Summary of Liquidated Damages Amounts**

10.   Counsel also asked me to calculate damages under the Liquidated Damages provision in the HMA under certain assumptions regarding the appropriate "Imputed Management Fees" amount.  I present those scenarios below in the figure below:

| Figure 2 | Summary of Liquidated Damages Amounts | | | |
|---|---|---|---|---|
| Scenario | Reference Period | Imputed Management Fees (US$) | Multiplier | Liquidated Damages Amount (US$) |
| 1 | Average 2015-2019 | 1,977,134 | 17 | 33,611,278 |
| 2 | Average 2018-2019 | 1,994,547 | 17 | 33,907,299 |
| 3 | 2019 | 1,892,238 | 17 | 32,168,046 |
| 4 | Feb 2020-Jan 2021 | 298,180 | 17 | 5,069,060 |

---

[28] Taylor Expert Report, pg. 5, para. 10.

REH Capital Partners, LLC

## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

106.    Mr. Taylor offers narrative discussion on pages 26-27 of his Expert Report, but he offers no opinion on whether any one of his Liquidated Damages calculations constitute damages suffered by Accor due to the Debtors' Alleged Breaches of the HMA.

107.    I point out that none of these amounts were included on page 5, Figure 1 Summary of Damages table in Mr. Taylor's Expert Report to which writes in paragraph 9 of his Expert Report, "Based on my review, assumptions, and restrictions, I calculated the quantum of damages suffered by Accor:" This was followed by his Figure 1 chart presented in Table 14, below:

**Table 14, Chart from Taylor Expert Report on his Summary of Damages:**

| Figure 1 | Summary of Damages | |
|---|---|---|
| | Item | Amount (US$) |
| | Lost Management Fees | 24,657,609 |
| | Unpaid Fees and Reimbursements[5] | 2,029,201 |
| | Less: Present Value of Shortfall Payments | (2,417,097) |
| | **Total** | **24,269,713** |



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

### D.  Other Alternative Damages Calculations

108.    I was asked by Counsel to assume arguendo that the plain language meaning of Section 16.11 and its application to the actual facts was not followed, and instead to consider and make two other alternative calculations of Liquidated Damages and Damages Amounts pertaining to Lost Management Fees allegedly suffered by Accor due to Debtor's termination of the HMA, which are presented in Exhibits C and D in the Appendix to this Expert Rebuttal Report.  Provided below is a summary of these calculations:

**Table 15, Alternative 1 and 2 Summary of Damages Amounts**

| Alternative 1 - Weighted Average Liquidated Damages Amount – Exhibit C: | |
|---|---|
| (E)  Weighted Average Liquidated Damages (Tr. 12 Mos. Feb. 20 [20%] / Tr. 12 Mos. Feb. '21 [80%] | $8,260,031 |
| (F)  Less: Extraordinary Operating Deficits Funded by Owner due to Covid-19 Downturn | ($11,500,000) |
| (G)  Net Damages Calculation | ($3,239,969) |
| **(H) Say** | **$0** |
| **Alternative 2 – Net Damages Amount Using Taylor Prospective Revenue Model with Revised Assumptions – Exhibit D:** | |
| (E)  Total Gross Fees to 12/31/2050 | $66,249,030 |
| (F)  Total PV of Lost Management Fees to 12/31/50 | $19,025,362 |
| (G)  Less: Extraordinary Operating Deficits Funded by Owner due to Covid-19 Downturn | ($11,500,000) |
| **(H)  Net Damages Amount** | **$7,525,362** |



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

109.    For Alternative 1 summarized above, I have been instructed by Counsel to assume for purposes of this section of my Expert Rebuttal Report that a Breach Termination by Owner has occurred and to use a weighted average approach to calculate Imputed Management Fees under Section 16.11(b)(A) of the HMA, exercising my judgement by placing the heaviest weighting on Imputed Management Fees calculated for the trailing 12 month period ended February 21, 2021, averaged with Imputed Management Fees calculated for the trailing 12 month period ended February 21, 2020.  For this calculation I used an 80% weighting to the trailing 12-month period ended February 21, 2021 and 20% to the trailing 12-month period ended February 21, 2020 in calculating the weighted average.  This weighting is in acknowledgement that (i) Covid-19 is real and happened (ii) the prescription for calculating Imputed Management Fees under Section 16.11(b)(A) of the HMA (as presented in Table 2, earlier in this Expert Rebuttal Report) is specific and clear in the plain language meaning of what is written in the HMA for making the calculation, and (iii) the suffrage of the impacts of Covid-19 rests significantly with the Debtors.  Also factored into this calculus, is a subtraction from the Liquidation Damages Amount so determined under the weighted-average approach, for cash funds expended by the Owner so far in 2020 and 2021 (prior to Hotel closure), the amount of which was communicated to me by Counsel, stemming from the extraordinary Covid-19 negative impact on Hotel operations resulting in large operating deficits of the Hotel that required extraordinary cash funding by Owner.

110.    For Alternative 2 summarized above, I have been instructed by Counsel to hypothetically assume that some other theory of alleged Lost Management Fees damages suffered by Accor due to termination of the HMA by Owner and Debtors' Alleged Breaches of Contract of the HMA, other than Liquidated Damages as provided in Section 16.11 of the HMA, is applicable.  Accordingly, I have been



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

instructed by Counsel to recalculate Mr. Taylor's estimates of Lost Hotel Management Fees Damages, generally following the prospective modeling approach used by Mr. Taylor, but making informed adjustments to assumptions regarding the Hotel's future recovery and future estimation of Total Hotel Revenues and Lost Basic Management Fees. This I did by making a considered and reasoned analysis of historical trends in Occupancy, ADR, RevPAR, Hotel business segmentation, Hotel revenue by department (including food and beverage and ancillary operated departments) and a reasoned approach to recovery of revenues in the future.

111.     Under Alternative 2, I was further instructed by Counsel to make calculations through the end of the Initial Operating Term that ends on December 31, 2025 and through each of the five 5-Year Extension Terms through December 31, 2050, hypothetically assuming that the HMA would have remained in effect with Accor as Manager under the HMA's current terms, fee structures and other provisions having an impact on Management Fee calculations. While I would likely have considered using a shorter damages period, I was asked by Counsel to use the same damages period that Mr. Taylor used in his calculations. Also, I adjusted Mr. Taylor's discount rate of 8.7% that he used in his calculations upward by 100 basis points above the WAAC Rate, to 9.7%, to account for the unusually high projection risk as was previously discussed relating to the highly speculative nature of revenues and fee estimates over 29-plus years into the future, especially in consideration of the present instability of the lodging market stemming from the Covid-19 Pandemic.

112.     This approach results in a far overweighted bias in relief towards Accor as relating to the Covid-19 Pandemic, almost as if it never occurred. As with Alternative 1, I subtracted the amount of cash funds expended by the Owner so far in 2020 and 2021 (prior to Hotel Closure), an amount that was



**EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA**

communicated to me by Counsel, stemming from the extraordinary Covid-19 negative impact on Hotel operations resulting in large operating deficits of the Hotel that required extraordinary cash funding by Owner. Subtracting the amounts funded by Owner from the present value of hypothetical Lost Management Fees determined under this approach to prospective damages approach, has the effect to rebalance in part, the bias in relief to Operator discussed above.

113. I believe additional adjustments should be made to amounts determined under this Alternative 2 analysis to (i) determine and subtract a reasonable estimate of Accor's avoidable costs and expenses as a result of the closure of the Hotel and termination of the HMA, which I have not determined, and (ii) to potentially adjust the time frame and estimates of Lost Management Fees for Accor's potential to mitigate damages by no longer being subject to the non-compete Radius Restriction under the HMA that would allow Accor to brand and manage another hotel in a 25 radius to the subject hotel, which is a plausible and realistic future outcome over the next 29-plus years in the damages period.

114. The detailed assumptions and calculations made in the determination of hypothetical Lost Management Fees, and the Discounted Present Value of Lost Management Fees on or proximate to March 5, 2021, the effective date of termination of the HMA, are presented in Exhibits D and E in the Appendix to this Expert Rebuttal Report.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## VII.    CLOSING

115.    In summary, the Sidley-instructed approach used by Mr. Taylor and Mr. Taylor's conclusion on Lost Management Fees Damages allegedly suffered by Accor due to Debtors' Alleged Breaches of Contract, in my professional opinion, ignore the provisions of Section 16.11 of the HMA dealing with Breach Termination by Owner and Liquidated Damages calculations. Furthermore, Mr. Taylor's Lost Management Fees Damages determination made under a highly speculative and prospective analysis of estimating and calculating future Hotel Total Revenues and Management Fees is (i) unfounded in reliable evidence or findings, (ii) ignores substantial specific and actual historical trends in performance and operations of the Hotel, (iii) is based in chief on broad-based lodging market predictions made and presented in a general publication of CBRE, (iv) is not based on any sound hospitality expert analysis of issues, trends, and competitive metrics specific to the Hotel in support of projection assumptions, and in my opinion does not provide a reasonable and sound foundation for calculating Lost Management Fees damages in this Case (assuming there is even a basis for undertaking such a calculation, which I do not).

116.    Following his conclusion and presentation of the amount of Lost Management Fees Damages and Total Damages allegedly suffered by Accor as a result of Debtors' Alleged Breaches of Contract, Mr. Taylor made and presented four additional calculations that he labeled as "Liquidated Damages Amounts."  In his Expert Report, he stated, "Counsel also asked me to calculate damages under the Liquidated Damages provision in the HMA under certain assumptions regarding the appropriate "Imputed Management Fees" amount."  Three of the four calculations he made in this regard were based on assumptions regarding the periods and amounts of "Imputed Management Fees" not in conformity



## EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

with Section 16.11 (b)(B) that was the basis of my own calculation of the Liquidation Damages Amount under the HMA due to Breach Termination by the Owners, that I presented and opined on in my Expert Report on Liquidated Damages that I submitted to the Court on May 19, 2021 as follows: "In my professional opinion, the amount of Liquidated Damages owing Accor by Debtors under Section 16.11(b) of the HMA due to Breach Termination of the HMA is $2,433,924 as of March 5, 2021, the date of the Breach Termination of the HMA."

117.    I respectfully reserve the right to amend or supplement this Expert Rebuttal Report based upon later learned facts, or to express additional professional opinions pertaining to additional information and observations not fully covered by this Expert Rebuttal Report in connection with additional work I may perform after the date of this Expert Rebuttal Report, and after reviewing additional discovery materials, witness statements and other expert reports submitted in this proceeding.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

118.    I will be prepared to answer any questions or provide any clarifications that the Court may require.

Dated: May 28, 2021

Respectfully submitted,

FRANCIS J. NARDOZZA

Chairman and CEO

REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## VIII.   APPENDIX OF EXHIBITS

### A.  EXHIBIT A – DOCUMENTS RELIED UPON AND CONSIDERED

- Hotel Management Agreement between Light Tower Associates, L.P. and Fairmont Hotel Management, L.P. dated September 14, 1999.
- Amended and Restated Hotel Management Agreement between San Jose Fairmont Lessee, LLC, and Fairmont Hotels and Resorts (U.S.) Inc. dated as of December 2, 2005.
- Tri-Party Agreement and Amendment to the HMA dated December 24, 2009.
- Second Amendment to Amended and Restated Hotel Management Agreement dated September 20, 2012.
- Third Amendment to Amended and Restated Hotel Management Agreement dated as of January 2, 2018.
- Assignment and Assumption of Hotel Management Agreement dated January 2, 2018.
- Owner Agreement between SC SJ Holdings LLC, FMT SJ LLC and Fairmont Hotels & Resorts (U.S.) Inc. dated as of January 2, 2018.
- Lease agreement for the Hotel between FMT SJ and SC SJ dated as of January 2, 2018.
- Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings.
- Debtors Motion For Entry Of An Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreements Between Debtors And Fairmont, Effective As Of The Debtors' Respective Petition Dates, dated March 10, 2021.
- Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreement Between Debtors And Fairmont, dated April 5, 2021.
- Accor Bid Letter and Appendices A-E, May 7, 2021.
- FHR - San Jose - Dec 1-05 Contract Summary Income Statement (By Month) Year 2020.
- FHR - San Jose - Dec 1-05 Contract Summary Income Statement February 2021.
- Declaration of Mr. Greig Taylor in Support of Accor's Supplemental Opposition in Response to the Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc. filed with the Court on April 23, 2021.
- Expert Report prepared by Mr. Greig Taylor, AlixPartners LLP, dated May 19, 2021.
- Article authored by Professor Jan A. deRoos, the HVS Professor of Hotel Finance and Real Estate at the Cornell University School of Hotel Administration, and Scott D. Berman, the industry leader of the hospitality and leisure practice of PricewaterhouseCoopers LLP, in the Cornell Hospitality Report entitled Calculating Damage Awards in Hotel Management Agreement Terminations ……
- FHR - San Jose - Dec 1-05 Contract Month-End Market Segmentation Report December 2019 Currency: USD.
- FHR - San Jose - Dec 1-05 Contract - Summary Income Statement Dec. 2015, 2016, 2017, 2018, 2019, 2020.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

