**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SC SJ HOLDINGS LLC, *et al.*[1] | Case No. 21-10549 (JTD) |
| Debtors. | (Jointly Administered) |

**Expert Report of John R. Dent**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SC SJ Holdings LLC (5141) and FMT SJ LLC (7200). The mailing address for both Debtors is 3223 Crow Canyon Road, Suite 300 San Ramon, CA 94583.

1.    My name is John R. Dent, and I have been retained by Sidley Austin LLP, on behalf of Accor Management US Inc., to provide an expert opinion in connection with the dispute between Accor Management US Inc. and SC SJ Holdings LLC and FMT SJ LLC regarding the hotel formerly known as the Fairmont San Jose Hotel.

**A.    Rule 26(a)(2)(B) disclosures**

2.    With this report, I am expressing the following opinions:

i.    When Fairmont Hotel Management L.P. (**Fairmont**) and Light Tower Associates, L.P. (the **Original Owner**) negotiated the Hotel Management Agreement dated September 14, 1999 (the **Original HMA**) for the Fairmont San Jose hotel, they explicitly stated their intention that Fairmont would be fully compensated if the owner subsequently breached the agreement by terminating it without cause (a so-called "Breach Termination"). In the context of the Covid-19 pandemic, however, the formula set forth in the liquidated damages provision of the Original HMA (which was carried forward into the Amended and Restated Hotel Management Agreement dated December 2, 2005 (the **Amended and Restated HMA**)) would defeat rather than implement their expressed intent. Using the 12-month period from March 2020 through February 2021 as the base for calculating liquidated damages for a Breach Termination would not only be contrary to the parties' stated intention but would flip the risk allocation that is central to an HMA.

ii.    If the court or arbitration panel determines that the liquidated damages provision is enforceable, a base period that would more accurately reflect the

1

parties' stated intention would be either 2019, or an average of 2018 and 2019.

    iii.  The covenant of quiet enjoyment in the Original HMA and the Amended and Restated HMA is a typical provision in HMAs that traces back to their genesis in real property leases. The covenant can be breached when a hotel owner improperly interferes with a manager's contractual rights to operate a hotel, regardless of whether or not the HMA is terminated. Defining those rights is a common focus of HMA negotiations, and there are historical examples of such interference that do not involve termination of the associated HMA.

3.    The basis and reasons for my opinions are set forth in this report. The materials that I considered in formulating my opinions are listed in Exhibit A. My qualifications are set forth below and in the C.V. attached as Exhibit B. The publications I have authored in the last 10 years are listed on Exhibit C. I have not previously testified as an expert at trial or by deposition. A copy of the engagement letter setting forth the compensation to be paid for my study and testimony is attached as Exhibit D.[2]

4.    Much of my professional career has been focused on how agency law applies to HMAs, including a hotel owner's power of termination and the consequences of exercising that power. After graduating from the University of Chicago Law School in 1990, I was an associate and then a partner at Tuttle & Taylor, a since-dissolved business litigation firm in Los Angeles,

---

[2] Full disclosure:  according to the notice provisions of both the Original HMA and the Amended and Restated HMA, Fairmont was represented in both transactions by Heller Ehrman. At the time of the Original HMA, my wife was an associate in Heller Ehrman's Los Angeles office. Although she worked from time to time on Fairmont matters, she has no memory of the San Jose Fairmont and there is no indication that she worked on the Original HMA. She had left the firm by the time of the Amended and Restated HMA. Since being retained I have not discussed the substance of the case with her other than to confirm the above facts. Her association with Heller Ehrman has not affected my opinion, particularly to the extent that my opinion implies any criticism of Heller Ehrman's work.

where I developed an expertise in disputes between hotel owners and operators. I co-founded the firm's hospitality practice group and edited *Hospitality Litigation News,* a quarterly newsletter distributed to several thousand industry participants describing litigation developments in the industry.

5.      In 2000, I joined what was then called Hilton Hotels Corporation (now known as Hilton Worldwide Holdings Inc.) (NYSE: HLT). From 2000 to 2008, I was the lawyer principally responsible for supporting "owner relations," which involved working with owners to resolve disputes before they deteriorated into litigation, but litigating or arbitrating disputes as necessary. During that time, I was also principally responsible for the form and content of Hilton's domestic HMA template, including dispute resolution provisions and Hilton's attempts to adapt to the changing landscape of agency law in the hotel industry. During my tenure, I negotiated several high-profile HMAs and amended hundreds of others.

6.      In 2008, I assumed responsibility for the legal team supporting the company's HMAs, franchising, real estate and asset management throughout the Americas. In 2010, I was named Acting General Counsel. After the appointment of the company's permanent General Counsel, I was named Deputy General Counsel, responsible for legal support of Hilton's HMAs, franchising, real estate, asset management, and hotel operations worldwide and for oversight of specific matters on a case-by-case basis.

7.      In 2015, I was appointed General Counsel of Extended Stay America, Inc. and its "paired-share" REIT, ESH Hospitality, Inc. (NASDAQ: STAY), which together formed the largest brand of extended stay properties in North America. At Extended Stay America, I was one of the persons primarily responsible for launching the company's franchising and management

3

programs, including creating the company's franchise disclosure document and its franchise agreement and HMA templates.

8.     In 2018, I left Extended Stay America to form Dent Legal Strategy LLC, a Washington-based legal consultancy focused on the hotel industry. From August 2018 to April 2019, I served in an interim role as Chief Legal Officer for G6 Hospitality Inc., the parent company of the Motel 6 brand, to resolve an outstanding multi-front litigation matter and groom a new permanent General Counsel. I now represent owners and brands in, among other things, negotiation, interpretation, and enforcement of HMAs and franchise agreements, primarily for full-service hotels.

9.     Over the course of my career I have drafted, interpreted, amended, enforced, and litigated hundreds of HMAs and franchise agreements, the vast majority of them concerning full-service and luxury hotels. I have also been involved in several of the industry's most significant owner-operator disputes, and as part of my professional duties have monitored and opined on others in which I was not personally involved.

10.     I currently sit on the Advisory Board and the Planning Committee of the Hotel and Lodging Legal Summit, an annual conference hosted by Georgetown Law Center and attended by several hundred hospitality law specialists nationwide. In recent years I have sat on that conference's General Counsel panel (2016) and moderated sessions entitled *If It's "Not My Problem," Then Whose Problem Is It?* (2018), which focused on risk allocation between owners, managers, brands, and insurers, and *Management Agreement Fundamentals for the Franchise Lawyer, and Vice Versa* (2020).

B.    **Hotel management agreements and their roots in real estate**

11.    Most branded hotels are not owned by the company whose brand name is on the building. Hotels are typically owned by real estate investors, who then contract with branded hotel companies for the right to use the brand name and its affiliated systems and services (such as reservations, marketing, IT support, loyalty programs, quality assurance, and the like). In the United States, there are two predominant frameworks for these contracts:

- In a **branded HMA**, the hotel owner hires a hotel company to manage the hotel (or "operate" it, the terms are interchangeable) under the hotel company's brand name, systems and services.

- In a **franchise agreement**, the hotel owner licenses the right to use a hotel company's brand name and participate in its affiliated systems and services. The owner then either operates the hotel itself or hires a third party to operate the hotel under an **independent HMA** in accordance with the requirements of the franchise agreement.

12.    The prevalence of branded HMAs, franchise agreements, and independent HMAs is closely correlated with hotel "chain scales," the categories of hotels spanning from economy on one end to luxury on the other. In the economy segment, the vast majority of branded properties are franchised and self-operated. In the luxury segment, the vast majority are operated under long-term branded HMAs. In between, franchising becomes more prevalent in mid-tier and lower chain scales, with independent HMAs most prevalent in the middle tiers and self-management most prevalent in the lower ones.

