**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SC SJ HOLDINGS LLC, *et al.*[1] | Case No. 21-10549 (JTD) |
| Debtors. | (Jointly Administered) |

**Expert Report of Greig Taylor**

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SC SJ Holdings LLC (5141) and FMT SJ LLC (7200). The mailing address for both Debtors is 3223 Crow Canyon Road, Suite 300 San Ramon, CA 94583.

# Table of Contents

I.    Introduction and Assignment.................................................................................. 2

II.   Summary of Conclusions...................................................................................... 3

III.  Background......................................................................................................... 6

IV.   Damages arising from the Debtors' Alleged Breaches of Contract ...................... 9

V.    Liquidated Damages Provision........................................................................... 25

Appendix 1    Curriculum Vitae of Greig Taylor................................................... 29

Appendix 2    Materials Relied Upon ................................................................... 36

Appendix 3    Modeling the Hotel's Financial Performance .................................. 39

Appendix 4    Discount Rate ............................................................................... 50

Exhibit 1    Calculation of Lost Management Fees ............................................... 55

Exhibit 2    2015 to 2020 Historical Performance and 2021 March Forecast .......... 58

Exhibit 3    The Impact and the Recovery from the Pandemic................................ 59

Exhibit 4    Historical Fees Reconciliation ........................................................... 60

Exhibit 5    Performance Test ............................................................................. 61

Exhibit 6    Beta Calculation............................................................................... 62

**I.  Introduction and Assignment**

1.      My name is Greig Taylor. I am a graduate of the University of Manchester, England, a Fellow of the Institute of Chartered Accountants in England and Wales, and a Managing Director in the New York office of AlixPartners LLP, a global expert services firm specializing inter alia in litigation support and valuation.  My expertise and experience relate to the identification, quantification and valuation of damages, lost profits, business enterprise value and sunk costs in matters involving contract disputes.  I have attached a copy of my qualifications and relevant experience in **Appendix 1**.

2.      I have been engaged by counsel to provide expert evidence regarding damages resulting from breach of contract, including, being engaged on numerous occasions to provide expert evidence regarding the damages resulting from the termination of hotel management agreements.

3.      AlixPartners is being compensated at a rate of $895 per hour for my work on this matter.  Neither my nor AlixPartners's compensation is contingent on my findings or on the outcome of this matter.  I have been assisted in the preparation of this expert report by AlixPartners's staff working under my direction and supervision.

4.      I have been retained by Sidley Austin LLP ("**Counsel**"), on behalf of Accor Management US Inc. (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) ("**Operator**" or "**Fairmont**" or "**Accor**") in relation to its dispute with SC SJ Holdings LLC ("**SC Holdings**") and FMT SJ LLC ("**FMT**"; together with SC Holdings, "**Owner**" or "**Debtors**").[2]  I understand that Accor has asserted a number of breach of contract claims arising out of (i) Debtors' removal of Accor

---

[2] Throughout this report, I use the terms "Owner" or "Debtors" interchangeably to refer to either or both of the Debtors in this proceeding. In so doing, I do not express any opinion as to which Debtor, if either, performed any particular act described herein.

management from and closure of the hotel formerly known as the Fairmont San Jose Hotel (the "**Hotel**"), (ii) Debtors' rejection of the Amended and Restated Hotel Management Agreement between San Jose Fairmont Lessee, LLC, and Fairmont Hotels and Resorts (U.S.) Inc. dated as of December 2, 2005, (as further amended, assumed, modified, and/or restated, and together with any annexes, exhibits, and ancillary agreements) (the "**HMA**") pursuant to which Accor managed the Hotel, and rejection of the Owner Agreement between SC SJ Holdings LLC, FMT SJ LLC and Fairmont Hotels & Resorts (U.S.) Inc. dated as of January 2, 2018 (the "**Owner Agreement**"), (iii) Debtors' termination of the HMA, and (iv) Debtors' failure to pay management fees and reimbursable amounts due and owing to Accor (collectively, "**Debtors' Alleged Breaches of Contract**"). I have been instructed by Counsel to provide my independent and objective opinion as to the quantum of economic damages, if any, suffered by Accor as a result of Debtors' Alleged Breaches of Contract. The Operator and Debtors are referred collectively herein as the "**Parties**".

5.      As instructed by counsel, I prepared my opinion of damages as of March 5, 2021 ("**Valuation Date**"), which I understand was the date on which the Owner removed Accor management from the Hotel and shut down the operations of the Hotel (the "**Closure**").

6.      I have been instructed to make certain assumptions on legal matters, which are relevant to the position taken by the Operator in this dispute. I refer to those assumptions in the relevant sections of this expert report. This expert report must not be construed as expressing opinions on matters of law, which are outside my expertise.

## II.  Summary of Conclusions

7.      I have undertaken an analysis to determine the quantum of damages suffered by Accor as a result of Debtors' Alleged Breaches of Contract. My analysis of the damages is

3

premised on the forgone basic and incentive management fees that Accor would have reasonably expected to receive during the remaining term of the HMA, in the absence of the actions of the Owner starting on March 5, 2021.  Avoided expenses have also been considered as part of the analysis.

8.      The estimated fees, net of expenses, represent future cash flows.  In order to present the future cash flows as at the Valuation Date, I discounted the future cash flows using a discount rate that reflects the risk of realizing the future cash flows.[3]  In addition, I have added to the damages estimate the amount of fees and reimbursables that Accor earned, but had not been paid by Owner to date.[4]

9.      Based on my review, assumptions, and restrictions, I calculated the quantum of damages suffered by Accor:

---

[3] I have not added prejudgment interest to account for the fact that Accor did not receive payment on the Valuation Date.  I will update my calculations for pre-judgment interest should Counsel make that request.

[4] I understand that Accor may also have indemnification claims against Debtors arising out of the Closure of the Hotel, but those claims are not yet settled.  I have not included in this analysis any amounts that may be due as a result of Accor's indemnification claims.  If requested by Counsel or the Court, I will update my calculations once those claims have been settled.

**Figure 1        Summary of Damages**

| Item | Amount (US$) |
|---|---|
| Lost Management Fees | 24,657,609 |
| Unpaid Fees and Reimbursements[5] | 2,029,201 |
| Less: Present Value of Shortfall Payments | (2,417,097) |
| **Total** | **24,269,713** |

10.    Counsel also asked me to calculate damages under the Liquidated Damages provision in the HMA under certain assumptions regarding the appropriate "Imputed Management Fees" amount.  I present those scenarios below in the figure below:

**Figure 2        Summary of Liquidated Damages Amounts**

| Scenario | Reference Period | Imputed Management Fees (US$) | Multiplier | Liquidated Damages Amount (US$) |
|---|---|---|---|---|
| 1 | Average 2015-2019 | 1,977,134 | 17 | 33,611,278 |
| 2 | Average 2018-2019 | 1,994,547 | 17 | 33,907,299 |
| 3 | 2019 | 1,892,238 | 17 | 32,168,046 |
| 4 | Feb 2020-Jan 2021 | 298,180 | 17 | 5,069,060 |

11.    The materials that I relied on in coming to my opinions in this matter are referenced in this expert report and accompanying exhibits or are listed in **Appendix 2** to this expert report.  I reserve the right to reconsider my opinions in light of additional information that may be made available to me in the future, especially in light that fact discovery is still ongoing as of the date of this expert report.

---

[5] According to Section 1.14 of the HMA, "All payments which are required or permitted to be made by one Party to another Party pursuant to this Agreement and which are not made on the due date of payment shall, unless this Agreement indicates otherwise, bear interest at the Agreed Rate from the due date of payment to the date that payment is made. Whenever such interest is to be calculated over a period of one or more years, it shall be compounded semi-annually."  I have not added interest owed to this calculation, but I will update my calculations for interest owed through trial should Counsel make that request.

## III. Background

12.     Accor is a subsidiary of Accor, S.A.,[6] which describes itself as "a world-leading augmented hospitality group, offering unique and unmatched experiences in more than 5,000 hotels, resorts and residences across 100 countries."[7]   As I understand it, SC Holdings purchased the Hotel on January 2, 2018.[8]  FMT leased the Hotel from SC Holdings pursuant to a lease agreement that was dated January 2, 2018.[9]

13.     The Hotel is an 805-room luxury hotel located in San Jose in the "heart of Silicon Valley", which was opened in 1987 and expanded in 2002.[10]  It is a 20-story, two tower hotel with "65,000 square feet of state-of-the-art meeting and event space, three restaurants with bars, a café bakery, a fitness center, and a rooftop pool and gazebo."[11]  The Hotel "features grand ballrooms for large conferences and conventions as well as intimate spaces for smaller gatherings."[12]  According to the Debtors' Chief Restructuring Officer ("**CRO**"), San Jose's downtown area "is in the midst of robust growth with numerous development projects underway thanks to tremendous growth fueled by the information and technology industries."[13]

### A.  Hotel Management Agreement, Closure of the Hotel, and Rejection and Termination of the HMA

14.     As I understand it, Accor managed the Hotel under the terms of the HMA.

---

[6] Accor 2019 Universal Registration Document (Annual Financial Report, Integrated Report), filed on April 9, 2020, with the French Market Authority, at 355.
[7] Accor 2019 Universal Registration Document (Annual Financial Report, Integrated Report), filed on April 9, 2020, with the French Market Authority, at 7.  *See also* "Accor at a Glance, February 2021" (available in "Accor At a Glance" from https://group.accor.com/en/group/who-we-are/accor-in-brief).
[8] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶¶ 35-36.
[9] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 8.
[10] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶¶ 7, 32.
[11] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 31.
[12] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 31.
[13] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 32.

15.     The initial term of the HMA ends on December 31, 2025 (the "**Initial Term**").[14] In addition, the HMA provides for an automatic renewal for five consecutive five-year terms at the Operator's option (the "**Extension Terms**").  Specifically, the term extends as follows:[15]

> *The Operator shall have the right to extend the Operating Term for five consecutive 5-year Extension Terms, provided that at the time of exercise of the right to extend and at the commencement of the ensuing Extension Term the Operator and its Affiliates continue to be engaged in the operation of Operator Hotels having in the aggregate not fewer than 2,800 guest rooms. In addition, the Operating Term shall be extended automatically by a period equal to the period between any termination and subsequent reinstatement of this Agreement pursuant to Section 13.5.*

16.     Under the HMA, Accor was to receive 2.75% of the Hotel's Total Revenues during each Fiscal Period.[16]  I understand that there also was a separate management fee for parking revenue which equaled 1.00% of parking revenue (these combined fees are referred to as "**Basic Management Fee**").[17]  In addition, Accor was entitled to an annual incentive fee in each "Fiscal Period equal to 30% of the amount, if any, by which the Net Operating Income of the Hotel for such Fiscal Period exceeds the Threshold Net Operating Income for such Fiscal Period…" (the "**Incentive Fee**", the combined Incentive Fee and the Basic Management Fee

---

[14] HMA, Section 2.1.

[15] HMA, Section 2.2.

[16] HMA, Section 9.1.  According to the HMA, Total Revenues "means, subject to Section 9.4, all revenue, income and proceeds of sales of every kind, whether in cash or on credit, resulting from the Operation of the Hotel and properly attributable to the Fiscal Month, Fiscal Period or portion of a Fiscal Period under consideration, determined on an accrual basis under the Operator's Accounting Policies…"  (HMA, Section 9.3.)  Under the HMA, amounts from beverage sales made pursuant to a separate agreement (formerly called the Liquor Management Agreement) are excluded from Total Revenues in order to calculate the Basic Management Fee.  (HMA, Section 9.3.)  However, Accor charges an equivalent fee of 2.75% on those beverage sales, as shown in Accor's financial reports. Therefore, the Total Revenues that I use to calculate the Basic Management Fee are inclusive of all food and beverage revenue. Discovery is ongoing and I reserve the right to revise this report in the event later discovery suggests the beverage sales charge is not 2.75%.  In addition, "the net proceeds of use and occupancy or business interruption insurance payable to either the Owner or the Operator with respect to the Operation of the Hotel after deduction from such proceeds of all necessary expenses incurred in the adjustment or collection thereof" are included in Total Revenues. There are specific exclusions from Total Revenues in Section 9.4 of the HMA, such as excise taxes, gratuities, and certain insurance proceeds.

[17] *See* "SAJ 1999-2020 Rev+Fees - HMA.xlsx" and email from Brett Conner to Daryl Benjamin, June 2, 2017, Subject: SAJ – 1% management fee for garage revenues.

are the "**Management Fee**").[18]   The Threshold Net Operating Income was set to $22,183,214 as of January 2, 2018 under the Third Amendment to Amended and Restated Hotel Management Agreement made and entered into by and between Fairmont Hotels & Resorts (U.S.) Inc., a Delaware corporation and FMT SC LLC, a Delaware limited liability company, dated January 2, 2018 (the "Third Amendment").[19]

17.     The Owner was able to terminate the HMA if the Hotel fails a specified "Performance Test" metric in two consecutive calendar years without a cure, except if there is a Force Majeure event.[20]   The Performance Test metric specifies that the Hotel's Net Operating Income must exceed an "NOI Base".   The NOI Base was set to $10,663,874 in the Third Amendment as of January 2, 2018.[21]   The NOI Base was set to increase by 1% of the 1998 Net Operating Income in each year through the end of the Initial Term.[22]   In each extension period, the NOI Base in the first extension year would reset to 75% of the prior year's Net Operating Income and would grow by 1% of the 1998 Net Operating Income in each subsequent year of the extension period.[23]   The Operator can cure a failure of the Performance Test (two consecutive shortfall years) by paying the Owner the difference between the Net Operating Income and the NOI Base, or the "Shortfall", for those two years.[24]

---

[18] HMA, Section 9.1. The Net Operating Income is defined as "The "Net Operating Income" of the Hotel for any Fiscal Month, Fiscal Period or portion of a Fiscal Period shall be the amount, if any, by which Total Revenues exceed Operating Expenses for such Fiscal Month, Fiscal Period or portion of a Fiscal Period. "Net Loss" shall mean a negative Net Operating Income." (HMA, Section 9.2.)  Operating Expenses are defined in Section 9.6 of the HMA.
[19] Third Amendment, ¶ 5 (The "Threshold Net Operating Income").  In the event that, in any Fiscal Period, the Owner pays for Capital Improvements or for replacements, substitutions or additions to Furniture, Fixtures and Equipment, in either case with funds in excess of funds resident in or to be deposited into the Capital Replacement Reserve in such year (the "Additional Capital"), the Threshold Net Operating Income shall be increased for succeeding Fiscal Periods by an amount equal to ten percent (10%) of the Additional Capital." (HMA, Section 9.1.)
[20] HMA, Section 16.10.
[21] Third Amendment, ¶ 7.
[22] HMA, Section 16.10(d).
[23] HMA, Section 16.10(e).
[24] HMA, Section 16.10(b)(C).

