**<u>EXHIBIT A</u>**

**Proposed Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| SC SJ HOLDINGS LLC, *et al.*[1] | Case No. 21-10549 (JTD) |
| Debtors. | (Jointly Administered) |
| | **Ref. Docket No. 71** |

**ORDER UNDER BANKRUPTCY CODE SECTION 502(c) AND BANKRUPTCY RULE 3018 ESTIMATING ACCOR'S CLAIM FOR FEASIBILITY PURPOSES**

Upon the Motion Of Debtors For Order Under Bankruptcy Code Section 502(c) and Bankruptcy Rule 3018 Estimating Maximum Amount Of Contingent And Unliquidated Claim Of Fairmont Hotels & Resorts (U.S.) Inc. (the "Estimation Motion"),[2] by which the Debtors moved for entry of an order (this "Order") estimating the amount of the contingent and unliquidated claims of Accor Management US Inc. (f/k/a Fairmont Hotels & Resorts (U.S.) Inc.) ("Accor") against the Debtors arising from rejection, breach and/or termination of that certain Amended and Restated Hotel Management Agreement dated December 2, 2005, as amended (the "HMA"), and that certain Owner Agreement dated January 2, 2018 (the "Accor Claim"); and this Court having found that the Estimation Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and this Court having found that due and sufficient notice of the Estimation Motion has been given; and after due deliberation thereon; and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED THAT:

1.    For the reasons stated in the transcript of the hearing held on the Estimation Motion on June 29, 2021 attached hereto as **Exhibit A** (the "Hearing Transcript"), which is incorporated

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, include: SC SJ Holdings LLC (5141) and FMT SJ LLC (7200). The mailing address for both Debtors is 3223 Crow Canyon Road, Suite 300 San Ramon, CA 94583.

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Estimation Motion.

herein by reference, the Estimation Motion is granted in part and denied in part, as further set forth herein.

2.      For the reasons set forth in the Hearing Transcript, the Debtors' request for estimation of the Accor Claim for all purposes is denied because it is not required to prevent undue delay.  Instead, pursuant to Bankruptcy Code section 502(c), the Accor Claim is hereby estimated, for the limited purpose of determining feasibility of the Debtors' Joint Chapter 11 Plan (as may be amended, supplemented, or otherwise modified from time to time) (the "Plan").

3.      For the reasons set forth in the Hearing Transcript, the Accor Claim is estimated in the maximum amount of $22.24 million (the "Estimated Amount").  For the sake of clarity, the Estimated Amount does not include any amount that may be owed by the Debtors to Accor for outstanding management fees and reimbursable expenses, or for indemnification and/or reimbursement.

4.      Because the Court is estimating for the limited purpose of Plan feasibility, it is not required to make any specific findings of fact on the merits of the Accor Claim, and any findings made on the merits of the Accor Claim in connection with this Order are not binding on the arbitrators in the arbitration of the Accor Claim currently pending before the American Arbitration Association.

5.      The terms of this Order are immediately effective and are enforceable upon its entry.

6.      The Court shall retain jurisdiction to hear any and all disputes arising out of the interpretation or enforcement of this Order.

# Exhibit A

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | . | Chapter 11 |
| IN RE: | . | |
| | . | Case No. 21-10549(JTD) |
| SC SJ HOLDINGS, LLC, et al, | . | |
| | . | 824 Market Street |
| | . | Wilmington, Delaware 19801 |
| Debtors. | . | |
| . . . . . . . . . . . . . . . | . | Tuesday, June 29, 2021 |

TRANSCRIPT OF VIDEO HEARING RE:
COURT DECISION ON ESTIMATION MOTION REGARDING
CLAIM OF ACCOR MANAGEMENT U.S., INC.
BEFORE THE HONORABLE JOHN T. DORSEY
UNITED STATES BANKRUPTCY JUDGE

Audio Operator:              Electronically Recorded by
                             Jason Spencer, ECRO

Transcription Company:       Reliable
                             1007 N. Orange Street
                             Wilmington, Delaware 19801
                             (302)654-8080
                             Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

2

INDEX

Page

COURT DECISION                                                    3

1          (Proceedings commence at 11:00 a.m.)