- Monthly STAR Report: Fairmont San Jose For the Month of: December 2019, Tab 4, STR # 25366 / Created January 17, 2020.
- Custom HOST Reports prepared by STR.
- Custom TREND Reports prepared by STR.
- Fairmont SJ - P_L - Dec 2016 (Hotel Statement).pdf
- Fairmont SJ - P_L - Dec 2016 (Ref for RE Taxes).pdf
- Fairmont SJ - P_L - December 2017 (Hotel Statement).PDF
- Fairmont SJ - P_L - December 2018 (Hotel Statement).PDF
- Fairmont SJ - P_L - December 2018 Financials (Ref for RE Taxes).pdf
- Fairmont SJ - P_L - December 2019 Financials.pdf
- January 2021 Month-End Sum FINAL.pdf
- Fairmont SJ - STR Report Dec 2016.xls
- Fairmont SJ - STR Report Dec 2018.xls
- Fairmont SJ - STR Report Dec 2019.xlsx
- PricewaterhouseCoopers May 2021 Hospitality Directions.
- PricewaterhouseCoopers May 2021 Hospitality Directions US Outlook tables.
- Horwath HTL Market Report USA: Hotel Market Trends & Analysis, April 2020.
- "IMF World Economic Outlook - Managing Divergent Recoveries -Apr 2021" - NO_VALUE.pdf
- "CBRE: Vaccines, Stimulus Spur Second-Half 2021 U.S. Hotel Forecast -March 30, 2021" NO_VALUE_2.pdf
- "ACCOR_0014375-79" - NO_VALUE_3.pdf
- "ACCOR_0014177" - NO_VALUE_4.pdf
- "FOMC Summary of Economic Projections – March 17, 2021" - NO_VALUE_5.pdf
- "ACCOR_0014134-35-" - NO_VALUE_6.pdf
- "CBRE Hotels Research – Hotel Horizons® - Q4 2020 Edition – San Jose, CA" - NO_VALUE_7.pdf
- "Cornell University School of Hotel Administration The Scholarly Commons – Calculating Damage Awards in Hotel Management Agreement Terminations – 8-1-2014" - NO_VALUE_8.pdf
- "ACCOR_0014380-84" - NO_VALUE_9.pdf
- "ACCOR_0014370-74" - NO_VALUE_10.pdf
- "Financial Times – American Express says business travel unlikely to fully recover until 2023 – 4/23/21" - NO_VALUE_11.pdf
- SC SJ - Accor Management 5.19.21 Production Cover Letter (28147834.1).pdf

- ACCOR_0003393.pdf
- ACCOR_0003464.pdf
- ACCOR_0003535.pdf
- ACCOR_0003611.pdf
- ACCOR_0003685.pdf
- ACCOR_0003761.pdf



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

- ACCOR_0003837.pdf
- ACCOR_0003985.pdf
- ACCOR_0013035.pdf
- ACCOR_0013077.pdf
- ACCOR_0013122.pdf
- ACCOR_0013500.pdf
- ACCOR_0013501.pdf
- ACCOR_0013502.pdf
- ACCOR_0013645.pdf
- ACCOR_0013646.pdf
- ACCOR_0013665.pdf
- ACCOR_0013672.pdf
- ACCOR_0013675.pdf
- ACCOR_0013678.pdf
- ACCOR_0013679.pdf
- ACCOR_0013680.pdf
- ACCOR_0013682.pdf
- ACCOR_0000083.xls
- DEBTORS-002325 - DEBTORS-002326.pdf
- DEBTORS-002327 - DEBTORS-002334.pdf
- DEBTORS-002335.pdf
- DEBTORS-004607 - DEBTORS-004610.pdf
- DEBTORS-004611.pdf
- DEBTORS-004611.xlsx
- DEBTORS-004615 - DEBTORS-004616.pdf
- DEBTORS-004617.pdf
- DEBTORS-004617.xlsx
- DEBTORS-004969 - DEBTORS-004972.pdf
- DEBTORS-004973.pdf
- DEBTORS-004973.xlsx
- DEBTORS-004974.pdf
- DEBTORS-004974.xlsx
- DEBTORS-004975.pdf
- DEBTORS-004975.xlsx
- DEBTORS-004976 - DEBTORS-004979.pdf
- DEBTORS_004980.xlsx
- DEBTORS-004980.pdf
- DEBTORS-004981.pdf
- DEBTORS-004981.xlsx
- DEBTORS-004982.pdf
- DEBTORS-004982.xlsx
- DEBTORS-004983 - DEBTORS-004985.pdf
- DEBTORS-004986.pdf
- DEBTORS-004986.xlsx
- DEBTORS-005871.pdf
- DEBTORS-005872.pdf
- DEBTORS-005872.xls
- DEBTORS-005873 - DEBTORS-005924.pdf
- DEBTORS-005925 - DEBTORS-005927.pdf
- DEBTORS-005928.pdf
- DEBTORS-005929.pdf
- DEBTORS-005929.xlsx
- DEBTORS-005930.pdf
- DEBTORS-005930.xls
- DEBTORS-005931.pdf
- DEBTORS-005931.xls
- DEBTORS-006298 - DEBTORS-006349.pdf
- DEBTORS-006385.pdf
- DEBTORS-006385.xlsx
- DEBTORS-006386 - DEBTORS-006436.pdf
- DEBTORS-006443.pdf
- DEBTORS-006443.xlsx
- DEBTORS-006545.pdf
- DEBTORS-006545.xlsx
- DEBTORS-006546.pdf
- DEBTORS-006546.xls
- DEBTORS-006547 - DEBTORS-006598.pdf



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

- DEBTORS-006605.pdf
- DEBTORS-006605.xlsx
- DEBTORS-006654.pdf
- DEBTORS-006654.xlsm
- DEBTORS-006655.pdf
- DEBTORS-006655.xlsx
- DEBTORS-006659.pdf
- DEBTORS-006659.xlsx
- DEBTORS-006660.pdf
- DEBTORS-006660.xls
- DEBTORS-006661.pdf
- DEBTORS-006661.xls
- DEBTORS-006662.pdf
- DEBTORS-006662.xls
- DEBTORS-006663.pdf
- DEBTORS-006663.xlsx
- DEBTORS-006664.pdf
- DEBTORS-006664.xlsx
- DEBTORS-006665.pdf
- DEBTORS-006665.xlsx
- DEBTORS-006666.pdf
- DEBTORS-006666.xls
- DEBTORS-006667.pdf
- DEBTORS-006667.xls
- DEBTORS-006668.pdf
- DEBTORS-006668.xlsx
- DEBTORS-006669.pdf
- DEBTORS-006669.xls
- DEBTORS-006670.pdf
- DEBTORS-006670.xls
- DEBTORS-006671.pdf
- DEBTORS-006671.xls
- DEBTORS-006672.pdf
- DEBTORS-006672.xls
- DEBTORS-006673.pdf
- DEBTORS-006673.xlsx
- DEBTORS-006674.pdf
- DEBTORS-006674.xlsx
- DEBTORS-006675.pdf
- DEBTORS-006675.xls
- DEBTORS-006676.pdf
- DEBTORS-006676.xls
- DEBTORS-006677.pdf
- DEBTORS-006677.xlsx
- DEBTORS-006678.pdf
- DEBTORS-006678.xls
- DEBTORS-006679.pdf
- DEBTORS-006680 - DEBTORS-006684.pdf
- DEBTORS-006685 - DEBTORS-006693.pdf
- DEBTORS-006694 - DEBTORS-006695.pdf
- DEBTORS-006696.pdf
- DEBTORS-006697.pdf



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## B.  EXHIBIT B – SEGMENTATION OF BUSINESS

**Fairmont Hotel  San Jose**
**Historical Perofmance (US$)**

| BUSINESS SEGMENTATION | 2015 | % Bus. | % Chg. | 2016 | % Bus. | % Chg. | 2017 | % Bus. | % Chg. | 2018 | % Bus. | % Chg. | 2019 | % Bus. | % Chg. | 2020 | % Bus. | % Chg. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | | | | |
| Transient | 11,691,061 | 24.7% | NA | 13,259,693 | 26.7% | 13.4% | 13,649,909 | 28.3% | 2.9% | 11,694,714 | 23.2% | -14.3% | 12,300,931 | 25.2% | 5.2% | 3,931,942 | 34.7% | -68.0% |
| Corporate | 10,644,675 | 22.5% | NA | 11,155,168 | 22.5% | 4.8% | 9,866,850 | 20.4% | -11.5% | 11,662,218 | 23.1% | 18.2% | 11,158,067 | 22.8% | -4.3% | 2,026,213 | 17.9% | -81.8% |
| Group/Meetings | 22,435,383 | 47.4% | NA | 22,538,172 | 45.4% | 0.5% | 20,564,065 | 42.6% | -8.8% | 22,328,267 | 44.3% | 8.6% | 18,406,691 | 37.7% | -17.6% | 3,471,106 | 30.6% | -81.1% |
| Leisure/Wholesale | 86,918 | 0.2% | NA | 43,644 | 0.1% | -49.8% | 30,084 | 0.1% | -31.1% | 79,286 | 0.2% | 163.5% | 132,420 | 0.3% | 67.0% | 5,344 | 0.0% | -96.0% |
| Misc. - Flight Crew/Contract | 2,495,468 | 5.3% | NA | 2,634,734 | 5.3% | 5.6% | 4,184,069 | 8.7% | 58.8% | 4,638,281 | 9.2% | 10.9% | 6,843,492 | 14.0% | 47.5% | 1,890,937 | 16.7% | -72.4% |
| **Total Segments** | 47,353,505 | 100.0% | NA | 49,631,411 | 100.0% | 4.8% | 48,294,977 | 100.0% | -2.7% | 50,402,766 | 100.0% | 4.4% | 48,841,601 | 100.0% | -3.1% | 11,325,542 | 100.0% | -76.8% |
| **Paid Occupied Room Nights** | | | | | | | | | | | | | | | | | | |
| Transient | 55,305 | 23.9% | NA | 59,567 | 26.7% | 7.7% | 64,385 | 29.6% | 8.1% | 46,015 | 21.9% | -28.5% | 51,340 | 25.5% | 11.6% | 21,316 | 40.2% | -58.5% |
| Corporate | 43,989 | 19.0% | NA | 45,376 | 20.4% | 3.2% | 38,866 | 17.9% | -14.3% | 45,155 | 21.5% | 16.2% | 42,324 | 21.0% | -6.3% | 8,805 | 16.6% | -79.2% |
| Group/Meetings | 113,878 | 49.2% | NA | 100,883 | 45.3% | -11.4% | 90,063 | 41.4% | -10.7% | 93,545 | 44.5% | 3.9% | 72,942 | 36.2% | -22.0% | 13,722 | 25.9% | -81.2% |
| Leisure/Wholesale | 394 | 0.2% | NA | 199 | 0.1% | -49.5% | 119 | 0.1% | -40.2% | 350 | 0.2% | 194.1% | 587 | 0.3% | 67.7% | 40 | 0.1% | -93.2% |
| Misc. - Flight Crew/Contract | 17,960 | 7.8% | NA | 16,831 | 7.6% | -6.3% | 24,010 | 11.0% | 42.7% | 25,171 | 12.0% | 4.8% | 34,189 | 17.0% | 35.8% | 9,158 | 17.3% | -73.2% |
| **Total Segments** | 231,526 | 100.0% | NA | 222,856 | 100.0% | -3.7% | 217,443 | 100.0% | -2.4% | 210,236 | 100.0% | -3.3% | 201,382 | 100.0% | -4.2% | 53,041 | 100.0% | -73.7% |
| **ADR by Segment** | | | | | | | | | | | | | | | | | | |
| Transient | $211.39 | NA | NA | $222.60 | NA | 5.3% | $212.00 | NA | -4.8% | $254.15 | NA | 19.9% | $239.60 | NA | -5.7% | $184.46 | NA | -23.0% |
| Corporate | $241.98 | NA | NA | $245.84 | NA | 1.6% | $253.87 | NA | 3.3% | $258.27 | NA | 1.7% | $263.63 | NA | 2.1% | $230.12 | NA | -12.7% |
| Group/Meetings | $197.01 | NA | NA | $223.41 | NA | 13.4% | $228.33 | NA | 2.2% | $238.69 | NA | 4.5% | $252.35 | NA | 5.7% | $252.96 | NA | 0.2% |
| Leisure/Wholesale | $220.60 | NA | NA | $219.32 | NA | -0.6% | $252.81 | NA | 15.3% | $226.53 | NA | -10.4% | $225.59 | NA | -0.4% | $133.60 | NA | -40.8% |
| Misc. - Flight Crew/Contract | $138.95 | NA | NA | $156.54 | NA | 12.7% | $174.26 | NA | 11.3% | $184.27 | NA | 5.7% | $200.17 | NA | 8.6% | $206.48 | NA | 3.2% |
| **Total Segments** | $204.53 | | | $222.71 | | 8.9% | $222.10 | | -0.3% | $239.74 | | 7.9% | $242.53 | | 1.2% | $213.52 | | -12.0% |