13.    HMAs and franchise agreements have been the predominant form for hotel branding since the 1960's. Franchise agreements and HMAs, however, evolved separately and in

different contexts. Franchising is regulated, at both the federal and state level, and is used across hundreds of retail and service industries. Franchise agreements look generally similar across most of those industries; they use much of the same terminology, drafting conventions, and business approaches. HMAs, on the other hand, and especially branded HMAs, are unique to the hotel industry.

14.     The person generally recognized as the father of the HMA was a Chicago real estate lawyer named Greg Dillon. Beginning in 1950, Mr. Dillon worked for a law firm that served as outside general counsel for Hilton, which he ultimately joined in 1963. By then, Hilton had become the world's largest hotel chain through a series of hotel acquisitions culminating in its purchase of Statler hotels in 1954. When Mr. Dillon joined the company, it owned all of the hotels in its system.

15.     Hotel ownership had (and has) two significant downsides. First, it requires large amounts of capital – both to acquire hotels and, on an ongoing basis, to maintain them. Second, the hotel business is volatile, at least as compared to other commercial real estate. Unlike office, retail, and apartment buildings, for example, which generally have long-term leases with stable rents, hotel rooms are rented out every night, with rates and occupancy dependent on market conditions. While most hotels produce sufficient cash to cover operating expenses on an ongoing basis, hotel ownership requires providing cash to cover shortfalls during periods of low demand, such as during off seasons or during recession or other economic shocks.

16.     One way to address these ownership risks is to lease a hotel instead of owning it. With a hotel lease, a hotel company leases a property from a third-party investor, freeing the hotel company from the capital investment required to acquire fee title. The lessor gets a steady income stream in the form of rent, while the lessee gets operational control of the hotel property and long

undisturbed tenure. But leases still leave downside economic risk on the tenant; during a downturn, the rent is still due, the hotel must still be maintained, and cash shortfalls must be funded.

17.     Greg Dillon's innovation was the HMA. An HMA resembles a lease but flips the risk allocation. With an HMA, it is the property owner, rather than the lessee, who is responsible for paying for property maintenance and improvements and covering cash shortfalls. Likewise, it is the manager, rather than the lessor, who receives a steady income stream in the form of a management fee, with the owner, rather than the lessee, taking the economic risk of receiving or absorbing the residual profit or loss.

18.     Other than that risk allocation, HMAs resemble leases in many ways. Like a tenant, hotel managers retain near-total control over day-to-day property operations. Most HMAs include an explicit covenant of quiet enjoyment. For many years, HMA abstracts were recorded, even though they do not create a real property interest; both the Original HMA[3] and the Amended and Restated HMA[4] include such abstracts (although it's unclear whether they were ever recorded). HMAs are the subject of subordination and non-disturbance agreements (**SNDAs**), which are routinely used for apartment, retail, and office complexes (no lender wants to foreclose on a property whose tenant leases are extinguished as a result of the foreclosure), even though with an HMA there is no real estate interest to be subordinated. And branded HMAs have long tenure; HMAs for full-service hotels typically run for 10 or 20 years, while ones for luxury properties can last 50 years, 75 years, or in extraordinary cases even longer.

19.     HMAs quickly proved popular, and over the coming decades they were adopted by virtually every full-service hotel brand. Leases, on the other hand, largely disappeared (although

---

[3] See Original HMA, Schedule "E".
[4] See Amended and Restated HMA, Schedule "B".

they remain common in some foreign markets such as the United Kingdom and Germany). By the late 1980's, HMAs were ubiquitous.

20.    With the rise of HMAs and franchising, the major participants in the lodging industry sorted into two categories, owners and brands, with distinctly different risk appetites. Branding companies such as Hilton, Hyatt, and Marriott are almost all publicly traded; they have largely exited hotel ownership and emphasize the stable fee streams that they earn from managing and franchising hotels. Owners, on the other hand, span everything from publicly traded REITs, to institutional investors like insurance companies, private equity funds, and sovereign wealth funds, to high net worth individuals, and (particularly in the midscale and economy segments) to family entrepreneurs. What ties this disparate group together is willingness to take on the real estate ownership risks identified above in exchange for the potentially high returns that hotels can produce in good economic times.[5]

### C.    Management agreements as agency contracts

21.    For several decades after HMAs emerged on the scene, they were considered lease-like in both their length of tenure and the security of that tenure. In 1991, however, a California intermediate appellate court issued a decision that shook that foundation and immediately became a seminal case in the industry.

22.    In *Woolley v. Embassy Suites, Inc.,* 227 Cal.App.3d 1520, 278 Cal.Rptr. 719 (Cal.Ct.App. 1991), an owner declared defaults under nine Embassy Suites HMAs. Embassy responded by invoking arbitration. In the meantime, though, the cure period was running on the notice of default, so Embassy sought an injunction to prevent the owner from terminating the

---

[5] A third category, independent managers, is not relevant to this case.

agreements until the arbitration panel could resolve the alleged breach. The trial court duly granted the motion.

23.     On appeal, the court reversed. One of the risk-shifting aspects of a typical HMA is that it explicitly designates the manager as the agent of the owner. Among other things, this allows the manager to execute commercial contracts and leases in the owner's name, shielding the manager from liability in case of a breach of those agreements and shifting that liability to the owner.

24.     *Woolley* recognized a consequence of that relationship that HMAs had not previously contemplated:  under hornbook agency law, the court held, *a principal has the power to revoke an agency at any time, even if doing constitutes a breach of contract.*[6] Moreover, *Woolley* held, parties cannot contract around that power; it exists even if the contract characterizes the agency as irrevocable. *Woolley* therefore concluded that the owner, as principal, could not be enjoined from terminating the HMA, and that as its agent, Embassy's remedy was to seek damages.

25.     *Woolley* sent a seismic shock throughout the hotel industry, significantly changing the balance of power between owners and operators. That was particularly true for branded management companies, for whom the premature termination of an HMA could mean not only the loss of what was previously considered a stable fee stream but also the brand's presence in the marketplace. It was the subject of intense discussion and debate, and branded management companies spent the following decades adjusting their contracts and business models in response.

26.     Those responses took several different forms. One was to change the law, which Marriott sought to do in its home state, Maryland. In 2004, Maryland amended its Commercial

---

[6] Agency law refers to this principle as the "power," but not the "right," to revoke.

Law to provide that the explicit terms of an HMA supersede any contrary provision of agency law, that HMAs can be specifically enforced, and that the new law applied retroactively.[7]

27.    The Maryland legislation worked well for companies like Marriott, which is based in Maryland and many of whose HMAs were therefore governed by Maryland law. Although other companies attempted to incorporate Maryland law into their agreements as well, the relatively small community of sophisticated lawyers representing hotel owners knew the significance of that choice of law, and in the face of strong resistance it saw limited success.

28.    A second option was suggested by the *Woolley* court itself:  to create an "agency coupled with an interest," an obscure exception to a principal's power to terminate where exercising that power would defeat the purpose of granting the agency itself. A prototypical example is a deed of trust, a form of agency agreement where the borrower, as principal, gives the lender, as agent, the authority to sell the property in the event of a default. Allowing the borrower to revoke that authority would defeat the entire purpose of the deed of trust, and agency law therefore treats deeds of trust as irrevocable. Branded hotel management companies adopted various structures in an attempt to bring their HMAs within this exception; most of them failed.[8]

29.    A third approach was to separate the branded management agreement into two agreements:  (1) a franchise agreement and (2) in effect, an independent management agreement with the brand company as the "independent" manager. There is ample case law holding that franchise agreements are not agency agreements, which means that even if an owner exercises its power to terminate a management agreement, an accompanying franchise would remain in place – and with it, the brand's presence in the market and a portion of the fee stream.