8

18.     As I understand it, the Owner closed the Hotel on March 5, 2021 without Accor's consent and removed Accor management from the Hotel on that day.[25]  On the same day, FMT filed for bankruptcy relief, and SC Holdings filed for bankruptcy relief on March 10, 2021, which coincided with the date of Debtors' motion to authorize the rejection of the HMA and Owner Agreement.[26]  I understand that on March 15, 2021, the Debtors provided written notice to Fairmont that the HMA would be terminated in the event the Court granted Debtors' motion to reject the HMA.[27]  On April 5, 2021, the Court authorized the Debtors to reject the HMA and Owner Agreement effective as of the date of each Debtors' respective bankruptcy petitions.[28]

## IV.  Damages arising from the Debtors' Alleged Breaches of Contract

### A.  Approach

19.     I have undertaken an analysis to quantify the damages suffered by the Operator as of the Valuation Date as a result of the Debtors' actions, which ultimately resulted in the Closure, the rejection of the HMA and Owner Agreement, and the termination of the HMA.  In

---

[25] Debtors' Motion For Entry Of An Order Authorizing The Debtors To Reject Amended And Restated Hotel Management And Owner Agreements Between Debtors And Fairmont, Effective As Of The Debtors' Respective Petition Dates, dated March 10, 2021, ¶¶ 35-36.  Declaration Of Paul Tormey In Support Of Motion To (i) Modify The Automatic Stay To Permit Arbitration Of Disputes; And (ii) Compel Arbitration Of Disputes, dated March 22, 2021, ¶¶ 10-12.
[26] Debtors' Motion For Entry Of An Order Authorizing The Debtors To Reject Amended And Restated Hotel Management And Owner Agreements Between Debtors And Fairmont, Effective As Of The Debtors' Respective Petition Dates, dated March 10, 2021, ¶¶ 13, 36.
[27] Debtors' Memorandum And Points Of Authorities In Opposition To Fairmont's Motion To (i) Modify The Automatic Stay To Permit Arbitration Of Disputes; And (ii) Enforce Arbitration Clause Compelling Arbitration Of Disputes, dated March 30, 2021, at 8.  I understand the Parties dispute the effective date of termination of the HMA and I express no opinion on that issue.  Throughout this report, I may refer to the damages I calculate herein as damages resulting from the "termination of the HMA" for convenience, but I express no opinion regarding which Alleged Breaches of Contract are compensable with breach of contract damages as a matter of law, and I express no opinion regarding the date upon which the HMA was effectively terminated as a matter of law.
[28] Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreement Between Debtors And Fairmont, dated April 5, 2021.

the preparation of my analysis, I have assumed that there will be a legal finding that the Operator

is entitled to an award of damages.

20.    I understand that damages are compensatory by nature, and they are intended to

place the Operator in the same economic position they would have been in but for the Debtors'

Alleged Breaches of Contract.  In this case, the appropriate measure of damages compensates

the Operator for money that they expected to receive under the HMA.

21.    Therefore, my calculation of the damages is premised on the fees that the

Operator would have expected to earn under the HMA had the HMA been performed until the

end of its term.  This analysis comprises of the following factors:

> i.    Remaining term of the HMA ("**Period of Loss**");
>
> ii.    Loss of fees that the Operator would have earned over the remaining term of the HMA ("**Gross Fees**");
>
> iii.    Expenses that the Operator avoided as a consequence of the Closure and termination of the HMA.  Alternatively, these represent non-reimbursable expenses that the Operator would have incurred during the fulfillment of the services under the HMA had it been performed for the remaining term ("**Avoided Costs**");
>
> iv.    Gross Fees, net of Avoided Costs, represents "**Lost Fees**";
>
> v.    Lost Fees incurred after the date of the Closure (*i.e.*, March 5, 2021) are subject to discounting at an appropriate rate of return that reflects the risk of realization ("**Present Value of Lost Fees**");
>
> vi.    The present value of any Shortfall payments that that the Operator would need to make to cure a failure of the Performance Test (the "**Present Value of Shortfall Payments**"); and,
>
> vii.    Any unpaid fees and reimbursements owed to the Operator (such as unpaid Management Fees) or money that is due from the Operator to the Owner ("**Unpaid Fees and Reimbursements**").

22.    Total damages arising from the Debtors' Alleged Breaches of Contract comprise

the Present Value of Lost Fees, less the Present Value of Shortfall Payments, plus Unpaid Fees

and Reimbursements.

23.     In general, my damages methodology follows the damages methodology in an article authored by Professor Jan A. deRoos, the HVS Professor of Hotel Finance and Real Estate at the Cornell University School of Hotel Administration, and Scott D. Berman, the industry leader of the hospitality and leisure practice of PricewaterhouseCoopers LLP, in the *Cornell Hospitality Report* entitled "Calculating Damage Awards in Hotel Management Agreement Terminations" ("deRoos & Berman") where the authors state:[29]

---

**EXHIBIT 2**

**Methodology for estimating damages in a management contract termination**

(1)  **Establish the Period Covering the Loss**—The starting point for all damage estimates is the period covering the loss, which is the remaining term of the contract, plus the term expected from any renewal options in the contract or a reasonably expected renewal.

(2)  **Estimate Property Level Performance**—Lost management fee revenues and other contributions are a function of the expected performance of the terminated hotel; thus hotel revenues and expenses must be estimated over the period covering the loss.

(3)  **Estimate Gross Lost Fee Revenue**—Three categories of revenue loss are estimated using the estimates of property performance over the period covering the loss:

    o   *Base fees*—generally based on hotel revenues,

    o   *Incentive fees*—generally based on hotel profitability, and

    o   *Other contributions by the owner*—these include marketing fees, reservation fees, shared accounting services, shared marketing costs, shared regional management, training costs, and similar items enumerated in the management contract.

(4)  **Estimate Avoided Costs**—The gross lost revenue estimates need to be adjusted for any costs so that only the net lost fees are used in the economic loss calculation. The appropriate adjustment is to consider the actual marginal costs avoided, not average costs avoided.

(5)  **Determine Present Value of the Net Fee Losses**—The lost fees (adjusted for avoided costs) are discounted using an appropriate discount rate to establish a present value at the time of the termination.

(6)  **Estimate of Other Damages**

    o   *Investments in the Hotel*—The damages may include the recovery of investments in the terminated hotel. These include working capital, key money or loans to the owner or the property, adjustments necessary to reconcile accounts receivable and accounts payable, provisions for future claims from former guests, or other direct investments.

    o   *Human Capital Damages*—Damages can include the costs related to the lost costs of recruitment, training, and professional development, and the cost of severance packages for the existing staff, as well as the costs to recruit, train, and develop new employees for reentry into the market.

    o   *Reputation Damages*—Reputation damages result from the loss of reputation among guests, both at the unit level and system wide. Perhaps even more germane, reputation damages should be considered with the community of hotel owners, the community of hotel lenders, and the community of hotel operators.

    o   *Damages Due to Reentry*—Damages due to the cost of reentry into the market include the costs to identify a suitable property, negotiate a contract, and staff, train employees, and prepare the property for operation.

(7)  **Total the Damages**—The sums from 5 and 6 are added to produce a total estimate of damages.

---

[29] deRoos, J. A., & Berman, S. (2014). Calculating damage awards in hotel management agreement terminations [Electronic article]. *Cornell Hospitality Report*, 14(16), 6-16.  I have replicated Exhibit 2 of the article above.

24.     I present my analysis of each of these factors in detail below.

**B.  Period of Loss**

25.     The operating term of the HMA refers to the period for which the agreement is in effect, and it consists of:

      i.    The Initial Term of the HMA through December 31, 2025; and,

     ii.    All Extension Terms of the HMA from January 1, 2026 to December 31, 2050.

26.     If the Owner had not removed Accor and ultimately terminated the HMA, the Operator would have continued to operate and manage the Hotel and receive the fees under the HMA.  Therefore, I considered the remaining Initial Term of the HMA, from March 6, 2021 to December 31, 2025, to be part of the Period of Loss.

27.     Similarly, I considered the Extension Terms of the HMA to be part of the Period of Loss.  The Operator has the unilateral right to extend the term of the HMA for five consecutive five-year terms, which extends the term of the HMA from January 1, 2026 to December 31, 2050, as long as a minimum rooms provision is met by the Operator.[30]  Under the HMA, the terms are deemed renewed automatically without intervention from the Operator, absent termination or cancellation.  Therefore, had the HMA not been terminated by Debtors, it is reasonable to assume that the Operator would have continued to operate and manage the Hotel up to December 31, 2050.

---

[30] The HMA specifies "provided that at the time of exercise of the right to extend and at the commencement of the ensuing Extension Term the Operator and its Affiliates continue to be engaged in the operation of Operator Hotels having in the aggregate not fewer than 2,800 guest rooms."  (HMA, Section 2.2.).  As of December 2020, Accor had over 753,000 rooms in its network and 37,200 in its network in North and Central America and in the Caribbean. ("Accor at a Glance, February 2021," available in "Accor At a Glance" from https://group.accor.com/en/group/who-we-are/accor-in-brief).

28.     My conclusion on the Extension Terms of the HMA is consistent with how industry practitioners view extension terms in the context of valuing damages in hotel management agreement terminations.  deRoos and Berman wrote:[31]

> *The probability that the manager would have continued in place for the remaining contractual renewals depends on the contract's language. In most cases, however, this probability approaches 100 percent, because many contracts provide that the manager has the unilateral right to renew the contract absent any breach.  These clauses are often tempered with language giving the owner the right to terminate if certain performance hurdles have not been achieved, and thus the probability of continuation needs to be tempered by this fact, if such language appears.  Otherwise, we estimate that the expected probability of contract renewal is 100 percent.*

29.     While the HMA does not contemplate any extension terms beyond December 31, 2050, the Parties could have renewed the HMA beyond its operating term.  However, in the absence of relevant clauses in the HMA, I do not consider it reasonable to include any terms beyond December 31, 2050 in the Period of Loss.

30.     I conclude that the Period of Loss is from March 6, 2021 to December 31, 2050.

## C.  Gross Fees

31.     After establishing the Period of Loss, I examined the forgone fees that the Operator would have reasonably expected to receive had the Hotel not been closed and the HMA not been terminated by Debtors.

32.     Under the HMA, the Operator is entitled to the following types of fees:

    i.    Basic Management Fee, equal to 2.75% of the Total Revenues, excluding parking revenue, and 1.00% of parking revenue;

    ii.   Incentive Fee, equal to 30% of Net Operating Income above the Threshold Net Operating Income; and,

    iii.  Other fees.

[31] deRoos, J. A., & Berman, S. (2014). Calculating damage awards in hotel management agreement terminations [Electronic article]. *Cornell Hospitality Report*, 14(16), 6-16.

33.     I discuss each of the fees below.

**D.  Basic Management Fee**

34.     Accor earns the Basic Management Fee for the services rendered under the HMA.  This fee amounts to 2.75% of the "Total Revenues" of the Hotel, excluding parking revenue, and 1.00% of the parking revenue.[32]

35.     Thus, in order to determine the amount of Basic Management Fee that Accor would have expected to receive in the absence of the termination, I estimated the Total Revenues that the Hotel would have generated during the Period of Loss but for the Closure and termination.

36.     The COVID-19 pandemic has had a major negative impact on the hospitality industry generally and on the Hotel in 2020 and 2021 and may be expected to have continuing impacts beyond 2021.  Therefore, I need to establish an appropriate base-line performance of the Hotel which excludes the impact of COVID-19, as well as an appropriate estimate of when the Hotel will return to such base-line performance levels.

37.     As **Figure 3** below shows, between 2015 and 2019, the Hotel's occupancy rate declined from 79% to 69% with an average occupancy rate of 74%.  In 2020 (during the pandemic), the occupancy rate for the Hotel was 18%:

---

[32] HMA, Sections 9.1, 9.3-9.4; "SAJ 1999-2020 Rev+Fees - HMA.xlsx" and email from Brett Conner to Daryl Benjamin, June 2, 2017, Subject: SAJ – 1% management fee for garage revenues.

**Figure 3**        **Occupancy Rates for the Hotel from 2015 to 2020 (%)[33]**



38.    As **Figure 4** below shows, between 2015 and 2019, the Hotel's "**ADR**", or average daily rate, range increased from $205 to $243 with an average ADR of approximately $226.  The ADR in 2020 was $214.

**Figure 4**        **ADR for the Hotel from 2015 to 2020 (US$)[34]**



39.    Consistent with the figures above, I show the revenue per available room ("**RevPAR**") for the Hotel between 2015 and 2020 in **Figure 5.**  RevPAR ranged from $161 to $172 between 2015 and 2019 and then dropped to $38 in 2020.  The average RevPAR between 2015 and 2019 was $166.  Due to the countervailing factors of higher relative ADR and lower

---

[33] *See* Exhibit 2, "Occupancy without Complimentary".
[34] *See* Exhibit 2, "Average Room Rate without Complimentary".

relative occupancy rate, the RevPAR for 2019 was in line with the average for the preceding years ($166).

**Figure 5        RevPAR for the Hotel from 2015 to 2020 (US$)[35]**



40.        Therefore, in terms of RevPAR I consider 2019 an appropriate base-line performance level for the Hotel.  I present the Hotel's historical financial performance in **Exhibit 2**.

41.        Having established the base-line performance, I need to consider when the Hotel will return to that base-line.  The Hotel's performance, like the rest of the industry, has been severely negatively affected by COVID-19 and the resultant travel restrictions and stay-in-place orders in 2020 and 2021.  However, many industry specialists predict a recovery to pre-COVID-19 level in the immediate coming years.  This is corroborated by the Debtors' CRO who stated that:[36]

> *Analysts' forecasts predict a long recovery period for the entire hospitality sector. One industry analyst predicts that occupancy will not return to pre-pandemic levels until 2022 or 2023.*

---

[35] *See* Exhibit 2, "RevPAR".
[36] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 42.

42.     The Debtors have stated that "Expectations for the Hotel are generally in line with industry-wide forecasts."[37]  While they state that they "do not anticipate disclosing a business plan or forward-looking projections" at this time, Debtors also state that the *"high-level expectations for the Hotel are currently as follows:"*[38]

| Revenue Expectations Upon Hotel Reopening |
|---|
| • *Occupancy Rate*: Expected to grow through 2021 and 2022 and reach pre-pandemic levels by the end of 2022 |
| • *ADR*: Expected to increase to its pre-pandemic levels by the end of 2022. |
| • *Food & Beverage Revenue*: Expected to increase as occupancy increases. |
| • *Impact of Qualified Manager*: The Hotel's performance is expected to improve under the post-Effective Date management of a new Qualified Manager.  Hotel brands that have expressed interest in the Hotel thus far generally offer improved marketing prospects for the Hotel, broader guest/booking pipelines, and better positioning to capture a larger share of the convention business as COVID-19-related restrictions continue to ease. |
| • *Operating Profit*: Expected to become positive in calendar year 2022. |

43.     That is, the Debtors expect the occupancy rate and average daily rate to be at pre-pandemic levels by the end of 2022 through both market factors and managerial selection.

44.     The Debtors' CRO also stated that *"Hotel's owner believes the value of the Hotel substantially exceeds the balance of the Secured Loan of approximately $175 million."*[39]  In other words, the Owner believes that there is substantial value in the Hotel even during the COVID-19 pandemic.