2               THE COURT:  Good morning, everyone.  This is Judge

3     Dorsey.  We are on the record in SC SJ Holdings, LLC, Case

4     Number 21-10549.

5               I see from the agenda the only thing going forward

6     is my ruling on the estimation motion.  Is there anything

7     else we need to talk about before we get to the main event?

8          (No verbal response)

9               THE COURT:  No?  Okay.  Can everyone hear me?

10    Okay.  I want to make sure everyone can hear me.

11              UNIDENTIFIED:  Yes, Your Honor.

12              UNIDENTIFIED:  Yes.

13              THE COURT:  All right.

14              UNIDENTIFIED:  Yes, Your Honor.  Thank you.

15              UNIDENTIFIED:  Good morning.

16              THE COURT:  All right.  So this is my ruling on the

17    estimation hearing.

18              Debtors moved for an estimation of a Accor

19    Management's rejection damages claim for all purposes,

20    including determining the liquidation value of that claim.

21    Accor opposes the motion, arguing that it should be

22    liquidated through arbitration, as provided for in the

23    underlying amended and restated hotel management agreement or

24    HMA.  I previously lifted the automatic stay to allow that

25    arbitration proceeding to go forward.

1        Debtors claim that waiting for the arbitration

2    proceeding to conclude will cause undue delay in their

3    Chapter 11 case.  Accor counters that, while liquidation of

4    their claim through arbitration will take somewhat longer

5    than an estimation proceeding, it will not cause undue delay

6    to the bankruptcy process.  In the alternative, Accor argues

7    that, if I were inclined to estimate, it should be for the

8    limited purpose -- for a limited purpose, rather than final

9    adjudication.  For the reasons I will explain, I agree with

10   Accor's alternate suggestion.

11        Debtor SC SJ owns the hotel currently known as the

12   Fairmont San Jose, the hotel, having purchased it on January

13   2nd, 2018.  The hotel comprises 20 stories with 805 rooms and

14   suites and 65,000 square feet of meeting and event space.

15   Debtor FMT leases the hotel from SC SJ.  Accor is the hotel

16   management company that has managed the hotel since 1987,

17   when it first opened.  Prior to the petition date, Accor

18   managed the hotel subject to the amended and restated HMA

19   dated December 2, 2005.

20        Although I previously lifted the stay to allow the

21   arbitration to proceed, I also concluded that I would proceed

22   with claim estimation, reserving until the hearing on

23   estimation the scope of what that estimation would take.

24   During the preliminary hearing on debtors' motion, I found

25   that there were issues of fact that required an evidentiary

1    hearing.

2    That evidentiary hearing was held on June 10 and

3    11, 2021, with closing arguments made on June 17, 2021.

4    During the hearing, two witnesses testified live, five

5    witnesses testified via video deposition, and four

6    declarations and nearly one hundred exhibits were entered

7    into evidence.

8    Prior to the start of the evidentiary hearing on

9    June 10, 20201, I heard arguments relating to two motions in

10   limine brought by the debtors.  The first motion was to

11   exclude the reports of Accor's expert witnesses John Dent and

12   Greig Taylor.  I allowed Mr. Dent's testimony on industry

13   standards at the time the HMA was executed, but not on

14   matters of law or the interpretation of the HMA.  With

15   respect to Mr. Taylor, I allowed him to testify and indicated

16   I would determine the weight and relevance of his testimony

17   after trial.

18   The debtors' second motion in limine sought to

19   exclude the pre-bankruptcy marketing efforts of the debtors;

20   that is, debtors' efforts to find a new manager for the hotel

21   prior to breach of termination.  Debtors argued that the pre-

22   breach termination marketing efforts were irrelevant to the

23   estimation of breach termination damages under the liquidated

24   damages provision of the HMA.  Accor argued that these

25   marketing efforts were relevant, as they supported its

1    argument that there were potential contractual breaches prior

2    to the first petition date on March 5, 2021, specifically

3    breaches of the covenant of good faith and fair dealing and

4    quiet enjoyment and rejection damages.  On those grounds, I

5    denied the motion and allowed the evidence.