Source: FHR - San Jose - Dec 1-05 Contract - Summary Income Statement Dec. 2015, 2016, 2017, 2018, 2019, 2020.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## C. EXHIBIT C – ALTERNATIVE 1 CALCULATION OF DAMAGES – WEIGHTED AVERAGE LIQUIDATED DAMAGES

**Nardozza Expert Rebuttal Report**
**Alternative 1 - Weighted Average Liquidated Damages**

| | | | Basic Management Fees Tr. 12 Mos. Feb. '20 | Basic Management Fees Tr. 12 Mos. Feb. '21 | Weighted Average 20% - Tr. 12 Feb. 20 80% - Tr. 12 Feb. 21 |
|---|---|---|---|---|---|
| | | | **20%** | **80%** | |
| Mar. | Actual | 1 | $171,698 | $41,525 | $67,560 |
| Apr | Actual | 2 | $138,523 | $4,760 | $31,513 |
| May | Actual | 3 | $156,112 | $7,475 | $37,202 |
| Jun | Actual | 4 | $156,587 | $6,600 | $36,597 |
| Jul | Actual | 5 | $137,958 | $10,142 | $35,705 |
| Aug | Actual | 6 | $124,053 | $10,456 | $33,175 |
| Sep | Actual | 7 | $153,243 | $11,887 | $40,158 |
| Oct | Actual | 8 | $187,575 | $12,229 | $47,298 |
| Nov | Actual | 9 | $158,893 | $10,324 | $40,038 |
| Dec | Actual | 10 | $146,210 | $9,618 | $36,936 |
| Jan | Actual | 11 | $160,509 | $7,792 | $38,335 |
| Feb | Actual | 12 | $165,372 | $10,364 | $41,366 |
| **Imputed Management Fees Sec. 16.11(b)(A) HMA** | | | **$1,856,733** | **$143,172** | **$485,884** |
| | | | | | |
| **Applicable Multiplier Sec. 16.11(b)(B) HMA** | | | | 17 | 17 |
| **Liquidated Damages Amount** | | | | $2,433,924 | $8,260,031 |
| | | | | | |
| **Less:** | | | | | |
| Net Hotel Operating Losses Funded by Owner - 2020 and 2021 (A) | | | | | ($11,500,000) |
| **Alternative 1 Net Damages Calculation** | | | | | ($3,239,969) |
| **Alternative 1 Net Damages Calculation - Say** | | | | | $0 |
| | | | | | |
| **Other Consideration if Court Decides "Multiplier" is 14:** | | | | | |
| **Applicable Multiplier Sec. 16.11(b)(B) HMA** | | | | 14 | 14 |
| **Liquidated Damages Amount** | | | | $2,004,408 | $6,802,379 |
| | | | | | |
| **Less:** | | | | | |
| Net Hotel Operating Losses Funded by Owner - 2020 and 2021 (A) | | | | | ($11,500,000) |
| **Alternative 1 Net Damages Calculation** | | | | | ($4,697,621) |
| **Alternative 1 Net Damages Calculation - Say** | | | | | $0 |

**Source:** Management Fees for March 2020 to December 2020 derived from "FHR - San Jose - Dec 1-05 Contract Summary Income Statement (By Month) Year 2020", and for January 2021 to February 2021 derived from "FHR - San Jose - Dec 1-05 Contract Summary Income Statement February 2021."
(A) Amount of Owner Funding information provided by Owner through Counsel


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## D.  EXHIBIT D – ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 1

Nardozza Expert Rebuttal Report
Alternative 2 - Re-Calculation of Lost Management Fees (US$)
Schedule 1

| | Note | Actual Revenues and Fees (A) | | | | Taylor 2021 Partial | REH Analysis | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | 2017 | 2018 | 2019 | 2020 | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
| **Revenues** | | | | | | | | | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1][2] | 69,766,179 | 75,593,695 | 68,179,164 | 16,269,535 | 17,486,099 | 45,696,126 | 58,014,068 | 65,003,379 | 68,909,159 | 69,598,251 | 70,294,233 | 70,997,176 | 71,707,147 | 72,424,219 |
| Parking Revenue | [1][2] | 2,057,287 | 1,802,972 | 1,628,930 | 348,575 | 698,389 | 1,229,757 | 1,446,504 | 1,608,656 | 1,664,087 | 1,680,728 | 1,697,536 | 1,714,511 | 1,731,656 | 1,748,973 |
| | | 71,823,466 | 77,396,667 | 69,808,094 | 16,618,110 | 18,184,488 | 46,925,883 | 59,460,572 | 66,612,035 | 70,573,247 | 71,278,979 | 71,991,769 | 72,711,687 | 73,438,803 | 74,173,191 |
| **Fees** | | | | | | | | | | | | | | | |
| Basic Management Fees per HMA | [3] 2.75% | 1,918,570 | 2,078,827 | 1,874,927 | 447,412 | 480,868 | 1,256,643 | 1,595,387 | 1,787,593 | 1,895,002 | 1,913,952 | 1,933,091 | 1,952,422 | 1,971,947 | 1,991,666 |
| Basic Management Fees on Parking Revenue | [4] 1.00% | 20,573 | 18,030 | 16,289 | 3,486 | 6,984 | 12,298 | 14,465 | 16,087 | 16,641 | 16,807 | 16,975 | 17,145 | 17,317 | 17,490 |
| Total Gross Fees | | 1,939,143 | 2,096,856 | 1,891,216 | 450,898 | 487,852 | 1,268,941 | 1,609,852 | 1,803,679 | 1,911,643 | 1,930,759 | 1,950,067 | 1,969,567 | 1,989,263 | 2,009,156 |
| **Discount Factor** | | | | | | | | | | | | | | | |
| Date of Payment | | | | | 3/5/2021 | 8/2/2021 | 6/30/2022 | 6/30/2023 | 6/30/2024 | 6/30/2025 | 6/30/2026 | 6/30/2027 | 6/30/2028 | 6/30/2029 | 6/30/2030 |
| Discount Factor | [5] 9.7% | 1.0000 | 1.0000 | 1.0000 | 1.0000 | 0.9627 | 0.8849 | 0.8067 | 0.7352 | 0.6702 | 0.6109 | 0.5569 | 0.5075 | 0.4626 | 0.4217 |
| **Present Value of Lost Fees** | | | | | | | | | | | | | | | |
| PV of Basic Fees | | 1,939,143 | 2,096,856 | 1,891,216 | 450,898 | 469,639 | 1,122,914 | 1,298,627 | 1,325,993 | 1,281,097 | 1,179,497 | 1,085,954 | 999,576 | 920,303 | 847,316 |

| | |
|---|---|
| **Total Gross Fees to 12/31/2050** | 66,249,230 |
| **Total PV of Lost Management Fees to 12/31/50** | 19,025,362 |
| **Less:** | |
| Net Hotel Operating Losses Funded by Owner - 2020 and 2021 [6] | (11,500,000) |
| **Alternative 2 Net Damages Calculation** | 7,525,362 |

Percent Changes:

| | | | 2018 | 2019 | 2020 | | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| % Change in Total Revenues (excl. Parking) | | | 8.4% | -9.8% | -76.1% | | 161.3% | 27.0% | 12.0% | 6.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |
| % Change in Management Fees (excl. Parking) | | | 8.4% | -9.8% | -76.1% | | 161.3% | 27.0% | 12.0% | 6.0% | 1.0% | 1.0% | 1.0% | 1.0% | 1.0% |

Notes:
(A) Source Historical Revenue and Fees: ACCOR_0000083.xlsx
[1] HMA Based Revenues for Fees  - exclude portion of service charges distributable to employees
[2] Estimated Revenues and assumptions for 2022-2025 presented on Schedule 2, assumed 1% increase per year post recovery 2026-2030.
[3] Basic Fee % per Section 9.1 of HMA
[4] Per Greig Taylor Expert Report - Fairmont receives 1% fees on the parking revenue of the Hotel. See Email between Brett Conner and Daryl Benjamin with the subject "SAJ - 1% management fee for garage revenues".
[5] Discount Factor used by Greig Taylor per Taylor Expert Report
[6] Amount of Owner Funding provided by Owner through Counsel
See Schedule 2 for Estimated Revenues and Assumptions post-2021.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## D - EXHIBIT D – ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 1 (CONT.)

Nardozza Expert Rebuttal Report
Alternative 2 - Re-Calculation of Lost Management Fees (US$)
Schedule 1

| | Note | | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 | 2041 | 2042 | 2043 | 2044 | 2045 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1][2] | | 73,510,582 | 74,613,241 | 75,732,439 | 76,868,426 | 78,021,452 | 79,737,924 | 81,492,159 | 83,284,986 | 85,117,256 | 86,989,836 | 88,903,612 | 90,859,491 | 92,858,400 | 94,901,285 | 96,989,113 |
| Parking Revenue | [1][2] | | 1,775,207 | 1,801,835 | 1,828,863 | 1,856,296 | 1,884,140 | 1,925,591 | 1,967,954 | 2,011,249 | 2,055,497 | 2,100,718 | 2,146,933 | 2,194,166 | 2,242,438 | 2,291,771 | 2,342,190 |
| | | | 75,285,789 | 76,415,076 | 77,561,302 | 78,724,722 | 79,905,593 | 81,663,516 | 83,460,113 | 85,296,236 | 87,172,753 | 89,090,553 | 91,050,545 | 93,053,657 | 95,100,838 | 97,193,056 | 99,331,304 |
| **Fees** | | | | | | | | | | | | | | | | | |
| Basic Management Fees per HMA | [3] | 2.75% | 2,021,541 | 2,051,864 | 2,082,642 | 2,113,882 | 2,145,590 | 2,192,793 | 2,241,034 | 2,290,337 | 2,340,725 | 2,392,220 | 2,444,849 | 2,498,636 | 2,553,606 | 2,609,785 | 2,667,201 |
| Basic Management Fees on Parking Revenue | [4] | 1.00% | 17,752 | 18,018 | 18,289 | 18,563 | 18,841 | 19,256 | 19,680 | 20,112 | 20,555 | 21,007 | 21,469 | 21,942 | 22,424 | 22,918 | 23,422 |
| Total Gross Fees | | | 2,039,293 | 2,069,882 | 2,100,931 | 2,132,445 | 2,164,431 | 2,212,049 | 2,260,714 | 2,310,450 | 2,361,280 | 2,413,228 | 2,466,319 | 2,520,578 | 2,576,030 | 2,632,703 | 2,690,623 |
| **Discount Factor** | | | | | | | | | | | | | | | | | |
| Date of Payment | | | 6/30/2031 | 6/30/2032 | 6/30/2033 | 6/30/2034 | 6/30/2035 | 6/30/2036 | 6/30/2037 | 6/30/2038 | 6/30/2039 | 6/30/2040 | 6/30/2041 | 6/30/2042 | 6/30/2043 | 6/30/2044 | 6/30/2045 |
| Discount Factor | [5] | 9.7% | 0.3844 | 0.3504 | 0.3194 | 0.2911 | 0.2654 | 0.2419 | 0.2205 | 0.2010 | 0.1832 | 0.1670 | 0.1522 | 0.1387 | 0.1265 | 0.1153 | 0.1051 |
| **Present Value of Lost Fees** | | | | | | | | | | | | | | | | | |
| PV of Basic Fees | | | 783,980 | 725,194 | 670,986 | 620,830 | 574,424 | 535,016 | 498,438 | 464,360 | 432,613 | 402,934 | 375,386 | 349,721 | 325,811 | 303,459 | 282,712 |
| | | | | | | | | | | | | | | | | | |
| **Total Gross Fees to 12/31/2050** | | | | | | | | | | | | | | | | | |
| **Total PV of Lost Management Fees to 12/31/50** | | | | | | | | | | | | | | | | | |
| **Less:** | | | | | | | | | | | | | | | | | |
| Net Hotel Operating Losses Funded by Owner - 2020 and 2021 | [6] | | | | | | | | | | | | | | | | | |
| **Alternative 2 Net Damages Calculation** | | | | | | | | | | | | | | | | | |
| **Percent Changes:** | | | | | | | | | | | | | | | | | |
| % Change in Total Revenues (excl. Parking) | | | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| % Change in Management Fees (excl. Parking) | | | 1.5% | 1.5% | 1.5% | 1.5% | 1.5% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |

Notes:
(A) Source Historical Revenue and Fees: ACCOR_0000083.xlsx
[1] HMA Based Revenues for Fees - exclude portion of service charges distributable to employees
[2] Estimated Revenues and assumptions for 2022-2025 presented on Schedule 2, assumed 1% increase per year post recovery 2026-2030.
[3] Basic Fee % per Section 9.1 of HMA
[4] Per Greig Taylor Expert Report - Fairmont receives 1% fees on the parking revenue of the Hotel. See Email between Brett Conner and Daryl Benjamin with the subject "SAJ - 1% management fee for garage revenues".
[5] Discount Factor used by Greig Taylor per Taylor Expert Report
[6] Amount of Owner Funding provided by Owner through Counsel
See Schedule 2 for Estimated Revenues and Assumptions post-2021.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## D - EXHIBIT D – ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 1 (CONT.)

**Nardozza Expert Rebuttal Report**
**Alternative 2 - Re-Calculation of Lost Management Fees (US$)**
**Schedule 1**

| | Note | | 2046 | 2047 | 2048 | 2049 | 2050 |
|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1][2] | | 99,122,874 | 101,303,577 | 103,532,256 | 105,809,965 | 108,137,785 |
| Parking Revenue | [1][2] | | 2,393,718 | 2,446,380 | 2,500,201 | 2,555,205 | 2,611,420 |
| | | | 101,516,592 | 103,749,957 | 106,032,456 | 108,365,170 | 110,749,204 |
| **Fees** | | | | | | | |
| Basic Management Fees per HMA | [3] | 2.75% | 2,725,879 | 2,785,848 | 2,847,137 | 2,909,774 | 2,973,789 |
| Basic Management Fees on Parking Revenue | [4] | 1.00% | 23,937 | 24,464 | 25,002 | 25,552 | 26,114 |
| Total Gross Fees | | | 2,749,816 | 2,810,312 | 2,872,139 | 2,935,326 | 2,999,903 |
| **Discount Factor** | | | | | | | |
| Date of Payment | | | 6/30/2046 | 6/30/2047 | 6/30/2048 | 6/30/2049 | 6/30/2050 |
| Discount Factor | [5] | 9.7% | 0.0958 | 0.0873 | 0.0796 | 0.0725 | 0.0661 |
| **Present Value of Lost Fees** | | | | | | | |
| PV of Basic Fees | | | 263,384 | 245,377 | 228,543 | 212,918 | 198,361 |
| | | | | | | | |
| **Total Gross Fees to 12/31/2050** | | | | | | | |
| **Total PV of Lost Management Fees to 12/31/50** | | | | | | | |
| **Less:** | | | | | | | |
| Net Hotel Operating Losses Funded by Owner - **2020 and 2021** | [6] | | | | | | |
| **Alternative 2 Net Damages Calculation** | | | | | | | |
| **Percent Changes:** | | | | | | | |
| % Change in Total Revenues (excl. Parking) | | | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |
| % Change in Management Fees (excl. Parking) | | | 2.2% | 2.2% | 2.2% | 2.2% | 2.2% |

**Notes:**
(A) Source Historical Revenue and Fees: ACCOR_0000083.xlsx
[1] HMA Based Revenues for Fees - exclude portion of service charges distributable to employees
[2] Estimated Revenues and assumptions for 2022-2025 presented on Schedule 2, assumed 1% increase per year post recovery 2026-2030.
[3] Basic Fee % per Section 9.1 of HMA
[4] Per Greig Taylor Expert Report - Fairmont receives 1% fees on the parking revenue of the Hotel. See Email between Brett Conner and Daryl Benjamin with the subject "SAJ - 1% management fee for garage revenues".
[5] Discount Factor used by Greig Taylor per Taylor Expert Report
[6] Amount of Owner Funding provided by Owner through Counsel
See Schedule 2 for Estimated Revenues and Assumptions post-2021.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## E.  EXHIBIT E– ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 2

Nardozza Expert Rebuttal Report
Alternative 2 - Re-Calculation of Lost Management Fees (US$)
Schedule 2

| BUSINESS SEGMENTATION | 2018 | % Bus. | % Chg. | Historical Actual 2019 | % Bus. | % Chg. | 2020 | % Bus. | % Chg. | 2022 | % Bus. | % Chg. FY2019 | 2023 | % Bus. | % Chg. FY2022 | 2024 | % Bus. | % Chg. FY2023 | 2025 | % Bus. | % Chg. FY2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenue** | | | | | | | | | | | | | | | | | | | | | |
| Transient | 11,694,714 | 23.2% | -14.3% | 12,300,931 | 25.2% | 5.2% | 3,931,942 | 34.7% | -68.0% | 9,410,212 | 28.6% | -23.5% | 11,593,381 | 27.5% | 23.2% | 12,520,852 | 26.8% | 8.0% | 12,520,852 | 25.6% | 0.0% |
| Corporate | 11,662,218 | 23.1% | 18.2% | 11,158,067 | 22.8% | -4.3% | 2,026,213 | 17.9% | -81.8% | 7,587,486 | 23.1% | -32.0% | 10,034,450 | 23.8% | 32.3% | 11,062,981 | 23.7% | 10.3% | 11,339,555 | 23.2% | 2.5% |
| Group/Meetings | 22,328,267 | 44.3% | 8.6% | 18,406,691 | 37.7% | -17.6% | 3,471,106 | 30.6% | -81.1% | 9,571,479 | 29.1% | -48.0% | 13,553,215 | 32.2% | 41.6% | 15,975,852 | 34.3% | 17.9% | 18,012,773 | 36.8% | 12.8% |
| Leisure/Wholesale | 79,286 | 0.2% | 163.5% | 132,420 | 0.3% | 67.0% | 5,344 | 0.0% | -96.0% | 119,178 | 0.4% | -10.0% | 119,178 | 0.3% | 0.0% | 119,178 | 0.3% | 0.0% | 119,178 | 0.2% | 0.0% |
| Misc. - Flight Crew/Contract | 4,638,281 | 9.2% | 10.9% | 6,843,492 | 14.0% | 47.5% | 1,890,937 | 16.7% | -72.4% | 6,176,252 | 18.8% | -9.8% | 6,793,877 | 16.1% | 10.0% | 6,963,724 | 14.9% | 2.5% | 6,963,724 | 14.2% | 0.0% |
| **Total Segments** | **50,402,766** | **100.0%** | **4.4%** | **48,841,601** | **100.0%** | **-3.1%** | **11,325,542** | **100.0%** | **-76.8%** | **32,864,607** | **100.0%** | **-32.7%** | **42,094,101** | **100.0%** | **28.1%** | **46,642,586** | **100.0%** | **10.8%** | **48,956,082** | **100.0%** | **5.0%** |
| | | | | | | | | | | | | | | | | | | | | | |
| **Paid Occupied Room Nights** | | | | | | | | | | | | | | | | | | | | | |
| Transient | 46,015 | 21.9% | -28.5% | 51,340 | 25.5% | 11.6% | 21,316 | 40.2% | -58.5% | 43,639 | 27.3% | -15.0% | 48,003 | 26.8% | 10.0% | 48,003 | 25.3% | 0.0% | 48,003 | 24.4% | 0.0% |
| Corporate | 45,155 | 21.5% | 16.2% | 42,324 | 21.0% | -6.3% | 8,805 | 16.6% | -79.2% | 35,975 | 22.5% | -15.0% | 41,372 | 23.1% | 15.0% | 43,440 | 22.9% | 5.0% | 43,440 | 22.1% | 0.0% |
| Group/Meetings | 93,545 | 44.5% | 3.9% | 72,942 | 36.2% | -22.0% | 13,722 | 25.9% | -81.2% | 47,412 | 29.6% | -35.0% | 56,895 | 31.7% | 20.0% | 65,429 | 34.5% | 15.0% | 71,972 | 36.6% | 10.0% |
| Leisure/Wholesale | 350 | 0.2% | 194.1% | 587 | 0.3% | 67.7% | 40 | 0.1% | -93.2% | 528 | 0.3% | -10.0% | 528 | 0.3% | 0.0% | 528 | 0.3% | 0.0% | 528 | 0.3% | 0.0% |
| Misc. - Flight Crew/Contract | 25,171 | 12.0% | 4.8% | 34,189 | 17.0% | 35.8% | 9,158 | 17.3% | -73.2% | 32,480 | 20.3% | -5.0% | 32,480 | 18.1% | 0.0% | 32,480 | 17.1% | 0.0% | 32,480 | 16.5% | 0.0% |
| **Total Segments** | **210,236** | **100.0%** | **-3.3%** | **201,382** | **100.0%** | **-4.2%** | **53,041** | **100.0%** | **-73.7%** | **160,035** | **100.0%** | **-20.5%** | **179,277** | **100.0%** | **12.0%** | **189,880** | **100.0%** | **5.9%** | **196,423** | **100.0%** | **3.4%** |
| Days | 365 | | | 365 | | | 366 | | | 365 | | | 365 | | | 366 | | | 365 | | |
| Room Count | 808 | | | 808 | | | 808 | | | 808 | | | 808 | | | 808 | | | 808 | | |
| Total Available Room Nights | 294,920 | | | 294,920 | | | 295,728 | | | 294,920 | | | 294,920 | | | 295,728 | | | 294,920 | | |
| Occupancy % | 71.3% | | | 68.3% | | | 17.9% | | | 54.3% | | | 60.8% | | | 64.2% | | | 66.6% | | |
| | | | | | | | | | | | | | | | | | | | | | |
| **ADR by Segment** | | | | | | | | | | | | | | | | | | | | | |
| Transient | $254.15 | NA | 19.9% | $239.60 | NA | -5.7% | $184.46 | NA | -23.0% | $215.64 | NA | -10.0% | $241.51 | NA | 12.0% | $260.84 | NA | 8.0% | $260.84 | NA | 0.0% |
| Corporate | $258.27 | NA | 1.7% | $263.63 | NA | 2.1% | $230.12 | NA | -12.7% | $210.91 | NA | -20.0% | $242.54 | NA | 15.0% | $254.67 | NA | 5.0% | $261.04 | NA | 2.5% |
| Group/Meetings | $238.69 | NA | 4.5% | $252.35 | NA | 5.7% | $252.96 | NA | 0.2% | $201.88 | NA | -20.0% | $238.22 | NA | 18.0% | $244.17 | NA | 2.5% | $250.28 | NA | 2.5% |
| Leisure/Wholesale | $226.53 | NA | -10.4% | $225.59 | NA | -0.4% | $133.60 | NA | -40.8% | $225.59 | NA | 0.0% | $225.59 | NA | 0.0% | $225.59 | NA | 0.0% | $225.59 | NA | 0.0% |
| Misc. - Flight Crew/Contract | $184.27 | NA | 5.7% | $200.17 | NA | 8.6% | $206.48 | NA | 3.2% | $190.16 | NA | -5.0% | $209.17 | NA | 10.0% | $214.40 | NA | 2.5% | $214.40 | NA | 0.0% |
| **Total Segments** | **$239.74** | | **7.9%** | **$242.53** | | **1.2%** | **$213.52** | | **-12.0%** | **$205.36** | | **-15.3%** | **$234.80** | | **14.3%** | **$245.64** | | **4.6%** | **$249.24** | | **1.5%** |

Continued next page.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## E - EXHIBIT E – ALTERNATIVE 2 CALCULATION OF DAMAGES -SCHEDULE 2 (CONT.)