---

[7] MD Code Comm. Law Title 23 – Operating Agreements – Hotels and Retirement Communities.
[8] *See FHR TB, LLC v. TB Isle Resort, LP,* 865 F.Supp.2d 1172 (S.D. Fla. 2011) ("***Turnberry***") and the cases discussed therein.

30.     Embassy Suites had already used that approach for many years, and Hilton (which acquired Embassy Suites in 1999) attempted to implement it with its other full-service brands. So did Starwood. It met, though, with mixed results. For one thing, it was often too expensive for the owner; the combined management and franchise fees could be substantially higher than the management fees under a branded HMA alone. Moreover, franchising and management operated as different operations within many hotel companies, each with their own approaches to their legal documents that were unexpectedly difficult to reconcile. The owners' bar was unfamiliar with the structure and resistant to it, particularly if (like choosing Maryland law) it meant blunting a valuable owner right. And for companies that had little or no franchising infrastructure – such as Fairmont – it was not a practical option.

31.     A fourth approach was an increased use of so-called "key money." Key money is essentially a self-amortizing loan from the manager to the owner, usually in the low millions of dollars for a full-service or luxury hotel, that is forgiven if the HMA runs its full term. If the HMA is terminated early, on the other hand, the unamortized portion must be repaid – in addition to damages if the termination was in breach of the HMA. Unlike damages, though, which can be heavily litigated and offset by counterclaims, key money is easily calculated and easier to collect through attachment and similar processes. If nothing else, it provides a disincentive for owners to terminate, especially in the earlier years of an HMA term when the repayment obligation is largest.

32.     Fifth, many brands began showing a greater openness to contractual termination rights, usually with payment of a fee, under certain defined circumstances. These provisions are routine today and come in numerous flavors. A common example is termination on sale; because a hotel "unencumbered" by an HMA will often fetch a higher price, many owners are willing to

11

pay a substantial fee for that right. Or an HMA may be terminable with a nominal fee (or no fee at all) if the hotel converts to a franchise.

33.     Yet another approach was to insert language in the HMA asserting that it is not terminable. (Both the Original HMA and the Amended and Restated HMA have such a clause, even though governed by California law and *Woolley*'s explicit rejection of those clauses.) It is similar to a provision defining a Chapter 11 filing as a breach: likely unenforceable, part hope that the law changes at some point (as it did in Maryland), part hope to shame the counterparty into not breaking its explicit promise.

34.     All of these efforts helped operators on the margins. But unless an HMA was governed by Maryland law, it could not stop an owner intent on breaching and terminating an HMA from doing so. Instead, an operator had to, as *Woolley* suggested, rely on damages. To that end, branded managers began taking more aggressive positions in HMA negotiations to ensure adequate owner equity in case of a breach, most commonly with caps on loan-to-value and debt-service-coverage ratios. With the Original HMA, Fairmont went a step further:  it made explicitly clear what those damages would be by spelling them out in a liquidated damages provision.

**D.     HMA damages and liquidated damages in the hotel industry**

35.     Despite the green light that *Woolley* gave hotel owners to exercise their power to terminate, few have done so. One deterrent is the magnitude of the resulting liability.

36.     Courts that have addressed damages for termination of an HMA generally consider both lost profits and other elements of damage. The lost profits methodology is settled. Oversimplifying, it involves projecting the hotel's future revenues (either through expiration or up to a point where a terminal value can be assigned), calculating the fees that would be earned on those revenues, and discounting the total back to present value. If the HMA includes an incentive

fee, the projection also includes the metric on which the incentive fee is based. *See e.g., Amended Findings of Fact and Conclusions of Law on Estimation of Marriott Claim* in *In re M Waikiki, LLC,* Case No. 11-02371 (Bankr. D. Haw.) (slip op. June 7, 2012) (**M Waikiki**); *Bench Ruling re: Trial on Motion of MSR Resort Golf Course, LLC, et al, for Entry of an Order Estimating Damages Resulting from Rejection of the Hilton Management Agreements and an Order Authorizing Rejection of the Hilton Management Agreements* in *In re: MSR Resort Golf Course, LLC,* Case No. 11-10372 (Bankr. S.D.N.Y) (**MSR**).[9]

37.    In the luxury space, this leads to sizeable damages. In *MSR,* the combined lost profits from three HMAs was $123,776,000.[10] In *M Waikiki,* it was $15,812,868.72.[11]

38.    These cases followed closely on another high-profile dispute involving the Four Seasons Aviara Resort in Carlsbad, California (the **Aviara** litigation). In that case, an arbitration panel held that Four Seasons was not in breach but that, pursuant to agency law, the owner had the power to terminate the management agreement. It therefore allowed the owner to solicit offers from potential new managers, but conditioned the appointment of the new manager on the owner first paying Four Seasons its damages.[12]

---

[9] *MSR* is another case where, as here, a party used Chapter 11 as part of an attempt to terminate an HMA without paying full lost profits. In *MSR,* a case that both sides in this dispute have cited to the Bankruptcy Court, a mezzanine lender sitting on the fulcrum (and therefore effectively controlling the bankruptcy) attempted to terminate three Waldorf Astoria HMAs, erroneously believing that there were no SNDAs in place and that the HMAs would therefore not survive foreclosure. When it learned that SNDAs did exist, it attempted to avoid them on the grounds that they had not been identified in an estoppel certificate issued years earlier to a third party. When the lender lost that effort, it brought an estimation motion in the hopes of establishing a value low enough to leave its reorganization plan feasible. That effort failed, and a plan was ultimately approved under which the lender's interest was lost and the properties went to its immediate senior.

[10] $30,961,000 plus $37,408,000 plus $55,767,000. See *Order Estimating Damages Resulting from Rejection of the Hilton Management Agreements,* Docket No. 1454 in *MSR.*

[11] See *M Waikiki* at 12. Marriott's other termination-related damages brought the total estimated claim to $20,665,787.72.

[12] San Diego Union-Tribune, *"Aviara and Four Seasons cut ties"* (April 20, 2010). Although the damages award was confidential, one person from each company solicited to be the new manager was permitted to see the award. I was that person at Hilton. I do not remember the specific amount of the award, and would still be bound by the confidentiality agreement from disclosing it if I could, but it was consistent with the methodology followed in *MSR* and *M Waikiki.*

39.    A decade before these cases, Fairmont and the Original Owner had agreed in the Original HMA to a liquidated damages provision that under normal circumstances would produce roughly the same result as the lost profits analysis in *MSR*, *M Waikiki* and *Aviara*, and thereby accomplish their stated objective of fully compensating Fairmont if the owner breached the agreement by terminating it without cause. The formula was simple:  multiply the management fees earned over the prior 12 months (the **base**) by roughly half the number of years remaining in the term (the **multiplier**).[13]

40.    That formula is not novel. Both liquidated damages provisions generally, and the specific framework (base times multiplier) are almost universal in hotel franchise agreements. But liquidated damage provisions are extremely rare in HMAs – almost unheard of – and there are several reasons why they are less risky in, and for that reason better suited to, franchise agreements.

41.    First, the fees involved – the base – are much less material in the franchise context. Franchise agreements are most common in the lower chain scales, where HMAs are almost nonexistent. Franchising works best at scale, with high numbers of franchised units and low concentration of fees; the major hotel companies have thousands of franchisees across multiple brands, and the fee contribution of any individual property is immaterial. The loss of a single franchise is therefore financially and strategically insignificant, and so is the risk of artificially low liquidated damages if the base year saw anomalously poor results.