45.     I show my forecasted Total Revenue in **Exhibit 3**.  In **Appendix 3**, I provide a more detailed analysis of the macroeconomic, industry, and local factors that I factored into my forecast.  I base my opinions on the Hotel's past performance and expectations for the economy,

---

[37] Exhibit B, Amended Disclosure Statement, to The Notice Of Filing Of (1) Blacklined Amended Joint Chapter 11 Plan Of Reorganization And (2) Blacklined Disclosure Statement With Respect To Amended Joint Chapter 11 Plan Of Reorganization, at 77.

[38] Exhibit B, Amended Disclosure Statement, to the Notice Of Filing Of (1) Blacklined Amended Joint Chapter 11 Plan Of Reorganization And (2) Blacklined Disclosure Statement With Respect To Amended Joint Chapter 11 Plan Of Reorganization, at 77. (Emphasis added.)

[39] Declaration of Neil Demchick in Support of Chapter 11 Petitions and First Day Pleadings, ¶ 34. (Emphasis added.)

the industry, and specific predictions for San Jose hotels.  I show my analyses of the trends and how I apply them to forecast future Total Revenues.

46.    With regard to independent industry analysts forecast, CBRE published a forecast for the hotel industry specifically in the San Jose area in February 2021, which predicts a recovery for San Jose upper priced hotels by 2023 to levels above 2019 on the basis of RevPAR.[40]

47.    I utilize the CBRE report for the San Jose area to forecast Total Revenue from 2022 through 2025.  Specifically, I apply the RevPAR for upper priced hotels in the San Jose market forecast by CBRE for those years relative to the 2019 RevPAR and apply that to the Hotel's 2019 revenue.  For the remainder of 2021, I rely upon the forecast prepared by Accor for the Owner.  After 2025, I grow Total Revenue by the expected long-term annual inflation rate of 2.2% as presented by the Federal Reserve Bank of Philadelphia, Survey of Professional Forecasters, through the Period of Loss.

48.    The nominal amounts of the lost Basic Management Fee are shown in the figure below for the Initial Term and the Extension Terms.

---

[40] CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition, p. 5.

**Figure 6**         **Nominal Lost Basic Management Fee**[41]

| Term | Nominal Lost Basic Management Fees (US$) |
|---|---|
| Initial Term | 8,209,163 |
| Extension Terms | 70,560,236 |
| **Total** | **78,769,399** |

## E.  Incentive Fee

49.     Accor also earns an Incentive Fee that is equal to 30% of Net Operating Income above the Threshold Net Operating Income.  However, since the Operator has not earned an Incentive Fee since 2000, I do not believe that it is reasonable to project the Operator earning an Incentive Fee in the future, therefore I forecast the Incentive Fee to be $0.

## F.  Other Fees

50.     Schedule C of the HMA lists fees for other "Centralized Services"[42]  However, as I understand it, these fees were not intended to generate profits for Accor.  Expenses to provide these services would offset the revenues earned these fees.  Therefore, I do not calculate any damages to Accor relating to these fees.

## G.  Gross Fees

51.     The Gross Fees therefore comprise only the Basic Management Fees which amount to $78,769,399.

## H.  Avoided Costs

52.     Avoided Costs comprise expenses that the Operator would have avoided as a consequence of no longer providing services under the HMA due to its Termination.  Avoided Costs are subtracted from the Gross Fees to calculate the Lost Fees.

---

[41] *See* **Exhibit 1**.
[42] HMA, Section 6.2 and Schedule C.

53.     Article VI of the HMA states explicitly states that:

> *The Operator acknowledges that the fees contemplated in this Article VI are intended to permit the Operator to recover the costs of providing Centralized Services and the benefits of the Global Reservations System, in each case without profit, but with inclusion of the Operator's internal costs equitably allocable to the Operator's provision of the Services and may include, without limitation, reimbursement for the costs incurred by the Operator in connection with the salaries (including payroll taxes, Employee Benefits, relocation expenses and severance) of the employees and officers of the Operator and its Affiliates involved in the provision of the Centralized Services or the Global Reservations System, out-of-pocket expenses and disbursements (including, without limitation, travel, communication, courier and mail) and the costs of all facilities, equipment and services employed in the provision of such services.*

54.     While Accor may avoid expenses as a result of the Debtors' Alleged Breaches of Contract, such as expenses from travelling to the Hotel, such expenses are reimbursable, and consequently, Accor's claim for reimbursement of the expenses will be equally reduced.[43]  As a result, the net impact on Accor's revenues and expenses is nil.

55.     Put differently, if Accor were to incur any expenses to provide services to the Hotel in the absence of the termination of the HMA, Accor would claim reimbursement of these expenses or they would have been paid from the Other Fees.  This claim would then increase the Gross Fee but also increase the Avoided Costs by the equal amount.  Therefore, Lost Fees, calculated as Gross Fees less Avoided Costs, will remain the same.

**I.  <u>Lost Fees</u>**

56.     The total Lost Fees therefore comprise only the Gross Fees which amount to $78,769,399.

---

[43] HMA, Article VI and Appendix C.

**J.  Present Value of Lost Fees**

57.    The Lost Fees represent future income to Accor.  In order to present the future income in present terms as at the Valuation Date, I discounted the Lost Fees by the appropriate rate of return that reflects the risk of realizing the future income.  In this regard, I selected the Weighted Average Cost of Capital ("**WACC**").  I present my detailed analysis of the WACC in **Appendix 4**.  Based on the analysis in Appendix 4, I discount the Lost Fees using an 8.7% discount rate.

58.    Based on my analysis, I computed the Present Value of Lost Fees to be $24,657,609.

**K.  Performance Test and Shortfall Payments**

59.    As I discussed previously, the HMA included a provision that allows the Owner to terminate the HMA if the Hotel fails a specified "Performance Test" metric in two consecutive calendar years without a cure, except if there is a Force Majeure event.[44]  Accor would be able to cure a failure of the Performance Test by making a shortfall payment (i.e., the amount the Net Operating Income falls below the NOI Base) in the amount of the "Shortfall" over those two consecutive years.  I understand that Accor had a Shortfall in 2019 and Accor declared a Force Majeure event had occurred in 2020.[45]  As a result, there was no failure of the Performance Test for a period of two consecutive calendar years.  Further, I am instructed that Accor will declare a Force Majeure event in 2021 as a result of the evident continuing financial impact on the Hotel as a result of COVID-19, and I have been instructed that if the Hotel

---

[44] HMA, Section 16.10.
[45] Letter from Barbara D. Kilner, Senior Vice President, General Counsel, North & Central America, Accor Management, dated March 18, 2020, "Re: Amended and Restated Hotel Management Agreement for Fairmont San Jose (the "Hotel") dated as of December 2, 2005 (as may have been assigned or amended from time to time, the "Management Agreement")" to FMT SJ LLC and Baker Botts L.L.P.

continues to suffer a financial impact from COVID-19-related effects in 2022, I should assume that Accor would declare a Force Majeure event in 2022.

60.    I project the Net Operating Income through the reminder of the Initial Term and first Extension Term of the HMA, which I present in **Exhibit 5**.  Net Operating Income is forecast to be "**Net Operating Profit**" less property tax, property insurance, and the capital reserve fund.  To compute Net Operating Profit, department operating costs, non-departmental operating costs, and Management Fees are deducted from "All Revenue". [46]  Department operating costs as a percentage of All Revenues were relatively constant over the years before COVID-19, ranging from 49% to 52%, but increased during the pandemic.  However, as these costs tend to be more variable in nature, the increase of these costs as a percentage of All Revenue during the pandemic was relatively modest.  Starting with the forecast prepared by Accor for 2021, I project the percentage of operating costs to All Revenues will gradually decline to 2019 level in 2023 and reach to the five-year average prior to the Pandemic starting in 2024.  I present the historical and forecast department operating costs as a percentage of All Revenue in the figure below.

[46] Total Revenues is a subset of All Revenue whereby Total Revenues exclude certain items such as bad debt and service charge distributions to employees.

**Figure 7          Historical and Projected Departmental Operating Costs / All Revenue (%)[47]**



61.     In addition, non-departmental operating costs as a percentage of All Revenue were relatively stable prior to the pandemic but increased in 2020 and were forecast to remain at an increased level in 2021.[48]  These are costs that are not assigned to a specific department and including sales and marketing, and general and administrative expenses.  As these costs tend to be more fixed in nature, the increase of these costs as a percentage of All Revenue during the pandemic is more pronounced than that of the departmental operating costs. However, as seen in Figure 7 for 2020 and the 2021 forecast, the levels of those costs can be reduced substantially with lower revenues.  Starting with Accor's forecast of non-departmental operating costs for 2021, I project the Hotel regains its historic efficiency beginning in 2022 and then returns to the five-year average prior to the pandemic from 2023 onwards. The following figure shows the historical and projected non-departmental operating costs for years from 2015 to 2025.

---

[47] *See* Exhibit 2 and Exhibit 5. Calculated as 1 – Department Operating Margin.
[48] *See* Exhibit 2.

**Figure 8        Historical and Forecast Non-Departmental Operating Costs (US$ millions)[49]**



62.        After deducting departmental operating costs, non-departmental operating costs, and Management Fees (as calculated above) from All Revenue, I calculate Net Operating Profit, and from this deduct amounts for property tax, property insurance, and the capital reserve fund to arrive at a forecast of Net Operating Income.[50]

63.        As a result, I forecast Shortfalls in 2021 through 2025.  However, as discussed above I am instructed that there will be a declaration of Force Majeure in 2021 and as the performance of the Hotel in 2022 indicates a continued adverse impact on economic or market conditions, it is reasonable to assume that an event of Force Majeure will also be declared for 2022.  I therefore consider the Shortfalls in 2023 through 2025 as an offset for my damages analysis.  Those Shortfalls on a nominal and present value basis are presented in the figure below.

---

[49] *See* Exhibit 2 and Exhibit 5.
[50] *See* Appendix 3.

**Figure 9**    **Shortfalls**[51]

| Year | Nominal (US$) | Present Value (US$) |
|------|---------------|---------------------|
| 2023 | (2,618,742) | (1,903,774) |
| 2024 | (461,365) | (335,403) |
| 2025 | (266,030) | (177,920) |
| **Total** | **(3,346,137)** | **(2,417,097)** |

## L.  Unpaid Fees and Reimbursements Owed to the Operator

64.    In addition, I understand that the Owner owes Accor fees and reimbursable expenses that it has not yet paid.  I understand that Accor is owed approximately $2.0 million in Unpaid Fees and Reimbursements.[52]

## M.  Damages Conclusion

65.    In summary, the damages arising from the Debtors' Alleged Breaches of Contract are $24.3 million:

**Figure 10**    **Summary of Damages**

| Item | Amount (USD) |
|------|--------------|
| Present Value of Lost Fees | 24,657,609 |
| Less: Present Value of Shortfall Payments | 2,029,201 |
| Plus: Unpaid Fees and Reimbursements | (2,417,097) |
| **Total** | **24,269,713** |

## V.  Liquidated Damages Provision

66.    Alternatively, I understand that Owner has proposed that Accor is compensated based on the Liquidated Damages provision in the HMA.  Section 16.11 of the HMA specifies that the Liquidated Damage Amount is:

---

[51] *See* Exhibit 5.
[52] Rider to Accor's Proof of Claim, May 7, 2021, for both Debtors (Nos. 137 and 140) and "Copy of Fairmont San Jose Stmt - as of 05-05-2021.xlsx"

*equal to (i) the Imputed Management Fees times (ii) the Multiplier, provided that the Liquidated Damage Amount shall not apply and the Operator shall be entitled to receive damages as proven with respect to any Breach Termination effected within the final two years of the final Extension Term. For such purposes:*

> *(A)    "Imputed Management Fees" shall be the aggregate Management Fees paid or payable to the Operator under the Agreement based on the 12-month period for which monthly operating reports have been delivered to the Owner immediately preceding the date of the written notice or other action of Owner which effects a Breach Termination; and*

> *(B)    The applicable "Multiplier" shall be 24 with respect to any Breach Termination prior to the second anniversary of the date of this Agreement and, thereafter, shall reduce by one point as of the close of each successive two-year period during the Initial Operating Term and the five Extension Terms, down to a minimum Multiplier of three. For example, the Multiplier for the two-year period commencing following the 10th anniversary of this Agreement would be 19 and the Multiplier for the initial two years of the second Extension Term would be nine.*

67.    I have been instructed by Counsel to assume for purposes of this section of my report that the Liquidated Damages provision did not contemplate an event like COVID-19.  I have looked at a normalized period for historical Management Fees from 2015 through 2019, consistent with my analysis of Lost Fees above, in order to determine "Imputed Management Fees" that excludes the impact of the pandemic.  On average, those Management Fees were approximately $2.0 million per year.[53]  I have been instructed by Counsel that the proper Multiplier to apply is 17, which is consistent with the HMA which provides that the Multiplier is 24 prior to the second anniversary of the HMA (i.e., 2007) and is reduced by one point at the

---

[53] "SAJ 1999-2020 Rev+Fees - HMA.xlsx". For 2006 and thereafter, the "Total Basic Fee (per system)" is used. The average is $1,977,134 over 2015 through 2019.  *See also* Declaration of Greig Taylor in Support of Accor Management (U.S.) Inc.'s (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) Supplemental Opposition in Response to the Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc. (Dkt. No. 71), filed by FMT SJ LLC and SC SJ Holdings LLC, dated April 23, 2021, Exhibit 1. (Taylor Declaration, Exhibit 1).

close of each success two-year period.  Based on these average Management Fees and a 17

multiplier, normalized Liquidated Damages would be approximately $33.6 million.[54]

68.     I have also been instructed to provide amounts for Liquidated Damages under

three further alternative bases.  First, should the trier-of-fact determine that the appropriate

Imputed Management Fees base is 2019, then the $1.9 million Management Fee in 2019

multiplied by 17 would equal $32.2 million.[55]  Second, if the trier-of-fact determines that the

appropriate Imputed Management Fees base is the average of 2018 and 2019, then the average

Management Fee of approximately $2.0 million multiplied by 17 would equal $33.9 million.[56]

Third, if the trier-of-fact determines that the appropriate Imputed Management Fee base is the

12 months prior to March 5, 2021, then the Management Fee for the period from February 2020

through January 2021 of approximately $0.3 million multiplied by 17 would equal $5.1

million.[57]  That is the appropriate time period because, as I understand it, the monthly operating

reports for February 2021 had not been delivered to Owner prior to March 5, 2021.

69.     I note that under any of the scenarios set forth above, Accor would still be owed

the additional amount of $2,029,201 for its unpaid fees and reimbursable amounts because

Section 16.11(d) of the Liquidated Damages provision specifically states that the Operator is

entitled to both the Liquidated Damages amount *plus* any amounts due and owing at the time

of the Breach Termination:

> *THE OWNER AND THE OPERATOR AGREE THAT THE*
> *OPERATOR'S RIGHT TO RECEIVE THE LIQUIDATED DAMAGE*
> *AMOUNT SHALL BE THE SOLE REMEDY OF THE OPERATOR AT*

---

[54] $1,977,134 *17 = $33,611,278.