6         Debtors purchased the hotel on January 2, 2018,

7    assuming the already existing HMA.  The HMA includes a

8    liquidated damages clause, which describes the compensation

9    for Accor if the debtor were to breach terminate the

10   contract.  The liquidated damages clause is included in part

11   because Accor's actual damages in the event of a breach

12   termination, quote, "would be difficult or impossible to

13   determine."

14        The liquidated damages amount is based on the

15   management fees paid to Accor over the most recent twelve-

16   month period, times a multiplier to reflect the remaining

17   length of the contract.

18        On March 11th, 2020, the World Health Organization

19   declared COVID-19 a pandemic, inciting a series of lock-down

20   orders and virtually shutting down the hotel industry, among

21   others.  Following this, the revenue of the hotel dropped

22   precipitously.  Sam Hirbod, the CEO of the debtors' parent

23   company and ultimate beneficial owner of the hotel notified

24   Accor of the hotel's need for capital in June of 2020.

25        The debtors retained Jones Lange LaSalle later that

summer in order to raise capital.  The debtors then retained

CHMWarnick on September 14, 2020, in order to discuss raising

capital with other hotel operators as part of a potential re-

brand.

Prior to retaining CHMWarnick, Mr. Hirbod alleges

that he, quote:

"-- made it clear to Wayne Buckingham, the Chief

Operating Officer of Accor, that the debtors were looking at

any and all potential possibilities, including all potential

brands, all major brands, including considering the

termination of the HMA.  That conversation was had at least

three different times prior to the debtors even talking to

CHMWarnick."

Mr. Hirbod says -- Mr. Hirbod says he never named

Hilton explicitly in these conversations.

Heather McCrory, CEO of Accor Hotels North and

Central America, contested this, stated that Wayne

Buckingham, now retired, never told her that Hirbod was

negotiating with the other brands, and he would have

certainly done so, had he been told.

After retaining CHMWarnick, the debtors entered

discussions with major hotel brands, including Hilton.  On

October 6, 2020, a Hilton representative toured the hotel

incognito, in order to prepare a property improvement plan,

or PIP.  Following this, on October 23, 2020, Hilton sent a

pro forma and PIP to Mr. Hirbod to further the discussions

over potential capital injection and management of the hotel.

On October 27, 2020, Mr. Hirbod sent a mezzanine letter of

intent to Hilton, in order to demonstrate market interest in

the hotel.

On October 29, 2020, Mr. Hirbod called Heather

McCrory.  Ms. McCrory testified that she was not told prior

to or during this call that the debtors or CHMWarnick had

already approached other hotel brands.  After this call, Ms.

McCrory wrote a letter to Mr. Hirbod, telling him that Accor

would not cooperate in attempts to re-brand the hotel.  On

November 10, 2020, Accor denied the debtors' request for a

tortious interference waiver.

On December 15, 2020, Maxine Taylor of CHMWarnick

sent an email to various other parties at CHMWarnick, stating

that she anticipated termination of the HMA, quote, "sometime

in the first quarter" of 2021.  She acknowledged that the

value of the liquidated damages clause would drop at a rate

of, quote, "$2 million a month over the next two months."

On February 4, 2021, Mr. Hirbod informed Accor of

his intention to breach terminate the HMA effective March 10,

2021.  On February 23, 2021, the debtors retracted the

previously sent termination letter on the stated belief that

Accor might provide capital.  Later that same day, Mr. Hirbod

received definitive notice that Accor would not provide

1   capital.   The HMA was subsequently terminated on March 5,

2   2021 with the closure of the hotel by the debtors.

3          11 U.S.C., Section 502(c) requires Bankruptcy

4   Courts to estimate contingent or unliquidated claims when

5   liquidating the claim in the non-bankruptcy setting would,

6   quote, "unduly delay the administration of the case."  There

7   is significant leeway granted to judges in how and when to

8   estimate claims, provided they are estimated, quote:

9          "-- in accordance with the legal rules that will

10  govern the final amount of the claim."