Nardozza Expert Rebuttal Report
Alternative 2 - Re-Calculation of Lost Management Fees (US$)
Schedule 2

| BUSINESS SEGMENTATION | 2018 | % Bus. | % Chg. | 2019 | % Bus. | % Chg. | 2020 | % Bus. | % Chg. | 2022 | % Bus. | % Chg. FY2019 | 2023 | % Bus. | % Chg. FY2022 | 2024 | % Bus. | % Chg. FY2023 | 2025 | % Bus. | % Chg. FY2024 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | **Historical Actual** | | | | | | | | | | | | | | | |
| Food & Beverage Revenue | 25,421,560 | | | 19,485,724 | | -23.3% | 4,369,913 | | -77.6% | 13,162,203 | | -32.5% | 16,219,319 | | 23.2% | 18,552,846 | | 14.4% | 20,151,748 | | 8.6% |
| Other Revenue | 2,379,521 | | | 1,865,127 | | -21.6% | 1,122,753 | | -39.8% | 1,269,240 | | -31.9% | 1,492,947 | | 17.6% | 1,753,703 | | 17.5% | 1,814,133 | | 3.4% |
| Parking Revenue | 1,802,972 | | | 1,628,930 | | -9.7% | 348,675 | | -78.6% | 1,229,757 | | -24.5% | 1,446,504 | | 17.6% | 1,608,656 | | 11.2% | 1,664,087 | | 3.4% |
| **Total - Non Rooms Revenues** | **29,604,053** | | | **22,979,781** | | **-22.4%** | **5,841,341** | | **-74.6%** | **15,661,199** | | **-31.8%** | **19,158,770** | | **22.3%** | **21,915,205** | | **14.4%** | **23,629,968** | | **7.8%** |
| **Total Revenues** | **80,006,819** | | | **71,821,382** | | **-10.2%** | **17,166,883** | | **-76.1%** | **48,525,806** | | **-32.4%** | **61,252,871** | | **26.2%** | **68,557,791** | | **11.9%** | **72,586,050** | | **5.9%** |
| Less: Distributable Employee Amts | 2,610,152 | | | 2,013,288 | | -22.9% | 548,773 | | -72.7% | 1,599,923 | | -20.5% | 1,792,299 | | 12.0% | 1,945,756 | | 8.6% | 2,012,803 | | 3.4% |
| Total - Hotel Revenue (HMA with Parking) | 77,396,667 | | | 69,808,094 | | -9.8% | 16,618,110 | | -76.2% | 46,925,883 | | -32.8% | 59,460,572 | | 26.7% | 66,612,035 | | 12.0% | 70,573,247 | | 5.9% |
| | | | | | | | | | | | | | | | | | | | | | |
| Total - Hotel Revenue (HMA without Parking) | 75,593,695 | | | 68,179,164 | | -9.8% | 16,269,435 | | -76.1% | 45,696,126 | | -33.0% | 58,014,068 | | 27.0% | 65,003,379 | | 12.0% | 68,909,159 | | 6.0% |
| Total - Hotel Revenue (HMA with Parking) | 77,396,667 | | | 69,808,094 | | -9.8% | 16,618,110 | | -76.2% | 46,925,883 | | -32.8% | 59,460,572 | | 26.7% | 66,612,035 | | 12.0% | 70,573,247 | | 5.9% |
| | | | | | | | | | | | | | | | | | | | | | |
| Food & Beverage Revenue per ORN | $ 120.92 | | | $ 96.76 | | -20.0% | $ 82.39 | | -14.9% | $82.25 | NA | -15.0% | $90.47 | NA | 10.0% | $97.71 | NA | 8.0% | $102.59 | NA | 5.0% |
| Other Revenue Per ORN | $ 19.89 | | | $ 17.35 | | -12.8% | $ 27.74 | | 59.9% | $15.62 | NA | -10.0% | $16.40 | NA | 5.0% | $17.71 | NA | 8.0% | $17.71 | NA | 0.0% |
| Parking Revenue Per ORN | $ 8.58 | | | $ 8.09 | | -5.7% | $ 6.57 | | -18.7% | $7.68 | NA | -5.0% | $8.07 | NA | 5.0% | $8.47 | NA | 5.0% | $8.47 | NA | 0.0% |
| Total Other Revenue Per ORN (net Parking) | $ 11.32 | | | $ 9.26 | | -18.2% | $ 21.17 | | 128.6% | $7.93 | NA | -14.4% | $8.33 | NA | 5.0% | $9.24 | NA | 10.9% | $9.24 | NA | 0.0% |
| Distributable Employee Amts Per ORN | $ 12.42 | | | $ 10.00 | | -19.5% | $ 10.35 | | 3.5% | $10.00 | NA | 0.0% | $10.00 | NA | 0.0% | $10.25 | NA | 2.5% | $10.25 | NA | 0.0% |

Assumptions:
[A] Assumed Segment Occupied Room Night absorption, recovery period ADR I deceding order of Group, Corporate, Tansient, Misc., based on historical trends.
[B] Assumed no new direct competition and Hotel continuing market penetration below competitive sets consistent with historical trend
[C] Assumed no major renovation of Hotel - maintaining status quo as of date of Breach Termination on March 5, 2021.
Source: Historical data: FHR - San Jose - Dec 1-05 Contract - Summary Income Statement Dec. 2015, 2016, 2017, 2018, 2019, 2020.


REH Capital Partners, LLC

# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## F. EXHIBIT F – ACCOR MANAGEMENT AND FRANCHISE FEE REVENUES BY GEORGRAPHY FROM ACCOR'S ANNUAL REPORT DECEMBER 31, 2020

**4.1.2 Detailed information for Management & Franchise**

A. Management & Franchise revenue

| (€ in million) | 2019 | 2020 | Variation (%) Actual | Variation (%) L/L (1) |
|---|---|---|---|---|
| Europe | 525 | 135 | (74.4)% | (74.3)% |
| Middle East & Africa | 107 | 29 | (72.9)% | (74.6)% |
| Asia Pacific | 214 | 76 | (64.6)% | (63.8)% |
| North America, Central America & Caribbean | 132 | 37 | (71.8)% | (72.0)% |
| South America | 49 | 15 | (69.1)% | (65.3)% |
| **Total** | **1,026** | **292** | **(71.6)%** | **(71.4)%** |

Source: Accor Annual Report – Consolidated financial statements and notes December 31, 2020, Page 23.



# EXPERT REBUTTAL REPORT OF FRANCIS J. NARDOZZA

## G.  EXHIBIT G - FRANCIS J. NARDOZZA CURRICULUM VITAE





Las Olas City Centre
Suite 1400
401 E. Las Olas Boulevard
Fort Lauderdale, FL 33301
Telephone: 954 332 2360
Fax: 954 332 2361

<u>**CONFIDENTIAL**</u>

**CURRICULUM VITAE**

**FRANCIS J. NARDOZZA**
**Chairman and CEO**
**REH Capital Partners, LLC**



Francis ("Frank") J. Nardozza is Chairman and CEO of REH Capital Partners, LLC, whose primary focus is on investment, transactional services and consulting services to the real estate and hospitality industries.  Mr. Nardozza has over 43 years of diversified, global real estate and hospitality consulting and advisory experience in the areas of market and business strategy, investments, development planning, accounting, finance, valuations, and operations.  Prior to launching REH in 2001, Mr. Nardozza was a partner and served as National and Global Real Estate and Hospitality Consulting Practice Leader for KPMG, LLP and KPMG Consulting, Inc., where his tenure with the two firms spanned over 25 years.

Mr. Nardozza is recognized nationally and internationally for his work in the areas of enterprise-wide strategic planning, mergers and acquisitions, transactional services and business performance improvement and has advised on over $15 billion in real estate and hospitality transactions in his career.  He is also a recognized expert in dispute resolution and litigation/arbitration matters pertaining to a variety of real estate and hospitality related topics, including brand affiliation and management contracts, condo-hotels, vacation ownership, mixed-use projects, operations, transactions, and insolvency matters.

Included among his clients are many of the world's largest real estate and hospitality companies.

**Affiliations**

Mr. Nardozza is a member of the Urban Land Institute, the American Hotel & Lodging Association (AH&LA), American Resort Development Association (ARDA) and the founding Chairperson of the U.S. Lodging Industry Investment Council (LIIC).  He presently serves as Chair of the Executive Advisory Board of the Real Estate Center of the College of Business - Florida State University and serves on the Advisory Council of the FSU Dedman College of Hospitality, the Executive Advisory Committee of NYU International Hotel Investment Conference, and the Executive Planning Board of Americas Lodging Investment Summit (ALIS).  He is past chairman of the "Market, Finance, and Investment Analysis Committee" of the AH&LA and past chairman of the AH&LA's "E-Business Committee".  Mr. Nardozza was also founder of the annual "Strategic Conference on Lodging, Operations and Technology,"

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 2**

sponsored by Lodging Hospitality Magazine and is a member of the American Institute of CPAs.

## Industry Recognition and Accomplishments

Mr. Nardozza is a frequent speaker at major industry conferences, including those of the American Hotel & Lodging Association, Americas Lodging Investment Summit, NYU Hotel Investment Conference, FSU Real Estate Trends Conference, and many others.  He has authored articles and has been quoted on real estate and lodging topics in a wide variety of business and industry trade publications including the *Wall Street Journal, New York Times, Miami Herald, Business Week, Urban Land Institute, Lodging,* and other key trade publications. Mr. Nardozza has been listed in *Who's Who in the Lodging Industry* published by the American Hotel & Lodging Association and was awarded a membership in Who's Who Worldwide for demonstrated leadership and achievement in the consulting industry.  Mr. Nardozza was previously selected and profiled by Lodging Magazine as one of the top 75 leaders of the US lodging industry for the new millennium and in April 2013, Mr. Nardozza was honored by his induction into the Florida State University College of Business Hall of Fame.

## Representative Clients

Representative clients for whom Mr. Nardozza has performed real estate and hospitality consulting and advisory services include:

| | | |
|---|---|---|
| Abu Dhabi Investment Authority | GE Capital | Oakhill Partners |
| American Golf | Gehr Industries | Portman Properties |
| Aoki Corporation | Gill Hotels Company | Principal Financial Group |
| Apollo Realty Advisors | Hard Rock International | Rank Organization |
| Arvida Realty | Holiday Inn Worldwide | Regent Properties |
| Atlantic Gulf Communities | Hoeng Leong Group | Richfield Hotels |
| BBX Capital | Homewood Development | Ritz Carlton Hotels |
| Bishop Holdings Corp | Host Marriott Corporation | Robert M. Bass Group |
| Blackstone Realty | Hunt Family Trust | Ronto Development |
| Bluegreen Vacations | InterContinental Hotels | Rosewood |
| Broadreach Capital Partners | Kamehameha Schools | Rouse Company |
| Burger King | Las Olas Company | Sanwa Bank |
| Cendant | Lehman Holdings (Successor) | Stark Investments |
| Centex | Lend Lease | Starwood Capital |
| CDL Hotels | Lennar | Starwood Hotels |
| Citicorp Real Estate | Lexington Homes | Sunny Isles Luxury Ventures |
| Club Corporation of America | LNR | Swerdlow Realty |
| Colony Capital | Maritz Wolff & Co | Trump Organization |
| Del Webb | Marriott International | Turner International |
| Disney Development | Marvin M. Schwan Foundation | Ty Warner |
| Destination Hotels & Resorts | MeriStar Hotels | Vail Resorts / Rock Resorts |
| DLJ Investment Advisors | Millennium Copthorne Hotels | Westin Hotels |
| Five Point | Minto Builders | Wexford Science & Tech., LLC |
| Four Seasons Hotel & Resorts | Morgan Stanley Realty Fund | Wyndham Hotels |

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 3**

**Representative Expert Experience in Dispute Resolution, Litigation and Arbitration Matters**

Mr. Nardozza's representative experience in serving as expert in dispute resolution, litigation, and arbitration matters:

- <u>Florida Beachfront Hotel</u> –Mr. Nardozza is presently serving as neutral Arbitrator in a hotel management agreement dispute before the American Arbitration Association.