42.    Consider, for example, Days Inn, a classic hotel franchise chain that is part of the Wyndham hotel system. The royalty fees that Days Inn receives from a typical franchise are about $75,000 each year, and in 2019 (before the pandemic) Days Inn shed 56 franchises and still had

---

[13] I am aware of a possible dispute between the parties over whether the multiplier should be based on the date of the Original HMA or the Amended and Restated HMA. I do not express an opinion on that issue.

almost 800 hotels.[14] According to its latest Form 10-K, Wyndham franchises over 8,900 hotels with approximately 796,000 rooms across 20 brands, and its 2019 (pre-pandemic) revenues were over $2 billion. Fairmont, in contrast, has (according to its website) only 82 hotels worldwide, most of them luxury properties that generate high revenues and correspondingly high fees, such that the loss of any of them is both strategically and financially significant.

43.    Even with full-service hotels, where revenues are higher, liquidated damages work because of a small multiplier. The reason that liquidated damage provisions are so common in franchise agreements generally (not just hotel franchise agreements) is because early franchising case law established a relatively short window for recovering lost profits. Particularly in the early years of franchising when these cases were decided, franchised business in the US were relatively simple – ice cream stores, fast food restaurants, specialized retail and the like – and courts applying a duty to mitigate damages held that a franchisor could reasonably be expected to replace a lost unit in a relatively short time. Liquidated damage provisions had to conform to that case law, resulting in a small multiplier. Today, hotel franchise agreements typically use a multiplier between two and five.

44.    The combination of a lower base and lower multiplier produces reduces the risk of an abnormal base year skewing a liquidated damages calculation in a material way. In a normal year, for example, the "typical" Days' Inn franchisee described above would be liable for about $150,000 in liquidated damages; if the base year was 2020, they would down to $107,270[15] – a

---

[14] Figures based on prototype room count of 89 rooms and 2019 average ADR of $75.85, occupancy of 55.9%, and royalty of 5.5% of rooms revenue. *See* Days Inn by Wyndham, Franchise Disclosure Document dated March 31, 2021 at 82-83.
[15] Based on prototype room count of 89 rooms and 2020 average ADR of $69.01, occupancy of 43.5%, and royalty of 5.5% of rooms revenue. *See* Days Inn by Wyndham, Franchise Disclosure Document dated March 31, 2021 at 82-83.

material drop in percentage terms, but to a company like Wyndham an immaterial one in absolute dollars.

45.     Finally, some franchisors often waive liquidated damages altogether. For many franchisors, the greatest risk of a failing franchise – one that is not maintaining standards or that can't afford to pay its fees – is bad customer experience and resulting damage to the brand. For that reason, these franchisors use liquidated damages as a bargaining chip to negotiate a cooperative exit, where the franchisor agrees to waive liquidated damages in exchange for the franchisee's agreement not to contest termination of the franchise.

**E.     The liquidated damages provision in the Original HMA**

46.     Which brings us back to the liquidated damages provision in the Original HMA. Fairmont and the Original Owner certainly made their intentions clear, explicitly stating both the difficulty of calculating actual damages and their rationale for the multiplier used.[16] In an ordinary HMA negotiation, an owner might not be as interested in ensuring full compensation to a manager facing a "breach termination," but Fairmont and the Original Owner were fully aligned in this case for a simple reason:  they were themselves owned by the same people.

---

[16] *See* Original HMA Section 16.11(b) (acknowledging that "Operator's damages in the event of termination of this Agreement by the Owner in breach of this Agreement (a "Breach Termination") would be difficult or impossible to determine, including, without limitation, loss of Management Fees and other revenue under this Agreement, harm to the Operator's reputation, loss of goodwill, disruption of operations, loss of contributions to budgeted system expenses and loss of a hotel with strategic significance to the Operator's system," "the inherent uncertainty as to the measure of such damages," and their "desire to establish a methodology for the calculation of damages") and Section 16.11(c) ("[t]he Owner and the Operator specifically acknowledge that the calculation of the Liquidated Damages Amount requires the use of a significant Multiplier in an effort to reflect (1) the Operator's loss of Management Fees and the benefit of the Agreement over the full remaining term of the Agreement (assuming the effective exercise of all extension rights), (2) the material impact of inflation on Management Fees over such an extended period, (3) the inability to predict with a more certain method absolute growth in the measure of Net Operating Income and, therefore, the Incentive Fee payable to the Operator over the balance of the term of the Agreement and (4) the inherent difficulty in predicting or quantifying the measure of damages from the non-fee components of the Operator's damages described in clause (b) above.").

47.     Maritz, Wolff & Co. was (and is) a highly sophisticated investor in luxury hotels and hotel brands that in 1998 bought a 50% interest in Fairmont.[17] Its partner, Saudi Prince Alwaleed Bin Talal bin Abdul Aziz Saud, owned the other 50%.[18] The same individual signed the Original HMA on behalf of both Fairmont and the Original Owner, and is listed with his Maritz Wolff address in the notice provision on behalf of both. Upon that signing, both Fairmont and the Original Owner had a shared interest in ensuring that Fairmont would be fully compensated if a successor owner committed a "Breach Termination."

48.     Unfortunately, though, the liquidated damages formula that the parties chose does not come close to achieving their stated outcome in the unique circumstances presented by this case, and a provision that was intended to provide certainty of recovery is instead being used to prevent it. Far from fully compensating Fairmont for the value of its contract, the value ascribed to Fairmont's claim by the debtors barely exceeds the fees that Fairmont would normally earn in a single year. As the Court put it in its April 29 hearing, it (and the arbitrators) face a choice between honoring the parties' stated objective or mechanically applying their chosen formula. The two are irreconcilable.

49.     Enforcing the liquidated damages provision would do more, though, than just frustrate the parties' explicit intention.  It would also flip the risk allocation upon which the entire structure of an HMA is based. With an HMA, operators take the risk that their fees will occasionally drop in down years; their fees are based on a combination of top-line hotel revenue and bottom-line hotel profits, and to the extent that either of those amounts shrink or disappear, so do the operators' fees. Indeed, as the debtors' expert Mr. Morone has testified, 26 of Accor's 37

---

[17] Los Angeles Times, *Maritz Wolff Buys 50% Stake in Fairmont Hotel Group* (March 17, 1998).
[18] *Id.*

hotels in the United States closed or left the system entirely at some point during the pandemic.[19]
For the full year in 2020, Accor reported a staggering loss of almost 2 billion euros[20] – hardly
putting it in a position to rescue the owners of dozens of shuttered hotels in the United States alone.
Other hotel branding companies reported similarly sobering losses.[21] Eye-popping as those losses
are, they go with the business model, and as the world economy recovers, so will they.

50.     What is not part of the model, though, is for an operator to receive less than full
compensation when an owner breaches and terminates an HMA. That is particularly true when the
explicit purpose of doing so is to enable an owner to obtain more favorable financing, a
responsibility and risk that HMAs put solely and squarely on the owner. Notably, the debtors here
have not said that they have been unable to obtain that financing; rather, they were careful to say
only that they were unwilling to pay for the type of "rescue capital" that other owners in similarly
dire situations have obtained.[22]

**F.    Alternative measures of liquidated damages**

51.     If the bankruptcy court or the arbitration panel wishes to honor the parties' intention
as expressed in the Original HMA without abandoning the concept of liquidated damages
altogether, there are alternatives.[23]

---

[19] *Declaration of Thomas Morone in Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit
Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes,* Docket No. 111, at
¶ 6 and Exhibit 1.
[20] See Press Release, Accor Full-Year 2020 Results, dated February 24, 2021.
[21] Marriott reported a net loss of over a quarter billion dollars, after making $1.273 billion in profit the year before.
Hilton lost two and half times more than that, even after laying off close to a quarter of its global corporate workforce,
compared to a profit of $886 million the prior year.
[22] See, *e.g.,* Ashford Hospitality Trust, Inc. Current Report on Form 8-K dated January 15, 2021 (announcing signing
of credit agreement for up to $350 million in loans at interest rates ranging from 14% to 18.5%). Ashford is a publicly
traded REIT that owns a portfolio of 101 hotels.
[23] Whether these options are available to the court or the arbitrators is a legal question on which I do not express an
opinion.