[55] "SAJ 1999-2020 Rev+Fees - HMA.xlsx". For 2006 and thereafter, the "Total Basic Fee (per system)" is used.
2019 fees of $1,892,238 * 17 = $32,168,046.  *See also* Taylor Declaration, Exhibit 1.

[56] "SAJ 1999-2020 Rev+Fees - HMA.xlsx". For 2006 and thereafter, the "Total Basic Fee (per system)" is used.
The average of 2018 and 2019 fees of $1,994,547 * 17 = $33,907,299.  *See also* Taylor Declaration, Exhibit 1.

[57] SAJ 12 Month Report Book – 2020 for management fees for the period from February 2020 to December 2020
and SAJ 2021.03 Forecast for management fees for January 2021.

*LAW, EXCEPTING THE OPERATOR'S RIGHT TO RECEIVE PAYMENT OF AMOUNTS ACCRUED, DUE OR OWING TO THE OPERATOR AS OF THE DATE OF THE BREACH TERMINATION UNDER THIS AGREEMENT AND WITHOUT AFFECTING OR LIMITING ANY RIGHTS THE OPERATOR MAY HAVE IN EQUITY.*

_____

Greig Taylor
Managing Director

May 19, 2021

**Appendix 1    Curriculum Vitae of Greig Taylor**

| | |
|---|---|
| **POSITION** | Managing Director- AlixPartners, LLP, New York City |

**EDUCATION**          B.A. (Hons) Modern History – University of Manchester, England

Fellow of Institute of Chartered Accountants of England and Wales

**PROFESSIONAL HISTORY**

Greig is an experienced financial and accounting expert witness with more than 20 years of experience in resolving disputes involving accounting, valuation, and economic damages. His experience includes breach-of-contract and loss-of-profits claims, expropriations, minority-shareholder and joint-venture disputes, and claims arising following acquisitions and sales of businesses. Greig has testified in numerous international arbitrations under various institutions such as the ICC, AAA-ICDR, ICSID, and JCAA, as well as before international courts and in ad hoc proceedings under UNCITRAL rules and free-trade agreements. He has also provided litigation consulting involving forensic accounting and financial investigations under various accounting and legal protocols.

**RECOGNITION**

Greig is listed in The International Who's Who of Commercial Arbitration since 2014 as a leading expert witness, and most recently as a Thought Leader for Arbitration 2018 and Global Elite Thought Leader for 2019.  Greig is also recognized by Who's Who Legal for Economic Consulting – Quantum of Damages since 2016.

**PROFESSIONAL EXPERIENCE**

**Economic Damages** - Greig has analyzed lost profits, unjust enrichment, and diminution in value damages in contentious settings over the past 20 years.  These have involved a broad range of complex commercial litigation, including breach of contract, expropriation, construction, fiduciary duty, and merger & acquisition disputes. These matters have often involved damage claims for up to $1 billion. As part of his damages analysis, Greig typically analyzes causation and mitigation issues that affect such claims.

**Alternative Dispute Resolution** - Greig has assisted the arbitrator in all phases of numerous ad-hoc arbitrations where his firm is appointed as Arbitrator / Independent Accountant by both parties in dispute.  This work has involved determining the timeframe and format of the

29

**PROFESSIONAL EXPERIENCE (continued)**

arbitration, reviewing both parties' submissions, drafting requests for information, conducting a hearing, and drafting the final determination.

**Accounting -** Greig serves as an expert in accounting related disputes. These disputes involve a broad range of circumstances and legal claims, including:

- Ownership disputes involving breach of fiduciary duty and fraud claims.
- Bankruptcy disputes involving fraudulent conveyance claims.
- Post-closing M&A transaction disputes involving working capital and earn-out adjustments.
- M&A disputes where the buyer claims the seller's financial statements were misstated.

**Forensic accounting / financial analyses** - Greig has led and conducted forensic accounting investigations and assignments throughout the world, involving the tracing, verifying and documenting sources of funding, advice and financial analyses in relation to proposed new taxation regimes, and post-acquisition due-diligence of a financial institutions.

**RANGE OF EXPERIENCE**

Greig has been retained as a consulting and testifying expert as follows [D=Deposition, H=Hearing, WS=Written Submission][58]:

**Complex Commercial Arbitration / Litigation**

- Assisted a hotel owner in relation to the valuation of claims related to the termination of a hotel management agreement in Panama. Akerman LLP. ICC arbitration. [WS, H]
- Assisted a global hotel chain as Respondent in relation to a breach of two hotel management agreement in Brazil.  King & Spalding LLP. ICC arbitration. [WS, H]
- Assisting a global hotel chain as Claimant in relation to a breach of a hotel management agreement in Brazil.  King & Spalding LLP.  ICC arbitration. [WS, H]
- Assisted Fairmont Hotels as Claimant in relation to a breach of a hotel management agreement in Acapulco.  Proskauer Rose LLP.  ICDR arbitration [WS, H]
- Assisted a global hotel chain as Respondent in relation to a breach of a hotel management agreement in Curacao.  Crowell & Moring LLP. ICDR arbitration [WS, D, H]
- Assisting a Brazilian purchaser of an Argentinean industrial plant in a post-acquisition M&A dispute. Proskauer Rose LLP.

---

[58] Certain entries have been anonymized to reflect the confidential and non-public nature of arbitration proceedings.

**RANGE OF
EXPERIENCE
(continued)**

- Assisting the German seller of a specialty seeds business in a multi-$billion post-acquisition M&A valuation dispute.  Sullivan & Cromwell.  ICC arbitration. [WS]
- Assisted a South Korean semi-conductor manufacturer in relation to a contract dispute over preferred pricing terms. Sidley Austin. AAA-ICDR arbitration. [WS]
- Assisted a principal in a dispute with their former partner over the accounting for the dissolution of their business relationships. Supreme Court of The State of New York. [WS]
- Assisted a producer of carbon black in a licensing and trade secrets dispute with the manufacturer of custom engineered facilities.  Hogan Lovells LLP. AAA arbitration.
- Assisting a coal producer in a dispute with their JV partner over the construction and operation of a coal briquetting plant in Indonesia. Davinder Singh Chambers.  Singapore International Court. [WS, H]
- Assisted a US telecoms technology company as Respondent in claim relating to the breach of an outsourcing agreement with an Indian counterparty. Sidley Austin LLP. ICC arbitration. [WS]
- Assisted a Japanese conglomerate as Respondent in relation to the valuation of a phosphate mining operation in Peru.  Paul, Weiss, Rifkind, Wharton & Garrison LLP. ICC arbitration. [WS, H]
- Assisted an Australian mining company as Claimant in relation to a JV dispute over the valuation of a gold and copper mine in the Philippines.  Drew & Napier LLC. SIAC arbitration. [WS, H]
- Assisted a Chinese distributor of clothing apparel in a distribution agreement termination claim.  ICC arbitration Hogan Lovells LLP. [WS, H]
- Assisting a major Japanese utility as Respondent in relation to a termination of long-term uranium supply contract.  Hughes, Hubbard & Reed LLP.  ICC arbitration. [WS]
- Assisted a South Korean conglomerate in the calculation of the cost of a contract termination in relation to the construction of a coal-fired power plant.  Sidley Austin LLP.
- Assisted a South Korean conglomerate in the negotiation of termination costs in relation to the manufacture of turbines and boilers for a coal-fired power plant.  Sidley Austin LLP.
- Assisted a global vehicle manufacturer as Claimant in a dispute against a foreign distributor.  Nishimura & Asahi / King & Spalding LLP.  JCAA arbitration. [WS, H]
- Assisted a Chinese technology company as Claimant in a breach of joint venture agreement.  Cabrera Cammarota PLLC.  ICC arbitration. [WS, H]
- Assisted a luxury watch distributer and retailer as Claimant in a breach of supply agreement dispute and alleged unfair termination. Winston & Strawn LLP.  ICDR arbitration.

**RANGE OF EXPERIENCE (continued)**

- Assisted an LNG producer as Respondent in two sales contract disputes. Skadden, Arps, Slate, Meagher & Flom LLP. UNCITRAL rules arbitrations. [WS, H]
- Assisted an Asian SWF as Claimant in relation to losses associated with the breach of an investment agreement. Quinn Emanuel Urquhart & Sullivan, LLP. ICDR arbitration. [WS]
- Assisted a US pharmaceutical distributer as Claimant in relation to the alleged unlawful termination of an exclusive distribution agreement. Vienna arbitration. Platte Rechtsanwälte. [WS, H]
- Assisted a Chinese asset management company as Claimant in relation to the alleged failure to market and distribute financial products in the US. King & Wood Mallesons, Oberdier Ressmeyer LLP. UNCITRAL rules arbitration. [WS]
- Assisted the Nigerian distributor of a European vehicle manufacturer as Respondent in a breach of contract dispute. Punuka Attorneys & Solicitors. UNCITRAL rules arbitration. [WS, H]
- Assisted a European hydroelectric company in multi-jurisdictional venues to enforce a court judgment. Quinn Emanuel Urquhart & Sullivan, LLP. Court of The Hague, Supreme Court of the State of New York. [WS]
- Assisted a Canadian producer and licensor of higher education training programs as Claimant against an institute of higher education related to performance under the licensing agreement. Whitehead, Bird & Miles. Court of Queen's Bench of New Brunswick, Canada.
- Assisted a Brazilian electric power company as Respondent in a multi-million-dollar claim brought by an American manufacturer related to the alleged breach of a supply agreement. Allen & Overy LLP. ICC arbitration. [WS, H]
- Assisted a Norwegian power company in a dispute with a Brazilian JV partner related to the purchase of an energy company. Wald Associados Advogados.
- Assisted a Far East oil and gas exploration company as Claimant against an African state for termination of multiple production sharing agreements. Fasken Matineau DuMoulin LLP. ICC arbitration
- Assisted a Polish chemical company as Respondent in a claim brought by an American chemical company related to the breach and termination of a supply contract. Weil Gotshal & Manges LLP. ICC arbitration. [WS]
- Assisted a US beverage company as Claimant against a South American glass manufacture related to the supply of faulty product and resulting termination of a supply agreement. McCarter & English LLP. ICC arbitration. [WS, H]
- Assisted a South Korean conglomerate as Claimant in a multimillion dollar claim against a Canadian commodity producer related to alleged breaches of an offtake agreement. Sidley Austin LLP. ICC arbitration. [WS]

**RANGE OF EXPERIENCE (continued)**

- Assisted a global private equity company as Claimant in a multimillion dollar claim against a Turkish individual related to a breach of contract in the retail industry. Kirkland & Ellis International LLP. ICC arbitration.
- Assisted a Middle East property developer as Respondent in a claim brought by an Indian purchaser related to a breach of contract for the development of a Dubai residential complex. Bredin Prat. DIAC arbitration.
- Assisted a European aircraft manufacturer as Claimant in a multimillion sterling claim against an American purchaser related to a breach of supply contract. Axinn, Veltrop & Harkrider LLP. ICC arbitration.
- Assisted a major Government defense contractor as Respondent in a multimillion dollar claim brought by an Italian company related to claims arising from the cancellation of an order to manufacture and supply fuse components. Hughes, Hubbard & Reed LLP. ICC Arbitration.
- Assisted a Fortune 100 company as Respondent in a multimillion dollar claim brought by an Australian company related to multiple claims arising from the sale of business operations and production facilities in South America. Hunton & Williams LLP. ICC Arbitration.
- Assisted a private jet business as Claimant in an expropriation claim against a Middle East government. Quinn Emanuel Urquhart & Sullivan, LLP. ICSID arbitration. [WS, H]
- Assisted a US aggregates company as Claimant in an expropriation claim against a North American government. Nash & Company. NAFTA arbitration.
- Assisted investors in a Southern European bank against a Southern European state in relation to the loss of their investment. Three Crowns LLP. ICSID arbitration.
- Assisted Claimants in relation to the expropriation of beachfront property against a Central American state. Fasken Matineau DuMoulin LLP. UNCITRAL rules DR-CAFTA arbitration.
- Assisted an individual investor as Claimant against an Eastern European state related to the alleged expropriation of several businesses. Bredin Prat, Mayer Brown LLP. ICSID arbitration. [WS]
- Assisted a French pharmaceutical company as Claimant against an Eastern European state related to the alleged expropriation of its investments in that country. Salans. UNCITRAL rules arbitration.
- Assisted a poultry producer as Claimant against a former Soviet state related to the alleged expropriation of its investments in that country. Crowell & Moring LLP, Jones Day LLP. UNCITRAL rules arbitration. [WS]

| RANGE OF EXPERIENCE (continued) | **Accounting Related Disputes** |
|---|---|

- Assisted a US privately held company in the assessment of the appropriate provision / contingent liability with respect to potential foreign exchange exposures on overseas sales contracts in the context of a post-acquisition dispute following the sale of its UK (and other) operations to another US entity.  Cravath, Swaine & Moore LLP.
- Assisted the court-appointed Trustee in one of the world's largest bankruptcy proceedings of a financial institution.  Services included investigating the causes of the demise of the company, as well as performing an analysis of all payments made prior to bankruptcy for potential preferential payments.  Hughes, Hubbard & Reed LLP.
- Performed a SEC-related internal investigation and provided investment accounting expertise to a $5bn hedge fund.