11         In Re World Armstrong Industries, 348 B.R. 111, at

12  123 (D. Del. 2006).

13         This Court has previously found that, quote:

14         "-- estimation is mandatory, provided that the

15  movant establishes that fixing or liquidation of a claim

16  would unduly delay the administration of the case."

17         In Re RNI Wind Down Corporation, 369 B.R. 174, at

18  191 (Bankr. D. Del. 2007).

19         Absent a finding of undue delay, estimation is

20  discretionary.  Id. at 191.

21         There's no dispute between the parties that Accor's

22  claim is unliquidated.  The only dispute is whether

23  liquidating the claim in the normal course will cause undue

24  delay in the debtors' bankruptcy.

25         To rise to the level demanded by Section 502(c),

1    the delay must be something more than the proposition that

2    liquidation will take longer than estimation.  In Re Dow

3    Corning Corporation, 211 B.R. 545, at 563 (Bankr. E.D. Mich.

4    1997).

5         Quote:

6         "From the plain language of Section 502(c), it is

7    clear that estimation does not become mandatory merely

8    because it may take longer and thereby delay administration

9    of a case.  Liquidation of a claim, in fact, will almost

10   always be more time consuming than estimation."

11        Quote:

12        "Bankruptcy law's general rule is to liquidate, not

13   to estimate."

14        In Re Dow Corning Corporation, 211 B.R. at 563.

15        Quote:

16        "For estimation to be mandatory then, the delay

17   associated with liquidation must be 'undue.'  Something is

18   undue if it is unjustifiable."

19        Id. at 563.

20        The debtors argue that Accor's claim must be

21   estimated or it will substantially delay the bankruptcy, add

22   costs they cannot afford, and cause them to miss RSA

23   milestones, which are necessary for plan support.  They more

24   specifically argue that emergence from bankruptcy hinges on

25   securing a new brand operator and $45 million of exit

1    financing, likely through a mezzanine loan.  Debtors contend

2    this is unlikely without greater certainty regarding Accor's

3    claim.  The debtors further argue that the current plan is

4    expressly conditioned on the liquidation of Accor's claim.

5           I am not convinced by the debtors' argument.  They

6    bore the burden of proving that estimation was necessary in

7    order to avoid undue delay in these proceedings; however, the

8    bulk of their fears have turned out to be unsubstantiated.

9           Hilton Cigna has been selected as the prevailing

10   bidder and is to become the new brand manager.  While their

11   bid remains non-binding, Mr. Hirbod testified at the

12   disclosure statement hearing on June 1, 2021, that this did

13   not trouble him.  That's transcript at Page 14, Lines 16

14   through 25.

15          Additionally, the debtors have asserted that there

16   are at least two entities, including JPMorgan, who are

17   interested in funding the mezzanine loan.  Like Hilton's bid,

18   the mezzanine financing remains non-binding.  Once again,

19   however, Mr. Hirbod testified at the disclosure statement

20   that this also did not concern him.  That's transcript, Page

21   19, 14 -- Lines 14 through 16.

22          Debtors argue that the Hilton bid requires all

23   claims, including Accor's to be paid or discharged as a

24   condition of closing; however, Mr. Hirbod has committed on

25   the record to, quote:

12

1          "-- pay the real estate secured debt that is owed,

2    the one and a half million that is owed, plus the Accor

3    Fairmont claim, with no limit on the" -- with, quote, "no

4    limit on the amount he is willing to pay in order to confirm

5    a plan."

6          Transcript of the evidentiary hearing, Page 36,

7    Line 5, through Page 36, Line 18.  It's also referring back

8    to the disclosure statement hearing at DI-386.

9          Mr. Hirbod went even further, when asked at the

10   disclosure statement hearing, about the lack of mezzanine

11   financing or capital infusion in Hilton's bid, when he

12   testified that, quote:

13          "It did something better.  It said you can

14   basically choose your mezz and I will fully guarantee the

15   principal."