- <u>Florida Luxury Mixed Use Resort</u> –Mr. Nardozza is presently serving as consulting expert and possible testifying expert for owner/operator in a condominium association dispute involving a mixed-use Florida luxury resort.

- <u>Midtown Manhattan Hotel</u> – In a case before the Supreme Court State of New York, Mr. Nardozza is presently serving as consulting expert on behalf of an owner in a hotel management contract dispute involving a large Mid-Town Manhattan Hotel.

- <u>Luxury Caribbean Resort</u> – Mr. Nardozza is serving as consulting expert and testifying damages expert on behalf of owners of a luxury Caribbean resort pertaining to a management and license contract dispute before the Supreme Court of the State of New York, County of Nassau.

- <u>Midtown Manhattan Hotel</u> – In a case before the Supreme Court State of New York, Mr. Nardozza served as consulting expert and testifying expert in deposition on behalf of the manager in a claim of wrongful termination of a hotel management contract involving a large Mid-Town Manhattan Hotel.

- <u>Five Star Luxury Hotel, CA</u> – Mr. Nardozza served as consulting expert and testifying expert on behalf of the owner of a California luxury hotel in an arbitration administered under Judicial Arbitration and Mediation Services (JAMS) over a territorial dispute with a major luxury brand operator pertaining to its acquisition of a competing global luxury brand.

- <u>Florida Treasure Coast Condo-Hotel Resort</u> – Mr. Nardozza served as hospitality expert to assist the condominium association board of a Florida luxury condo-hotel resort in expert dispute resolution pertaining to annual budgets and expense allocations between commercial and residential components of the resort.

- <u>Diamond Resorts</u> – In a matter before the Court of Chancery in the State of Delaware, Mr. Nardozza served as consulting expert on behalf of a major timeshare company in a shareholder dispute on valuation in connection with the sale and privatization of the company.

- <u>Hyatt Westlake Village, CA</u> – In case brought in the Superior Court of the State of California, Mr. Nardozza served as consultant and designated expert on behalf of the Defendant, Wheelock Street Capital on a complaint relating to the termination of sale of the Hyatt Westlake Village, CA.

- <u>Wykeham Inn, Washington, CT</u> - In a case administered under Judicial Arbitration and Mediation Services (JAMS), Mr. Nardozza served as consulting advisor and expert for

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 4**

Wykeham Rise, LLC, and derivatively to 101 Wykeham Road, LLC, in connection with a dispute with Paligroup Holdings, LLC pertaining to the proposed redevelopment of the former Wykeham Rise girls school in Washington, CT into the Wykeham Inn boutique hotel.

- <u>Bayview Market, Miami</u> - Mr. Nardozza served as consultant and testifying expert for Respondent, Frank R. Rosenblum, in a commercial arbitration matter with Claimants, Jeffrey T. Weil and Ignacio Garcia Du-Quesne, pertaining to their respective roles, responsibilities, and rights to allocations of earnings and profits from the development and sale of Bayview Market, a major "Big Box" retail development project in Downtown Miami, FL.

- <u>Santa Barbara Beach & Golf Resort, Curacao</u> - In a case administered under the International Centre for Dispute Resolution (ICDR), a Division of the American Arbitration Association, Mr. Nardozza served as consultant and testifying expert for the Claimants, Santa Barbara Hospitality, N.V. and SFT Investments Ltd. in a commercial arbitration matter with Respondents, Hyatt Regency Curacao, N. V. and Hyatt Corporation pertaining to the management of the Hyatt Regency Curaçao now known as Santa Barbara Beach & Golf Resort located in the Santa Barbara Plantation on the Island of Curaçao.

- <u>Hard Rock Hotel San Diego, San Diego, CA</u> – Mr. Nardozza served as consulting expert for insurer AIG and Cross Defendants 5th&K Master Association, et al. in a Class Action matter before the Superior Court of the State of California, County of San Diego, brought by Tamer Salameh, et al. on behalf of condo-hotel unit owners pertaining to hotel and condominium management and operational practices of the Hard Rock Hotel San Diego and related condominium associations.

- <u>Setai Luxury Resort and Residences, Miami Beach, FL</u> – In a matter before the International Court of Arbitration of the International Chamber of Commerce, Mr. Nardozza served as consultant and testifying expert for the Claimant, Setai Owners LLC, in a dispute with General Hotel Management LTD and GHM (South Beach) LLC (Respondents) pertaining to the operation and management of The Setai Hotel & Residences, a luxury condominium hotel, timeshare/fractional interests and residential project located in Miami Beach, Florida.

- <u>Modern Hotel Honolulu</u> – In a case before the United States Bankruptcy Court for the District of Hawaii, Mr. Nardozza served as hospitality advisor and testifying expert for M Waikiki LLC, Debtor in Possession, in Chapter 11 Bankruptcy proceedings pertaining to the Modern Hotel (formerly the Waikiki Edition), a 353-room luxury lifestyle hotel, located in Honolulu, Hawaii.

- <u>Wyndham Hotels/Blackstone Group</u> – In a case in Colorado State Court, Mr. Nardozza served as consulting advisor and damages expert for Brownstein, Hyatt, Farber, Schreck, P.C. and Wyndham in a marketing contract dispute pertaining to fractional interval sales (timeshare) involving the Wyndham Peaks Resort and the Franz Klammer Lodge in Telluride, CO.

- <u>Hacienda Beach Club & Residences, Cabo San Lucas, Mexico</u> – On behalf of Desarrollo Turistico S/K Cabo San Lucas Holding F/014, (as affiliate of Starwood

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 5**

Capital), Mr. Nardozza provided consulting assistance, expert rebuttal opinions on damages and testimony in the arbitration matter of Hacienda Management, S. de R.L. de C.V. ("Operator") versus Desarrollo Turistico S/K Cabo San Lucas Holding F/014 ("Owner") in a dispute alleging wrongful termination of a management contract for the management and operation of a 109 unit, full-service luxury condominium and villa resort known as the Hacienda Beach Club & Residences located in Cabo San Lucas, Mexico.

- <u>Essex House Hotel and Condominium</u> – On behalf of the Board of Managers of the Essex House, a major NYC mixed-use, luxury hotel condominium located in New York City, Mr. Nardozza served as neutral expert engaged to conduct a comprehensive review and evaluation of operating cost and expense allocations and recoveries by and between the Hotel owner and third party residential unit owners pertaining to common elements and hotel services.

- <u>One Bal Harbour Resort & Spa</u>– By Order of The Circuit Court of the 11th Judicial Circuit, in and for Miami-Dade County, Florida (the "Court") in connection with a case before the Court in the matter of 10295 Collins Avenue Residential Condominium Association, Inc., versus Elcom Hotel & Spa, LLC, Mr. Nardozza served as Court appointed "Budget Expert" to review, investigate, analyze, assess and report to the Court regarding the appropriate amount of, propriety of, and allocation of expenses amongst various entities and unit owners under Shared Facilities budgets pertaining to a large, luxury hotel-condominium resort and adjacent residences in Bal Harbour, Florida.  This was in connection with a dispute between the hotel operator and the residential HOA over common cost budgets and allocations.  In this capacity I reviewed, tested, and corroborated cost allocation methods and formulas, reviewed underlying financial and accounting records and support, and proffered opinions to the Court in expert testimony.

- <u>Mountain Lodge at Telluride</u> – In a case in Colorado State Court, Mr. Nardozza served as consulting advisor and testifying expert witness on behalf of plaintiff, Destination Hotels & Resorts, Inc., in a resort management contract dispute with defendant, The Lodge at Mountain Village Owners Association, Inc., pertaining to the operations of the Mountain Lodge at Telluride, a 140 unit luxury condominium resort located in Telluride, Colorado.

- <u>Turnberry Isle Resort & Club</u> – In a case administered under the International Centre for Dispute Resolution (ICDR), a Division of the American Arbitration Association, Mr. Nardozza served as single neutral arbitrator in a contract dispute between FHR TB, LLC (Fairmont Hotels & Resorts) and TB Isle Resort, LP involving contract termination and damages pertaining to the Turnberry Isle Resort & Club located in Aventura (Miami), Florida.  In this case TB Isle Resort, L.P. ceded the arbitration and moved to court jurisdiction over the matter.

- <u>Aviara Resort</u> – In a case administered under the Judicial Arbitration and Mediation Services (JAMS), Mr. Nardozza served as consulting advisor, testifying damages expert and testifying rebuttal expert for Broadreach Capital Partners and Maritz, Wolff & Co. in connection with a management contract dispute pertaining to the Four Seasons Aviara Resort located in Carlsbad, CA.

CURRICULUM VITAE
FRANCIS J. NARDOZZA
Page 6

- <u>Trump International Resort & Spa</u> – In a case administered under the American Arbitration Association, Mr. Nardozza served as consulting advisor and testifying expert on damages for Sunny Isles Luxury Ventures in a management contract dispute with Sonesta Hotels & Resorts pertaining to the operation of the Trump International Resort & Spa in Sunny Isles, FL and claim of lost profits and disputed termination payments.

- <u>Lifestyle Hospitality</u> – In a case administered under the Judicial Arbitration and Mediation Services (JAMS), Mr. Nardozza served as consulting advisor and testifying expert for Lifestyle Hospitality, LLC in a contract dispute with The Hill, LLC relating to development and financing of a proposed conversion of an historic bank building located in Durham, NC into a luxury boutique hotel.

- <u>J.W. Marriott Starr Pass Resort</u> – Under special dispute resolution provisions of a hotel management contract, Mr. Nardozza served as consultant and non-neutral arbitrator for Marriott Hotel Services, Inc. in connection with a multi-year budget dispute with the owner of the J.W. Marriott Star Pass Resort located in Tucson, AZ.

- <u>Chesterfield Hotel, Palm Beach, FL</u> – For a matter before the U.S. District Court - Southern District of New York, Mr. Nardozza prepared an expert report to determine the reasonableness of a contract purchase price for the sale of the Chesterfield Hotel located in Palm Beach, FL.

- <u>Cheeca Lodge & Resort</u> – In a case administered under the Judicial Arbitration and Mediation Services (JAMS), Mr. Nardozza served as consulting advisor and testifying damages expert for Vail Resorts and Rock Resorts in connection with a claim of wrongful termination of a hotel management agreement and related lost value and lost profits involving the famous Cheeca Lodge Resort in Islamorada, FL.

- <u>Fisher Island Club</u> – In a case administered under the American Arbitration Association, Southern Case Management Center, Mr. Nardozza served as arbitrator on a Tribunal in a dispute pertaining to club and hotel operations and cost allocations at Fisher Island Club and Resort in Miami, Florida.

- <u>Residence Inn by Marriott</u> – On behalf of the Defendants/Counter-Plaintiffs in a case that went to trial before the Circuit Court of the Ninth Judicial Circuit, (In Case No. CI 98-CI-1421) Osceola County, FL, between Cecile Resort, Ltd. and Euramerican Investment Consultants Corp. (Plaintiffs and Counter-defendants) versus Residence Inn by Marriott, Inc. and Marriott International Inc. (Defendants and Counter Plaintiffs); Mr. Nardozza served as testifying expert witness on damages and other matters relating to a wrongful termination of a franchise agreement and claims of lost value and lost profits with respect to an all-suites hotel located in the vicinity of the Walt Disney World Resort in Kissimmee (Orlando), Florida.

- <u>Petitioning Creditors of Spa Atlantis Management LLC (Debtor)</u> **–** Before the United States Bankruptcy Court, Southern District of Florida, on behalf of the Petitioning Creditors in a bankruptcy matter for Spa Atlantis Management, LLC, the operator of a full-service spa hotel in Pompano Beach, Florida, Mr. Nardozza served as testifying

expert involving matters of interpretation of certain hotel operating, lease and management agreements and damages calculations.

■  R. M. Mexicana, S.A. de C.V. – Mr. Nardozza served as lost profits damages expert and testifying witness for R. M. Mexicana, S.A. de C.V. (the "Claimant") in connection with a ICC Arbitration against Centro Professional Mariano Escobedo, S.A. de C.V., a Mexican corporation (the "Respondent") pertaining to a full-service international hotel in the Polanco District of Mexico City, which was supposed to be operated as a Renaissance Hotel.