52.     One option would be to use 2019 results as the base. Across the hotel industry, 2019 is being widely applied as the norm against which future performance should be measured. Publicly traded companies (both brands[24] and owners[25]), securities analysts[26], and consultants[27] routinely compare ongoing results against 2019, even now that normal trailing 12-month comparisons would ordinarily be made against 2020 results. Likewise, the biggest question in the industry is when future business (usually broken down by geography, market segment, and customer type) will "return to 2019 levels."[28]

53.     Moreover, 2019 is not a cherry-picked year for Accor. As the debtors' principal has previously testified, "revenue dropped from $80 million in 2018, to $71.8 million in 2019 (against Fairmont's own 2019 target of $83.6 million)" and "[t]he Hotel's gross operating profit under Fairmont's management dipped from $21.2 million in 2018, to $16.1 million in 2019 (against Fairmont's own 2019 target of $22.9 million)."[29] Using 2019 results as the base would therefore not unfairly inflate Fairmont's liquidated damages, and based on historical performance prior to 2019 might understate them.

54.     There are unfortunately not many other precedents to look to. The world's largest hotel company, Marriott, does use a 2-year, rather than 1-year, base for liquidated damages across

---

[24] See, e.g., InterContinental Hotels Group PLC 2021 First Quarter Trading Update (May 7, 2021) at 1 ("The improved Group RevPAR performance was led by the Americas, which strengthened to -43% versus 2019 levels compared to -50% in Q3 and Q4 2020").

[25] See, e.g., Host Hotels & Resorts, Inc. Reports Results for First Quarter 2021 (May 4, 2021) at 1 (adding 2019 comparison column to ordinary year-on-year comparison).

[26] See, e.g., Citi Research, Global Leisure - Web Visits Heat Map: US airlines & hotels recovering, little improvement elsewhere (May 10, 2021) (measuring activity on hotel brand web sites against 2019 levels).

[27] See, e.g., STR Inc., Hotel profit reaches 50% of 2019 level (May 4, 2021); Kalibri Labs, U.S. Primary Markets: Large Metropolitan Areas (May 2021) at 2 (comparing "2021, 2020 vs. 2019" performance).

[28] See, e.g., Hilton Worldwide Holdings, Inc. transcript of Q1 2021 Earnings Call (May 5, 2021) at 7 (Hilton CEO stating that "in terms of the global data, I think, the best way to look at it is against a 2019 comparison because looking at it against 2020, particularly right now as you are in the early stages of the pandemic is relatively useless"), and at 8-9, 11-12, and 13-14 (dialogue between CEO and securities analysts over when business will return to 2019 levels).

[29] Declaration of Sam Hirbod in Support of Debtors' Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim, Docket No. 238, at ¶ 6.

all its brands. The court or arbitration panel could do the same here, but if 2020 included in that average the resulting calculation will still be heavily skewed towards undercompensating Fairmont and frustrating the intent expressed in the liquidated damages provision itself. Other mechanisms used in some franchise agreements, such as alternative minimum calculations, are unfortunately difficult or impossible to create retroactively and are therefore not feasible here.

G.   **Quiet enjoyment and its relation to agency**

55.   Finally, some notes on quiet enjoyment and its relationship to the power to terminate announced in *Woolley*.

56.   As previously mentioned, virtually every HMA explicitly incorporates a covenant of quiet enjoyment. Quiet enjoyment is a real property concept, inherited in HMAs from their roots in leases, where a tenant is ensured the exclusive use of its property free from interference by the landlord. In the HMA context, it ensures an operator exclusive rights to operate the hotel free from the same type of interference by the hotel owner.

57.   Almost all HMAs – and especially branded HMAs – narrowly circumscribe an owner's rights to be physically present on property or to otherwise participate in the day-to-day operation of a hotel. For example, Owners are typically prohibited from communicating with hotel staff or attending staff meetings, and are required to communicate through the general manager or corporate personnel. Their rights to use physical space are negotiated and usually restricted to individual offices, if anything. These negotiations are an important topic in most branded HMA negotiations, and branded operators are notoriously inflexible on them.

58.   In that context, the covenant of quiet enjoyment can be violated through all kinds of actions completely independent of, and short of, termination of the HMA itself. Except as

authorized by the HMA, any owner action that interferes with the operator's ability to operate the hotel can trigger the covenant.

59.     Perhaps the best examples of how the covenant of quiet enjoyment operates independently of termination comes from another consequence of *Woolley*: the "midnight raid."

60.     In a midnight raid, an owner resorts to self-help to take control of a hotel, typically by appearing unannounced in the middle of the night with security to evict management personnel. Often, they are accompanied by an owner's announcement that it is terminating the HMA.[30] Other midnight raids, however, either involved limited attempts to take over aspects of hotel operations without terminating the HMA[31] or were enjoined before the HMA could be terminated.[32]

61.     As these cases demonstrate, the covenant of quiet enjoyment can be breached without a termination of the underlying HMA. Liquidated damages for a "breach termination" would therefore not apply to an independent breach of the covenant of quiet enjoyment that was not accompanied by termination of the Amended and Restated HMA itself.

## H.   Signature

Pursuant to Fed. R. Civ. P. 26(a)(2)(B), I hereby submit the above report.

John R. Dent
May 19, 2021

---

[30] The *M Waikiki* and *Turnberry* cases discussed above involved midnight raids and termination of the related HMA.
[31] See *N.Y. Overnight Partners, L.P., et al. v. The Ritz-Carlton Hotel Company, et al.,* Case No. 95-cv-00122-JSM (S.D.N.Y.), where the owner of four Ritz-Carlton hotels sued Ritz-Carlton for mismanagement and used a midnight raid to seize control of the hotel's accounting functions, but did not terminate the HMA and Ritz-Carlton otherwise remained in place as manager.
[32] See *Aviara,* where an owner initially declared a default and commenced an arbitration seeking authorization to terminate the HMA but then publicly announced that it was replacing management and attempted a (daytime) raid. Four Seasons barricaded the building, resulting in both parties seeking cross-TROs in federal court. *BRCP Hef Hotel Tenant, LLC v. Four Seasons Hotels Limited,* Case No. 09-cv-00912-JM-NLS (S.D. Cal.). Although the disposition on the motions is not public, Four Seasons stayed in place until the arbitration ultimately ruled on the merits of the underlying claims.