**SPEECHES / PUBLICATIONS / TRAINING**

- "Contractual Caps on Damages, Including Limitations on Consequential or Indirect Damages" – Juris Eighth Annual Damages in International Arbitration, New York.
- Accounting for Lawyers Training – White & Case LLP.
- "Constituting the Right Tribunal: Different Voices for Optimal Results" – ABA Section of International Law 2019 Annual Conference, Washington DC.
- "Risky Business: The Consequences of Counting on Liability Alone" - NYSBA's Spring 2019 edition of *New York Dispute Resolution Lawyer.*
- "Efficiency Is Money: Techniques to Improve International Arbitration" – 13th ICC New York Conference on International Arbitration
- Mock Expert Witness Cross Examination Training, Wilmer Hale LLP
- "Expert Reports in International Arbitration—An Outline" – Practicing Law Institute, International Arbitration 2018, New York.
- "Show me the Money!!" – Mock Case Study, 6th ICC YAF Global Conference, New York.
- Advocacy Training – Freshfields LLP.
- "Loss of Chance Damages" – 14th ICC Miami Conference, Miami.
- "The Use of Experts in International Arbitration: A view from all angles" – Florida International University College of Law, Miami.
- "Doing the Math: Understanding How to Calculate Damages in International Investment Treaty Disputes" - ABA Section of International Law 2015 Fall Meeting, Montreal.
- "Considerations for Testifying Experts" – The Journal of Technology in International Arbitration, Virtual Symposium.
- FIAA International Arbitration Advocacy Workshop: Questioning of Expert Witness in International Arbitration, Faculty Member, Paris, New York, Washington D.C.

| | |
|---|---|
| **SPEECHES /**<br>**PUBLICATIONS /**<br>**TRAINING**<br>**(continued)** | • "Hired gun experts: myths and realities" - ICC North American Chapter YAF Event, New York.<br>• Second Annual Damages in International Arbitration Conference: From Case Filing to Arbitral Award, Juris, Washington D.C.<br>• "Various criteria for damages assessment" - CBAr XI International Congress of Arbitration, Porte Alegre<br>• Damages in International Arbitration Conference, Juris, New York<br>• "The Recent Global Economic Environment: Impact on Damages and Valuation in International Arbitration" - The International Comparative Legal Guide to: International Arbitration 2011<br>• "Valuation Calculations in Litigation and Arbitration" – Practical Law<br>• "Volatility and Creative Destruction's Effects on Damages in Arbitration" – Global Arbitration Review<br>• "CPR Protocol on Determination of Damages in Arbitration" - International Institute for Conflict Prevention & Resolution |
| **PROFESSIONAL**<br>**AND BUSINESS**<br>**AFFILIATIONS** | • Fellow, Institute of Chartered Accountants of England and Wales (ICAEW)<br>• Acting Treasurer, New York International Arbitration Center (NYIAC)<br>• Former Regional Coordinating Committee Member, North America ICC/USCIB Young Arbitrators Forum<br>• Member, arbitration committee of the International Institute for Conflict Prevention and Resolution |

**Appendix 2   Materials Relied Upon**

<u>**Legal Documents, Agreements, and Letters**</u>

- Declaration of Neil Demchick in support of Chapter 11 Petitions and First Day Pleadings, *In re: SC SJ HOLDINGS LLC, et al.*, the United States Bankruptcy Court for the District of Delaware, Case No. 21-10549 (JTD), filed on March 10, 2021 (Dkt. 11), and associated exhibits, including:

  o Amended and Restated Hotel Management Agreement dated December 2, 2005, between San Jose Fairmont Lessee, LLC, and Fairmont Hotels and Resorts (U.S.) Inc.

  o Assignment and Assumption of Hotel Management Agreement for Fairmont San Jose made and entered into by and among San Jose Fairmont Lessee, LLC, a Delaware limited liability company, FMT SJ LLC, a Delaware limited liability company, and Fairmont Hotels & Resorts (U.S.) Inc., a Delaware corporation, dated January 2, 2018.

  o Third Amendment to Amended and Restated Hotel Management Agreement made and entered into by and between Fairmont Hotels & Resorts (U.S.) Inc., a Delaware corporation and FMT SC LLC, a Delaware limited liability company, dated January 2, 2018.

  o Owner Agreement between SC SJ Holdings LLC, FMT SJ LLC, and Fairmont Hotels & Resorts (U.S.) Inc., dated January 2, 2018.

- Hotel Management Agreement, Light Tower Associates, L.P. and Fairmont Hotel Management, L.P., dated September 14, 1999.

- Letter from Barbara D. Kilner, Senior Vice President, General Counsel, North & Central America, Accor Management, dated March 18, 2020, "Re: Amended and Restated Hotel Management Agreement for Fairmont San Jose (the "Hotel") dated as of December 2, 2005 (as may have been assigned or amended from time to time, the "Management Agreement")" to FMT SJ LLC and Baker Botts L.L.P.

- Rider to Accor's Proof of Claim, May 7, 2021, for both Debtors.

- Debtors' Motion For Entry Of An Order Authorizing The Debtors To Reject Amended And Restated Hotel Management And Owner Agreements Between Debtors And Fairmont, Effective As Of The Debtors' Respective Petition Dates, dated March 10, 2021..

- Declaration Of Paul Tormey In Support Of Motion To (i) Modify The Automatic Stay To Permit Arbitration Of Disputes; And (ii) Compel Arbitration Of Disputes, dated March 22, 2021.

- Debtors' Memorandum And Points Of Authorities In Opposition To Fairmont's Motion To (i) Modify The Automatic Stay To Permit Arbitration Of Disputes; And (ii) Enforce Arbitration Clause Compelling Arbitration Of Disputes, dated March 30, 2021.

- Order Authorizing The Debtors To Reject Amended And Restated Hotel Management Agreement And Owner Agreement Between Debtors And Fairmont, dated April 5, 2021.

- Exhibit B, Amended Disclosure Statement, to The Notice Of Filing Of (1) Blacklined Amended Joint Chapter 11 Plan Of Reorganization And (2) Blacklined Disclosure Statement With Respect To Amended Joint Chapter 11 Plan Of Reorganization-.

- Declaration of Greig Taylor in Support of Accor Management (U.S.) Inc.'s (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) Supplemental Opposition in Response to the Motion of Debtors for Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount of Contingent and Unliquidated Claim of Fairmont Hotels & Resorts (U.S.) Inc. (Dkt. No. 71), filed by FMT SJ LLC and SC SJ Holdings LLC, dated April 23, 2021.

## Materials from Accor

- SAJ 12 Month Report Books 2015 - 2020
- SAJ 2021.03 Forecast
- "Copy of Fairmont San Jose Stmt - as of 05-05-2021.xlsx"
- "SAJ 1999-2020 Rev+Fees - HMA.xlsx"
- Email from Brett Conner to Daryl Benjamin, June 2, 2017, Subject: SAJ – 1% management fee for garage revenues.

## External Data and Research

- Accor 2019 Universal Registration Document (Annual Financial Report, Integrated Report), filed on April 9, 2020, with the French Market Authority
- Accor at a Glance, February 2021
- CBRE Q4 2020 U.S. Hotel Figures
- CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition
- deRoos, J.A., & Berman, S, Calculating Damage Awards in Hotel Management Agreement Terminations, *Cornell Hospitality Report* (2014)
- IMF, World Economic Outlook, April 2021
- IMF, World Economic Outlook Database, April 2021
- Federal Reserve Bank, Summary of Economic Projections, March 17, 2021
- Federal Reserve Bank of Philadelphia, Survey of Professional Forecasters, February 12, 2021
- PwC, Hospitality Directions US, November 2020
- STR, 2020 U.S. Hotel Forecast Slightly Upgraded, Full Recovery still Unlikely Until 2024, November 12, 2020, https://str.com/press-release/2020-us-hotel-forecast-slightly-upgraded-full-recovery-still-unlikely-until-2024
- STR, TE Slightly Downgrade Latest U.S. Hotel Forecast, January 26, 2021, https://str.com/press-release/str-te-slightly-downgrade-latest-us-hotel-forecast

- STR, U.S. Performance Results for year-end 2020, January 28, 2021, https://str.com/data-insights-blog/video-us-performance-results-year-end-2020

- STR, U.S. Performance Results for January 2021 and Forecast, February 25, 2021, https://str.com/data-insights-blog/video-us-performance-results-january-2021

- BTN, CBRE: Vaccines. Stimulus Spur Second-half 2021 U.S. Hotel Forecast, March 30, 2021, https://www.businesstravelnews.com/Procurement/CBRE-Vaccines-Stimulus-Spur-Second-Half-2021-US-Hotel-Forecast

- Financial Times, American Expense Says Business Travel Unlikely to Fully Recover Until 2023, April 23, 2021, https://www.ft.com/content/6736234c-3cdd-4c04-8ec9-9dd8b220a873

- U.S. Department of the Treasury, Daily Treasury Yield Curve Rates

- Damodaran, Aswath. Equity Risk Premiums (ERP) Determinants, Estimation and Implications – The 2020 Edition. March 2020

- Damodaran, Aswath. Implied ERP by month for previous months (March 2021)

- Damodaran, Aswath, Marginal Corporate Tax Rate

- Bloomberg, 10-year Yield for U.S. Corporate Bond with a Rating of BB+, BB, BB-

- Bloomberg, Beta for Comparable Companies and Accor

- Bloomberg, Credit Rating for Comparable Companies and Accor

- Bloomberg, Weight of Debt and Weight of Equity for Comparable Companies and Accor

*All other materials referenced in this report, appendices and exhibits.

**Appendix 3    Modeling the Hotel's Financial Performance**

**A.    The Impact of the Pandemic on U.S. Hotel Industry**

1.      The COVID-19 Pandemic (the **"Pandemic"**) has affected the global economy. According to the World Economic Outlook published by International Monetary Fund (the "IMF"), the real GDP in advanced economies and United States declined by 4.7% and 3.5% respectively, in 2020.[59]

2.      Hospitality is one of the industries that suffered the hardest hit – hotels in the United States experienced the worst annual occupancy level in 2020 since the Great Depression in the 1930s.[60]  With year-over-year decreases of 36.6% and 21.3% in occupancy rate and ADR, respectively, RevPAR shrank by 50.1% in 2020,[61] ending nine years of growth that started in 2011.

**Figure 11       Year-over-year Change in RevPAR[62]**



3.      The impact of the Pandemic has not been consistent across property type and hotel class.  According to CBRE, convention hotels suffered the largest decline in profits during

---

[59] IMF, World Economic Outlook, April 2021, p. 129.
[60] CBRE, Q4 2020 U.S. Hotel Figures, p. 2.
[61] STR, TE Slightly Downgrade Latest U.S. Hotel Forecast, January 26, 2021, *https://str.com/press-release/str-te-slightly-downgrade-latest-us-hotel-forecast*. Accessed on April 19, 2020.
[62] PwC, Hospitality Directions US, November 2020, p. 3; STR, U.S. Performance Results for January 2021 and Forecast, *https://str.com/data-insights-blog/video-us-performance-results-january-2021*. Accessed on April 18, 2021.

2020 due to their dependence on group demand, which has dropped the most since March 2020.[63]

4.      As presented by STR, hotels at the high-end of the market suffered greater decline as the revenues from meetings and group booking usually represent a higher percentage in these hotels.[64]

**Figure 12      U.S. Hotel Performance by Class in 2020**



5.      CBRE observes that the larger markets underwent the biggest decline in RevPAR in 2020.  San Jose, as a popular place for conferences, conventions, business retreats and social gatherings in Silicon Valley, experienced a drastic downturn in 2020.  The average RevPAR for all hotels decreased from approximately $149 in 2019 to $51 in 2020, a year-over-year decline of 65.8%.  The decline in the average RevPAR for upper-priced hotels was even more severe, from $187 in 2019 to $50 in 2020, resulting a year-over-year change of 73.1%.[65]

6.      The Hotel, like other upper-priced hotels, has undergone a similar downturn. Its RevPAR decreased from $166 in 2019 to $38 in 2020.  And the overall revenues declined to $17 million, a reduction of 76.1% compared to 2019 level.[66]

---

[63] CBRE, Q4 2020 U.S. Hotel Figures, p. 14.
[64] STR, U.S. Performance Results for year-end 2020, January 28, 2021, *https://str.com/data-insights-blog/video-us-performance-results-year-end-2020*. Accessed on April 18, 2021.
[65] CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition, pp. 4-5.
[66] *See* Exhibit 2. Calculated as $17,166,883 / $71,821,382 – 1.

**B.** **The Recovery from the Pandemic**

**i.  The U.S. Economy**

7.      After the initial disruption and contraction, there are positive expectations for the growth of the U.S. economy.  In its 2020 December forecast, the Federal Reserve Bank projected the real GDP to grow by 4.2%, 3.2%, and 2.4% in 2021, 2022, and 2023, respectively.[67]  In addition, certain factors, including the roll-out of COVID-19 vaccinations, have contributed to a more bullish stance on the economic recovery.  In its forecast published in March 2021, the Federal Reserve Bank revised its projection for real GDP growth to be 6.5% in 2021, 3.3% in 2022 and 2.2% in 2023.[68]

8.      Meanwhile, the Federal Reserve Bank expects the unemployment rate to drop to 4.5% in 2021 in its latest forecast, down from the peak of 8.1% in 2020.[69]

---

[67] Federal Reserve Bank, Summary of Economic Projections, March 17, 2021.
[68] Federal Reserve Bank, Summary of Economic Projections, March 17, 2021.
[69] Federal Reserve Bank, Summary of Economic Projections, March 17, 2021; IMF, World Economic Outlook Database, April 2021.

**Figure 13        Forecast of Real GDP Growth and Unemployment Rate[70]**



### ii.  The U.S. Hotel Industry

9.      Multiple organizations have expressed their opinions with respect to the recovery of the U.S. hotel industry.  Resonating with the strong positive momentum in the overall economy, the hotel industry is expected to experience fast growth and recover to pre-pandemic level in the next a few years.  I summarize and discuss the forecasts from STR, Tourism Economics and American Express in the following paragraphs.

10.     In its 2020 November forecast, STR and Tourism Economics expect that the industry will recapture 80% of demand by the end of 2021 and anticipate that ADR and revenue will follow a slower recovery timeline.  They see a full demand recovery at the end of 2023 and the RevPAR return to pre-pandemic level by the close of 2024.[71]  In January 2021, STR and Tourism Economics revised their forecast for the U.S. hotel market by incorporating the full

---

[70] Federal Reserve Bank, Summary of Economic Projections, March 17, 2021; IMF, World Economic Outlook Database, April 2021.
[71] STR, 2020 U.S. Hotel Forecast Slightly Upgraded, Full Recovery still Unlikely Until 2024, November 12, 2020, *https://str.com/press-release/2020-us-hotel-forecast-slightly-upgraded-full-recovery-still-unlikely-until-2024*. Accessed on April 18, 2021.

year 2020 results.  In the revised forecast, expected growth was downgraded in 2021 and upgraded in 2023.  STR and Tourism Economics still expect a full recovery of demand in 2023 and a close-to-complete RevPAR recovery in 2024.[72]

11.    STR also opined that corporate room demand in 2021 and 2022 would lag the recovery of the leisure travel and client-facing transient, which have already begun in summer of 2020[73] and early 2021.[74]  STR expects the corporate and group room demand will "show more progressive improvement" in Q3 2021 and will lead to a higher level of recovery in 2022.[75]

12.    In their updated forecast published in March 2021, CBRE provided similar views on the recovery of the U.S. hotel market in that the average ADR and RevPAR is expected to return to 2019 level in 2024.  CBRE also mentioned that the reduction in the growth of traditional lodging supply is a supporting factor for the market.[76]

13.    American Express, upon closely monitoring its customers monthly spending on travel and entertainment, has seen pent-up demand for consumer travel and anticipates the spending of corporate customers to bounce back to 2019 levels in 2023.[77]

14.    In summary, the consensus among several analysts is the expectation that the U.S. hotel industry will experience high growth due to the release of the suppressed demand of

---

[72] STR, TE Slightly Downgrade Latest U.S. Hotel Forecast, January 26, 2021, *https://str.com/press-release/str-te-slightly-downgrade-latest-us-hotel-forecast*. Accessed on April 19, 2020.
[73] STR, 2020 U.S. Hotel Forecast Slightly Upgraded, Full Recovery still Unlikely Until 2024, November 12, 2020, *https://str.com/press-release/2020-us-hotel-forecast-slightly-upgraded-full-recovery-still-unlikely-until-2024*. Accessed on April 18, 2021.
[74] STR, U.S. Performance Results for January 2021 and Forecast, February 25, 2021, *https://str.com/data-insights-blog/video-us-performance-results-january-2021*. Accessed on April 23, 2020.
[75] STR, TE Slightly Downgrade Latest U.S. Hotel Forecast, January 26, 2021, *https://str.com/press-release/str-te-slightly-downgrade-latest-us-hotel-forecast*. Accessed on April 19, 2020.
[76] BTN, CBRE: Vaccines. Stimulus Spur Second-half 2021 U.S. Hotel Forecast, March 30, 2021, *https://www.businesstravelnews.com/Procurement/CBRE-Vaccines-Stimulus-Spur-Second-Half-2021-US-Hotel-Forecast, Accessed on May 10, 2021.*
[77] Financial Times, American Expense Says Business Travel Unlikely to Fully Recover Until 2023, April 23, 2021.

travelling after vaccinations become widespread.  These analysts expect a full recovery to pre-Pandemic levels in 2023 to 2024.