16          That's the disclosure statement hearing transcript,

17   Page 46, Line 23 through Page 47, Line 1.

18          This guarantee by Mr. Hirbod and Hilton's corporate

19   guarantee makes it significantly less likely that Hilton or

20   any potential mezzanine financer will be unwilling to proceed

21   with closing on the deal.  The debtors presented no evidence

22   to the contrary at the estimation hearing.

23          The debtors asserted that this guarantee by Mr.

24   Hirbod is taken out of context, that Mr. Hirbod's guarantee

25   is limited to roughly $4 million for the Accor claim, based

13

1    on the underlying disclosure statement.  I disagree.  The

2    disclosure statement clearly states, quote:

3          "Fairmont contends that it's entitled to nearly $30

4    million in breach of contract damages."

5          That's the disclosure statement, Page 36, DI-391.

6          While the disclosure statement goes on to say that

7    the debtors dispute the validity of this amount, there is no

8    doubt that Mr. Hirbod was aware of that amount in dispute

9    when he committed to paying the entire amount without

10   limitation.

11         The debtors also focus on -- a fair amount of their

12   argument on the theory that the arbitration will take longer

13   than estimation.  That is likely true based on the record

14   before me.  However, the fact that arbitration will take

15   longer than estimation does not, in and of itself, mean that

16   the case will be unduly delayed.  Despite the debtors'

17   protestations, both parties appear to be actively

18   participating and moving arbitration forward.  Therefore, I

19   do not find that the fact that arbitration is not as fast as

20   estimation is sufficient to establish undue delay in this

21   case.

22         Because the debtors' primary concerns supporting

23   their argument for undue delay are no longer relevant, I find

24   that they have failed to meet their burden of proving that

25   estimation is mandatory in this case.  However, I am

1  persuaded by the debtors' argument that the plan itself is

2  contingent on assigning a value to Accor's claim in order to

3  establish feasibility.  Therefore, I find it is prudent to

4  exercise my discretion and estimate Accor's claim; however, I

5  will do so only to address the limited concern of feasibility

6  to allow the plan process to proceed.  I will not estimate

7  for all purposes.

8         Having determined that estimation is appropriate in

9  this case, I'll now turn to Accor's underlying claims.

10  Because I am estimating only for the limited purpose of

11  feasibility, it is not necessary for me to make specific

12  findings of fact on the merits of Accor's claim.  And any

13  findings I make in connection with this ruling are certainly

14  not binding on the arbitrators who will be hearing the case

15  in the near future.

16         Debtors argue that the only appropriate basis for

17  awarding damages to Accor is by reference to the liquidated

18  damages provision of the HMA, which is clearly unambiguous.

19  Under that provision, damages should be awarded using the 12

20  months of management fees prior to breach termination date

21  and then applying a multiplier based on the remaining years

22  of the contract and discount that amount to present value.

23         Accor argues that, while the intent of the parties

24  can be determined by the HMA itself, it is clear that the

25  parties made a mistake when negotiating the HMA by failing to

account for the possibility that the hotel would be nearly

shut down for a year as a result of a worldwide pandemic.

Alternatively, Accor argues that the liquidated damages

provision was intended to ensure that Accor receive the

benefits of the contract through the remaining term of the

agreement and using the 12 months prior to March 2021 does

not achieve that result.  Accor also raises claims for breach

of the covenants of quiet enjoyment, breach of contract and

rejection, and breach of the covenant of good faith and fair

dealing.

Despite Accor's counsel's statement during the --

during argument that denying reformation of the contract

would be an abuse of discretion, I think it is reasonably

likely that Accor will not succeed in its attempt to reform

the liquidated damages provision under California law for

either mistake or unreasonableness.  To reform the HMA on the

basis of mistake, Accor would have to prove that the

liquidated damages provision does not reflect the true intent

of the parties.  Hess v. Ford Motor Company, 27 Cal. 4th 516,

at 525 (Cal. Supreme Ct. 2002).