■  Marriott International Hotels, Inc.- Mr. Nardozza served as testifying damages expert to calculate the amount of lost profits suffered by the Claimants, Marriott International Hotels, Inc., Marriott Worldwide Corporation, Marriott International Design & Construction Services, Inc, and Marriott International, Inc. (collectively "Marriott" or "Claimants"), in connection with the IACAC arbitration in Miami filed against Hoteles y Desarrollos, S.A. de C.V. ("Hoteles" or the "Respondent"), ICDR No. 50 T 180 0031403 (the "Arbitration") in connection with a wrongful termination of the management agreement for the Marriott San Salvador in San Salvador, El Salvador.

■  Walt Disney Company/VMS Realty/The Continental Companies – Mr. Nardozza served as final arbitrator in a dispute regarding the buyout value of joint venture interests in a contract for the management of the Boca Raton Hotel and Resort & Club in Boca Raton, Florida.

■  Marriott International - Mr. Nardozza served as testifying expert for the defendant, Marriott International in connection with a complaint filed against them by A.R. Milkes and D.R. Burklew individually, and on behalf of a class of all others similarly situated as limited partners of Courtyard by Marriott II Limited Partnership (Plaintiffs), for various matters pertaining to the Defendants' operation and management of over 200 Courtyard by Marriot Hotels.

■  Ritz Carlton Hotel Company (In affiliation with W. B. Johnson Properties)  - Mr. Nardozza served as expert witness and damages expert for the defendant, Ritz Carlton Hotel Company, versus N.Y. Overnight Partners, L.P. D.C. Overnight Partners L.P., Savannah Limited Partnership, and New Remington Partners, (plaintiffs) in a Civil Action No. 95 Civ. 0122 (JSM), in The United States District Court for the Southern District of New York, in a case involving a variety of claims in connection with the Ritz Carlton Hotel in Houston, Texas, and three other Ritz Carlton Hotels in Washington, D.C., New York City, and Aspen, Colorado.

■  Renaissance Hotels International and CTF Central Corporation (Prior to Acquisition of Renaissance by Marriott) - Mr. Nardozza served as expert testifying witness for the plaintiff, Renaissance Hotels, et al, in a case argued before an International Arbitration tribunal involving the ownership, operation and management of six full-service luxury hotels. - CTF Central Corporation (United States of America), Claimant, against Turnal, S.A. de C.V., Liber, S.A. de C.V., Bancomer, S.A., Nacional Financiera, S.N.C., Inmobiliaria Hotelera El Presidente Chapultepec, S.A. de C.V., and Operadora El Presidente Las Palmas, S.A. de C.V. (Republic of Mexico), Defendants,

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 8**

International Chamber of Commerce, International Court of Arbitration, Reference: 8813/FMS.

- <u>DKH Properties versus Atico Financial Corp</u>. – Mr. Nardozza served as expert testifying witness for the defendant, Atico Financial Corp., in a lender liability suit, tried in the Circuit Court of the 11th Judicial Circuit, in Dade County, Florida.

- <u>Marriott International</u> - Mr. Nardozza served as damages expert for the defendant, Marriott/Host International in a dispute between Edwin Goldenberg and Harvey J. Gushner, individually and on behalf of all other similarly situated parties, (Plaintiffs) vs. Marriott PLP Corporation, Host Marriott Corporation and Marriott International, Inc., (Defendants), Civil Action No. PJM95-3461 in The United States District Court for The District of Maryland (Southern Division) pertaining to the Chesapeake Hotel Limited Partnership ("CHLP") and the management and operation of the hotels.  Expert opinions were rendered in the areas management contract terms, fee computations, hotel market performance, hotel operating performance, and damages.

- <u>Grand Metropolitan / InterContinental Hotels</u> **–** Mr. Nardozza **s**erved as consultant and expert to Grand Metropolitan and their counsel Hogan & Hartson to refute a multi-million-dollar IRS claim of under apportionment of the reported US tax gain on the sale of the global InterContinental Hotels chain to a Japanese company.  Services included a reallocation of the sale price to real estate and other property, including franchise and licensing agreements and other intangible assets and the allocation of the sale price to US versus foreign based assets and entities.

- <u>Place for Steak versus Ukatel, et al</u> - Mr. Nardozza served as testifying expert witness for the plaintiff, Place for Steak, in connection with claims of fraud and mismanagement involving several food and beverage establishments and related businesses in Miami, Florida, tried in Dade County Court.

- <u>Charter Company, et al</u> - Mr. Nardozza served as expert for the Official Committee of Unsecured Creditors of the Charter Corporation, in connection with Chapter 11 bankruptcy proceedings, U.S. Bankruptcy Court, Jacksonville, Florida.

**Representative Transactional Experience**

Mr. Nardozza has served as consultant and advisor in the evaluation, negotiation and consummation of acquisitions and transactions of real estate and hospitality assets and companies comprising, in the aggregate, over $15 billion throughout his professional career.  In connection with these undertakings he has prepared and evaluated budgets and projections, evaluated operations and business processes, prepared market assessments and valuations of business operations and assets, reviewed and/or negotiated licensing and brand affiliation agreements, management agreements, purchase and sale agreements, lease agreements, and financing agreements, conducted due diligence, and evaluated critical transaction documentation.  A representative sample of major transactions in which Mr. Nardozza has participated in this regard is presented below:

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 9**

- Recapitalization and sale of the Peninsula Papagayo Resort and Four Seasons Hotel in Guanacaste, Costa Rica.

- Acquisition of the Hard Rock Hotel & Casino, Biloxi, MS.

- Strategic spinoff and disposition of the Residential Communities Division of Bluegreen Corporation (NYSE), a major international timeshare operator.

- Recapitalization and sale of the Yankee Clipper and Yankee Trader Hotels totaling 1,000 rooms in Fort Lauderdale, Florida.

- Financial restructuring of the Royal Palm Resort on Miami Beach.

- Companywide acquisition of 210-unit Red Roof Inns limited-service hotel chain.

- 1031 Tax Free Exchange Transaction for the Gehr Family Trust involving the acquisition of a South Florida portfolio of office buildings and large, grocery anchored shopping centers.

- Diageo PLC spinoff of Burger King Corporation (focus on real estate portfolio) into a new free-standing worldwide company.

- Multi-billion Dollar companywide acquisition of Inter-Continental Hotels.

- Bankruptcy restructuring of Divi Resorts timeshare company.

- Companywide acquisition of the Westin Hotels & Resorts.

- Acquisition of the New York Four Seasons Hotel on W. 57th Street in New York City.

- Arvida/JMB Limited Partnership Syndication of a portfolio of 10 master-planned community developments.

- Acquisition of the New York Palace Hotel in New York City.

- Acquisition of the Inter-Continental Hotel in Miami

- Companywide acquisition of the American Skiing Company

- Acquisition of the Plaza Hotel, Macklowe Hotel and Millennium Hotel in New York City valued in excess of $1 billion.

- Acquisition of NBC Tower, a 36-story, 897,000 SF office building and ground floor retail space in Chicago, IL

- Acquisition of the Grand Cypress Resort and the Hyatt Regency Grand Cypress in Orlando, Florida.

- Acquisition of the Hotel Maurice, Paris.

- Acquisition of the Mayfair and Britannia Hotels, London.

- Purchase of the Carlton Hotel, Nice, France.

- Merger and acquisition of Doubletree Hotels & Resorts.

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 10**

- Acquisition of Astro Domain Hotels in Houston including the Sheraton Astro Dome, Days Inn Astrodome and Holiday Inn Astrodome

- Acquisition of the Drake Hotel in New York City

- Purchase of the Swissotel, Atlanta, GA.

- Purchase of the Algonquin Hotel in New York City

- Company-wide merger and acquisition of MeriStar Hotel & Resorts

- Acquisition of Regal Hotel New York City

- Companywide acquisition of Regent International Hotels

- Merger and acquisition of Richfield Hotels and Regal Hotel Group

**Other Representative Real Estate and Hospitality Industry Experience**

A representative sample of Mr. Nardozza's general real estate and hospitality consulting experience is presented below:

- <u>Advisor to Major Loan Special Servicer</u> – Through multiple assignments, Mr. Nardozza is presently serving as hospital advisor for one of the largest hotel loan special servicers in analyzing defaulted hotel loans, assisting in loan foreclosures, and generally advising the company on hospitality related matters.

- <u>Multi-Unit Owner of Upscale Brand</u> – Mr. Nardozza is presently assisting a multi-property resort owner on matters pertaining to a blanket franchise licensing agreement and brand loyalty program.

- <u>Peninsula Papagayo / Four Seasons Hotel and Golf Resort</u> – Mr. Nardozza served as owner's representative, business advisor and financial advisor to a US Foundation in the turn-around and recapitalization of the Peninsula Papagayo Resort, a 2,200-acre luxury resort, located on the Guanacaste Peninsula of Costa Rica. The Resort includes multiple luxury hotels including the Four Seasons Hotel, condominiums, fractional residence club, villas, a 180-slip marina, golf course, beach club, custom home sites and land for future development.  This assignment entailed devising and implementing a turn-around strategy for the Resort, restructuring debt, and orchestrating a financial recapitalization of the Resort that was successfully completed.

- <u>Major California Real Estate Company</u> – Mr. Nardozza is advising a major California real estate company on the development of multiple hotels in major redevelopment projects across the State of California including the former Candlestick Park and Hunter's Naval Shipyard in San Francisco.

- <u>Parent of Major Timeshare Company</u> – Mr. Nardozza advised the parent of a major U.S. timeshare company on the launch of a U.S. hotel investment platform to capitalize on the expansion of timeshare mini-vacation programs of its timeshare subsidiary.

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 11**

- Legacy Central, Plano, TX – Mr. Nardozza is advising a major U.S. commercial and residential real estate developer on the hotel component of a major redevelopment of the former Texas Instruments Campus in Plano, TX, including advising on hotel programming, brand affiliation, and secondary hotel developer sourcing.

- Major US Timeshare Company – Mr. Nardozza served as lead consultant for a major US timeshare company in a companywide transformation of business practices and processes pertaining to a key line of business for this company.

- Hyde Hotel and Residences Mid-Town Miami – Mr. Nardozza advised the developers of luxury hotel branded residences and condominium hotel suites under development in Mid-Town Miami, Florida on structuring and negotiation of brand affiliation and management agreements, and brand fee structures, as well as assisting in review of budgets and approach to cost allocations.

- Aruba Hotel and Timeshare Resort – Mr. Nardozza advised the developer of a large beach area hotel and timeshare resort on the Island of Aruba in preparation of resort development and design plans, assistance in securing and negotiating brand affiliation and management agreements and supporting loan underwriting and documentation.

- Major US Developer – Mr. Nardozza advised a US developer in project planning for a major mixed-use residential, retail and hotel project near Universal Studios in Orlando, FL.  Services included market and financial evaluations, and solicitation and evaluation of hotel brand affiliations and sourcing secondary hotel developers.

- Stein Eriksen Residences – Mr. Nardozza advised the developers of a luxury vacation residential and condominium project in Park City/Deer Valley, Utah on structuring and negotiation of various condominium, brand affiliation, and management agreements, in connection with the first ever licensing expansion of a world famous 5-star luxury resort brand.

- S. Florida Developer – Mr. Nardozza advised a publicly traded real estate company on the joint venture development of a mixed- use hotel and residential project in Fort Lauderdale, FL.  Services entailed market assessment, programming, projections, brand affiliation assessment, and financial underwriting of this major project.

- Bluegreen Vacations – Mr. Nardozza served as financial advisor to Bluegreen Vacations (NYSE BXG), a major timeshare resort and residential community developer, in a strategic evaluation, and disposition of Bluegreen Communities Division.  This entailed a company-wide strategic review of projects and operations, enterprise and project-level valuations, and identification of transactional options leading to his arrangement of a successful strategic disposition of the Communities Division to a U.S. based community developer who was backed by a private equity investor.

- Inter-Continental Hotels Group, London – Mr. Nardozza assisted Inter-Continental Hotels Group with a global asset review that entailed a strategic assessment of each owned hotel across multiple brands and a recommendation on whether to retain ownership, licensing and/or management as a precursor to staged dispositions of over $2 billion in hotel assets.

CURRICULUM VITAE
FRANCIS J. NARDOZZA
Page 12

- <u>Major Sovereign Wealth Fund</u> – Mr. Nardozza served as financial advisor to a major sovereign wealth fund in connection with their planned establishment of a major hotel investment platform for North America.