**Exhibit A**

**Materials Considered**

I.     Bankruptcy court filings

| Docket # | Date Filed | Title |
|---|---|---|
| 284 | 5/6/21 | Order Setting Hearing Date, Briefing Schedule, and Discovery Deadlines with Respect to Estimation Motion |
| 240 | 4/30/21 | Transcript Regarding Hearing Held 4/29/2021 Re: Omnibus. |
| 239 | 4/23/21 | Appendix to Debtors' Memorandum of Points and Authorities in Support of Debtors' Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim |
| 238 | 4/23/21 | Declaration of Sam Hirbod in Support of Debtors' Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim |
| 237 | 4/23/21 | Declaration of Eben Perison in Support of Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
| 236 | 4/23/21 | Declaration of Terence P. Badour |
| 235 | 4/23/21 | Declaration of Peter J.W. Sherwin in Support of Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
| 234 | 4/23/21 | Declaration of Greig Taylor in Support of Accor Management (U.S.) Inc.'s (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) Supplemental Opposition in Response to the *Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc.* (Dkt. No. 71), filed by FMT SJ LLC and SC SJ Holdings LLC |

| 233 | 4/23/21 | Declaration of Chad S. Hummel in Support of Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
|-----|---------|---|
| 232 | 4/23/21 | Declaration of Paul Tormey in Support of Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
| 231 | 4/23/21 | Declaration of Dan McGowan in Support of Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
| 230 | 4/23/21 | Accor Management (U.S.) Inc.'s Supplemental Opposition to Debtors' Motion to Estimate Maximum Amount of Accor's Claim |
| 226 | 4/23/21 | Debtors' Memorandum of Points and Authorities in Support of Debtors' Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim Filed by SC SJ Holdings LLC |
| 225 | 4/23/21 | CLNC 2019-FL1 Funding, LLC'S Supplemental Brief in Support of Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc. |
| 224 | 4/23/21 | Statement of the Official Committee of Unsecured Creditors in Support of the Debtors' Estimation Motion |
| 181 | 4/9/21 | Order Granting Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Compel Arbitration of Disputes |
| 130 | 4/1/21 | Declaration of Chad S. Hummel in Support of Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Compel Arbitration of Disputes |
| 129 | 4/1/21 | Accor's Omnibus Reply and Preliminary Evidentiary Objections in Support of Its Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Compel Arbitration of Disputes |
| 126 | 4/1/21 | Joinder of the Official Committee of Unsecured Creditors to the Debtors' Objection to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |

Exhibit A – Materials Considered                                                                 2

| | | |
|---|---|---|
| 113 | 3/30/21 | Declaration of Sam Hirbod in in [sic] Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 112 | 3/30/21 | Declaration of Neil Demchick in Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 111 | 3/30/21 | Declaration of Thomas Morone in Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 110 | 3/30/21 | Declaration of Francis J. Nardozza in Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 109 | 3/30/21 | Appendix to Debtors' Objection to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 108 | 3/30/21 | Debtors' Memorandum of Points and Authorities in Opposition to Fairmont's Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 107 | 3/30/21 | Accor Management (U.S.) Inc.'s Preliminary Objection to Debtors' Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim |
| 103 | 3/30/21 | CLNC 2019-FL1 Funding, LLC's Objection to Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 94 | 3/23/21 | Declaration of Sam Newman in Support of Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Compel Arbitration of Disputes |

| 93 | 3/23/21 | Declaration of Paul Tormey in Support of Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Compel Arbitration of Disputes |
| 92 | 3/23/21 | Motion to (i) Modify the Automatic Stay to Permit Arbitration of Disputes; and (ii) Enforce Arbitration Clause Compelling Arbitration of Disputes |
| 72 | 3/16/21 | Declaration of Neil Demchick in Support of Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Ind. |
| 71 | 3/16/21 | Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc. |
| 43 | 3/11/21 | Declaration of Sam Hirbod in Support of Motion for an Order Authorizing Marketing Process to Solicit Hotel Brands |
| 42 | 3/11/21 | Morone Declaration in Support of Debtors' Motion for an Order Authorizing Marketing Process to Solicit Hotel Brands |
| 41 | 3/11/21 | Debtors' Motion for an Order Authorizing Marketing Process to Solicit Hotel Brands |
| 22 | 3/10/21 | Debtors' Motion for Entry of an Order Authorizing the Debtors to Reject Amended and Restated Hotel Management and Owner Agreements Between Debtors and Fairmont, Effective as of the Debtors' Respective Petition Dates |
| 11 | 3/10/21 | Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings |

II.    Other dockets

   A.    *BRCP HEF Hotel Tenant, LLC v. Four Seasons Hotels Limited,* Case No. 09 CV
         912 (S.D. Cal.)

| Docket # | Date Filed | Title |
|---|---|---|
| 28 | 5/27/09 | Order Deferring Ruling on Cross-motions for Temporary Restraining Order |
| 10 | 5/11/09 | Declaration of Robert D. Cima in Support of Four Seasons Hotels Limited's Motion for a Temporary Restraining Order |
| 9 | 5/11/09 | Declaration of Forrest A. Hainline III in Support of Four Seasons Hotels Limited's Motion for a Temporary Restraining Order |
| 8 | 5/11/09 | Memorandum of Points and Authorities in Support of Four Seasons Hotels Limited's Motion for a Temporary Restraining Order |
| 6 | 5/8/09 | First Amended Complaint for Relief in Aid of Pending Arbitration |

   B.    *FHR TB, LLC v. TB Isle Resort, L.P.,* Case No. 11-cv-23115 (S.D.Fla.)

| Docket # | Date Filed | Title |
|---|---|---|
| 122 | 6/11/12 | Reply in Support of Plaintiff FHR TB, LLC's Motion for Summary Judgment |
| 98 | 4/12/12 | Plaintiff FHR TB, LLC's Motion for Final Summary Judgment and Incorporated Memorandum of Law |
| 96 | 3/19/12 | Third Amended Complaint |

C.    *In re M Waikiki, LLC,* Case No. 11-02371 (Bankr. D. Haw.)

| Docket # | Date Filed | Title |
|---|---|---|
| 537 | 6/7/12 | Amended Findings of Fact and Conclusions of Law on Estimation of Marriott Claim |
| 13 | 9/1/11 | Motion for Relief from Stay to Enforce Specific Provision in Temporary Restraining Order |

D.    *In re MSR Resort Golf Course LLC, et al.,* Case No. 11-10372 (Bankr. S.D.N.Y.)

| Docket # | Date Filed | Title |
|---|---|---|
| 1454 | 8/27/12 | Order Estimating Damages Resulting from Rejection of the Hilton Management Agreements |
| 1397 | 8/10/12 | Bench Ruling re: Trial on Motion of MSR Resort Golf Course, LLC, et al, for Entry of an Order Estimating Damages Resulting from Rejection of the Hilton Management Agreements and an Order Authorizing Rejection of the Hilton Management Agreements |

E.    *M Waikiki LLC v. Marriott Hotel Services, Inc., et al.,* Index No. 651457-2011 (N.Y. Sup. Ct.)

| Docket # | Date Filed | Title |
|---|---|---|
| 16 | 8/30/11 | Complaint of Counterclaim-Plaintiff Marriott Hotel Services, Inc. Against Counterclaim-Defendant M Waikiki LLC |
| 1 | 5/26/11 | Summons and Complaint |

III.    Cases

    A.    *FHR TB, LLC v. TB Isle Resort, L.P.,* 865 F.Supp. 1172 (S.D. Fla. 2011)

    B.    *Gov't Guarantee Fund v. Hyatt Corp.,* 95 F.3d 291 (3rd Cir. 1996)

    C.    *Pacific Landmark Hotel, Ltd. V. Marriott Hotels, Inc.,* 19 Cal.App.4th 615, 23 Cal.Rptr.2d 255 (Cal.Ct.App. 1993)

    D.    *2660 Woodley Road Joint Venture v. ITT Sheraton Corp.,* 369 F.3d 732 (3rd Cir. 2004)

    E.    *Woolley v. Embassy Suites, Inc.,* 227 Cap.App.3d 1520, 278 Cal.Rptr. 719 (Cal.Ct.App. 1991)

IV.    Franchise Disclosure Documents (see Wisconsin Department of Financial Institutions [site] and Minnesota Commerce Department [site])