**Figure 14      Forecasts for U.S. Hotels Recovery**

| Company | Recovery |
|---|---|
| STR/Tourism Economics | Demand: 2023; RevPAR: 2024 |
| CBRE | RevPAR: 2024 |
| American Express | Business travel: 2023 |

### iii.  Hotels in San Jose

15.      CBRE also examined the market conditions in San Jose and provided their forecasts for the overall San Jose market, as well as the submarkets by property type.  CBRE expects that the occupancy rate and ADR for the whole market will exceed the pre-Pandemic level in 2023 and 2024 respectively.  RevPAR is then projected to be very close to 2019 levels in 2023.[78]

16.      Upper-priced hotels in San Jose are expected to recover sooner than the whole market due to rising demand.  As shown in the figure below, CBRE anticipates by 2023, the occupancy, ADR and RevPAR will exceed 2019 levels.  CBRE also expects the RevPAR will continue to increase in 2024 and 2025 by 5.2% and 2.6% respectively.[79]

---

[78] CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition, p.4.
[79] CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition, p.5.

**Figure 15      San Jose Forecast – Upper-priced Hotels**



## C.  Financial Projection for the Hotel

### i. Revenues

17.    Based on the foregoing information, I estimate the hotel's Total Revenues from

2021 to 2025 as follows:

      i.    2021: I rely on the Hotel's forecast for 2021 prior to the Closure as this represents the most appropriate forecast ("2021 Forecast"); and,

      ii.    2022 to 2025: I rely on CBRE's projection for the performance of the upper-priced hotels in San Jose as I consider this forecast is most relevant to the Hotel in terms of the location and property type.

18.    The projection for the Total Revenues is shown below.

**Figure 16      Recovery of Hotel's Total Revenues[80]**

| Item | 2019A | 2020A | 2021E | 2022E | 2023E | 2024E | 2025E |
|---|---|---|---|---|---|---|---|
| RevPAR (US$) per CBRE (SJ Upper-priced) | 187.1 | 50.3 | 77.3 | 161.1 | 192.7 | 202.6 | 208.0 |
| Hotel Total Revenues (US$ millions) | 69.8 | 16.6 | 18.9 | 60.1 | 71.8 | 75.6 | 77.6 |
| Annual Growth in Total Revenue (%) | N/A | (76.2%) | 13.8% | 217.5% | 19.6% | 5.2% | 2.6% |

---

[80] *See* Exhibit 3.

19.    For the steady state period post-2025, I assume the Hotel's revenues will grow at the long-term inflation rate of 2.2% starting from 2026 to 2050.[81]

20.    To estimate parking revenue, I assume that the percentage of parking revenue to Total Revenues (excl. parking revenue) will be constant at 2.4% (2019 level).  I show the actual (2015 to 2020) and forecasted (2021 to 2025) parking revenue and Total Revenues (excl. parking revenue) in the figure below.

**Figure 17        Total Revenues Projection (US$ millions)[82]**



ii.   **Costs**

21.    In order to forecast Net Operating Income for the Performance Test, I also estimate costs as follows:

        i.   Departmental Operating Costs: Departmental operating costs include the operating costs that can be directly attributed to each department such as room, food & beverage.  As shown in Exhibit 2, the percentage of the department operating costs to all revenues were relatively constant over the years before the pandemic, ranging from 49% to 52%.  During the Pandemic, this ratio increased to 57% in 2020 and was expected to be 57% in 2021 according to the

---

[81] Federal Reserve Bank of Philadelphia, Survey of Professional Forecasters, February 12, 2021.
[82] *See* Exhibit 4 and Exhibit 5.

2021 Forecast.  To be consistent with the projection for Total Revenues, I assume the percentage of operating costs to All Revenues will gradually decline to 2019 levels in 2023 and reach to the 5-year average prior to the pandemic starting 2024 as shown in the figure below:

**Figure 18    Historical and Projected Department Operating Costs / All Revenues[83]**



ii.    Non-departmental operating costs: The non-departmental operating costs cover the costs that cannot be directly assigned to each department.  Specifically, these costs include administration and general costs, sales and marketing costs, and repair, maintenance and utility costs.  Similar to the department operating costs, the non-departmental operating costs represented a relatively constant percentage of All Revenues before the Pandemic, and drastically increased to 57% in 2020 and 2021 Forecast from an average of approximately 24% between 2015 and 2019.[84]  This increase is unsurprising given that these costs tend to be more fixed, but as shown in the figure below, these costs can be reduced with a diminished revenue.  Starting from 2022, I model that these costs will trend towards the historical average, and the non-departmental operating costs will stabilize at 24% of All Revenues (five-year average prior to the Pandemic).[85]  The following figure shows the historical and projected non-departmental operating costs for years from 2015 to 2025.

---

[83] *See* Exhibit 2 and Exhibit 5. Calculated as 1 – Department Operating Margin.
[84] *See* Exhibit 2.
[85] *See* Exhibit 5.

**Figure 19      Historical and Projected Non-Departmental Operating Costs (US$ millions)[86]**



iii.   Other items:

    a.  Property Insurance: I assume the property insurance will gradually return to 2020 level in 2022 and grow at inflation rate of 2.2% thereafter.

    b.  Property Tax: I assume these costs will increase at the inflation rate of 2.2% based on the estimates in 2021 Forecast.

    c.  Capital Replacement Reserve: according to Article 11.1 of the HMA, I calculate the capital replacement reserve as 4% of the Total Revenues.

### iii.  Performance Test

22.      Based on the projections of All Revenues and costs discussed above, I calculate the NOI, NOI Base and the Shortfalls (if any) for years from 2021 to 2030 to forecast whether the Hotel will pass the Performance Test.  The detailed calculation can be found in **Exhibit 5**.

23.      I am instructed by Counsel that the Force Majeure clause in the HMA is triggered by the Pandemic which started in 2020 and continues to impact the operations of the Hotel in 2021 and 2022.  Although I offer no opinion on the applicability of the Force Majeure provision as a matter of law, I note that the industry projections I described earlier demonstrate

---

[86] *See* Exhibit 2 and Exhibit 5.

it is reasonable to conclude from a financial perspective that there will be continuing "material and adverse changes in general and economic or market conditions" in 2021 and 2022 due to the Pandemic.  Therefore, I exclude the years 2021 and 2022 from the Performance Test.  As shown below the Hotel is projected to fail the Performance Test in 2023, 2024 and 2025.  The total undiscounted Shortfall for these years would be $3,346,137.

**Figure 20        Performance Test**[87]



24.        I discount the Shortfall amounts to the Valuation Date using the discount rate of 8.7%. The present value of the Shortfall amounts is $2,417,097 as of March 5, 2021.[88]

---

[87] See Exhibit 5.
[88] See Exhibit 5.

**Appendix 4    Discount Rate**

**A.  Overview**

1.       My assessment of damages comprises estimating future fees that Accor would have earned over the remaining term of the HMA.  The future fees need to be discounted to the Valuation Date, and in order to do so, I discounted the future fees using a rate of return that reflects the risk associated with receiving the expected amount of cash flows at the expected time of receipt.

2.       The discount rate that I chose for the purposes of this analysis is the WACC. The WACC represents an average of the rate of return expected by a notional equity investor ("**cost of equity**") and an appropriate after-tax cost of debt, weighted based on the optimal capital structure of the investment.

3.       I provide a detailed analysis of each of the factors considered in the WACC below.

**B.  Cost of Equity**

4.       I derived the cost of equity using the Capital Asset Pricing Model ("**CAPM**"). The CAPM is commonly used and widely accepted approach to determining the required rate of return on an equity investment, and it consists of:

     i.      A risk-free rate of return;

     ii.     An equity risk premium ("**ERP**"), which is equivalent to the excess return that a notional investor expects from an investment in the stock market over a risk-free asset; and,

     iii.    A "beta" factor, which measures volatility of stock returns against returns of an overall market.

1.       The formula for the CAPM is as follows:

Cost of Equity = Risk-free rate + (Beta) x (ERP)

50

### i. Risk-free rate

2.        The risk-free rate is the baseline rate of return for an asset with no risk of financial loss or an asset that is "riskless".  The yields on government bonds issued by countries with mature and stable economies are generally used as a proxy for the risk-free rate.  This is a pre-tax rate of return.

3.        I selected the yield on a 10-year U.S. treasury bond of 1.56%[89] to be a proxy for the risk-free rate.  This ensures that the risk-free rate I selected is consistent with the input used by Professor Damodaran of the Stern School of Business at New York University, who provides estimates of the implied ERP, which I also considered for the calculation of WACC.

### ii. Equity risk premium

4.        The ERP represents the expected return from an equity market as a whole in excess of the expected return on a risk-free asset.  The ERP measures the difference between a pre-tax interest rate and an after-tax equity rate of return, and thus by adding ERP to the risk-free rate, I derive an after-tax rate of return.

5.        To determine the ERP, I adopted a prospective approach based on current market conditions and analyst price forecasts, which provides a forward-looking view.  To do so, I relied on the implied ERP model developed by Professor Damodaran.  Professor Damodaran's ERPs are based on the closing Standard & Poor 500 Index prices, growth expectations of the index prepared by industry analysts, and forecasted total returns from the index including dividends and share buybacks.[90]  The implied ERP for March 2021 is 6.72%.[91]

---

[89] U.S. Department of the Treasury, Daily Treasury Yield Curve Rates.
[90] Damodaran, Aswath. Equity Risk Premiums (ERP) Determinants, Estimation and Implications – The 2020 Edition. March 2020.
[91] Damodaran, Aswath. Implied ERP by month for previous months (March 2021)

### iii.  Industry beta

6.      Beta is a measure of volatility of a share price compared to the market as a whole. Beta is calculated through regression analysis of a particular security's historical returns against a particular market's returns.  This regression analysis returns a beta coefficient that indicates the tendency of a security's return to move relative to the subject market. A beta of 1.0 indicates that a security moves perfectly with the market, while a beta of 2.0 means that the security is twice as volatile as the market.

7.      Beta is used in the CAPM to add an investment-specific attribute to the ERP.

8.      In order to estimate the beta, I utilized an industry beta, which aims to measure the overall beta coefficient of the hotel industry.

9.      I independently computed the industry beta using the data of five publicly listed hotel operators.  These companies were selected based on their primary industry classification, geographic location, and size.  The selected companies are global hotel operators, and they are Marriott International, Inc, Hyatt Hotels Corporation, Choice Hotels International, Inc., and Hilton Worldwide Holdings, Inc., and Accor, S.A.

10.      I determined the average five-year unlevered beta of the comparable companies to be 1.08.[92]

11.      In order to account for the optimal capital structure of the Hotel, the average five-year unlevered beta was re-levered based on the following formula:

Levered Beta = Unlevered Beta x [1 + (1 – Tax Rate) x Debt / Equity]

---

[92] Shares of Accor's comment stock are listed on Euronext Paris. I use Accor's ADR traded in U.S. for the beta calculation. See Exhibit 6.

12.    I calculated the levered five-year beta to be 1.36 based on the average capital structure of the comparable companies, which I assumed to be equivalent to the optimal capital structure, and the marginal corporate tax rate of 27.0%.[93]

### iv. Conclusion on cost of equity

13.    Based on the inputs discussed above, I calculated the cost of equity to be 10.71%.

### C. Cost of Debt

14.    I have reviewed its credit ratings for the long-term issue provided by independent credit rating agencies for the five companies.  As of the Valuation Date, these companies were rated in low investment-grade or high non-investment-grade by Standard & Poor's ("S&P"), Moody's, or Fitch, as shown below:

**Figure 21    Credit Ratings for Comparable Companies and Accor[94]**

| Company | Moody's | S&P | Fitch |
|---|---|---|---|
| Accor | N/A | BB+ | BB+ |
| Hilton | N/A | BB | N/A |
| Marriott | Baa3 | BBB- | N/A |
| Hyatt | Baa3 | BBB- | N/A |
| Choice Hotels International | Baa3 | BBB- | N/A |

15.    I use the 10-year composite yield for U.S. corporate bonds with a rating of BB+, BB, BB- presented by Bloomberg as an approximation for the cost of debt because this yield is considered to provide a forward-looking view on the financing cost of a company.  As of the Valuation Date, the pre-tax cost of debt is estimated to be 4.37 % on the Valuation Date.[95]

---

[93] Damodaran, Aswath. Marginal Corporate Tax Rate.
[94] Bloomberg, Credit Rating for Comparable Companies and Accor.
[95] Bloomberg, 10-year yield for U.S. Corporate Bond with a rating of BB+, BB, BB-.

### i. Corporate tax rate

16.     The U.S. marginal corporate tax rate in 2020 was 27.0% as presented by Professor Damodaran.[96]  Therefore, I applied the 27.0% corporate tax rate to compute the after-tax cost of debt of 3.19%.[97]

### D.   Capital Structure

17.     I based my consideration of the capital structure on the average capitalization of the four comparable companies and Accor, which amounted to 26.49% of debt and 73.51% of equity.[98]

### E.   Conclusion

18.     I calculated the WACC as of the Valuation Date to be 8.70% based on the following inputs:

**Figure 22     Weighted Average Cost of Capital**

| Inputs | Values |
|:---:|:---:|
| Cost of Equity | 10.71% |
| Cost of Debt (after-tax) | 3.19% |
|  |  |
| Equity / Capital | 73.51% |
| Debt / Capital | 26.49% |
|  |  |
| WACC | 8.72% |
| WACC (rounded) | 8.70% |

---

[96] Damodaran, Aswath. Marginal Corporate Tax Rate.
[97] Calculated as $4.37\% \times (1 - 27\%) = 3.19\%$.
[98] Accor's actual debt to capital is in line (slightly above) the average of the five comparable companies.