To reform on the basis of unreasonableness, Accor

would have to prove that the liquidated damages provision was

unreasonable under the circumstances existing when the

parties entered into the contract.  Viatech International,

Inc. v. Sporn, 16 Cal. App. 5th 796, at 806 (Cal. Ct. App of

1   Appeals 2017).

2              Based on the evidence presented, I think it is

3   unlikely that Accor will meet either of these burdens.

4   Accor's witnesses who spoke to the intent of the liquidated

5   damages provision consistently stated that the intent is

6   reflected in the plain text of the HMA.  Nor did Accor

7   present any evidence that the liquidated damages provision

8   was unreasonable when it was drafted, rather than as it is

9   applied now.

10             While the HMA states the purpose of the liquidated

11  damages provision is to provide Accor with compensation for

12  lost management fees and other damages over the remaining

13  term of the contract, the evidence showed that the parties

14  understood when they entered into the contract that using a

15  single previous year as a baseline for calculating liquidated

16  damages could result in wide fluctuations in the calculation

17  of liquidated damages in any given year.

18             While the parties might not have has anticipated a

19  worldwide pandemic that could result in a near shutdown of

20  the hotel for a year, putting myself into the shoes of the

21  parties at the time the HMA was negotiated, as is required

22  under California law cited to be my Accor, the parties

23  certainly could have envisioned any number of other types of

24  scenarios that would have resulted in a closure of the hotel

25  for an extended period of time.

1    Moreover, the financials for the hotel show that

2    management fees fluctuated from a high of approximately 2.2

3    million in 2000 to a low of less than 900,000 in 2010.  It is

4    also notable that, in the 20 years from 2020 -- or excuse me

5    -- from 2000 to 2020, management fees never recovered to year

6    2000 levels.  Moreover, following the precipitous drop in

7    management fees during the Great Recession of 2008, it took 6

8    years to recover to 2007 management fee levels.

9    In hindsight, perhaps, Accor would have selected a

10   different method of calculating liquidated damages.  But of

11   course, as California law provides, it is not appropriate to

12   use hindsight to determine the intent of the parties at the

13   time the HMA was negotiated.  Again, none of this is binding

14   on the arbitrators who will be hearing the case and -- as

15   required under the contract, and they may come to a different

16   conclusion.

17   I, likewise, think it is unlikely that Accor will

18   be able to prove a breach of the covenant of quiet enjoyment

19   or a breach of contract for rejection of the HMA.  Indeed,

20   Accor did not even press these arguments at the time of the

21   estimation hearing, beyond arguing that debtors breached the

22   HMA when it began negotiating with other hotel brands to take

23   over management of the hotel.

24   Accor's argument is based upon a strained reading

25   of the provisions of the HMA, providing that the hotel owner

1 may not affect a transfer without the prior written consent

2 of the hotel manager.  Accor's argument is that the owner

3 could not choose a new hotel manager or even negotiate with

4 other brands without Accor's written consent.  This argument

5 is unpersuasive for several reasons:

6       First, the plain language of the HMA shows that it

7 is meant to cover a transfer of the HMA to a new hotel owner,

8 not the hiring of a new hotel manager by existing owner.

9       Second, it would make the breach of -- the breach

10 termination provisions of the HMA superfluous because if the

11 owner could only change hotel managers with Accor's

12 permission, there could never be a breach termination.

13       And third, the argument is counter to California

14 law, which holds that a hotel owner is always allowed to

15 breach his hotel management contract.  See Woolley v. Embassy

16 Suites, 227 Cal. App. 3d 1520, (Cal. Ct. App. 1991).  Indeed,

17 Accor's own witness testified that this case was forefront in

18 negotiations of the liquidated damages provision at the time

19 the contract was negotiated.

20       However, Accor's claim for breach of the covenant

21 of good faith and fair dealing is different.  California law

22 makes it clear that, quote:

23       "The covenant of good faith and fair dealing

24 implied by law in every contract exists merely to prevent one

25 contracting party from unfairly frustrating the other party's

right to receive the benefits of the agreement actually

made."