- <u>Global Insurance Company – Defaulted Resort Loan, SE Florida</u> - For the real estate arm of a global insurance company, Mr. Nardozza assisted in a strategic evaluation of a defaulted loan obligation pertaining to a large scale, mixed use, "five-star" hotel and condominium project in Southeast Florida and advised on loan workout and restructuring strategies.

- <u>Royal Hawaiian Hotel and Sheraton Waikiki Hotel Leases</u> – Mr. Nardozza served as advisor to Kamehameha Schools in Hawaii on the renegotiation and restructuring of several long-term ground leases encumbering the Royal Hawaiian Hotel and the Sheraton Waikiki Hotel in Honolulu, Hawaii.

- <u>Troubled Full-Service Hotel</u> – On behalf of a Midwestern hedge fund, Mr. Nardozza conducted a repositioning study for a troubled full service deluxe hotel in SE Florida that entailed a change in management, development of recapitalization strategy, and preparation of troubled asset valuation in support of partner buyout and loan restructuring considerations.

- <u>Gill Family Trust</u> –Mr. Nardozza served as strategic advisor to prominent family estate to determine redevelopment strategies for two large beachfront hotels and arranged and negotiated a sale/joint venture transaction valued more than $100 million with Starwood Capital.

- <u>Bishop Holdings Corporation</u> – Over a multi-year assignment, Mr. Nardozza conducted strategic review, financial analysis, transaction structuring, developer solicitation, and financial execution for large-scale resort, residential and timeshare development project on the Big Island of Hawaii.

- <u>Paradise City, Myrtle Beach, SC</u> – Mr. Nardozza served as hospitality and financial advisor for the lodging and timeshare components of Paradise City, a mixed-use, lifestyle entertainment, retail and lodging development in Myrtle Beach, South Carolina.  Services included advising on project plans, assessing financial merits, sourcing brands and sourcing project participants.

- <u>US-Chinese Holding Company</u> - On behalf of a US-Chinese investment and development consortium, Mr. Nardozza acted as strategic advisors on funding and re-capitalization of a portfolio of existing and under-development 5-star hotels, retail, office, and residential properties throughout the Peoples Republic of China

- <u>Leeward Harbour Resort Limited</u> – Mr. Nardozza prepared a resort development planning analysis and valuation and advised on capital funding strategies for a large-scale luxury resort on Great Abaco, The Bahamas.

- <u>Innisbrook Resort, Palm Bay FL</u> – On behalf of a strategic investment fund, Mr. Nardozza conducted a business review, reposition strategy and evaluation of an integrated, mixed use golf, hotel, and vacation real estate resort in connection with a planned acquisition.

CURRICULUM VITAE
FRANCIS J. NARDOZZA
Page 13

- Florida Resort Hotel – On behalf of an international brand operator and investment partner, Mr. Nardozza conducted a "post 9-11" financial re-structuring and re-capitalization plan for newly re-developed, large-scale beachfront resort and hotel on Miami Beach.

- Marriott Vacations – Mr. Nardozza served as industry expert and lead client relationship executive on a major assignment entailing business process re-engineering and system implementation of a new customer relationship management platform for Marriott Vacation Ownership, (at the time a division of Marriott International) one of the world's largest timeshare/ vacation ownership companies.

- Florida's Turnpike – Mr. Nardozza advised Florida's Turnpike on facilities expansion plans including a comprehensive evaluation and feasibility assessment for hotel, motel and conference center development on excess lands surrounding primary service plazas along Florida's Turnpike.  Services included master plan support, sizing and density analysis, market and financial feasibility, lease and fee valuation, facility design recommendations, lease-concession terms, and facilitation of developer solicitation.

- Lake Cecile Suites Associates – Mr. Nardozza served as advisor on the acquisition and arranged debt and equity financing for the acquisition and renovation of a 144-unit all-suites hotel resort near Disney World in Kissimmee, Florida.

- Wyndham Hotel Miami Beach – Mr. Nardozza performed a business and financial review of operations of the existing Miami Beach Hotel and prepared financial projections for conversion and redevelopment of the hotel to condominiums and condo-hotel units.

- New Yorker Hotel and Manhattan Center– Mr. Nardozza advised the ownership group on the repositioning, redevelopment and re-capitalization plan and execution for this landmark NYC complex.

- Universal Studios Florida Resort – Mr. Nardozza led an integrated advisory team in the Investment evaluation and underwriting analysis for the $1.3 billion expansion of Universal Studios Florida Resort in Orlando Florida including theme park, hotel, retail, and timeshare components.

- Ritz Carlton Hotel Company – Mr. Nardozza served as strategic advisor to the Ritz Carlton Hotel Company on the company's initial expansion into Europe and the Middle East, including assessing market potential, fee structures, and business infrastructure requirements.

- Grand Cypress Resort Orlando – Mr. Nardozza served as advisor for the acquisition and financial structuring of this large-scale golf resort in Central Florida.

- Burger King/ Diageo – Mr. Nardozza led an assignment to develop a global real estate strategy and tactical business plan and subsequent valuation of the Burger King's U.S. portfolio of owned and leased assets comprised of over 1,700 stores and real estate assets valued more than $1 billion, in connection with the spin-off of the company from the parent.

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 14**

- <u>Plaza Hotel New York City</u> – Mr. Nardozza conducted an acquisition due diligence assignment in connection with the acquisition of this landmark asset on behalf of an overseas acquisition partnership.  This entailed an in-depth review of business and financial operations, trade name valuation, and post-acquisition performance improvement initiatives.

- <u>Carolyn Hunt Family / Rosewood Hotels</u> – Mr. Nardozza led an assignment to develop a strategic business plan for expansion of the Rosewood Hotel brand, leading to the re-capitalization and partial sale of the company and select assets to a private equity firm.  This engagement entailed a review of the organization, investment strategies, governance, asset valuations, market potential, competition, operations and management practices.

- <u>Holiday Inn Worldwide</u> – Mr. Nardozza conducted a strategic assessment of the U.S. mid-priced hotel segment on behalf of the parent company of Holiday Inn Worldwide leading to the introduction and expansion of mid-priced brands throughout the U.S.

- <u>Global Hotel Company</u> – Mr. Nardozza led an assignment to develop an e-Business strategy for a major global hotel company pertaining to e-procurement, customer management, back office systems and development of customer Internet portal.

- <u>Numerous Clients</u> – Mr. Nardozza has prepared and reviewed hundreds of hospitality and real estate related feasibility studies, market assessments, cash flow projections, valuations, and operational assessments and branding evaluations for hotels, resorts, timeshare and vacation ownership companies and projects throughout the United States, Latin America, the Caribbean, Europe and Asia.

- <u>Numerous Clients</u> – Mr. Nardozza has reviewed, evaluated, and/or negotiated virtually hundreds of hotel franchise and license/affiliation agreements, and management agreements globally, including those pertaining to Marriott, Starwood, Hyatt, Wyndham, Kempinski, Melia, Barcelo, InterContinental, Four Seasons, Choice, Holiday Inn, Ritz Carlton, Regent, Fairmont, Hilton, Radisson, Peninsula, Omni, Hardrock, SLS, Mandarin Oriental, Kimpton, Trump International, and other brands and brand families, as well as independent operators.


**Education and Certification**

Mr. Nardozza is a graduate of Florida State University - B.S. Accounting, 1977.  Additionally, in May 1993, he completed an executive certificate program on international business at The Wharton School, University of Pennsylvania.  Mr. Nardozza has also completed thousands of hours in structured continuing professional education throughout his professional career in the fields of real estate, finance, business valuation, accounting, and other finance related topics. Mr. Nardozza holds an active license as a Certified Public Accountant in the State of Florida.

**CURRICULUM VITAE**
**FRANCIS J. NARDOZZA**
**Page 15**


**Chronological Work Experience**

KMG Main Hurdman    Fort Lauderdale, Florida
       1977-1978          Staff Accountant
       1979-1980          Senior Accountant
       1981-1983          Supervisor (audit and consulting services)
       1984-1987          Manager (audit and consulting services, appointed National Director of Real Estate and Hospitality Services in 1986)

KPMG LLP               Miami, Florida and New York, NY
       1987-1988          Senior Manager, Consulting Department
       1988-1996          Partner, Consulting Department, National Hospitality Industry Director

KPMG Consulting, Inc.     Miami, Florida and New York, NY
       1997-2001          Managing Director and National Practice Leader Real Estate and Hospitality, as well as Global Hospitality Practice Leader

REH Capital Partners, LLC   Fort Lauderdale, Florida
       2002-Present       Chairman and CEO


<u>**Mr. Nardozza's Expert Testimony Last Ten Years:**</u>

- Mr. Nardozza, appearing for SC SJ Holdings LLC, et al. (Debtors) in United States Bankruptcy Court for the District of Delaware, Chapter 11, Case No. 21-10549 (JTD), 2021, (Re: Former Fairmont Hotel, San Jose, CA).

- Central Carillon Beach Condominium Association, North Carillon Beach Condominium Association, Inc., and South Carillon Beach Condominium Association, (Plaintiffs), v. Carillon Hotel LLC and Z Capital Partners, LLC, (Defendants), CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT, IN AND FOR MIAMI-DADE COUNTY, FLORIDA COMPLEX BUSINESS LITIGATION DIVISION, 2021, (Re: Carillon Hotel & Wellness Resort, Miami Beach, FL).

- Wymara LTD. and Wymara Developments, LTD (Plaintiff's)v. Gansevoort Hotel Group, LLC (Defendant) before Supreme Court of the State of New York, County of Nassau, 2020, (Re: Wymara Hotel & Villas located in Providenciales, Turks & Caicos Islands).

- Burton Way Hotels, Ltd., Burton Way Hotels, LLC, and ACC Company (Claimants) v. Four Seasons Hotels Limited (Respondent), in commercial arbitration administered under Judicial Arbitration and Mediation Services (JAMS), 2018 (Re: Four Seasons Los Angeles, Los Angeles, CA)

- Highgate Hotels, L.P. (Plaintiff/Counterclaim-Defendant) v. MTS NY Lessee, L.P., and XYZ Corp., (Debtors/Counter-Claimants) before Supreme Court of the State of New

York, County of New York, 2018, (Re: Manhattan at Times Square Hotel, New York, NY)

- Jeffrey T. Weil and Ignacio Garcia Du-Quesne (Claimant) v. Frank B. Rosenblum (Respondent), in commercial arbitration administered under American Arbitration Association (AAA), 2016, (Re: Bayview Miami, Miami FL).

- Santa Barbara Hospitality, N.V. and SFT Investments, Ltd. (Claimants) v. Hyatt Regency Curacao, N. V. and Hyatt Corporation (Respondents), in a commercial arbitration administered under the International Centre for Dispute Resolution (ICDR), a Division of the American Arbitration Association, 2016, (Re: Former Hyatt Regency Curacao).

- Setai Owners LLC (Claimant) v. General Hotel Management LTD and GHM (South Beach) LLC (Respondents), in a commercial arbitration administered before the International Court of Arbitration of the International Chamber of Commerce, 2013/2014, (Re: Setai Hotel Miami Beach).

- In a case before the United States Bankruptcy Court for the District of Hawaii, Mr. Nardozza served as hospitality advisor and testifying expert for M Waikiki LLC, Debtor in Possession, in Chapter 11 Bankruptcy proceedings pertaining to the Modern Hotel (former Waikiki Edition), a 353-room luxury lifestyle hotel, located in Honolulu, Hawaii and related dispute between M Waikiki LLC (Plaintiff) v. Marriott Hotel Services, Inc., I.S. International, LLC and Ian Schrager (Defendants) before the Supreme Court of the State of New York, County of New York, 2012, (Re: Waikiki Edition Hotel)

- Hacienda Management, S. de R.L. de C.V. (Claimant) v. Desarrollo Turistico S/K Cabo San Lucas Holding F/014 (Respondent) in a commercial arbitration administered before an independent Tribunal, 2011, (Re: Hacienda Beach Club & Residences, Cabo San Lucas, Mexico).

- 10295 Collins Avenue, Residential Condominium Association, Inc., a Florida not-for-profit corporation (Plaintiff) v. Elcom Hotel & Spa, LLC, a Florida limited liability company (Defendant) as Court appointed expert in a case before The Circuit Court of the 11th Judicial Circuit in and for Miami-Dade County, Florida, 2011, (Re: One Bal Harbour f/k/a Regent Bal Harbour Hotel and Residences, Bal Harbour, FL).