    A.    Caption by Hyatt Franchise Disclosure Document dated March 25, 2020

    B.    Comfort Franchise Disclosure Document dated April 1, 2020

    C.    Crowne Plaza Franchise Disclosure Document dated April 30, 2020 (as amended May 14, 2020)

    D.    Days Inn by Wyndham Franchise Disclosure Document dated March 31, 2021

    E.    Embassy Suites by Hilton Franchise Disclosure Document dated March 30, 2020 as amended June 30, 2020

    F.    Extended Stay America Franchise Disclosure Document dated March 26, 2020 as amended July 2, 2020

    G.    Fairfield by Marriott Franchise Disclosure Document dated March 31, 2021

    H.    Hampton Inn by Hilton Franchise Disclosure Document dated March 30, 2020

    I.    Hilton Franchise Disclosure Document dated March 30, 2020 as amended June 30, 2020

    J.    Holiday Inn / Holiday Inn Express / Holiday Inn Resort Franchise Disclosure Document dated April 30, 2020 (as amended May 14, 2020 and September 28, 2020)

    K.    Hotel Indigo Franchise Disclosure Document dated April 30, 2020 (as amended May 14, 2020)

    L.    Hyatt Place Franchise Disclosure Document dated March 25, 2020

    M.    Hyatt Regency Franchise Disclosure Document dated March 25, 2020

N.   Intercontinental Hotels & Resorts Franchise Disclosure Document dated April 30, 2020 (as amended May 14, 2020)

O.   Kimpton Hotels & Restaurants Franchise Disclosure Document dated April 30, 2020 (as amended May 14, 2020)

P.   La Quinta by Wyndham Franchise Disclosure Document dated March 31, 2020

Q.   Marriott and JW Marriott Franchise Disclosure Document dated March 31, 2020 as amended June 1, 2020

R.   Radisson Franchise Disclosure Document dated March 27, 2020 as amended April 14, 2020

S.   Waldorf Astoria Franchise Disclosure Document dated March 30, 2019

T.   Woodspring Suites Franchise Disclosure Document dated April 15, 2020

U.   Wyndham Franchise Disclosure Document dated March 31, 2020

V.   Securities Filings

A.   Wyndham Hotels & Resorts, Inc. Annual Report on Form 10-K for the fiscal year ended December 31, 2020

B.   Ashford Hospitality Trust, Inc. Current Report on Form 8-K dated January 15, 2021

VI.   Press Releases

A.   *Hilton Reports Fourth Quarter and Full Year Results* dated February 17, 2021

B.   *Marriott International Reports Fourth Quarter 2020 Results* dated February 18, 2021

C.   *Accor Full-Year 2020 Results* dated February 24, 2021

D.   InterContinental Hotels Group PLC 2021 First Quarter Trading Update dated 7 May 2021

VII.   Press Reports

A.   The Wall Street Journal, *Hilton Cutting About 22% of Global Corporate Workforce* (updated June 16, 2020)

VIII.   Other materials

A.   Hotel Management Agreement dated September 14, 1999 by and between Light Tower Associates, L.P. and Fairmont Hotel Management, L.P.

**Exhibit B**

**Curriculum Vitae**

## EDUCATION

University of Chicago Law School (J.D. 1990)
University of California, Los Angeles (B.A. English 1984)
University of Sussex, Falmer, England (1982-83) (as a participant in the University of
California Education Abroad Program)

## PROFESSIONAL EXPERIENCE

Dent Legal Strategy, LLC
Washington, DC

*Principal*                                                                                    *2018 – Present*
Legal and strategic solutions for general counsel, senior executives, and boards of
directors through expertise in hotel franchising and management; dispute
resolution; arbitration and mediation; expert testimony; and corporate legal
operations.

G6 Hospitality LLC
Carrollton, TX

*Chief Legal Officer*                                                            *August 2018 – April 2019*
Hired by private equity owner as part of senior management overhaul to resolve
outstanding major litigation, groom new General Counsel, and prepare company
for eventual sponsor exit.

Extended Stay America, Inc. and ESH Hospitality, Inc. (NASDAQ: STAY)
Charlotte, NC

*General Counsel and Corporate Secretary*                         *January 2015 – May 2018*
Responsible for the legal, risk management, and corporate secretarial functions of
the largest lodging REIT in North America (by room and unit count) and its
paired-share operating company. Authored company's first franchise disclosure
document, franchise agreement form, and HMA form.

Hilton Worldwide, Inc. (NYSE: HLT) (f/k/a Hilton Hotels Corporation)
McLean, VA and Beverly Hills, CA

*Senior Vice President and Deputy General Counsel*                         *2011 - 2014*
Second-in-command for the global legal department at Hilton, which at the time
had over 4000 hotels operating under ten brands in 90 countries and over $9
billion in annual revenues.  Directly responsible for a team of 35 attorneys and
paralegals in London, Shanghai, Singapore, New Delhi, Dubai, and the company's
headquarters in McLean.  Team responsibilities included legal support for

franchising, management, and related agreements; operations; real estate acquisitions, dispositions, and financing; and asset management.

*Acting General Counsel*                                          *November 2010 – June 2011*
Served as interim General Counsel during search for a permanent replacement after prior General Counsel's departure.

*Senior Vice President and Assistant General Counsel, Development*  *2009 - 2011*
Responsible for a team of 12 attorneys and paraprofessionals supporting the company's franchising, management, and related agreements; real estate acquisitions, dispositions, and financing; and asset management functions in the Americas.

*Vice President and Senior Counsel*                                    *2001 - 2009*
Initially managed defense of major uninsured litigation; transitioned to transactional role in negotiating, drafting, interpreting and enforcing management agreements and related development agreements.

*Senior Counsel*                                                  *2000 - 2001*
Managed defense of major uninsured litigation.

Representative luxury transactions:
- Conrad Washington DC HMA negotiation
- Waldorf Astoria Chicago HMA negotiation
- Conrad New York HMA negotiation
- Cosmopolitan Las Vegas HMA negotiation
- Acquisition and renegotiation of management agreement portfolio from KSL hospitality and conversion to Waldorf Astoria Collection branding
- Conrad Las Vegas HMA negotiation
- Beverly Hilton HMA negotiation

Representative owner/operator litigation and arbitration matters:
- Defense of breach of contract and fiduciary duty claims arising out of area restriction and corporate merger
- Defense of breach of contract claim arising out of HMA termination due to corporate merger and effect on pre-existing contract obligations
- Enforcement of brand standard requirement for franchisee to participate in loyalty program
- Enforcement of liquidated damages provision allowing actual damages in case of intentional breach
- Enforcement of brand standard prohibiting resort fees

- Defense of breach of contract claim arising out of pre-construction termination of HMA
- Interpretation of cross-termination provisions in franchise agreement and HMA
- Defense of franchisee breach of contract and fraud claims arising out of brand sale to third party
- Adversary proceeding in bankruptcy over validity and estimated value of portfolio of luxury hotel management agreements

Representative other litigation and arbitration:
- Defense of class action arising out of resort fees
- Defense of class action arising out of energy surcharges
- Defense of California "Proposition 65" claims based on exposure to secondhand tobacco smoke

Tuttle & Taylor, A Law Corporation
Los Angeles, California

*Shareholder*                                                                        *1997 – 2000*
*Litigation Associate*                                                          *1990 – 1997*
Matters included directors' and officers' liability; insurance coverage; tax and accounting, particularly as to real estate; and agency and fiduciary duty, particularly as applied to hotel management agreements.