**Exhibit 1: Calculation of Lost Management Fees (US$)**

| | Note | 2021 Partial | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1] | 17,486,099 | 58,651,272 | 70,169,587 | 73,792,958 | 75,741,203 | 77,407,509 | 79,110,474 | 80,850,905 | 82,629,625 | 84,447,476 |
| Parking Revenue | | 698,389 | 1,402,221 | 1,677,598 | 1,764,224 | 1,810,803 | 1,850,640 | 1,891,354 | 1,932,964 | 1,975,489 | 2,018,950 |
| **Fees** | | | | | | | | | | | |
| Basic Management Fees per HMA | [2] | 480,868 | 1,612,910 | 1,929,664 | 2,029,306 | 2,082,883 | 2,128,706 | 2,175,538 | 2,223,400 | 2,272,315 | 2,322,306 |
| Basic Management Fees on Parking Revenue | [3] | 6,984 | 14,022 | 16,776 | 17,642 | 18,108 | 18,506 | 18,914 | 19,330 | 19,755 | 20,190 |
| Total Gross Fees | | 487,852 | 1,626,932 | 1,946,440 | 2,046,949 | 2,100,991 | 2,147,213 | 2,194,452 | 2,242,730 | 2,292,070 | 2,342,495 |
| **Discount Factor** | | | | | | | | | | | |
| Date of Payment | | 8/2/2021 | 6/30/2022 | 6/30/2023 | 6/30/2024 | 6/30/2025 | 6/30/2026 | 6/30/2027 | 6/30/2028 | 6/30/2029 | 6/30/2030 |
| Discount Factor | [4] | 0.9665 | 0.8958 | 0.8241 | 0.7581 | 0.6974 | 0.6416 | 0.5903 | 0.5430 | 0.4996 | 0.4596 |
| **Present Value of Lost Fees** | | | | | | | | | | | |
| PV of Basic Fees | | 471,513 | 1,457,359 | 1,604,015 | 1,551,833 | 1,465,321 | 1,377,698 | 1,295,315 | 1,217,858 | 1,145,033 | 1,076,563 |

| | |
|---|---|
| **Total Gross Fees** | 78,769,399 |
| **Total PV of Lost Management Fees** | 24,657,609 |

**Notes:**

[1] See Exhibit 3. I assume the revenues will grow at the long-term inflation rate of 2.2% for years 2026 to 2050.

2021 Partial year is adjusted for the revenues earned in January and February 2021, as well as the first 5 days (pro-rated by 5/31) in March 2021. Monthly data is sourced from 2021 Forecast.

Long-term inflation rate is sourced from Federal Reserve Bank of Philadelphia, Survey of Professional Forecasters, February 12, 2021.

[2] HMA, Article 9.1 "Management Fee". Basic Fee equals to 2.75% of Total Revenues of the Hotel.

[3] I understand that Fairmont receives 1% fees on the parking revenue of the Hotel. See Email between Brett Conner and Daryl Benjamin with the subject "SAJ - 1% management fee for garage revenues".

[4] Discount rate is 8.7% (See discussions in Appendix 4). The cash flows are discounted to March 5, 2021, using the mid-period convention.

**Exhibit 1: Calculation of Lost Management Fees (US$)**

| | Note | 2031 | 2032 | 2033 | 2034 | 2035 | 2036 | 2037 | 2038 | 2039 | 2040 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1] | 86,305,321 | 88,204,038 | 90,144,527 | 92,127,706 | 94,154,516 | 96,225,915 | 98,342,885 | 100,506,429 | 102,717,570 | 104,977,357 |
| Parking Revenue | | 2,063,367 | 2,108,761 | 2,155,154 | 2,202,567 | 2,251,024 | 2,300,546 | 2,351,158 | 2,402,884 | 2,455,747 | 2,509,773 |
| | | | | | | | | | | | |
| **Fees** | | | | | | | | | | | |
| Basic Management Fees per HMA | [2] | 2,373,396 | 2,425,611 | 2,478,974 | 2,533,512 | 2,589,249 | 2,646,213 | 2,704,429 | 2,763,927 | 2,824,733 | 2,886,877 |
| Basic Management Fees on Parking Revenue | [3] | 20,634 | 21,088 | 21,552 | 22,026 | 22,510 | 23,005 | 23,512 | 24,029 | 24,557 | 25,098 |
| Total Gross Fees | | 2,394,030 | 2,446,699 | 2,500,526 | 2,555,538 | 2,611,759 | 2,669,218 | 2,727,941 | 2,787,956 | 2,849,291 | 2,911,975 |
| | | | | | | | | | | | |
| **Discount Factor** | | | | | | | | | | | |
| Date of Payment | | 6/30/2031 | 6/30/2032 | 6/30/2033 | 6/30/2034 | 6/30/2035 | 6/30/2036 | 6/30/2037 | 6/30/2038 | 6/30/2039 | 6/30/2040 |
| Discount Factor | [4] | 0.4228 | 0.3890 | 0.3578 | 0.3292 | 0.3028 | 0.2786 | 0.2563 | 0.2358 | 0.2169 | 0.1996 |
| | | | | | | | | | | | |
| **Present Value of Lost Fees** | | | | | | | | | | | |
| PV of Basic Fees | | 1,012,187 | 951,661 | 894,754 | 841,250 | 790,945 | 743,648 | 699,180 | 657,371 | 618,061 | 581,103 |

**Exhibit 1: Calculation of Lost Management Fees (US$)**

| | Note | 2041 | 2042 | 2043 | 2044 | 2045 | 2046 | 2047 | 2048 | 2049 | 2050 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | | | | | |
| Total Revenues (excl. Parking Revenue) | [1] | 107,286,859 | 109,647,170 | 112,059,407 | 114,524,714 | 117,044,258 | 119,619,232 | 122,250,855 | 124,940,374 | 127,689,062 | 130,498,221 |
| Parking Revenue | | 2,564,988 | 2,621,418 | 2,679,089 | 2,738,029 | 2,798,266 | 2,859,828 | 2,922,744 | 2,987,044 | 3,052,759 | 3,119,920 |
| | | | | | | | | | | | |
| **Fees** | | | | | | | | | | | |
| Basic Management Fees per HMA | [2] | 2,950,389 | 3,015,297 | 3,081,634 | 3,149,430 | 3,218,717 | 3,289,529 | 3,361,899 | 3,435,860 | 3,511,449 | 3,588,701 |
| Basic Management Fees on Parking Revenue | [3] | 25,650 | 26,214 | 26,791 | 27,380 | 27,983 | 28,598 | 29,227 | 29,870 | 30,528 | 31,199 |
| Total Gross Fees | | 2,976,038 | 3,041,511 | 3,108,425 | 3,176,810 | 3,246,700 | 3,318,127 | 3,391,126 | 3,465,731 | 3,541,977 | 3,619,900 |
| | | | | | | | | | | | |
| **Discount Factor** | | | | | | | | | | | |
| Date of Payment | | 6/30/2041 | 6/30/2042 | 6/30/2043 | 6/30/2044 | 6/30/2045 | 6/30/2046 | 6/30/2047 | 6/30/2048 | 6/30/2049 | 6/30/2050 |
| Discount Factor | [4] | 0.1836 | 0.1689 | 0.1554 | 0.1429 | 0.1315 | 0.1210 | 0.1113 | 0.1024 | 0.0942 | 0.0867 |
| | | | | | | | | | | | |
| **Present Value of Lost Fees** | | | | | | | | | | | |
| PV of Basic Fees | | 546,354 | 513,684 | 482,967 | 454,086 | 426,933 | 401,403 | 377,400 | 354,833 | 333,615 | 313,665 |

**Exhibit 2: 2015 to 2020 Historical Performance and 2021 Forecast (US$)**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 Forecast |
|---|---|---|---|---|---|---|---|
| **Revenues** | | | | | | | |
| Rooms | 47,353,503 | 49,631,410 | 48,294,977 | 50,402,766 | 48,841,602 | 11,325,542 | 13,263,560 |
| Food & Beverage | 23,357,660 | 21,263,118 | 21,423,949 | 25,421,560 | 19,485,723 | 4,369,914 | 4,996,639 |
| Telephone | 32,235 | 19,124 | 10,941 | 7,940 | 6,581 | 1,045 | 683 |
| Laundry and Valet | 141,237 | 176,434 | 115,561 | 135,273 | 86,725 | 13,658 | 3,804 |
| Golf Operations | – | – | – | – | – | – | – |
| Spa / Health Club | 9,993 | 9,314 | 7,168 | 9,548 | 6,900 | 285 | 3,584 |
| Store Rentals | 729,211 | 736,747 | 674,346 | 502,305 | 258,634 | 102,251 | 77,804 |
| Other Income | 816,096 | 381,802 | 613,116 | 1,042,983 | 869,112 | 833,999 | 286,787 |
| All Other Minor Operating Departments | 2,962,774 | 2,922,732 | 2,574,628 | 2,484,444 | 2,266,106 | 520,189 | 798,273 |
| All Revenues | 75,402,708 | 75,140,681 | 73,714,686 | 80,006,819 | 71,821,382 | 17,166,883 | 19,431,145 |
| | | | | | | | |
| **Operating Profit** | | | | | | | |
| Rooms | 32,496,756 | 34,025,181 | 32,361,581 | 34,487,708 | 32,304,564 | 6,282,923 | 7,367,853 |
| Food & Beverage | 4,684,266 | 3,067,271 | 2,774,998 | 4,381,638 | 954,118 | 48,879 | 491,813 |
| Telephone | (489,558) | (568,370) | (641,816) | (678,455) | (702,718) | 1,045 | 683 |
| Laundry and Valet | 14,126 | 18,093 | 11,556 | 13,527 | 8,672 | 6,875 | – |
| Golf Operations | – | – | – | – | – | – | – |
| Spa / Health Club | (208) | (528) | (2,324) | 3,917 | (4,943) | (2,844) | (35,421) |
| Store Rentals | 729,211 | 736,747 | 674,346 | 502,305 | 258,634 | 102,251 | 77,804 |
| Other Income | 816,096 | 381,802 | 613,116 | 1,042,983 | 869,112 | 833,999 | 286,787 |
| All Other Minor Operating Departments | 442,177 | 507,854 | 440,876 | 614,863 | 577,965 | 171,614 | 80,159 |
| Department Operating Profits | 38,692,865 | 38,168,051 | 36,232,334 | 40,368,486 | 34,265,403 | 7,444,741 | 8,269,679 |
| % of All Revenues | 51.3% | 50.8% | 49.2% | 50.5% | 47.7% | 43.4% | 42.6% |
| | | | | | | | |
| **Non-departmental Operating Costs** | | | | | | | |
| Administration General | 5,483,041 | 6,006,839 | 5,856,086 | 6,521,828 | 6,341,310 | 2,781,931 | 2,926,597 |
| Sales and Marketing | 4,468,738 | 4,264,186 | 4,644,828 | 5,374,302 | 4,743,928 | 1,959,370 | 2,351,742 |
| Information Technology | | | | | | 729,075 | 826,522 |
| POMEC | 6,548,058 | 7,063,450 | 6,908,501 | 7,236,398 | 7,029,292 | 4,237,836 | 4,961,026 |
| Total Non-departmental Operating Costs | 16,499,836 | 17,334,475 | 17,409,415 | 19,132,529 | 18,114,530 | 9,708,211 | 11,065,886 |
| % of All Revenues | 21.9% | 23.1% | 23.6% | 23.9% | 25.2% | 56.6% | 56.9% |
| | | | | | | | |
| **Gross Operating Profit** | 22,193,028 | 20,833,575 | 18,822,919 | 21,235,958 | 16,150,873 | (2,263,470) | (2,796,207) |
| *GOP Margin* | 29.4% | 27.7% | 25.5% | 26.5% | 22.5% | (13.2%) | (14.4%) |
| | | | | | | | |
| **Management Fees** | | | | | | | |
| Basic Mgmt. Fees | 1,982,255 | 1,988,734 | 1,925,587 | 2,096,856 | 1,892,238 | 450,898 | 508,269 |
| Incentive Mgmt. Fees | – | – | – | – | – | – | – |
| Prior Year Adjustments To Fees | – | 81,900 | (14,447) | – | – | – | – |
| Residential Mgmt. Fees | – | – | – | – | – | – | – |
| Yield Maintenance Reduction | – | – | – | – | – | – | – |
| Management Fee Expense | 1,982,255 | 2,070,635 | 1,911,140 | 2,096,856 | 1,892,238 | 450,898 | 508,269 |
| | | | | | | | |
| **Occupancy Expenses** | | | | | | | |
| Rental Expense | 21,217,206 | 21,755,103 | 20,727,055 | 10,860,344 | 11,152,481 | 11,483,683 | 11,842,119 |
| Property Tax | | | 29,133 | 1,933,286 | 1,983,037 | 2,181,746 | 2,321,921 |
| Property Insurance | 1,310,642 | 1,228,147 | 1,068,928 | 1,147,759 | 1,820,633 | 1,857,138 | 581,213 |
| Other Occupancy Costs | 128,705 | 93,280 | 1,362,155 | 61,909 | 737,028 | 38,804 | – |
| Asset Management Fees | 674,256 | 483,949 | 266,241 | 314,855 | 270,909 | 301,476 | 295,000 |
| Total Occupancy Expense | 23,330,809 | 23,560,479 | 23,453,511 | 14,318,152 | 15,964,089 | 15,862,848 | 15,040,253 |
| | | | | | | | |
| **EBITDA** | (3,120,036) | (4,797,539) | (6,541,732) | 4,820,949 | (1,705,454) | (18,577,216) | (18,344,729) |
| | | | | | | | |
| **EBIT** | (3,120,036) | (4,797,539) | (6,541,732) | 4,820,949 | (1,705,454) | (18,577,216) | (18,344,729) |
| | | | | | | | |
| **Net Income** | (3,120,036) | (4,797,539) | (6,541,732) | 4,820,949 | (1,705,454) | (18,577,216) | (18,344,729) |
| | | | | | | | |
| **Net Operating Profit** | 20,210,773 | 18,844,841 | 16,897,332 | 19,139,102 | 14,258,635 | (2,714,368) | (3,304,476) |
| | | | | | | | |
| **Rooms Occupied** | | | | | | | |
| With Complimentary | 233,799 | 225,556 | 219,931 | 213,346 | 203,676 | 54,003 | 67,624 |
| Without Complimentary | 231,526 | 222,856 | 217,443 | 210,236 | 201,382 | 53,041 | 66,967 |
| | | | | | | | |
| **Average Room Rate** | | | | | | | |
| with complimentary | 202.54 | 220.04 | 219.59 | 236.25 | 239.80 | 209.72 | 196.14 |
| without Complimentary | 204.53 | 222.71 | 222.10 | 239.74 | 242.53 | 213.52 | 198.06 |
| | | | | | | | |
| **% Occupancy** | | | | | | | |
| with complimentary | 79.57% | 76.56% | 74.85% | 72.61% | 69.32% | 18.33% | 23.02% |
| without Complimentary | 78.80% | 75.64% | 74.00% | 71.55% | 68.54% | 18.00% | 22.79% |
| | | | | | | | |
| **RevPAR** | 161.16 | 168.45 | 164.37 | 171.54 | 166.23 | 38.44 | 45.14 |