That's Guz v. Bechtel National, Inc., 24 Cal. 4th

317, at 349 (Cal. Ct. App. 1992).

Quote, "Breach of a specific provision of the

contract is not a necessary prerequisite" to breach the

covenant of good faith and fair dealing.  Karma Development

California, Inc. v. Marathon Development California, Inc., 2

Cal. 4th 342, at 373 (1992).

California law is particularly concerned with,

quote:

"-- situations where one party is invested with a

discretionary power affecting the rights of another.  Such

power must be exercised in good faith."

Karma Development at 372.

The debtors and Accor offered opposing, mutually

exclusive stories of why the HMA was terminated one year

after the start of COVID-19.  Accor alleges that the debtors,

who had the absolute power to breach the HMA whenever they

chose, exercised that discretion to breach it in March of

2021.  Excuse me.  The debtors allege that they had the right

to breach at their discretion.  Accor alleges that the

debtors decided to terminate the HMA and replace Accor with

Hilton months before they did so, but waited in order to

breach the HMA for an unreasonably low price.  The debtors,

1   of course, disagree with this narrative and argue that they

2   were in negotiations with Accor and seriously considering not

3   terminating the HMA up until the date of the bankruptcy.

4   They alleged that they were losing money throughout the

5   pandemic and, if not for Accor's continued negotiations, they

6   would have terminated the HMA earlier, closing the hotel and

7   saving money.

8          Both sides presented evidence that tends to support

9   their narrative.  Accor argued that, if they were successful

10  -- if they were to successfully prove a breach of the

11  covenant of good faith and fair dealing, they would be

12  entitled to lost profits over the remaining term of the HMA

13  from the date of the breach.  Accor's expert Greig Taylor

14  calculated lost profits at 22.24 million.  The debtors'

15  expert, Francis Nardozza, performed a more limited

16  calculation of lost profits, but ultimately settled on a

17  little over 19 million in his report.  Debtors did not

18  present expert testimony on the amount of the potential

19  damages in the event of a breach of the covenant of good

20  faith and fair dealing.

21         Based on the evidence presented, it is reasonable

22  to me that Accor may succeed in proving their claim for

23  breach of the covenant of good faith and fair dealing and be

24  entitled to breach damages.  Neither party specifically

25  addressed what the proper calculation for damages for breach

1   of the implied covenant of good faith and fair dealing would

2   be if the breach occurred at some point prior to breach

3   termination on March 5, 2021, and the interplay of that

4   breach with the liquidated damages provision of the HMA.

5           For example, if a finder of fact determined that a

6   breach of the covenant occurred in December of 2020 and

7   applied the liquidated damages provision as of that date,

8   what would the proper calculation of damages be?  Based on

9   the record, I do not have an answer to that question.

10          Given that I'm only estimating damages for purposes

11  of plan feasibility, prudence dictates that I estimate

12  Accor's claim at the highest value they could reasonably

13  receive to ensure that they would be -- there will be funds

14  necessary if Accor ultimately is successful with its claim;

15  that is, the amount of lost profits over the term of the

16  remaining time of the contract, without applying the

17  liquidated damages provision.  I will therefore estimate the

18  value of Accor's claim at 22.24 million.  The parties should

19  confer and submit an appropriate form of order consistent

20  with this ruling.

21          Any questions?

22      (No verbal response)

23          THE COURT:  All right.  Anything else before we

24  adjourn?

25      (No verbal response)

1              THE COURT:  All right.  Thank you, all.  We are

2      adjourned.

3              UNIDENTIFIED:  Thank you, Your Honor.  Thank you,

4      Your Honor.

5          (Proceedings concluded at 11:25 a.m.)

6                              *****

1          CERTIFICATION

2          I certify that the foregoing is a correct

3 transcript from the electronic sound recording of the

4 proceedings in the above-entitled matter to the best of my

5 knowledge and ability.

6

7

8

9

10 _____          June 29, 2021

11 Coleen Rand, AAERT Cert. No. 341

12 Certified Court Transcriptionist

13 For Reliable