## PROFESSIONAL ASSOCIATIONS

State Bar of California

District of Columbia Bar

American Bar Association

Association of Corporate Counsel (inactive)

Advisory Board, Georgetown University Hotel and Lodging Legal Summit

**<u>Exhibit C</u>**

**Publications**

I have authored the following articles in the last ten years. All were self-published on LinkedIn and at www.dentlegalstrategy.com/articles:

*When Downside Risk Becomes Reality* (February 2021)

*Making Sense of Jargon in Hotel Management and Franchise Deals* (July 2020)

*The Coronavirus Meets "Full Service"* (June 2020)

*A Question for 112 Seasons* (May 2020)

*Navigating Economic Shock – Practical Tips for Hotel Owners and Managers* (March 11, 2020)

*The Hotel Owner-Operator Wars Are Dead. Long Live the Owner-Brand Wars.* (January 2020)

*Rethinking Hotel "Brands"* (December 2019)

*Hilton's Other Anniversary* (October 2019)

Exhibit C – Publications                                                                                                          1

## **Exhibit D**

## **Engagement Letter**



Dent
Legal
Strategy

<u>By email</u>
Pete Benudiz
Stacy Horth-Neubert
Sidley Austin LLP
555 West Fifth Street
Los Angeles, California 90013
shorthneubert@sidley.com

May 1, 2021

      Re:      *Engagement of John Dent as Testifying Expert*

Dear Pete and Stacy,

This will confirm the terms under which Sidley Austin LLP ("**Sidley**") and Accor Management US Inc. ("**Accor**") are retaining me as a testifying expert in the following two proceedings:

- *Debtors Motion to Estimate Maximum Amount of Fairmont Hotel & Resorts (U.S.) Inc.'s Contingent and Unliquidated Claim* (the "**Estimation Motion**") filed in *In re SC SJ Holding LLC, et al.,* United States Bankruptcy Court for the District of Delaware, Case No. 21-10549 (JTD), and jointly-administered proceedings (collectively, the "**Bankruptcy**")
- *Accor Management US Inc. (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) v. FMT SJ LLC, et al.,* American Arbitration Association Case No. 01-21-002-1684 (the "**Arbitration**")

    1.   *Scope of engagement.* I am being retained as a testifying expert regarding (i) the use of liquidated damages provisions in hotel management and franchise agreements, including their history, purpose, structure, prevalence, and relation to other provisions in those agreements and ancillary agreements, (ii) my evaluation of the liquidated damages provision in the Fairmont San Jose management agreement, both in that overall context and as applied to the specific disputes at issue in the Bankruptcy and the Arbitration, (iii) the use of covenants of quiet enjoyment in hotel management agreements, including their history, purpose, and prevalence, (iv) my evaluation of how the hotel owner's actions at issue in the Bankruptcy and the Arbitration complied with or violated the covenant of quiet enjoyment in the Fairmont San Jose management agreement and the consequences of that violation, and (v) industry standards and norms relative to the foregoing. The scope of my engagement includes testimony by affidavit or declaration, deposition, and live or recorded testimony at any hearing or trial in the Bankruptcy or the Arbitration, and the preparation of written reports as necessary or required. The scope

1300 I Street NW • Suite 400E • Washington DC 20005
(202) 749-8338 • john.dent@dentlegalstrategy.com
www.dentlegalstrategy.com



of my engagement does not include the calculation of damages or any other issues. Sidley, Fairmont, and I may expand the scope of my engagement only by mutual agreement through a written amendment of this engagement letter.

2.  *Fees.* My fees for this engagement will be as set forth below. In each case, I will invoice Accor directly, who will be solely responsible for payment. Invoices will be paid within 30 days.

    a.  *Research, investigation, and fact discovery: To be billed hourly, at a rate of $1000/hour, up to a cap of $50,000.* This phase includes:

        i.  review of relevant pleadings and filings in the Bankruptcy and the Arbitration;
        ii.  review of materials produced in discovery, including documentary evidence and deposition testimony;
        iii.  market research, including review of competitor practices, and other research that I consider necessary or useful to support my opinion;
        iv.  consultation with Sidley regarding potential further discovery and deposition topics to support my opinion;
        v.  testimony (by declaration, affidavit, or live) in connection with pretrial proceedings such as discovery disputes, motions for preliminary relief, motions to dismiss or for summary judgment; and
        vi.  assistance as requested in connection with mediation or other settlement proceedings.

    b.  *Report preparation: To be billed hourly, at a rate of $1000/hour, up to a cap of $40,000.* This phase will commence upon Sidley's instruction to me to prepare an expert report. This phase includes:

        i.  preparation of the report, including consideration of your comments on preliminary drafts;
        ii.  review and evaluation of any opposition report;
        iii.  consultation regarding potential topics or questions for deposition of opposing experts;
        iv.  preparation of a rebuttal report, if Sidley asks me to prepare one; and
        v.  further research that I consider necessary or useful to support the rebuttal report.

    c.  *Deposition: To be billed hourly, at a rate of $1000/hour, up to a cap of $30,000.* This phase will include:

        i.  deposition preparation;
        ii.  appearance and testimony at deposition; and
        iii.  review of and, if Sidley requests or approves, attendance at the opposing expert's deposition(s).

    d.  *Trial: $20,000.* This phase will include:

        i.  preparation for trial testimony at the Arbitration;



    ii.   trial testimony, including rebuttal testimony, at the Arbitration;

   iii.   attendance as Sidley requests for any other portion of the Arbitration hearing; and

   iv.   assistance and consultation regarding potential topics or questions for other Arbitration witnesses, including experts.

I will issue the invoice for this fee upon commencement of trial testimony preparation with Sidley. This $20,000 fee assumes trial testimony is needed in only the Arbitration. In the event trial testimony is required in both the Arbitration and the Bankruptcy, I will charge the $20,000 fee for each of the Arbitration and the Bankruptcy.

The phased fee schedule above assumes that phases a, b, and c will be completed contemporaneously in the Arbitration and the Bankruptcy. To the extent those tasks are instead addressed separately in the Arbitration or the Bankruptcy (such as at the currently-scheduled June 10-11, 2021 hearing on the Estimation Motion), I will invoice my time at an hourly rate of $1,000 and credit those amounts against the above fees in the other proceeding.

    3.   *Expenses.* Accor will reimburse me for reasonable parking, travel, lodging, meals, postage and overnight delivery fees, and other out-of-pocket expenses that I incur in connection with this engagement as evidenced by appropriate backup/receipts. Air travel will be in "economy plus" or equivalent class. I will not incur any travel expenses without Sidley's advance authorization. I do not charge for telephone, fax, copying, printing, or other administrative expenses except to the extent that volume or other requirements necessitate my using a third party with Sidley's advance approval. Expenses will be invoiced as incurred, no more frequently than monthly.

    4.   *Capacity.* I am an active member of the State Bar of California and the District of Columbia Bar. For purposes of this engagement, however, I am being retained for my knowledge, experience, and expertise in hotel management and franchise agreements and operations, not to provide legal advice, and this engagement does not create an attorney-client relationship with any party or counsel to this matter. Neither my consultations with Sidley or Accor nor my testimony will disclose privileged communications with any of my existing or former clients except as previously waived through prior public disclosure or otherwise. Neither the work product doctrine nor the attorney-client privilege will apply to my communications on this engagement except as applicable due to the involvement of other attorneys. My fees will be deemed fully earned upon receipt and will not be held in a client trust account.

    5.   *Termination.* Sidley or Accor may terminate this engagement at any time for any reason with no further payment other than (i) invoiced but unpaid fees and (ii) reimbursement for incurred but not yet invoiced expenses.

Please indicate your agreement to these terms by countersigning this engagement letter below and returning it to me at your convenience.

Sincerely,

John Dent



Acknowledged and agreed:

Sidley Austin LLP

*Peter Benudiz*

By:     Pete Benudiz

Accor Management US Inc.

By: Barbara Kilner

Its: Senior Vice President, General Counsel, North & Central America