**Source:**
SAJ 12 Month Report Book from 2015 to 2020 and 2021 Forecast.

**Exhibit 3: The Impact and the Recovery from the Pandemic**

| U.S. Economy [1] | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | Long-term | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Real GDP %** | | | | | | | | | | | | | |
| Federal Reserve Bank - December Projection | 1.80 | 2.50 | 3.10 | 1.70 | 2.30 | 3.00 | 2.20 | (3.50) | 4.20 | 3.20 | 2.40 | 1.80 | |
| Federal Reserve Bank - March Projection | 1.80 | 2.50 | 3.10 | 1.70 | 2.30 | 3.00 | 2.20 | (3.50) | 6.50 | 3.30 | 2.20 | 1.80 | |
| **Unemployment %** | | | | | | | | | | | | | |
| Federal Reserve Bank - December Projection | 7.36 | 6.16 | 5.28 | 4.88 | 4.35 | 3.89 | 3.68 | 8.11 | 5.00 | 4.20 | 3.70 | 4.10 | |
| Federal Reserve Bank - March Projection | 7.36 | 6.16 | 5.28 | 4.88 | 4.35 | 3.89 | 3.68 | 8.11 | 4.50 | 3.90 | 3.50 | 4.00 | |

| Upper-Priced Hotels in San Jose [2] | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Occupancy | | | | 78% | 79% | 79% | 75% | 28% | 44% | 69% | 77% | 78% | 79% |
| ADR | | | | 232.2 | 232.9 | 245.4 | 248.0 | 177.8 | 176.7 | 234.3 | 250.6 | 259.7 | 264.7 |
| RevPAR | | | | 181.9 | 184.0 | 193.0 | 187.1 | 50.3 | 77.3 | 161.1 | 192.7 | 202.6 | 208.0 |
| *Change %* | | | | | | | | | *53.6%* | *108.5%* | *19.6%* | *5.2%* | *2.6%* |

| Hotel | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues (excl. Parking Revenue)[3] | | | 71.2 | 71.1 | 69.7 | 75.6 | 68.1 | 16.3 | 18.2 | 58.7 | 70.2 | 73.8 | 75.7 |
| *Change %* | | | | | | | | | *11.9%* | *222.3%* | *19.6%* | *5.2%* | *2.6%* |
| Parking Revenue [4] | | | 2.3 | 2.2 | 2.1 | 1.8 | 1.6 | 0.3 | 0.7 | 1.4 | 1.7 | 1.8 | 1.8 |
| *Change %* | | | | | | | | | *106.0%* | *95.3%* | *19.6%* | *5.2%* | *2.6%* |
| Total Revenues | | | 73.5 | 73.3 | 71.8 | 77.4 | 69.8 | 16.6 | 18.9 | 60.1 | 71.8 | 75.6 | 77.6 |

**Notes:**
[1] IMF, World Economic Outlook Database, April 2021; Federal Reserve Bank, Summary of Economic Projections, March 17, 2021.
[2] CBRE Hotels Research, Hotel Horizons San Jose, CA, Q4 2020 Edition, p.5.
[3] 2015 - 2021: See Exhibit 4. 2022 - 2025: Calculated as 2019 Total Revenues × RevPAR of Upper-priced hotels of the year / 2019 RevPAR of upper-priced hotels.
[4] 2015 - 2021: See Exhibit 4. 2022 - 2025: Calculated as 2019 parking revenue × Total Revenues of the year / 2019 Total Revenues.

**Exhibit 4: Historical Fees Reconciliation (2015 to 2020, US$)**

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 Forecast |
|---|---|---|---|---|---|---|---|
| **Revenues [1]** | | | | | | | |
| Rooms | 47,353,503 | 49,631,410 | 48,294,977 | 50,402,766 | 48,841,602 | 11,325,542 | 13,263,560 |
| Food & Beverage | 23,357,660 | 21,263,118 | 21,423,949 | 25,421,560 | 19,485,723 | 4,369,914 | 4,996,639 |
| Telephone | 32,235 | 19,124 | 10,941 | 7,940 | 6,581 | 1,045 | 683 |
| Laundry and Valet | 141,237 | 176,434 | 115,561 | 135,273 | 86,725 | 13,658 | 3,804 |
| Golf Operations | – | – | – | – | – | – | – |
| Spa / Health Club | 9,993 | 9,314 | 7,168 | 9,548 | 6,900 | 285 | 3,584 |
| Store Rentals | 729,211 | 736,747 | 674,346 | 502,305 | 258,634 | 102,251 | 77,804 |
| Other Income | 816,096 | 381,802 | 613,116 | 1,042,983 | 869,112 | 833,999 | 286,787 |
| All Other Minor Operating Departments | 2,962,774 | 2,922,732 | 2,574,628 | 2,484,444 | 2,266,106 | 520,189 | 798,273 |
| All Revenues | 75,402,708 | 75,140,681 | 73,714,686 | 80,006,819 | 71,821,382 | 17,166,883 | 19,431,145 |
| Provision For Bad Debts | 26,070 | 143,527 | 71,016 | 74,520 | 114,672 | 74,635 | 17,974 |
| Employee Service Charge Distributed | 1,855,304 | 1,731,058 | 1,840,262 | 2,518,853 | 1,943,836 | 474,138 | 497,553 |
| Total Revenues | 73,521,334 | 73,266,096 | 71,803,408 | 77,413,446 | 69,762,874 | 16,618,110 | 18,915,618 |
| Parking Revenue | 2,302,765 | 2,187,363 | 2,057,287 | 1,802,972 | 1,628,930 | 348,575 | 718,114 |
| Total Revenues (excl. Parking Revenue) [2] | 71,218,569 | 71,078,733 | 69,746,121 | 75,610,474 | 68,133,944 | 16,269,535 | 18,197,504 |
| | | | | | | | |
| **Fees Calculation** | | | | | | | |
| Basic fees (excl. Fees on Parking Revenue) [3] | 1,958,511 | 1,954,665 | 1,918,018 | 2,079,288 | 1,873,683 | 447,412 | 500,431 |
| Fees on Parking Revenue [4] | 23,028 | 21,874 | 20,573 | 18,030 | 16,289 | 3,486 | 7,181 |
| Total | 1,981,538 | 1,976,539 | 1,938,591 | 2,097,318 | 1,889,973 | 450,898 | 507,613 |
| Basic Fees Per P&L (before previous adj.) [1] | 1,982,255 | 1,988,734 | 1,925,587 | 2,096,856 | 1,892,238 | 450,898 | 508,269 |
| Variance | (717) | (12,195) | 13,004 | 462 | (2,265) | (0) | (657) |
| Total Variance (2015 - 2020) | (1,711) | | | | | | |

**Notes:**

[1] See Exhibit 2. "Provision For Bad Debts", "Employee Service Charge Distributed" and "Parking Revenue" are from SAJ 12 Month Report Book from 2015 to 2020 and 2021 Forecast.

[2] HMA, Articles 9.3 and 9.4. The provision for bad debts and employee services charge distributed should be excluded from the Total Revenues.

I also understand that Fairmont receives fees that equal to 1.0% of parking revenue of the Hotel. I thus exclude the parking revenue from the Total Revenues that are used to calculate the Basic Fees.

[3] HMA, Article 9.1 "Management Fee". Basic Fee equals to 2.75% of Total Revenues (excl. Parking Revenue) of the Hotel.

[4] I understand that Fairmont receives 1% fees on the parking revenue of the Hotel. See Email between Brett Conner and Daryl Benjamin with the subject "SAJ - 1% management fee for garage revenues".

**Exhibit 5: Performance Test (US$)**

| | Note | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 [14] |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Revenues | [1] | 77,413,446 | 69,762,874 | 16,618,110 | 18,915,618 | 60,053,493 | 71,847,184 | 75,557,182 | 77,552,005 | | | | | |
| All Revenues | [2] | 80,006,819 | 71,821,382 | 17,166,883 | 19,431,145 | 61,825,504 | 73,967,195 | 77,786,664 | 79,840,349 | | | | | |
| | | | | | | | | | | | | | | |
| Department Operating Profits | [3] | 40,368,486 | 34,265,403 | 7,444,741 | 8,269,679 | 27,904,348 | 35,289,153 | 38,804,350 | 39,828,843 | | | | | |
| *% of All Revenues* | | *50.5%* | *47.7%* | *43.4%* | *42.6%* | *45.1%* | *47.7%* | *49.9%* | *49.9%* | | | | | |
| | | | | | | | | | | | | | | |
| Non-departmental Operating Costs | [4] | 19,132,529 | 18,114,530 | 9,708,211 | 11,065,886 | 15,999,515 | 17,412,500 | 18,311,635 | 18,795,089 | | | | | |
| *% of All Revenues* | | *23.9%* | *25.2%* | *56.6%* | *56.9%* | *25.9%* | *23.5%* | *23.5%* | *23.5%* | | | | | |
| | | | | | | | | | | | | | | |
| Management Fee | [5] | 2,096,856 | 1,892,238 | 450,898 | 508,269 | 1,626,932 | 1,946,440 | 2,046,949 | 2,100,991 | | | | | |
| | | | | | | | | | | | | | | |
| Net Operating Profit | [6] | 19,139,101 | 14,258,635 | (2,714,368) | (3,304,476) | 10,277,901 | 15,930,214 | 18,445,766 | 18,932,762 | | | | | |
| | | | | | | | | | | | | | | |
| Occupancy Expenses | | | | | | | | | | | | | | |
| Property Tax | [7] | 1,933,286 | 1,983,037 | 2,181,746 | 2,321,921 | 2,373,003 | 2,425,209 | 2,478,564 | 2,533,092 | | | | | |
| Property Insurance | [8] | 1,147,759 | 1,820,633 | 1,857,138 | 581,213 | 1,857,138 | 1,897,995 | 1,939,751 | 1,982,425 | | | | | |
| | | | | | | | | | | | | | | |
| Capital Replacement Reserve | [9] | 3,096,538 | 2,790,515 | 664,724 | 756,625 | 2,402,140 | 2,873,887 | 3,022,287 | 3,102,080 | | | | | |
| | | | | | | | | | | | | | | |
| **Performance Test** | | | | | | | | | | | | | | |
| Net Operating Income | [10] | 12,961,518 | 7,664,450 | (7,417,976) | (6,964,235) | 3,645,620 | 8,733,122 | 11,005,164 | 11,315,164 | 11,564,098 | 11,818,508 | 12,078,515 | 12,344,242 | 12,615,816 |
| Opening NOI Balance | [11] | 10,663,874 | 10,778,539 | 10,893,204 | 11,007,869 | 11,122,534 | 11,237,199 | 11,351,864 | 11,466,529 | | 8,685,896 | 8,800,561 | 8,915,226 | 9,029,891 |
| 1% of 1998 NOI | | 114,665 | 114,665 | 114,665 | 114,665 | 114,665 | 114,665 | 114,665 | 114,665 | | 114,665 | 114,665 | 114,665 | 114,665 |
| NOI Base | [12] | 10,778,539 | 10,893,204 | 11,007,869 | 11,122,534 | 11,237,199 | 11,351,864 | 11,466,529 | 11,581,194 | 8,685,896 | 8,800,561 | 8,915,226 | 9,029,891 | 9,144,556 |
| Shortfall | | – | (3,228,754) | (18,425,845) | (18,086,769) | (7,591,579) | (2,618,742) | (461,365) | (266,030) | – | – | – | – | – |
| Pass/Fail | | *Pass* | *NA* | *Force Majeure* | | | *Shortfall* | *Shortfall* | *Shortfall* | *Pass* | *Pass* | *Pass* | *Pass* | *Pass* |
| NPV | [13] | | | | | | (1,903,774) | (335,403) | (177,920) | | | | | |

**Notes:**

[1] 2018 - 2021: See Exhibit 4. 2022 - 2025: See Exhibit 3.

[2] 2018 - 2021: See Exhibit 4. 2022 - 2025: calculated as the Total Revenues multiplied by 2019 All Revenues / 2019 Total Revenues.

[3] 2018 - 2021: See Exhibit 2. I assume the department operating profits margin will gradually recover to 2019 level in 2023 and will stay at steady state (5-year average prior to the Pandemic) starting 2024.

[4] 2018 - 2021: See Exhibit 2. I assume the non-departmental operating costs % will gradually decrease to the 5-year average level prior to the Pandemic in 2023.

[5] 2018 - 2021: See Exhibit 2. 2022 - 2025: See Exhibit 1.

[6] Calculated as department operating profits - non-departmental operating costs - management fees.

[7] 2018 - 2021: See Exhibit 2. 2022 - 2025: increase at inflation rate of 2.2%.

[8] 2018 - 2021: See Exhibit 2. I assume the property insurance will gradually return to 2020 level in 2022 and grow at inflation rate of 2.2% thereafter.

[9] Calculated as 4% × Total Revenues Per HMA, Article 11.1.

[10] Calculated as Net Operating Profits - property tax - property insurance - capital replacement reserve. For years after 2025, I assume the NOI will grow at inflation rate of 2.2%.

[11] Third Amendment to Amended and Restated Hotel Management Agreement dated January 2, 2018, Article 7.

   Per HMA, Article 16.10, the NOI Base for the initial year of the Extension Terms will be reset at 75% of the NOI of last year of the Initial Term.

[12] Calculated as opening NOI balance + 1% of 1998 NOI.

[13] Per HMA 16.10, I assume the shortfall payments for 2023 and 2024 will be paid on 12/31/2024, the shortfall payment for 2025 will be paid on 12/31/2025.

[14] The Hotel will pass the Performance Test in the years after 2030 as the annual increase of 2.2 % (inflation) will be higher than  1% of the NOI in 1998.

**Exhibit 6: Beta Calculation**

| Company | Ticker | Adj. Levered Beta | Weight of Debt | Weight of Equity | D/E Ratio | Corporate Marginal Tax Rates | Adj. Unlevered Beta |
|---|---|---|---|---|---|---|---|
| | | [1] | [2] | [2] | [3] | [4] | [5] |
| Accor | ACCYY US Equity | 1.233 | 33.07% | 66.93% | 49.41% | 27.00% | 0.906 |
| Hilton | HLT US Equity | 1.222 | 27.35% | 72.65% | 37.65% | 27.00% | 0.959 |
| Marriott | MAR US Equity | 1.601 | 20.96% | 79.04% | 26.52% | 27.00% | 1.341 |
| Hyatt | H US Equity | 1.377 | 32.67% | 67.33% | 48.52% | 27.00% | 1.017 |
| Choice Hotels International | CHH US Equity | 1.322 | 15.31% | 84.69% | 18.08% | 27.00% | 1.168 |
| Average | | 1.35 | | | 36.03% | | 1.08 |
| Re-levered Beta | | 1.36 | | | | | |

**Notes:**

[1] Bloomberg calculates the 5-year beta using a regression of the historical trading prices of the stock against the S&P 500 over a five year period ending March 5, 2021.
    See Bloomberg, Beta for Comparable Companies and Accor.

[2] 2020 Q4 data retrieved from Bloomberg.
    See Bloomberg, Weight of Debt and Weight of Equity for Comparable Companies and Accor.

[3] Weight of Debt / Weight of Equity.

[4] Damodaran, Aswath. Corporate Marginal Tax Rate.

[5] Adj. Levered Beta / [1 + (1 - Tax Rate) × D/E Ratio]